1  John D. Vaughn, State Bar No. 171801
   Jeffrey A. Feasby, State Bar No. 208759
2  Christopher W. Rowlett, State Bar No. 257357
   PEREZ VAUGHN & FEASBY Inc.
3  600 B Street, Suite 2100
   San Diego, California 92101
4  Telephone: 619-702-8044
   Facsimile: 619-460-0437
5  E-Mail: vaughn@pvflaw.com

6  Jeffrey L. Fillerup, State Bar No. 120543
   Rincon Law LLP
7  90 New Montgomery St
   Suite 1400
8  San Francisco, California 94105
   Telephone:  (415) 996-8199
9  Facsimile: (415) 996-8280
   E-Mail:   jfillerup@rinconlawllp.com

10

11 Attorneys for Defendant and Counterclaimant
   Windermere Real Estate Services Company

12

13              **UNITED STATES DISTRICT COURT**
                **CENTRAL DISTRICT OF CALIFORNIA**

14

| | |
|---|---|
| 15 BENNION & DEVILLE FINE HOMES, INC., a California corporation, BENNION & DEVILLE FINE HOMES SOCAL, INC., a California corporation, WINDERMERE SERVICES SOUTHERN CALIFORNIA, INC., a California corporation, | Case No. 5:15-CV-01921-DFM Hon. Douglas F. McCormick **DECLARATION OF JEFFREY A. FEASBY IN SUPPORT OF DEFENDANT AND COUNTERCLAIMANT WINDERMERE REAL ESTATE SERVICES COMPANY'S REPLY IN SUPPORT OF DEFENDANT AND COUNTERCLAIMANT'S MOTION TO ALTER OR AMEND JUDGMENT** |
| Plaintiffs, | |
| v. | |
| WINDERMERE REAL ESTATE SERVICES COMPANY, a Washington corporation; and DOES 1-10 | Date:      October 30, 2018 Time:      10:00 a.m. Courtroom: 6B |
| Defendant. | |
| AND RELATED COUNTERCLAIMS | |

16
17
18
19
20
21
22
23
24
25
26
27
28

1    I, Jeffrey A. Feasby, declare:

2    1.    I am an attorney at law, duly licensed to practice law in the State of
3    California, and am one of the attorneys for defendant Windermere Real Estate
4    Services Company ("WSC") in the above-captioned matter. I have personal
5    knowledge of the facts set forth in this declaration, and if called upon to testify
6    thereto, would do so competently.

7    2.    As one of the attorneys for WSC, I am intimately familiar with the
8    details of this case and all that has taken place over the past three years, including
9    the exhibits and transcripts from the trial held in this matter, which are maintained in
10   our office as a part of the normal course of business.

11   3.    Attached as Exhibit A to this declaration is a true and correct copy of
12   The Reporter's Transcript of Day 7 of the Trial, July 18, 2018, Volume 1.

13   4.    Attached as Exhibit B to this declaration is a true and correct copy of
14   The Reporter's Transcript of Day 8 of the Trial, July 19, 2018, Volume 2.

15   5.    Attached as Exhibit C to this declaration is a true and correct copy of
16   The Reporter's Transcript of Day 9 of the Trial, July 20, 2018, Volume 1.

17   I declare under penalty of perjury under the laws of the State California that
18   the foregoing is true and correct, and that this declaration was executed on
19   October 9, 2018.

20

21

22   /s/ Jeffrey A. Feasby
     Jeffrey A. Feasby
23

24

25

26

27

28

1

# EXHIBIT A

1

```
                  UNITED STATES DISTRICT COURT

        CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

        HONORABLE DOUGLAS F. McCORMICK, U.S. MAGISTRATE JUDGE


BENNION AND DEVILLE FINE HOMES,      )
et al.,                              )
                                     )   Certified Transcript
    Plaintiffs/Counter Defendants,   )
                                     )   Case No.
          vs.                        )   5:15-CV-01921-DFM
                                     )
WINDERMERE REAL ESTATE SERVICES      )
COMPANY,                             )
                                     )   Day 7, Volume I
    Defendant/Counter Claimant.      )
_____     )




                  REPORTER'S TRANSCRIPT OF
                       JURY TRIAL
                 WEDNESDAY, JULY 18, 2018
                       8:50 A.M.
                 SANTA ANA, CALIFORNIA




             DEBBIE HINO-SPAAN, CSR 7953, CRR
                FEDERAL OFFICIAL COURT REPORTER
              411 WEST FOURTH STREET, ROOM 1-191
               SANTA ANA, CALIFORNIA 92701-4516
                     dhinospaan@yahoo.com


                  UNITED STATES DISTRICT COURT
```

---

2

**APPEARANCES OF COUNSEL:**

FOR THE PLAINTIFFS AND COUNTER DEFENDANTS BENNION AND DEVILLE FINE HOMES, INC., ET AL.:

    MULCAHY LLP
    BY:  JAMES M. MULCAHY, ESQ.
        KEVIN A. ADAMS, ESQ.
        FILEMON "PHIL" CARRILLO, ESQ.
    4 Park Plaza
    Suite 1230
    Irvine, California 92614
    949-252-9377

FOR THE DEFENDANT AND COUNTERCLAIMANT WINDERMERE REAL ESTATE SERVICES COMPANY:

    PEREZ VAUGHN & FEASBY, INC.
    BY:  CHRISTOPHER WAYNE ROWLETT, ESQ.
        JEFFREY ALAN FEASBY, ESQ.
        JOHN D. VAUGHN, ESQ.
    600 B Street
    Suite 600
    San Diego, California 92101
    619-784-3549

ALSO PRESENT:

    Michael Teather, representative
    John Tisa, technician for both sides

UNITED STATES DISTRICT COURT

---

3

I N D E X

| WITNESSES | PAGE |
|---|---|

**ROBERT BENNION, CALLED BY THE PLAINTIFFS**

| | |
|---|---|
| Direct Examination by Mr. Adams (Resumed) | 16 |
| Cross-Examination by Mr. Feasby | 49 |
| Redirect Examination by Mr. Adams | 95 |
| Recross-Examination by Mr. Feasby | 102 |

EXHIBITS

| EXHIBIT | | IN EVIDENCE | WITHDRAWN OR REJECTED |
|---|---|---|---|
| 828 | Document | 8 | |
| 290 | Oct 3, 2014 email from Mike Teather to Bob Bennion and Bob Deville re: "Yesterday's meeting" (B&D0038285-0038287) | 23 | |
| 330 | Nov 11, 2014 email from Bob Bennion to Mike Teather and Bob Deville re: Windermere Real Estate Southern California poised for Continued growth" (B&D0038495) | 28 | |
| 549 | Demonstrative: Revenue #3 | 34 | |
| 794 | Windermere services statements | 82 | |
| 270 | Aug 11, 2014 email from Robert Sunderland to Mike Teather re: "Urgent" (WSC026842-026844) | 97 | |

UNITED STATES DISTRICT COURT

---

4

SANTA ANA, CALIFORNIA; WEDNESDAY, JULY 18, 2018

8:50 A.M.

- - -

(Out of the presence of the jury.)

08:50AM   THE COURT:  Mr. Adams, you want to give me something you talked about yesterday?

  MR. ADAMS:  Yes, Your Honor, I do.  I have it here.

  THE COURT:  Hand it to Ms. Boehme.

08:50AM   MR. ADAMS:  And, Your Honor, I can briefly tell you what the packet consists of, if I may.

  THE COURT:  Could I see the instructions?  This all goes to the discount rate; is that correct?

  MR. ADAMS:  The present value discount rate, yes, Your Honor.

08:51AM   THE COURT:  I guess my concern would be how do you present evidence over revenue stream?

  MR. ADAMS:  Yes, Your Honor.  We believe that there is case law both cited in this -- in these CACI instructions, in particular we have this *Wilson v. Gilbert* case, California

08:51AM   case, that talks about, No. 1 -- this is a little bit off point but related -- No. 1, it's defendant's burden to identify this present value.  It's not even plaintiff's burden to identify the present value or discount rate.  They don't have to.

  THE COURT:  Okay.

08:52AM   MR. ADAMS:  As it relates to the revenue stream, as

UNITED STATES DISTRICT COURT

5

1  we alluded -- as we talked about yesterday and I alluded to
2  during my arguments several days ago, these owners are planning
3  to identify based on their history with Windermere what it
4  would take to unwind and get out of the system.  They had every
08:52AM 5  intention of staying in.  This is their brand.  They had every
6  intention of staying in for years to come.
7         THE COURT:  I don't have any -- I don't have a
8  problem with the -- your principal stating that they had every
9  intention of staying in for years to come.
08:52AM 10        MR. ADAMS:  And they will also -- they also plan to
11 testify, Your Honor, that the revenue stream to their franchise
12 operations from serving as the area representative was "X"
13 amount per year at the time of termination.
14        THE COURT:  Okay.  That's where we get into
08:53AM 15 difficulty, because that is -- that is a revenue stream that
16 has not been -- that computation has not been modeled or
17 provided or given or disclosed in accordance with the rules.
18 And if I'm wrong about that, I mean, I don't want to -- we
19 don't want to -- I don't want to -- I don't want to go back
08:53AM 20 over that because I've ruled on that.
21        MR. ADAMS:  Yeah.  I'm sorry, Your Honor.
22 Mr. Mulcahy has just corrected my verbiage.  It's the value of
23 the discount.  Okay?  I refer to it as revenue.  But it's the
24 value of the discount to these offices operated by Bennion &
08:53AM 25 Deville.  And that is a number that is within numerous exhibits

UNITED STATES DISTRICT COURT

6

1  that Windermere has identified in this case, not to mention
2  numerous exhibits we have identified.  And that is $2500 per
3  month, per office.  And, in fact, it coincides with the exact
4  damages that Windermere seeks from these franchisees, $2500 per
08:54AM 5  franchise fee per office.  Same figure.
6         THE COURT:  All right.  So let's suppose that that
7  computation or that number was adequately disclosed.  How do we
8  project a revenue stream -- I mean, how do we come up with
9  something that becomes -- what do you ask for?  You're going to
08:54AM 10 stand up and ask for a number.  What are you going to ask for?
11        MR. ADAMS:  We're going to ask for this discount,
12 the value --
13        THE COURT:  On what though?
14        MR. ADAMS:  The value of this discount.
08:54AM 15        THE COURT:  On what?
16        MR. ADAMS:  The value of the discount -- this is
17 what they were earning at the time they left, and they would
18 have stayed in.  That's what --
19        THE COURT:  You're eluding my point, which is at
08:54AM 20 some point you're talking about a stream of revenue which you
21 have not computed for the Court or for the defense.
22        MR. ADAMS:  Your Honor, table -- CACI Instruction
23 3904b, if you look at Table B, which is Page 780 of the CACI
24 instructions, the jury -- this contemplates the exact situation
08:55AM 25 we're in.

UNITED STATES DISTRICT COURT

7

1         The jury would identify this fixed dollar figure for the
2  period of years that they felt, based on the evidence,
3  Bennion & Deville would have stayed in, and then they would
4  identify the present value factor.  This is a computation that
08:55AM 5  the instructions contemplate the jury doing in light of the
6  evidence that we should be able to get in, Your Honor.
7         THE COURT:  Okay.  I will review this while we
8  continue with the trial and consider also your comments.  But
9  until I rule otherwise, you are to proceed in accordance with
08:55AM 10 the Court's order from yesterday.
11        MR. ADAMS:  Yes, Your Honor.
12        THE COURT:  Okay.  Any other issues for us to
13 review?
14        MR. ADAMS:  None from the plaintiffs.
08:56AM 15        MR. FEASBY:  Your Honor, a couple of issues.  First
16 of all, we had talked a couple days ago about the Washington
17 loan promissory note, and this is the one where you had the
18 three pages versus the five pages.
19        THE COURT:  Yes.
08:56AM 20        MR. FEASBY:  Mr. Adams and I have conferred and the
21 parties agree that the copy that I have here can be admitted.
22        THE COURT:  Okay.
23        MR. FEASBY:  So I have got one for the witness stand
24 and then one for --
08:56AM 25        THE COURT:  Do we need to -- do we need to discuss

UNITED STATES DISTRICT COURT

8

1  that with the witness or do we simply need to put on the record
2  that the exhibit numbers have been admitted?
3         MR. FEASBY:  I think we just need to put on the
4  record that it's been admitted.
08:56AM 5         THE COURT:  What's the -- I don't remember the
6  exhibit.
7         MR. FEASBY:  It's No. 828.
8         THE COURT:  All right.  Any objection to 828?
9         MR. ADAMS:  No, Your Honor.
08:56AM 10        THE COURT:  828 is received.
11        **(Exhibit No. 828 received.)**
12        MR. FEASBY:  Two other issues, Your Honor.  One has
13 to do with your motion in limine ruling regarding getting into
14 the finances of Mr. Bennion and Deville, in particular, the
08:57AM 15 amounts they were paying themselves and the benefits that they
16 were taking through these corporations.
17        THE COURT:  Yes.
18        MR. FEASBY:  I believe that they've opened the door
19 to that already by claiming that this discount was required for
08:57AM 20 them to continue operations.  I think we should be entitled to
21 test that and show the jury what was really going on here in
22 terms of where they were spending money on themselves.
23        I also think during Mr. Bennion's testimony, we have
24 admissions from him in his deposition that they could not
08:57AM 25 afford to pay the fees in 2014 because of the losses they were

UNITED STATES DISTRICT COURT

9

1  sustaining on the coast, and they were subsidizing those
2  through their Coachella Valley entity.  And rather than ask for
3  a sidebar while the jury is here, I wanted to raise that with
4  you.
5       THE COURT:  Okay.  I reviewed motion in limine
6  rulings yesterday for another issue and one quarter anticipated
7  this issue.
8       So my ruling stated that if plaintiffs suggest or
9  argue that defendant's conduct left them unable to afford the
10 fees or the plaintiffs were unable to pay the fees because of
11 financial constraints, then defendant is entitled to rebut
12 those claims by showing that the B&D franchisees were able to
13 pay the salaries and non-business expenditures at issue.
14      I don't have the transcript of Mr. Deville's testimony in
15 front of me, but my sense of it was that Mr. Deville stated
16 that they were able to pay the license fees and that perhaps he
17 was a bit equivocal about whether the performance of the coast
18 franchisees would have impacted his decision to make those
19 payments.  But, you know, that -- you really didn't -- in my
20 view, you didn't really pin him down on that inability.
21      But I'd be happy, if you have the daily, which I think you
22 do because I think I saw it in my e-mail last night, if you
23 think there's a particular spot I should look at, I'd be happy
24 to look at that.
25      MR. FEASBY:  Well, I don't think there's anything

UNITED STATES DISTRICT COURT

10

1  specific that Mr. Deville said.  And, in fact, you're correct,
2  he did testify that we could always afford -- I asked him
3  specifically, "oh, yeah, we could always afford it."
4       But their whole theory at this point, Your Honor, is that
5  when we terminated the area representation agreement, they
6  could no longer afford to operate in this Windermere system
7  because they weren't receiving the savings of the 50 percent --
8  what they say was the savings of the 50 percent of the fees.
9       And I think that goes directly -- it directly contradicts
10 Mr. Deville's testimony.  And I think the evidence also
11 establishes that fact.  And I have Mr. Bennion's deposition
12 testimony, and we're going to play it for the jury.  I'm happy
13 to read that into the record if you would like.  But it's
14 unequivocal that in 2014 they did not have the money to pay the
15 fees, and they went to my client and discussed that with them.
16      THE COURT:  Say that again, the last thing.
17      MR. FEASBY:  It's unequivocal that --
18      THE COURT:  The deposition or --
19      MR. FEASBY:  It's in the deposition.
20      THE COURT:  Okay.
21      MR. FEASBY:  If you would prefer, I can play that,
22 and we can, you know, take a sidebar, and I'm happy to review
23 with you the exhibits I intend to use with him regarding those
24 expenditures.  I just wanted to address it with you now.
25      THE COURT:  Let's take a sidebar at the time.  I

UNITED STATES DISTRICT COURT

11

1  mean, I'm going to tell you right now I'm disinclined to get
2  into their expenditures.  I believe my motion in limine ruling
3  was correct.  I think it avoids an issue that is of very little
4  probative value and is potentially highly prejudicial.
5       And, you know, I think the jury understands the testimony
6  about why Mr. Bennion and Mr. Deville wanted to hang on to that
7  discount for their operations.  I don't think at any point in
8  time Mr. Deville yesterday or Mr. Bennion a few days ago was
9  unequivocal in saying that, you know, they could not -- they
10 would basically be bankrupted by losing that.  Unless that was
11 the kind of testimony they gave, I think we -- you know, you
12 need to -- you needed to or you would need to pin them down
13 further about whether that statement really represents an
14 inability to proceed or just a businessman's statement about
15 the business sensibility of proceeding without the discount.
16      Maybe I'm parsing it too fine, but I think that there's a
17 distinction there, and it's not one that's been -- I'm going to
18 use a nonlegal term -- "squished" at this point.
19      MR. FEASBY:  I understand.  I think your ruling,
20 Your Honor, was correct at the time.  I think, again, that
21 we've kind of crossed that threshold that you recognized in
22 your ruling in terms of them putting it at issue.
23      THE COURT:  And one of the things about the ruling
24 obviously was at that point in time I was brand new to the
25 case.  And now I've sat through -- where are we? -- six days of

UNITED STATES DISTRICT COURT

12

1  testimony.  And so I understand the case a whole lot better.
2       On the one hand I feel good that I still think that -- I
3  still think the ruling is fundamentally correct.  Nothing I've
4  heard really causes me to think, you know -- it would be one
5  thing if there was affirmative representations to this jury
6  that, you know, we simply could not proceed another month with
7  our cash flow situation given, you know, "X," "Y" or "Z," when
8  the true facts would show that, you know, certain expenditures
9  or salaries were being paid to the principals.  I would agree
10 with you.
11      But I don't think the testimony has been unequivocal in
12 that regard.  If we get to that point or if you think there's
13 things I missed, because certainly I've been -- I've been
14 listening very carefully, but I could have missed something,
15 you'll need to let me know.
16      MR. FEASBY:  I will.  And I will just add, Your
17 Honor, I think it bears on credibility.  They have the ability
18 at this point to prevent the testimony from coming in by
19 saying, "We had the money."  And I think these documents prove
20 otherwise.  But I'll leave it at that.
21      THE COURT:  Okay.
22      MR. FEASBY:  The other issue, Your Honor, is I
23 anticipate we'll move for judgment as a matter of law at the
24 close of plaintiff's evidence --
25      THE COURT:  Okay.

UNITED STATES DISTRICT COURT

13

1 MR. FEASBY: -- on a couple of issues. And so I
2 don't know how you would like to address that.
3 THE COURT: What we'll do is if there's going to
4 be -- when we close -- when Mr. Mulcahy or Mr. Adams closes the
09:05AM 5 evidence, we will take a short recess so that you can make
6 those motions and put them on the record. And I'm -- I will do
7 the -- I don't remember the magic language off the top of my
8 head, but I'll be prepared to do the magic language to defer
9 those until the end of the case.
09:05AM 10 MR. FEASBY: Thank you.
11 THE COURT: Okay. Mr. Adams?
12 MR. ADAMS: No, Your Honor. I appreciate it. Thank
13 you.
14 THE COURT: So we're going to return -- recommence
09:06AM 15 with Mr. Deville. I take it we presumably have some redirect?
16 MR. ADAMS: Mr. Deville is done.
17 THE COURT: Oh, you're not going to do any redirect?
18 MR. ADAMS: Correct, Your Honor.
19 THE COURT: Okay. He had a lot of things he wanted
09:06AM 20 to say. I wanted to give him a chance to answer those
21 questions.
22 MR. ADAMS: We want to -- and I do this on the
23 record, but, of course, we preserve the right to recall him as
24 rebuttal, if necessary.
09:06AM 25 THE COURT: Okay.

UNITED STATES DISTRICT COURT

14

1 MR. ADAMS: But other than that, we're done for now,
2 Your Honor.
3 THE COURT: And what's -- and who's next?
4 MR. ADAMS: Mr. Bennion.
09:06AM 5 THE COURT: Okay. We'll resume with Mr. Bennion.
6 And then who would be after Mr. Bennion?
7 MR. ADAMS: And then we have our expert to come in
8 tomorrow, but that's the end of the road for us.
9 THE COURT: Okay. So if we conclude with
09:06AM 10 Mr. Bennion today, we would then take the -- once we're done
11 with Bennion cross, redirect, et cetera, we would then be at a
12 point where we would need to take that recess; is that correct?
13 MR. ADAMS: Understood, Your Honor, yes.
14 THE COURT: Well, actually, we probably need to hear
09:06AM 15 from Mr. Wrobel first. So it will be a little bit artificial,
16 Mr. Feasby, but you may need to take the ball to start your
17 case. And you've now highlighted the issue for me so you
18 preserve that judgment as a matter of law issue for tomorrow
19 after we finish Mr. Wrobel. Should be finished with
09:07AM 20 Mr. Bennion today. I don't know whether we will. Okay?
21 MR. FEASBY: Thank you, Your Honor.
22 THE COURT: Okay. Sounds good.
23 Ms. Boehme, let the jury know we're five minutes away or
24 so.
09:07AM 25 (Recess from 9:07 a.m. to 9:12 a.m.)

UNITED STATES DISTRICT COURT

15

1 (In the presence of the jury.)
2 THE COURT: All right. Ladies and gentlemen, I
3 wanted to give you a quick update as we start our seventh day
4 together. We are making very good progress, and I think we are
09:12AM 5 ahead of the game plan a little bit.
6 Today we are going to have a full day. Tomorrow we're
7 going to start at 9:30 and otherwise have a full day. And then
8 Friday we're going to start at 9:00 and plan to be done by
9 either noon or 12:30. I know a couple of you have afternoon
09:12AM 10 conflicts, and I want to try to accommodate those. So we'll be
11 out of here by 12:30 on Friday.
12 By the end of the day Friday or maybe shortly before the
13 end of the day Friday I'll give you an update about the plan
14 for next week. I think the fact we're making very good
09:13AM 15 progress suggests to me that our plan of finishing the case in
16 the early-to-middle part of next week is on target. And so
17 that's a good thing.
18 With that, I'll turn things back over to Mr. Adams. I
19 guess Mr. Deville is concluded. So we'll ask you to call your
09:13AM 20 next witness.
21 MR. ADAMS: Thank you, Your Honor. Plaintiffs call
22 Bob Bennion back to the stand.
23 THE COURT: Okay. We're going to resume
24 Mr. Bennion's testimony.
25 THE CLERK: Mr. Bennion, I'd like to remind you that

UNITED STATES DISTRICT COURT

16

1 you're still under oath.
2 THE WITNESS: Yes.
3 THE COURT: Okay.
4 MR. ADAMS: Thank you, Your Honor.
5 **ROBERT BENNION, PLAINTIFF, RESUMED THE STAND**
6 **DIRECT EXAMINATION**
7 BY MR. ADAMS:
8 Q Good morning, Mr. Bennion.
9 A **Good morning.**
09:14AM 10 Q We'll be relatively brief this morning. But let's start
11 with an exhibit that the jury has already seen. Let's go to
12 Exhibit 729. Now I have put two binders in front of you. So
13 today you're just going to have to follow me in the numeric
14 order that the binders are in.
09:14AM 15 A **Okay.**
16 Q But 729 should be in one of those.
17 A And this is in evidence already.
18 A **Yes, I have 729.**
19 Q Okay. Great. Now, this is the e-mail that we have seen
09:15AM 20 from Mr. Drayna to Mr. Sunderland cc'ing Mr. Teather. Do you
21 see that?
22 A **Yes, I do.**
23 Q And you recognize this document from this lawsuit?
24 A **Yes, I do.**
09:15AM 25 Q But you're not cc'd on it; correct?

UNITED STATES DISTRICT COURT

17

```
 1   A    No, I'm not.
 2   Q    Let's look at a couple items in here.  Turn with me,
 3   please, to Page 3.
 4   A    Okay.
 5   Q    Now Page 3 is the addendum to the franchise license
 6   agreement.  Do you see that?
 7   A    Yes, I do.
 8   Q    And the party to this proposed addendum was Bennion &
 9   Deville Fine Homes, Inc.  Do you see that?
10   A    Yes, I do.
11   Q    Okay.  And Bennion & Deville Fine Homes, Inc., is your
12   Coachella Valley franchise; right?
13   A    Yes, that's our franchisee operation.
14   Q    So you understood that this addendum proposed to modify
15   or change your Coachella Valley franchise agreement; right?
16   A    Yes, uh-huh.
17   Q    Now have you seen a similar proposed addendum that would
18   change your San Diego franchise agreement?
19   A    No, I have not.
20   Q    Were you ever presented with one from Windermere?
21   A    No.
22   Q    Now if we look down at the second paragraph under
23   "recitals," this proposed addendum reads:
24            "Under the original license as previously
25       amended, certain services were provided to licensee
```

UNITED STATES DISTRICT COURT

18

```
 1   by Windermere Services Southern California, Inc.,
 2   area representative."
 3       Now what do you understand this to be referring to?
 4   A    That's the services our service company would provide to
 5   our franchisees, the ones we -- company stores we owned and the
 6   other franchisees in our system.
 7   Q    Okay.  And your services provider was required under the
 8   original franchise agreement, the franchisee, your Coachella
 9   Valley entity, to provide those services; correct?
10   A    Yes.
11   Q    Now this recital goes on to state:
12            "Area representative," under this proposed
13       addendum, "will cease providing services to all
14       Windermere franchisees in Southern California."
15       Now were you having discussions with Windermere at this
16   time about ceasing operations in Southern California as a
17   services provider?
18   A    No.
19   Q    Okay.  And this is something that you did not prepare;
20   correct?
21   A    I did not prepare that, no.
22   Q    And you did not instruct your attorney to prepare this?
23   A    No, we did not.
24   Q    Okay.  And this goes on to read that:
25            "Licensee has proposed that in exchange for a
```

UNITED STATES DISTRICT COURT

19

```
 1   discount on the ongoing franchise license fees it
 2   pays, it will continue to provide certain services
 3   to itself rather than relying on Windermere for
 4   such services."
 5       Now this sentence refers to a discount; correct?
 6   A    Yes, it does.
 7   Q    And what discount is that?
 8   A    That is the 50 percent discount we were already receiving
 9   under our current agreement with Windermere Seattle, WSC.
10   Q    And if you entered into this addendum, the proposed
11   language says that a discount, possibly the same discount,
12   would continue for your Coachella Valley entity?
13   A    Yes, correct.
14   Q    That 50 percent discount would remain the same going
15   forward; correct?
16   A    Yes, correct.
17   Q    But it doesn't address the discount for San Diego
18   franchise; correct?
19   A    No, it does not.
20   Q    Was that a problem for you?
21   A    Yes.
22   Q    How so?
23   A    Well, when we entered into the relationship to restake the
24   claim to the coast, we entered into that arrangement to do that
25   knowing we would have the benefit of that discount, which was
```

UNITED STATES DISTRICT COURT

20

```
 1   very important to the success of restaking the coast.
 2   Q    And if you agreed to this addendum that was sent to your
 3   attorney, you wouldn't get that discount; correct?
 4   A    No, we would not.
 5   Q    Okay.  Let's take a look at another page of this document
 6   that Windermere's attorney prepared.  Let's go to Page 6.  Now
 7   this page is titled "Termination Agreement."  Do you see that?
 8   A    Yes.
 9   Q    Okay.  And you understood that this was a proposed
10   termination agreement for your area representation agreement?
11   A    Yes, correct.
12   Q    And the parties to this proposed termination agreement
13   were Windermere, the franchisor, and your area representative
14   business; correct?
15   A    Yes.
16   Q    Now if we look at the recitals, Recital C in the middle
17   of the page, we'll go down a sentence, and this reads -- this
18   is some preliminary information.  Do you understand that about
19   the recitals?
20   A    Yes.  Uh-huh.
21   Q    It reads:
22            "It was contemplated that this role, the role
23       of the services provider, would include both
24       selling new franchises and providing ongoing
25       services to all Windermere franchises in the
```

UNITED STATES DISTRICT COURT

21

```
 1   region."
 2       Now is this recital consistent with your rights under this
 3   agreement?
 4   A   Yes.  That was --
09:20AM 5       MR. FEASBY:  Objection.  Calls for speculation.
 6       THE COURT:  Overruled.
 7       THE WITNESS:  Yes, that was our original area rep
 8   agreement.
 9   Q   BY MR. ADAMS:  Now if you signed this termination
09:20AM 10   agreement, you would be agreeing to dissolve those rights;
11   correct?
12   A   Correct.  We can no longer sell franchises or support the
13   other franchisees in the system.
14   Q   But to sign this agreement, you would have to do
09:21AM 15   something else.  Let's turn to Page 7.
16       In addition to dissolving those rights and terminating
17   the area representation agreement, you would also be agreeing
18   in Paragraph 2 at the top of the page to amend the franchise
19   agreements; correct?
09:21AM 20   A   Yes.
21   Q   And by amending the franchise agreements, you would be
22   agreeing to remove services as a party to those agreements;
23   correct?
24   A   Yes, correct.
09:21AM 25   Q   Now did you ever agree to do that?
```

UNITED STATES DISTRICT COURT

22

```
 1   A   No.
 2   Q   And this language says in the second sentence:
 3       "All franchise agreements in the region shall
 4       be amended to eliminate any reference to the area
09:21AM 5       representative."
 6       That's something you never agreed to do?
 7   A   Never agreed to do that, no.
 8   Q   Now at the time that Windermere terminated the area
 9   representation agreement, was the area representative still a
09:22AM 10   party to your franchise agreements?
11       MR. FEASBY:  Objection.  Calls for speculation.
12   Calls for a legal conclusion.
13       THE COURT:  Overruled.
14       THE WITNESS:  Yes, they were.
09:22AM 15   Q   BY MR. ADAMS:  Okay.  So this Exhibit 729 that we're
16   looking at is the e-mail from Mr. Drayna dated August 27, 2014.
17   Last time you were on the stand you testified to an October 3rd
18   meeting in 2014 that you had with Mr. Teather and the gentleman
19   in San Diego.  Do you recall that?
09:22AM 20   A   October 3rd or October 2nd?
21   Q   I'm sorry.  October 2nd.
22   A   Yes, uh-huh.
23   Q   I misspoke.  I apologize.
24       And we also saw an e-mail you exchanged with Mr. Teather
09:22AM 25   identifying -- you say "where the rub begins."  Do you recall
```

UNITED STATES DISTRICT COURT

23

```
 1   that?
 2   A   Yes, uh-huh.
 3   Q   I'm not going to show that e-mail again, but what I want
 4   to do is I want to show Exhibit 290, which is the e-mail from
09:23AM 5   Mr. Teather following your e-mail.
 6   A   That's going to be in this first book?
 7   Q   I hope so.
 8   A   Yes, I have it.
 9   Q   Okay.  This is -- do you recognize this e-mail, sir?
09:23AM 10   A   Yes, uh-huh.
11   Q   And this is an e-mail that you received from Mr. Teather
12   on October 3rd, 2014?
13   A   Yes, uh-huh.
14       MR. ADAMS:  Your Honor, I'd like to move Exhibit 290
09:23AM 15   into evidence.
16       THE COURT:  Any objection to 290?
17       MR. FEASBY:  No objection.
18       THE COURT:  290 is received.
19       (Exhibit No. 290 received.)
09:23AM 20   Q   BY MR. ADAMS:  It's a rather lengthy e-mail, so I just
21   want to focus on a portion of it, Mr. Bennion.  Let's look at
22   the second paragraph of this e-mail.
23       John, if you could blow that up.  Thanks.
24       Now before receiving this e-mail from Mr. Teather, were
09:24AM 25   you clear with him on where you stood with respect to the area
```

UNITED STATES DISTRICT COURT

24

```
 1   representation rights, whether or not you would be giving those
 2   up?
 3   A   Yes.  We had a conversation in person October 2nd.
 4   Q   And as we discussed, you never signed that termination
09:24AM 5   agreement that Mr. Drayna had drafted and sent over; correct?
 6   A   No.
 7   Q   Okay.  Now in Mr. Teather's e-mail that we're looking at
 8   here, his second sentence he says:
 9       "I do, in fact, believe that you own more
10       than enough offices.  It is my belief that the
11       future lies in franchising."
12       Now what was he communicating to you around this period of
13   time about your future in franchising?
14   A   Well, when we met in person on October 2nd in that -- in
09:25AM 15   that meeting, our attorney had indicated to us he had sent
16   something approaching us about wanting to give up services.  So
17   that was in my head at that October 2nd meeting.  And I asked
18   Mr. Teather directly, "What is it you want from us?"  I mean, I
19   was confused.  I said, "Do you want us to give up services?"
09:25AM 20       And he said, "No, we want you to continue to be the
21   services provider as long as you want to be the services
22   provider."
23       And so I'm, like, "Okay, that's off the table."  He's
24   telling us as long as we want to do it.
09:25AM 25       He said, "Let us show you how to make a bunch of money in
```

UNITED STATES DISTRICT COURT

25

1 franchising. The money is in franchising." And he stated that
2 to me in the parking lot on the way to the car from that
3 meeting.
4        And then the next thing that was in my head as we were
09:26AM 5 going to meet with Gooding, Schuster, Johnson, I knew there was
6 something out there that they wanted to possibly purchase our
7 Carlsbad office. I had no idea they were evaluating all of our
8 offices or had interest in all of our offices.
09:26AM 9 Q      Now I'm going to ask you the same question or similar
10 question that I asked Mr. Deville. Were you aware at this
11 point in time in 2014 that Mr. Teather was communicating with
12 Homes & Estates folks about taking back services?
13 A      No.
14 Q      Let's go down in this same paragraph two sentences.
09:26AM 15 Mr. Teather writes:
16        "I feel that you have taken enough financial
17        risk on behalf of Windermere, and it is time that
18        both of you reap the reward of other people's
19        risks."
09:26AM 20       What's he referring there, to your understanding?
21 A      Well, I think there's two chapters to this story. One in
22 Coachella Valley, when we built up the Coachella Valley and
23 took on the area rep, and you saw all the offices that we
24 added. We took great risk to build that, and then we were hit
09:27AM 25 with a big downturn. And Windermere Seattle was very

UNITED STATES DISTRICT COURT

26

1 supportive and in step with us. It was actually a very
2 exciting time, you know, to try and build the brand for
3 Southern California.
4        Then Chapter 2, we get to the coast when the coast goes
09:27AM 5 dark when we agree that we will take on the task to plug the
6 hole there after vacating those offices, when we put the
7 financial risk back on us to do those $750,000 in loans and
8 take on the risk of the leases and the cost to build -- rebuild
9 the coast. So that's what he's referring to, I believe, those
09:27AM 10 two chapters.
11 Q      And the end of his paragraph -- or his paragraph
12 concludes with:
13        "Again, like I said above, I'm not a fool. I
14        know the risks. I know others have failed us. But
09:28AM 15        damn it, I also know that working together we can
16        succeed as franchisors."
17       Again, is that consistent with your discussions with
18 Mr. Teather?
19 A      Yes. After the October 2nd in-person conversation, we
09:28AM 20 were full steam ahead to build the franchisor business as an
21 area rep to sell and support more franchises. We
22 were crystal clear. I pointedly asked him the question because
23 I personally wanted to know. You hear things from my partner,
24 Bob Deville. You hear things from the attorney. I'm the 50
09:28AM 25 percent owner of the enterprise. I wanted to hear right from

UNITED STATES DISTRICT COURT

27

1 the horse's mouth what did you want us to do.
2 Q      And what was his response?
3 A      "Let's build franchises. As long as you want to do it,
4 let's do the franchising business. Let's show you how to make
09:28AM 5 a lot of money being a franchisor."
6 Q      After this October 2nd meeting and your October 3rd
7 e-mail exchange, how did you feel about the relationship?
8 A      I felt like -- you know, I felt like after the meeting we
09:29AM 9 were getting things back on track. I felt prior to that
10 meeting there was some tension out there. But I thought, okay,
11 seems like we're back on track. Let's go with it.
12 Q      Let's take a look at Exhibit 330. This may not be in one
13 of those two binders. 330.
09:29AM 14 A      330?
15 Q      Yes, sir. Sorry.
16 A      That's okay.
17 Q      The front cover identifies the range.
18 A      Okay.
09:29AM 19 Q      Keep both of those handy, though, sir.
20 A      330.
21        MR. ADAMS: Your Honor, may my associate approach?
22        THE COURT: Yes.
23        THE WITNESS: I think I stop at 307.
24 Q      BY MR. ADAMS: Do you have it in front of you, sir?
09:30AM 25 A      Yes, I do.

UNITED STATES DISTRICT COURT

28

1 Q      Okay. This is a single-page document. It appears to be
2 an exchange of e-mails on November 11, 2014.
3        Do you recognize this document?
4 A      Yes, I do.
09:30AM 5 Q      And is this a series of e-mails you either sent or
6 received from Mr. Teather?
7 A      Yes.
8 Q      On November 11, 2000 -- November 11, 2014?
09:30AM 9 A      My response is on November 11, yes. He sent his on
10 November 10th.
11        MR. ADAMS: Your Honor, I'd like to move Exhibit 330
12 into evidence.
13        THE COURT: Any objection to 330?
14        MR. FEASBY: No objection.
09:30AM 15        THE COURT: 330 is received.
16        (Exhibit No. 330 received.)
17 Q      BY MR. ADAMS: Okay, Mr. Bennion, so this e-mail follows
18 the meeting and the exchanges we just discussed; correct?
19 A      Yes, correct.
09:30AM 20 Q      Okay. And in this e-mail, you are talking about what?
21 A      He had obviously saw an article that was complimentary of
22 what we were doing. He commented on that. And then when he
23 was inquiring the status of when we would make our next fee
24 payment.
09:31AM 25 Q      And you responded to him?

UNITED STATES DISTRICT COURT

**29**

```
 1   A    And I responded to him -- we had come out of the slow of
 2   the summer season, so we're always allocating to manage our
 3   cash flow.  Things start to pick up in November for
 4   Thanksgiving because we're in the desert.  And just indicating
 5   to him when we're going to make the next payments.
 6   Q    What was your thought process at this time with respect
 7   to your relationship with Windermere?
 8   A    Well, I thought it appeared from the e-mails that we were
 9   back on track, things were moving forward.  We still had a
10   question in our mind what was going on behind the scenes
11   because Mr. Deville had had the conversation with Mr. Schuster
12   that Mr. Teather had told them without our knowledge that we
13   were giving up services and divesting ourselves from the
14   San Diego market, which, you know, was not true.  So we were --
15   we were concerned, but we were trying to roll with what was
16   being presented to us.
17   Q    Okay.  And so we're at the beginning of November.  What
18   happened to the relationship, just generally?  And we've kind
19   of already touched on this.  But generally what happened to the
20   relationship in January of 2015?
21   A    Well, we received a termination letter from Windermere.
22   Q    Let's take a look at that, Exhibit 367.  And this is
23   already in evidence.  Do you have it in front of you?
24   A    Yes, I do.
25   Q    Okay.  And this is the letter that was received from
```

**30**

```
 1   Mr. Drayna purporting to terminate your services business;
 2   correct?
 3   A    Yes, uh-huh.
 4   Q    Okay.  And Mr. Drayna writes in his notice:
 5            "This letter constitutes formal notice from
 6   Windermere, franchisor, that it is exercising its
 7   right to terminate your area representation
 8   agreement pursuant to the 180-day notice provision
 9   of Paragraph 4.1."  Do you see that?
10   A    Yes, I do.
11   Q    Let's take a look at that 180-day notice provision of
12   Paragraph 4.1.  Please turn to Exhibit 10.
13   A    Boy, I don't see numbers out though.
14            MR. ADAMS:  Your Honor, may Mr. Carrillo approach?
15            THE COURT:  Yes.
16            MR. ADAMS:  Thanks.
17            THE WITNESS:  Probably in another binder, I would
18   guess.
19            All right.  Here we are.  No. 10.
20   Q    BY MR. ADAMS:  Thank you.
21            So the termination notice purported to terminate the
22   agreement pursuant to the 180-day notice provision of
23   Paragraph 4.1.  So let's turn to Paragraph 4.1.  This is going
24   to be Page 6 of that exhibit.
25   A    Okay.  I'm here.
```

**31**

```
 1   Q    Okay?
 2   A    Uh-huh.
 3   Q    Paragraph 4.1 contains a 180-day provision on
 4   Subparagraph B.  It says essentially:
 5            "This agreement may be terminated by either
 6   party upon 180 days' written notice to the other
 7   party."  Do you see that?
 8   A    Yes, I do see that.
 9   Q    And if that provision is triggered, if a party purports
10   to terminate pursuant to this 180 days' notice, then that would
11   take the parties to Section 4.2 on the next page.  Please turn
12   to Page 7.
13            And this 4.2 titled "Termination Obligation" --
14   If you could blow that up, John.
15            -- this reads, "In the event either party elects to
16   terminate the agreement as provided in Section 4.1B" -- that's
17   the 180-day notice provision; correct?
18   A    Yes, correct, uh-huh.
19            "It is agreed that the other party, the terminated
20   party, will be paid an amount equal to the fair
21   market value and the terminated party's interest in
22   the agreement in accordance with the provisions of
23   this agreement."  Do you see that?
24   A    Yes, I do.
25   Q    When you received Mr. Drayna's notice, were you paid
```

**32**

```
 1   anything for your area rep agreement being terminated?
 2   A    No, we were not.
 3   Q    Okay.  This paragraph goes on to read, I think, two
 4   sentences down:
 5            "The fair market value of the terminated
 6   party's interest" -- this is the amount to be
 7   paid -- "will be determined by the appraisers
 8   without consideration of speculative factors."
 9   And then it goes on to state:
10            "The appraisers shall look at the gross
11   revenues received under the transaction during the
12   12 months preceding the termination date from
13   then-existing licensees that remain with or
14   affiliate with the terminated party."  Do you see
15   that?
16   A    Yes, I do.
17   Q    Okay.  Let's break that last sentence down.  Okay?
18   A    Okay.
19   Q    To value the business pursuant to this provision, you
20   understood that it was -- the valuation would reflect the gross
21   revenues received under this agreement; correct?
22   A    Yes, the gross revenues.
23   Q    And what does that mean?
24   A    That's all or any fees that we collect from our
25   franchisees during that 12-month period.
```

UNITED STATES DISTRICT COURT

33

1 Q  Okay.  And that's -- the second point is for the prior 12

2 months.

3 A  **Prior 12 months to our departure, which I think would have**

4 **been that date that you mentioned, the July 28th or --**

09:37AM 5 Q  Okay.  We'll get to that.  You're jumping ahead of me.

6 So gross revenues received for the prior 12 months by

7 your services business; correct?

8 A  **Yes, uh-huh.**

9 Q  And those prior 12-month fees would only include those

09:38AM 10 amounts paid by franchisees or licensees that remained with

11 Windermere after the termination of this services business;

12 correct?

13 A  **Yes, after our departure.**

14 Q  Okay.  Let's take -- keep those three things in mind we

09:38AM 15 just addressed.  Okay?

16 A  **Got it.**

17 Q  And let's turn to Exhibit 549.

18       MR. CARRILLO:  Your Honor, may I approach?

19       THE COURT:  Yes.

09:39AM 20       THE WITNESS:  Okay.  I'm at 549.

21 Q  BY MR. ADAMS:  Okay.  And we just addressed the language

22 of that termination obligation in the area rep agreement;

23 correct?

24 A  **Yes, uh-huh.**

09:39AM 25 Q  And can you explain for us, what is this Exhibit 549?

UNITED STATES DISTRICT COURT

34

1 A  **This is what I worked with Patrick Robinson to put**

2 **together.  These are the total fees collected, both franchise**

3 **and tech fees, for the prior 12 months prior to our termination**

4 **or departure date.**

09:39AM 5 Q  And who is Mr. Robinson?

6 A  **He's in our accounting department in Coachella Valley.**

7       MR. ADAMS:  Your Honor, I'd like to move Exhibit 549

8 into evidence.

9       THE COURT:  Any objection?

09:40AM 10       MR. FEASBY:  Object on foundational grounds, Your

11 Honor.

12       THE COURT:  549 -- overruled.  549 will be received.

13       **(Exhibit No. 549 received.)**

14       MR. ADAMS:  Go ahead and blow up that chart at the

09:40AM 15 top.

16 Q  Okay.  Mr. Bennion, we just identified those three

17 components of the termination obligation.  Tell me this:  Does

18 this chart reflect the gross revenues received by your services

19 business?

09:40AM 20 A  **Yes.  The remaining franchise owners, not our fees, but**

21 **the other franchisees that were under our area rep agreement at**

22 **the time.**

23 Q  Okay.  And we see here in the left-hand column, we've got

24 October 14 through September 2015.  Why does it reflect that

09:40AM 25 period of time?

UNITED STATES DISTRICT COURT

35

1 A  **I believe after the 180-day notice, our termination date,**

2 **we would have been done in September of '15.  So it's for the**

3 **12 months of the gross receipts as stated in Paragraph 4.2 of**

4 **the area rep agreement.**

09:41AM 5 Q  Okay.  So is it your opinion that this chart reflects

6 those gross revenues received as identified in the termination

7 obligation of your area rep agreement?

8 A  **Yes, it does.**

9 Q  Okay.  And I've totaled these numbers.  You could tell me

09:41AM 10 if my math is correct.  The total for this is $615,000 --

11 $615,075.13.  Does that sound accurate to you?

12 A  **Yes, it does, uh-huh.**

13 Q  And you mentioned this a moment ago, but I want to know,

14 does this chart include revenues paid by franchisees that

09:41AM 15 exited the system before you exited the system?

16 A  **There was one that exited during this time frame.  We did**

17 **not include Mr. King's fees in this calculation.**

18 Q  Okay.  Mr. King had left before the September 30th date?

19 A  **Yeah, he wasn't in a full 12 months, so we did not include**

09:42AM 20 **his fees.**

21 Q  Does this include your own franchise business?

22 A  **No, it does not, none of our fees.**

23 Q  These were fees paid by other franchisees?

24 A  **Yes, correct.**

09:42AM 25 Q  That remained with Windermere after the termination?

UNITED STATES DISTRICT COURT

36

1 A  **Yes.  Those were the three others that remained after the**

2 **termination.**

3 Q  And you were not paid any of this amount; is that

4 correct?

09:42AM 5 A  **Correct.**

6 Q  Let's look at Exhibit 370.

7 John, this is already in.

8       MR. CARRILLO:  Your Honor, may I approach?

9       THE COURT:  Yes.  You have carte blanche to approach

09:42AM 10 to help the witness with exhibits.

11       MR. ADAMS:  Thank you, Your Honor.

12       THE WITNESS:  I'm there.

13 Q  BY MR. ADAMS:  Thank you, Mr. Bennion.

14 Okay.  Mr. Bennion, you received a second notice of

09:43AM 15 termination; correct?

16 A  **Yes, we did.**

17 Q  Okay.  Now this second notice of termination, did this

18 catch you off guard?

19 A  **It did.**

20 Q  And if we look at the second notice of termination, the

21 first paragraph it says, second sentence down:

22       "As you are aware, Paragraph 4.1 of the

23       agreement provides that either party may terminate

24       the agreement without cause upon 180 days' notice."

09:43AM 25 Now you understand that to be the 180 days' notice we just

UNITED STATES DISTRICT COURT

37

1   discussed; correct?

2   A   Correct, uh-huh.

3   Q   Now this letter purports to terminate the agreement on a

4   different -- for a different reason; correct?

09:44AM 5   A   Yes, uh-huh.

6   Q   And this letter purports to terminate your agreement for

7   cause?

8   A   Correct.

9   Q   Okay.  And Mr. Sirianni, who is the author of this as

09:44AM 10  we've already discussed, states that, "Windermere is now" a

11  month after you received the first notice of termination,

12  "seeking to terminate the agreement for the area

13  representative's failure to collect and remit fees"; correct?

14  A   Correct, uh-huh.

09:44AM 15  Q   But -- and he seeks to terminate the notice under a

16  different provision of the agreement, not the 180 days

17  provision?

18  A   Correct.

19  Q   He seeks to terminate the agreement pursuant to a 90-day

09:44AM 20  provision.  Are you aware of that?

21  A   Yes, I am.

22  Q   And that 90-day provision gave you the ability to cure

23  this identified breach; correct?

24  A   Correct, it did, uh-huh.

09:45AM 25  Q   But I want to be very clear about something here.  Let's

UNITED STATES DISTRICT COURT

38

1   look at the very last sentence in his first paragraph.

2   Mr. Sirianni is telling you that even if you cured that breach,

3   your agreement is still going to terminate pursuant to the

4   180-day provision; isn't that right?

09:45AM 5   A   Yeah.  I was very confused by this, because it was a

6   termination for cause, but you had the right to cure.  But if

7   you cured, you were still terminated.  It just -- it didn't

8   make sense.

9   Q   You could cure it in 90 days, but at the end of 180 days,

09:45AM 10  you're still out?

11  A   You're still out, yes, uh-huh.

12  Q   Now do you understand the purpose of this right to cure?

13  A   Yes.

14  Q   What do you understand that to be?

09:45AM 15  A   Well, it gives a party to a contract the right to cure any

16  breach or anything that's come up that you -- that they're

17  stating in the letter gives you the right to do that.  Once

18  you've cured that, your rights continue to go on under the

19  contract that you had with them.

09:46AM 20  Q   Now were your rights under this contract continuing for

21  90 or 180 days after you received this letter?

22  A   Well, I think in theory they were.  But by this time we

23  had talked to legal counsel.  We felt our agreement was

24  terminated, you know, back in September when they took away our

09:46AM 25  right to service the people that we were servicing, our

UNITED STATES DISTRICT COURT

39

1   franchisees, when they went behind our back and told them that

2   we were giving up services and undermine that relationship.

3   And they failed to register the FDD after we gave them the

4   documentation on August 1st, and it still wasn't registered.

09:47AM 5   So we felt we were terminated then.  We felt we were done back

6   then, but...

7   Q   So even though they're identifying this cure period where

8   you still have these rights to operate, was it your testimony

9   that you didn't have the right to operate?

09:47AM 10  A   We didn't have the right.  It was --

11      MR. FEASBY:  Objection.  Leading.

12      THE COURT:  Hold on.  I didn't quite catch the

13  objection, Mr. Feasby.

14      MR. FEASBY:  Leading.

09:47AM 15      THE COURT:  The question, "was it your testimony,"

16  I don't think that's leading.  Overruled.

17      THE WITNESS:  Repeat the question.  I'm sorry.

18  Q   BY MR. ADAMS:  Sure.  Was it your testimony that you did

19  not have this right to operate under the area representation

09:47AM 20  agreement during this purported cure period?

21  A   Right.  Our rights were gone.  We had no registered FDD

22  specific to our region with accurate information in it.  And

23  they had destroyed the relationship with our existing

24  franchisee, so we were unable to support them.  So we had no

09:48AM 25  rights.  It was gone.  It was gone back in the fall.

UNITED STATES DISTRICT COURT

40

1   Q   And let's try to put some of this in perspective based on

2   Windermere's own documents.  We've looked at that purported

3   termination agreement moments ago for your services business.

4   Do you recall that?

09:48AM 5   A   Yes, I do.

6   Q   And that identified in the recitals those two rights that

7   you mentioned?

8   A   Yes, to support and sell franchises.  That was the main

9   focus of the area rep agreement.  That's the two rights he gave

09:48AM 10  us, and they were gone, destroyed.

11  Q   And at the time you received this notice, did you have

12  those rights?

13  A   No, they were already gone.

14  Q   Okay.  Now ultimately you -- we've already heard

09:48AM 15  testimony about discussions about buying, et cetera.  We heard

16  Mr. Davey.  Ultimately your relationship with Windermere

17  severed completely; correct?

18  A   Yes, it did, uh-huh.

19  Q   And when was that?

09:48AM 20  A   I believe it's September of '15, 2015.

21  Q   If that relationship did not sever in September of 2015,

22  how long do you anticipate you would have stayed with

23  Windermere?

24  A   Well, we had been there 20-some years and were going to

09:49AM 25  ride the balance of our career out there, which probably, in my

UNITED STATES DISTRICT COURT

---

**Page 41**

1   life span before retiring, was probably another ten years.

2   Q    Now if you had changed, what would that -- what type of

3   undertaking would that have been?

09:49AM 4   A    It would be extremely expensive, what we had to go through

5   if you're going to rebrand.  I was well-known under the

6   Windermere brand and had worked there many years and proudly

7   so.  And, you know, it destroyed our whole business model.  And

8   we would have had to start over and we weren't going to do

9   that.

09:49AM 10   Q    That wasn't your plan?

11   A    That wasn't our plan.  We planned to be loyal soldiers to

12   Windermere and continue doing what we've been doing and working

13   as hard as we've been working the prior 20-some years.

14        MR. ADAMS:  Your Honor, can we take just a short

09:50AM 15   break?

16        THE COURT:  Ladies and gentlemen, let's go ahead and

17   just take five minutes.  We'll come back at 9:55, and we will

18   resume with the case.  Thank you.

19        THE COURTROOM DEPUTY:  All rise.

09:50AM 20        **(Out of the presence of the jury.)**

21        THE COURT:  Mr. Adams?

22        MR. ADAMS:  Thank you, Your Honor.  I just -- I need

23   to run out to the restroom very briefly.  I'm sorry about that.

24        THE COURT:  That's all right.

09:50AM 25        MR. ADAMS:  Thank you.

UNITED STATES DISTRICT COURT

---

**Page 42**

1        THE COURT:  No problem.

2        **(In the presence of the jury.)**

3        THE COURT:  Mr. Adams?

4        MR. ADAMS:  Thank you, Your Honor.  Sorry about

10:00AM 5   that.

6        THE COURT:  No worries.

7   Q    BY MR. ADAMS:  Mr. Bennion, let me pick up hopefully

8   where we left off here.

9   A    Okay.

10:00AM 10   Q    Okay.  You were testifying about how long you would stay

11   in the system but for the termination; is that fair?

12   A    Correct, yes.

13   Q    And what was that -- how long would that be?

14   A    My career span had another ten years to go.

10:01AM 15   Q    And you believed you would remain at Windermere that

16   entire time?

17   A    Yes, we did.  We had a 19-year history and a very large

18   investment in the brand.

19   Q    Now at the time your services agreement was terminated --

10:01AM 20   A    Uh-huh.

21   Q    -- did you receive a notice of Windermere's intent to

22   terminate your franchise agreements?

23   A    No, we did not.

24   Q    Did the termination of services have a detrimental effect

10:01AM 25   on your ability to operate under these franchise agreements?

UNITED STATES DISTRICT COURT

---

**Page 43**

1   A    Well, it destroyed the relationship.  I mean, it destroyed

2   the franchise agreement when they terminated the area rep.  It

3   was tied together.  So it terminated our rights under the

4   franchisee agreement as well.

10:01AM 5   Q    Okay.  Let's see if we can flesh that out.  When you say

6   it destroyed the relationship because it was tied together,

7   what do you mean by that?

8   A    All three contracts, the area rep, the Windermere Services

9   Seattle and our Windermere Services Southern California

10:02AM 10   agreements, they all went hand in hand together.  So when the

11   area rep was destroyed, when they terminated that, it, in

12   effect, destroyed our franchisee agreement as the franchisee

13   agreements we had.

14   Q    And that addendum for the Coachella Valley that we saw

10:02AM 15   that gave you -- or would have given you a 50 percent

16   reduction, that was not part of this termination; correct?

17   A    It was not, no.

18   Q    Okay.  And you were never even offered anything for

19   San Diego franchises; correct?

10:02AM 20   A    Nothing.

21   Q    And so as a result of the termination, your fees would

22   have doubled; is that fair?

23   A    Yes, they would have.

24   Q    And did that -- was that a problem for you in the

10:02AM 25   operation of your business?

UNITED STATES DISTRICT COURT

---

**Page 44**

1   A    Well, it was.  We -- the whole premise of us doing the

2   coast was built around that discount.  To take something on

3   that large -- that large of a task, to fill that void when

4   those owners left, it was a critical part of our business

10:03AM 5   decision to take on that effort.

6   Q    All right.  Now when the relationships completely

7   severed, when you and Windermere parted ways, how many

8   Windermere offices were you and Mr. Deville operating?

9   A    We had 12.

10:03AM 10   Q    And those were 12 branch offices?

11   A    Yes.

12   Q    Okay.  And what was the monthly benefit to you of each of

13   these branch offices as a franchisee working with this area

14   representation agreement in place?

10:03AM 15        MR. FEASBY:  Objection.  Lacks foundation.  It's

16   also irrelevant.

17        THE COURT:  That objection -- the foundation

18   objection is overruled.  The relevance objection we've

19   discussed, and it's also overruled as to this question.

10:04AM 20        THE WITNESS:  We were charged $5,000 per office.

21   And as the -- with the area rep agreement, it gave us the

22   right, the benefit of the 50 percent discount on the $5,000.

23   So, in effect, our cost profits was $2500 per month.

24   Q    BY MR. ADAMS:  Okay.  And that's $2500 for each of your

10:04AM 25   12 branch offices?

UNITED STATES DISTRICT COURT

45

| | | |
|---|---|---|
| 1 | A | Yes. Correct, uh-huh. |
| 2 | A | $30,000 per month? |
| 3 | A | Yes. Times 12, you know, $360,000 a year. |
| 4 | Q | Okay. And that was the benefit to your franchise |
| 10:04AM 5 | | businesses by also serving as the services provider? |
| 6 | A | Correct. |
| 7 | Q | And that benefit was taken from you when the services |
| 8 | | agreement was terminated -- |
| 9 | A | Yes. |
| 10:04AM 10 | | -- is that correct? |
| 11 | A | Yes. |
| 12 | Q | Okay. Let's look at Exhibit 23, please. That was one of |
| 13 | | the original two -- and apparently I got ahead of myself. That |
| 14 | | was one of the original two binders I had in front of you. |
| 10:05AM 15 | | I believe -- you said 22? |
| 16 | Q | 23. |
| 17 | A | 23. I think those are gone. I'm on Exhibit 23. |
| 18 | | MR. ADAMS: Okay. And I believe this is already in |
| 19 | | evidence. This is something that was addressed by Mr. Drayna. |
| 10:05AM 20 | Q | This is an agreement for forgiveness of fees in 2006. |
| 21 | | Can you tell us about this? |
| 22 | A | Yes. This was -- stemmed with, you know, the financial |
| 23 | | meltdown in the '05, '06, '07. Remember, we were in a second |
| 24 | | home market, so we were hit first before the primary markets. |
| 10:05AM 25 | | So this was a deferral of those fees in the amount of $500,084. |

UNITED STATES DISTRICT COURT

46

| | | |
|---|---|---|
| 1 | | But half of that amount, the 50 percent was our benefit as |
| 2 | | the area rep. So, in essence, Windermere Seattle was giving up |
| 3 | | the $250,420, and we were giving up the balance. |
| 4 | Q | Okay. And are you aware of whether or not Windermere was |
| 10:06AM 5 | | working with other franchise fees on their fees during this |
| 6 | | downturn in the economy? |
| 7 | A | Yes, they did work with other owners. And they did a new |
| 8 | | fee schedule for all of our -- all the offices in Southern |
| 9 | | California. |
| 10:06AM 10 | Q | Okay. Let's look at Exhibit 25, please. |
| 11 | | This is also in evidence. John, if you could put it up. |
| 12 | | Do you have it in front of you, Mr. Bennion? |
| 13 | A | Yes, I do. |
| 14 | Q | Okay. This is another document that was addressed by |
| 10:06AM 15 | | Mr. Drayna. Again, we're looking at something a decade ago. |
| 16 | | But tell me if you recognize this document. |
| 17 | A | This is an agreement for deferral of franchise fees in |
| 18 | | 2007. |
| 19 | Q | And what period of time was this deferral for? |
| 10:07AM 20 | A | I believe it was for one year, if I remember correctly. |
| 21 | | I'm sure you'll tell me. |
| 22 | Q | If you look at the agreement, Paragraph 1 at the bottom, |
| 23 | | it says, "Deferral of fees from January 2007 through December |
| 24 | | of 2007." |
| 10:07AM 25 | A | Yes, uh-huh. |

UNITED STATES DISTRICT COURT

47

| | | |
|---|---|---|
| 1 | Q | And what did that mean by deferring fees? |
| 2 | A | That means we would set them aside and -- how to agree and |
| 3 | | deal with them later. |
| 4 | Q | Okay. And did you deal with these later? |
| 10:07AM 5 | A | Yes, we did. |
| 6 | | Now this agreement, this same Paragraph No. 1 I was just |
| 7 | | reading from, states: |
| 8 | | "Fees deferred shall accrue interest at the |
| 9 | | prime rate as announced by Wells Fargo Bank in |
| 10:07AM 10 | | Seattle, Washington, from the date the fees were |
| 11 | | due." |
| 12 | | This is August 30th, 2007. Do you know what that rate |
| 13 | | at that time? |
| 14 | A | That, I do not. |
| 10:07AM 15 | Q | Okay. But you were to pay interest on these fees? |
| 16 | A | Yes, we were. |
| 17 | Q | And did that happen? |
| 18 | A | Yes, I believe it was calculated in the total. |
| 19 | Q | Okay. And you paid interest on all the loans that |
| 10:08AM 20 | | Windermere gave to you? |
| 21 | A | Yes. So the million, five that they lent us, we paid on |
| 22 | | three of the four loans $328,000 in interest. I could not find |
| 23 | | the amortization schedule on the fourth loan, but we were |
| 24 | | charged and paid the interest in full on the loan as well. |
| 10:08AM 25 | Q | Okay. Now can you tell us what the total -- what the |

UNITED STATES DISTRICT COURT

48

| | | |
|---|---|---|
| 1 | | total figure was you received in loans from Windermere's |
| 2 | | affiliates. |
| 3 | A | It was the million, five. |
| 4 | Q | Okay. Thank you. |
| 10:08AM 5 | A | Yes. I'm sorry. Yes, I said that, I thought. |
| 6 | Q | I wasn't sure if that was for Windermere and the |
| 7 | | affiliates. That's the total amount that was loaned to you |
| 8 | | during your history with Windermere? |
| 9 | A | Yes, uh-huh. |
| 10:08AM 10 | Q | And you've paid all that back? |
| 11 | A | Yes, we paid that all back in full. |
| 12 | Q | With interest? |
| 13 | A | With interest, yes, and loan fees. |
| 14 | Q | And none of those loans are at issue in this case; is |
| 10:09AM 15 | | that right? |
| 16 | A | Correct. |
| 17 | Q | You haven't been sued for that? |
| 18 | A | No. |
| 19 | Q | Can you tell us what the total fees were paid by your |
| 10:09AM 20 | | Bennion & Deville offices to Windermere over the history of |
| 21 | | your relationship? |
| 22 | A | Just for our offices, the ones that Mr. Deville and I |
| 23 | | owned, we paid just short of $4-1/2 million. |
| 24 | Q | And then what about those fees that you collected from |
| 10:09AM 25 | | third parties as the services provider and paid on to |

UNITED STATES DISTRICT COURT

49

```
 1   Windermere, how much was that?
 2   A      That was just over 2 -- another $2-1/2 million.
 3   Q      So it made sense for Windermere to keep you in the
 4   system; correct?
 5   A      Yes. We were a very profitable client for them.
 6          MR. ADAMS:  Your Honor, no further questions, but
 7   reserve the right to recall on rebuttal, if necessary.
 8          THE COURT:  You also, of course, will have a chance
 9   to do redirect.
10          Cross-examination.
11              CROSS-EXAMINATION
12   BY MR. FEASBY:
13   Q      Good morning, Mr. Bennion.
14   A      Good morning.
15   Q      You're an owner, correct, of Bennion & Deville Fine Homes
16   SoCal, and the services company?
17   A      Yes, uh-huh.
18   Q      And you're also a real estate agent in Seattle?
19   A      Correct, uh-huh.
20   Q      And your full-time job is selling real estate in Seattle;
21   isn't that correct?
22   A      I think I have several full-time jobs.
23   Q      You spend the bulk of your time in Seattle selling real
24   estate?
25   A      I do, yes. Uh-huh.
```

UNITED STATES DISTRICT COURT

51

```
 1   that as of August 27, 2014, there were discussions regarding
 2   you giving up services; isn't that correct?
 3   A      There were discussions, but negotiations, I had heard
 4   from -- after the 27th of August, post, there had been some
 5   agreements sent to us that Mr. Sunderland had given me the
 6   highlights of what those were post -- after the 27th.  But
 7   prior to that, no.
 8   Q      When did he give you those highlights?
 9   A      Sometime between the 27th of August and the October 2nd
10   meeting with Mr. Teather.
11   Q      So as of August 27, you did not know that those
12   discussions were ongoing?
13   A      I did not know there were any ongoing discussions.
14   Q      And Mr. Sunderland is your attorney?
15   A      Yes, uh-huh.
16   Q      And at that time he was tasked with working with Mike
17   Teather on various issues that the parties had; is that
18   correct?
19   A      Yes, he was.
20   Q      Now you testified -- and maybe you can just clarify this
21   for me.  You testified -- I believe you said that the issue
22   that you had with this proposal is that it did not include a
23   fee reduction for the coast; is that correct?
24   A      It was one of the things missing from the agreement, yes.
25   Q      And was that an item that you had discussed with my
```

UNITED STATES DISTRICT COURT

50

```
 1   Q      And Mr. Deville is the one during the parties'
 2   relationship that was in Southern California working on most of
 3   the day-to-day operations of those entities?
 4   A      Working with the agents on the front side and the owners.
 5   I was working day-to-day on the back side.
 6   Q      And you handled mostly the accounting issues and the
 7   marketing; isn't that correct?
 8   A      Yes.  That was my 4:00 a.m. to 9:00 a.m. job.
 9   Q      Now at the time you entered into the Coachella Valley
10   franchise agreement, there was no area representative in
11   Southern California, was there?
12   A      At that time when we -- that, we weren't aware of.
13   Q      And then you became the area representative in Southern
14   California in 2004; is that correct?
15   A      I believe that's correct.  But there was another area rep
16   in the middle there.
17   Q      Mr. Bennion, can you -- we talked about it earlier,
18   Exhibit 729.  This was the e-mail from Mr. Drayna to
19   Mr. Sunderland?
20   A      I think that's the 700s.
21          MR. ROWLETT:  May I approach, Your Honor?
22          THE COURT:  Yes.  And you also have carte blanche.
23          MR. ROWLETT:  Thank you, Your Honor.
24          THE WITNESS:  Yes, I've got it.  Thank you.
25   Q      BY MR. FEASBY:  Now you testified that you were not aware
```

UNITED STATES DISTRICT COURT

52

```
 1   client in terms of you being willing to give up services?
 2   A      I hadn't discussed anything with your client about wanting
 3   to give up services or willing to give it up.
 4   Q      And that's where I'm confused.  So when did this concern
 5   arise that you had that there was no offer for a fee reduction
 6   for the coast operations?
 7   A      When Mr. Sunderland gave an overview of what the offer
 8   was, he explained to me there was nothing in there for the
 9   coast.  But we weren't negotiating anything.  Mr. Teather asked
10   if he could -- Mr. Sunderland explained to me Mr. Teather asked
11   if he could propose something.  Mr. Sunderland said if you want
12   to propose something, propose it.  Mr. Sunderland indicated to
13   me what the proposal was.
14          And then we had the meeting with Mike Teather.  And I
15   asked him pointblank, "What do you want?"  I mean, I was -- I
16   was not aware of any negotiations or anything to give up
17   services.  So I was confused as well when I asked him in person
18   on the October 2nd meeting.
19   Q      And then subsequently in January of 2015, my client made
20   a similar offer for you to give up services in exchange for a
21   50 percent reduction in the fees for the Carmel Valley
22   franchises; correct?
23   A      I believe that was passed on to Mr. Sunderland, yes.
24   Q      And it also included an offer for you to receive 25
25   percent of the fees from the other franchises in Southern
```

UNITED STATES DISTRICT COURT

Timestamps (left margin): 10:09AM, 10:09AM, 10:11AM, 10:11AM, 10:11AM, 10:11AM, 10:12AM, 10:12AM, 10:12AM, 10:12AM, 10:13AM (panel 50); 10:13AM, 10:13AM, 10:14AM, 10:14AM, 10:14AM, 10:14AM, 10:15AM, 10:15AM, 10:16AM, 10:16AM (panels 51/52)

53

1  California for a period of four years after that; isn't that
2  correct?
3  A    I remember that was a term of when they made that offer to
4  us.
10:16AM 5  Q    And it did not include an offer to reduce fees for the
6  coast; correct?
7  A    I'm not aware that it did.
8  Q    And at that time you were paying for -- you were being
9  charged fees for three offices on the coast; is that correct?
10:16AM 10  A    At that time, I believe so.  Yes, uh-huh.
11  Q    And so the -- if you were to receive a reduction for the
12  coast, then that benefit to you would be $7500 per month;
13  correct?
14  A    Well, we had opened in -- at the end of '14 we had opened
10:17AM 15  two more offices, which one would have been a branch-paying
16  office, so there really would have been four, and the other one
17  was going to be a satellite.  So you got to help me figure out
18  the math.  Is it three or is it four?  Because there were two
19  more opened.  So...
10:17AM 20  Q    But throughout that time period up until the termination
21  of the franchise agreements on September 30, 2015, you weren't
22  charged for either of those branches; is that correct?
23  A    I don't believe they charged us, no.
24  Q    So at least at that point in January, the net savings
10:17AM 25  would have been $7500 per month; correct?

55

1  Q    And I understand that you're color-blind, but part of the
2  purpose of those maps was to show when they closed and when
3  they opened.
4  A    Yes, uh-huh.
10:18AM 5  Q    Do you recall specifically whether or not the Lees became
6  franchisees before or after Mr. King?
7  A    I would have to look at the records to answer.
8  Q    Now Exhibit 330 is the e-mail between you and
9  Mr. Teather.  Just let me know when you have that in front of
10:19AM 10  you.
11  A    I apologize for the delay.
12  Q    That's okay.  Take your time.  We've got, unfortunately,
13  a lot of documents in this case.
14  A    Yes, I've got it.
10:20AM 15       MR. FEASBY:  And, John, if you could put that up for
16  us.
17  Q    At the bottom of Mr. Teather's e-mail, he requests,
18  "Mr. Bennion, a status report regarding fees would be much
19  appreciated."  Do you see that?
10:20AM 20  A    Yes, I do, uh-huh.
21  Q    And he's requesting a status update on the outstanding
22  fees owed to my client at that time?
23  A    Yeah, he's checking in on those.
24  Q    And he checked in with you regularly on those amounts
10:20AM 25  during this time period, didn't he?

54

1  A    Prior to that fourth branch office being established, yes,
2  correct.
3  Q    And that branch office was established, at least at some
4  point, prior to September 30th, 2015?
10:17AM 5  A    It was opened; is that the question?
6  Q    Yes.
7  A    Yes, it was opened.
8  Q    And you were never charged for fees for that location;
9  correct?
10:17AM 10  A    I don't believe I saw a charge for that on the statements,
11  no.
12  Q    Now Mr. Bennion, isn't it true that after you signed up
13  Rich King as a franchisee in 2010, the only other franchisee
14  that was signed up by your Services company in Southern
10:18AM 15  California was the Homes & Estates -- and I'm talking about up
16  till 2014 -- was the Homes & Estates franchise that was signed
17  in 2013; isn't that correct?
18  A    There were the Lees in Riverside.  I'm not sure the exact
19  date, but I think they were prior to that time frame.
10:18AM 20  Q    Well, let's look at -- do you have your cheat sheet in
21  front of anything you were using when we talked -- I don't mean
22  to imply anything, but you had a sheet that was helping you --
23  A    No, I don't have that up here.
24  Q    Do you remember the maps that we had?
10:18AM 25  A    I do remember the maps, yes.

56

1  A    Periodically he would, yes.
2  Q    And I think you testified the last months that you --
3  excuse me -- the last month that you had paid fees was June of
4  2014; correct?
10:20AM 5  A    Yes.  Our next installment would be due August 22nd for
6  July fees.
7  Q    So at that point you didn't have July fees paid, August
8  fees paid, September fees paid, and then the October fees would
9  have just become due at that time?
10:21AM 10  A    Yes, correct, I believe.
11  Q    And you tell him:
12       "Thank you, Mike.  I have been studying it,
13       and it looks like we can start paying in
14       mid-December and catch them all up through our
10:21AM 15       season."  Do you see that?
16  A    Yes, uh-huh.
17  Q    And what were you studying?
18  A    The sales, looking at what our incoming sales were, what
19  the company dollar would be to the company.
10:21AM 20  Q    So at least at that point in time you didn't have the
21  cash available to pay the fees owed to my client; is that a
22  fair statement?
23  A    No, we had cash reserves.  But what we were allotting and
24  managing our resources were -- because we were a seasonal
10:21AM 25  business.  This happened yearly.  We were projecting how to pay

57

```
 1    out of cash flow.
 2    Q    Now at that time -- when did your busy season start?
 3    A    Well, sales started to pick up in November.  People would
 4    come to the desert.  So sales start in November, and you --
 5    closings are 45, 60 days.  So you see people coming into the
 6    Desert in November.  You make all your money -- this starts
 7    coming in January, because there's a 60-day lag in the
 8    closings.  And then that cash flow runs all the way through
 9    July.
10    Q    And you indicate to him here that you think you can start
11    paying in mid-December; correct?
12    A    Yes, uh-huh.
13    Q    And you didn't start paying at that time, did you?
14    A    Well, things started to unravel.  So we didn't know if we
15    owed those fees or not.  By this time, we're into looking --
16         MR. FEASBY:  Objection, Your Honor.  I'm going to
17    move to strike as nonresponsive.
18         THE COURT:  Question was:  "You didn't start paying
19    at that time, did you?"  And the answer is nonresponsive.  It
20    will be stricken.
21         Why don't you ask the question again.
22    Q    BY MR. FEASBY:  Mr. Bennion, did you start paying fees to
23    my client in mid December as you indicated here you would do in
24    this e-mail?
25    A    No, we did not.
```

UNITED STATES DISTRICT COURT

58

```
 1    Q    And, in fact, you never paid any fees to my client up
 2    until the termination of the franchise agreements in September
 3    of 2015; correct?
 4    A    Well, there's the question if those fees were owed.  So we
 5    did not pay them.
 6    Q    That's not my question.  My question is, did you pay
 7    those?
 8    A    No.
 9    Q    And you understand that that's the reason why my client
10    is suing you and your entities; correct?
11    A    That's one of their claims.
12    Q    Now cash flow was an issue for you at that time in 2014,
13    wasn't it?
14    A    We're always managing our cash flow.  We had five
15    entities, five businesses.  But the coast was a new operation.
16    Q    And the coast you were losing 80- to $90,000 a month?
17    A    About 80 at that time, yes, uh-huh.
18    Q    And you were using the revenue that the Coachella Valley
19    office was generating in order to help subsidize those losses;
20    isn't that correct?
21    A    All four of our entities subsidized those losses.
22    Q    And because of that, you didn't have money to pay your
23    franchise fees for Coachella Valley; isn't that correct?
24    A    No, it's not that we didn't have the money, but we had to
25    manage the cash flow and keep a reserve.  We had four big
```

UNITED STATES DISTRICT COURT

59

```
 1    companies.
 2    Q    So during that time you could have paid your fees then;
 3    is that your testimony?
 4    A    We could have if we were forced to come up with it.  But
 5    they were always checking in and discussing.  No one was
 6    demanding that we pay the fees.  They understood the cash flow
 7    of our business.
 8    Q    Now in February of 2015, there was a demand for you to
 9    pay your fees, correct, by Mr. Sirianni?
10    A    Yes, there were, uh-huh.
11    Q    And we looked at that -- I believe it's Exhibit 370.  Do
12    you recognize that document?
13    A    I do.  Yes, uh-huh.
14    Q    Are you aware of any language in the area representation
15    agreement that prevents a party from seeking to terminate the
16    area representation agreement in more than one of the
17    enumerated ways in that agreement?  Does that make sense?
18    A    I'm sorry, it doesn't.  Could you repeat it.
19    Q    Are you aware of any provision in the area representation
20    agreement that prevents a party from terminating the agreement
21    without cause and at the same time purporting to terminate it
22    with cause?
23    A    I am not.  I think you're saying can they terminate two
24    different ways?
25    Q    Correct.
```

UNITED STATES DISTRICT COURT

60

```
 1    A    Yes.  I believe that there is a Paragraph A and a
 2    Paragraph B under Section 4.1.
 3    Q    Right.  And the without cause is 180-day termination
 4    notice; correct?
 5    A    Yes.
 6    Q    And the with cause, assuming there's no cure for the
 7    breach, is 90 days; isn't that correct?
 8    A    Correct.
 9    Q    And Mr. Sirianni's letter is terminating the agreement
10    for cause; isn't that right?
11    A    Correct.  Yes, uh-huh.
12    Q    And that's due to the fact that the franchises at that
13    point hadn't paid fees in some time, at least since going back
14    to June of 2014; correct?
15    A    That would have been the payment due in August, yes.
16    Q    And the amount set forth in this letter are for Coachella
17    Valley $313,000 and change.  Do you see that?
18    A    Yes, I do, uh-huh.
19    Q    And $92,000 and change.  Do you see that?
20    A    Yes, I do.
21    Q    And if you would have cured this breach, then my client
22    would not be entitled to terminate that agreement for cause;
23    correct?
24    A    On the cause portion.  But the agreement states they
25    can --
```

UNITED STATES DISTRICT COURT

61

```
 1        MR. FEASBY:  Objection.  Move to strike.
 2        THE COURT:  Question is whether:
 3        "If you would have cured the breach, my
 4     client would have been entitled to terminate --
 5     would not be entitled to terminate that agreement
 6     for cause?"
 7        Objection is nonresponsive.  It will be stricken.
 8        You can answer -- ask the question again, please,
 9     Mr. Feasby.
10  Q   BY MR. FEASBY:  Mr. Bennion, is it your understanding
11     that if you did not cure the breach outlined in Mr. Sirianni's
12     letter, that the agreement would terminate for cause?
13  A   Yes.
14  Q   And you chose not to cure that breach; correct?
15  A   We felt our rights were already gone.
16        MR. FEASBY:  Objection.  Move to strike as
17     nonresponsive.
18        THE COURT:  That one's responsive.  Overruled.
19  Q   BY MR. FEASBY:  But you did not make any effort to cure
20     that breach, did you?
21  A   Our rights were gone.
22  Q   So you did not make any efforts; is that correct?
23  A   We didn't feel we owed the fees, no.
24  Q   And you never paid those fees; correct?
25  A   Correct.
```

UNITED STATES DISTRICT COURT

63

```
 1  A   No one instructed us to do otherwise.
 2  A   But that's not an offer you made?
 3  A   It wasn't -- they -- Windermere is the one that terminated
 4     the agreement.  It was up to -- we didn't know what the rules
 5     were.  We were in unprecedented territory.
 6  Q   Fair enough.  And you still have not -- you still retain
 7     those fees.  Those have not been paid over to my client;
 8     correct?
 9  A   No, they never asked for those fees.
10  Q   Now one other thing I wanted to talk to you about is the
11     termination notice that Mr. Davey sent to my clients regarding
12     the franchise fees.  Do you recall that?
13  A   I'm sorry.  Could you repeat.
14  Q   Do you recall the March 27, 2015, letters that Mr. Davey
15     sent to terminate the franchise agreements?
16  A   Yes, uh-huh.
17  Q   And there was one for each of your franchises; correct?
18  A   Yes, uh-huh.
19  Q   And in his letter he set forth what at the time he
20     perceived to be the various breaches of the agreement by my
21     client.  Do you recall that?
22  A   Yes, uh-huh.
23  Q   And in that letter, he didn't mention Windermere Watch,
24     did he?
25  A   I'd have to look at it.  But I trust you.  If you say he
```

UNITED STATES DISTRICT COURT

62

```
 1  Q   So under the agreement, it would terminate for cause
 2     after the 90 days' notice provided in Mr. Sirianni's letter;
 3     isn't that correct?
 4  A   In theory, yes.
 5  Q   And it was your choice not to pay those fees; correct?
 6  A   Yes.
 7  Q   And during that time, you continued to collect fees from
 8     the other franchisees in the area; isn't that right?
 9  A   Well, we certainly -- if they're saying this check is
10     going to pass them on to Seattle, that was our obligation.
11  Q   And you kept your 50 percent too; correct?
12  A   Yes.
13  Q   And that's because at least at that point you were
14     operating as if the agreement was still in effect; isn't that
15     right?
16  A   We didn't know what to do, to be honest.  We thought the
17     agreement was destroyed.  So...
18  Q   But you still continued to collect those fees, didn't
19     you?
20  A   They were sending us the fees.  Yes, we were collecting
21     them and passing them on.
22  Q   And you kept your portion too; correct?
23  A   Yes.
24  Q   And you never offered to give your portion to my client,
25     did you?
```

UNITED STATES DISTRICT COURT

64

```
 1     didn't he, he didn't.
 2  Q   And his -- your termination through Mr. Davey's letter of
 3     the two franchises, that occurred prior to the termination date
 4     set forth in Mr. Drayna's January 27 letter terminating the ARA
 5     without cause; correct?
 6  A   This was the 180-day letter?
 7  Q   Yes.
 8  A   Yes.  That would have been prior to the 180 days being up.
 9  Q   And it would have been prior to the expiration of the 90
10     days set forth in Mr. Sirianni's letter; isn't that correct?
11  A   Now you're testing me.  I would have to look at a
12     calendar.  But if you're telling me it is, I believe you.
13  Q   Well, if you look at Exhibit 370, this is the one we were
14     looking at before.
15  A   Uh-huh.  From Mr. Sirianni.
16  Q   Yeah.  And I'll just go based on what is in his letter
17     without you having the benefit of a -- a calendar.  But at
18     least in -- according to him, if you look on the last page --
19  A   Yes, uh-huh.
20  Q   -- it says, "The agreement will terminate on May 27,
21     2015, for cause unless W. SoCal cures its breach."
22  A   I see that date.
23  Q   And that was after you terminated the franchise
24     agreements; is that right?
25  A   Correct.  I believe our letter was in March.  Is that what
```

UNITED STATES DISTRICT COURT

65

```
 1    you said?  March?
 2    Q    March 27.
 3    A    March 27, yes.
 4    Q    Now you testified that once -- the benefit to you, at
 5    least as you perceived it, was that you saved on franchise fees
 6    that you would otherwise have to pay for my client.  That was
 7    the benefit of having the relationship with the
 8    representation -- excuse me -- with the services company that
 9    you also owned?
10    A    Yes, uh-huh.
11    Q    And that benefit to you, I think you quantified it
12    $360,000 a year; is that correct?
13    A    Yes, uh-huh.
14    Q    And once -- isn't it true that that benefit was only
15    something that you received during the life of the franchise
16    agreements?
17    A    Correct.
18    Q    So once those agreements were terminated, you were no
19    longer receiving any sort of benefit with regard to the lower
20    amount of fees that you were paying; correct?
21    A    Restate that question again, please.
22    Q    Once the franchise agreements were terminated, you were
23    no longer receiving any benefit related to a relief in fees,
24    because you didn't have to pay any fees anymore; isn't that
25    right?
```

UNITED STATES DISTRICT COURT

66

```
 1    A    Correct.  Yes, uh-huh.
 2    Q    And you also weren't paying any fees to my client after
 3    the agreements terminated; isn't that right?
 4    A    Correct, yes.
 5    Q    And my clients' share of that $360,000, had the
 6    agreements remained in place, would have also been $360,000 a
 7    year for the franchise fees portion; correct?
 8    A    Correct, yes.
 9    Q    And they would also be entitled to tech fees on top of
10    that; isn't that right?
11    A    Correct, yes.
12    Q    I want to talk really quickly about your testimony just
13    at the end there with regard to the fees that you collected and
14    remitted to my client over the course of your relationship.  Do
15    you remember that testimony?
16    A    Yes, uh-huh.
17    Q    And what was that number?
18    A    The total?
19    Q    Yes.
20    A    It was about $6.9 million since we -- the inception in
21    2001.
22    Q    And the 6.9 consists of both fees that your entities
23    paid; correct?
24    A    Our entities, plus we collected under other franchises.
25    It was their -- Windermere's 50 percent Seattle.  That was
```

UNITED STATES DISTRICT COURT

67

```
 1    their half passed on to them.
 2    Q    And the fees -- I believe you testified the fees for the
 3    other franchisees, the non-Bennion & Deville franchisees, was
 4    approximately $2 million; isn't that right?
 5    A    Just north of 2-1/2, I believe.
 6    Q    And your services entity received that same amount in
 7    franchise fees as its 50 percent share; isn't that right?
 8    A    Those are lump fees.  Those are paid to them.  They're
 9    tech fees plus franchise.  So we would have received the
10    benefit on the franchise portion.  That's not broken down to
11    that figure.
12    Q    And did you quantify that at all?
13    A    No, we did not have time to do that.
14    Q    Can you estimate what it was for me?
15    A    I can't.  I would have to look at the records.
16    Q    Was it over $2 million?
17    A    $2 million for our benefit for --
18    Q    Yes.
19    A    -- the franchise?
20    Q    For your portion of the franchise fees.
21    A    Yes, it would be.
22    Q    We talked about Exhibit 25.  So if you could find that in
23    your binder.  I'm also going to take a look at Exhibits 638 and
24    639, if you have those handy.  Mr. Rowlett could maybe assist
25    you?
```

UNITED STATES DISTRICT COURT

68

```
 1    A    I have 25.  What was the other one?  I'm sorry.
 2    Q    638 and 639.
 3    A    It should be in this book.  I got it.
 4    Q    So Exhibit 25 is the agreement for deferral for 2007;
 5    correct?
 6    A    Which one again you're looking at?
 7    Q    Exhibit 25.
 8    A    Yes, uh-huh.
 9    Q    And this agreement was the result of my client's
10    willingness to forego those collection of those fees during
11    this period that your businesses were suffering from the
12    recession; is that a fair statement?
13    A    Yeah, that's fair, yes, uh-huh.
14    Q    And this was subsequently -- so according to this
15    document, if you look at the repayment portion on Page 2 at the
16    top.
17    A    On 638?
18    Q    I'm sorry.  I meant on 25.
19    A    Okay.  I'm on 25.
20    Q    You were supposed to begin making payments on June 30th,
21    2008; correct?
22    A    Correct, yes, uh-huh.
23    Q    And you did not begin making payments at that time on
24    this -- pursuant to this agreement, did you?
25    A    Well, we had been paying, but the full amount had not been
```

UNITED STATES DISTRICT COURT

69

```
 1   paid.
 2   Q      And so if you look at Exhibit 638 --
 3   A      Yes.
 4   Q      -- this is a letter from Mr. Drayna to Mr. Deville.  Do
 5   you recognize this?
 6   A      Yes, uh-huh.
 7   Q      And it says in Paragraph 2, "You have been in default for
 8   nonpayment of fees since 2006."  Do you see that?
 9   A      Yes, uh-huh.
10   Q      And that includes payments that were supposed to have
11   been made under this 2007 deferral agreement; isn't that
12   correct?
13   A      Yes.  We only paid 945,000 of the fees, and this was the
14   balance that wasn't paid during that period.
15   Q      And the balance was $423,000 and change; correct?
16   A      Yes, uh-huh.
17   Q      And in this letter Mr. Drayna gave you and Mr. Deville
18   two options to repay that amount; isn't that right?
19   A      I'd have to read it --
20   Q      Sure.
21   A      -- but if you're telling me so, I'm sure it's there.
22   Q      Well, if you take a look at the bottom of the page, it
23   says, "First, you can tender the full amount, 423,000."
24   A      Yep.  Okay.  I'm back over to 638.  Yes, uh-huh.
25   Q      And then it says below, "Second, we would be willing to
```

71

```
 1   loan obligation than the 2009 CARMED loan; is that correct?
 2   A      Correct, yes.
 3   Q      And the 2009 CARMED loan was the one with the balloon
 4   payment that was March 1st, 2014.  Do you remember that?
 5   A      Yes, I do, correct.
 6   Q      And you didn't make the balloon payment on March 1st;
 7   correct?
 8   A      No, they extended the loan.
 9   Q      That's right.  At your request; isn't that right?
10   A      When we took those loans out, we were always told they
11   would be extended.  So it's disingenuous to say it wasn't going
12   to be extended.
13   Q      That wasn't my implication.  But you had requested that
14   it be extended; is that correct?
15   A      Yes, uh-huh.
16   Q      And my clients agreed to that?
17   A      Yes, they did.
18   Q      So I believe you testified, then, that all of the notes
19   that you signed, the three of them -- the 2009 loan, the 2011
20   loan, and the -- this 2008 loan -- were all repaid with
21   interest.  Isn't that your testimony?
22   A      This is a note for deferral of fees.  We were talking
23   about the four loans that were all cash loans, cash advance by
24   the franchisor.  This is a promissory note for deferral of
25   fees.  Those are two different things.  These are not part of
```

70

```
 1   agree to installment payments if you execute the enclosed
 2   promissory note."  Do you see that?
 3   A      Yes.
 4   Q      So my client was willing to offer you payments over time
 5   rather than having you come up with $423,000 at that point;
 6   correct?
 7   A      Yes, they were.
 8   Q      And did you appreciate that?
 9   A      Yes, very much.
10   Q      If you look at Exhibit 639, this is then the promissory
11   note that was signed.  This is the promissory note, then, that
12   was referred to in Mr. Drayna's letter; correct?
13   A      Yes, uh-huh.
14   Q      And it's signed by Mr. Deville?
15   A      Yes.
16   Q      And it provides that -- again, if you look at the bottom
17   of the first paragraph.
18   A      Yes, uh-huh.
19   Q      It provides for payments, 60 payments, 3,000 a month
20   commencing on March 1st, 2009.  Do you see that?
21   A      Yes, I do.
22   Q      And it's supposed to continue through February and then a
23   balloon payment in March; is that correct?
24   A      Correct, yes.
25   Q      And this is -- this is a different promissory note or
```

72

```
 1   those loans, those four loans that we were talking about
 2   earlier.  This is separate.
 3   Q      This is separate.
 4   A      Yes.
 5   Q      So the four -- just so I'm clear, the four loans you're
 6   referring to that -- I'm aware of three, and I'm sure you'll
 7   remind me of the fourth, but I know the 2009 CARMED loan that
 8   was $500,000?
 9   A      Correct, uh-huh.
10   Q      A 2011 loan from CARMED that was also -- that one was
11   501,000 maybe?  Does that sound right.
12   A      Yes, there was a loan fee that rounded it up to the 501
13   they charged.
14   Q      And then the third one was the $250,000 loan from
15   Washington Loan Company, Mr. Jacobi's --
16   A      Yes.
17   Q      What's the fourth loan you're talking about?
18   A      There was a fourth -- back at this time in the '05, '06, a
19   $250,000 loan from Mr. Jacobi through Washington Loan.
20   Q      And that was repaid as well?
21   A      Yes, in full, with interest, early.
22   Q      And then the $639,000 (sic) promissory note, that was
23   never fully repaid; is that correct?
24   A      639,000?
25   Q      I'm sorry.  I can't read.  It's 465,000, the Exhibit 639.
```

75

1   A   Oh, yeah. Exhibit -- you said the amount. Yes, 465.

2   Q   Yes. And this amount was never fully repaid; isn't that

3   right?

4   A   We made payments until the modification agreement on it, I

10:42AM 5   believe --

6   Q   And --

7   A   -- according to that.

8   Q   Sorry, I'll let you finish.

9       And it was then forgiven as a part of the modification

10:42AM 10   agreement; is that right?

11   A   Yes, it was.

12   Q   Incidentally, Mr. Bennion, could you have afforded in

13   December of 2008 to make a lump sum payment of $465,000 to my

14   client?

10:42AM 15   A   You know, if they demanded it, if we were forced to, if

16   they would not have rolled into a note, we would have come up

17   with the money.

18   Q   Did you have that kind of cash available at that time?

19   A   We had other entities, you know, we could have pulled

10:43AM 20   from.

21   Q   Let's take a look at Exhibit 549. This was the summary

22   that you provided. Mr. Bennion, if it would help, you could

23   look up -- it's on the screen.

24   A   Oh, yes.

10:43AM 25   Q   Do you recognize this?

UNITED STATES DISTRICT COURT

---

76

1       MR. FEASBY: Move to strike as non-responsive.

2       THE COURT: Sustained. Answer will be stricken.

3   The question was:

4       "Are you aware of any correspondence from

10:45AM 5   Mr. Davey indicating that my client's termination

6   of the ARA without cause was improper?"

7       THE WITNESS: I thought there was, but I'd have to

8   read the termination -- or the letter that he sent. I'd have

9   to study it.

10:46AM 10   Q   BY MR. FEASBY: Are you aware of any correspondence from

11   Mr. Davey indicating that my client's termination of the ARA

12   without cause was improper?

13       MR. ADAMS: Your Honor, we object as to vague.

14   Correspondence with whom?

10:46AM 15       THE COURT: Overruled.

16   You may answer.

17       THE WITNESS: Could you repeat the question. I'm

18   sorry.

19   Q   BY MR. FEASBY: Are you aware of any correspondence from

10:46AM 20   Mr. Davey indicating that my client's termination of the ARA

21   without cause was improper?

22   A   I'd have to review the letter. I'm sorry.

23   Q   As you sit here today, you can't think of any?

24   A   I'd have to study it to remember. I feel like there were

10:46AM 25   issues. So I'd have to look at it to see if there were or were

UNITED STATES DISTRICT COURT

---

74

1   A   Yes.

2   Q   And this summary that you provided, it reflects the

3   payments that you received as the services entity from the

4   other franchisees in California. Is that what this is

10:44AM 5   purporting to reflect?

6   A   Yes, it does.

7   Q   And the portion where you have the tech fees, tech fees

8   wasn't something that your services company was entitled to

9   receive under the area representation agreement. Isn't that

10:44AM 10   what you testified to before?

11   A   Correct.

12   Q   And the termination obligation, that was something that

13   would be paid in the event that the agreement was terminated

14   without cause; is that correct?

10:44AM 15   A   Yes, uh-huh.

16   Q   And after -- excuse me. After Mr. Drayna sent his

17   March -- excuse me -- his January 27, 2015, letter terminating

18   the ARA without cause, you retained Mr. Davey; is that right?

19   A   We had discussions with him. Yes, he was hired as a

10:45AM 20   result of that letter.

21   Q   And are you aware of any correspondence from Mr. Davey

22   indicating that my client's termination of the ARA without

23   cause was improper?

24   A   Well, I think that was one of the things he was

10:45AM 25   researching and questioning.

UNITED STATES DISTRICT COURT

---

76

1   not.

2   Q   And are you aware of any correspondence from Mr. Davey

3   asking for an appraisal -- asking my client for an appraisal of

4   the termination obligation?

10:46AM 5   A   I'm not, no.

6   Q   And, in fact, you never asked my client for an appraisal

7   of the termination obligation, did you?

8   A   They never -- we weren't negotiating with them to

9   terminate it. They -- that was not coming.

10:47AM 10   Q   But you knew if the agreement was terminated without

11   cause, that there was a termination obligation that might be

12   due; isn't that right?

13   A   Yes, I read that in the contract.

14   Q   And you never requested that the appraisal be made of

10:47AM 15   what that termination obligation might be, did you?

16   A   No, we did not.

17   Q   And, in fact, rather than do that, you sued my client in

18   this case; isn't that correct?

19   A   We did file suit against them for terminating our

10:47AM 20   agreement.

21   Q   Mr. Bennion, going back to the Exhibit 549 on the screen

22   there, did you total up the franchise fee column?

23   A   Yes, uh-huh.

24   Q   And what was the number that that totalled up to?

10:48AM 25   A   I'd have to look at my notes.

UNITED STATES DISTRICT COURT

**79**

| | |
|---|---|
| 1 | Q   You don't recall what that was? |
| 2 | A   **I'd have to look.  I'm not sure why the total's not on** |
| 3 | **there, but...** |
| 4 | Q   And this is the total franchise fees for the 12 months |
| 10:48AM 5 | preceding September 2015; correct? |
| 6 | A   **This reflects -- the paragraph calls for gross receipts.** |
| 7 | **This is the gross receipts received.  That's what these two** |
| 8 | **columns represent.** |
| 9 | Q   And just so I'm clear, that does not differentiate |
| 10:48AM 10 | between your client's 50 percent or my client's 50 percent; |
| 11 | correct? |
| 12 | A   **This is the gross receipts -- it does not include our 50** |
| 13 | **percent.  So this would be the gross receipts for the 50** |
| 14 | **percent for your client.** |
| 10:49AM 15 | Q   And during the 12 months reflected on this exhibit, your |
| 16 | franchisees didn't pay franchise fees for any of those months, |
| 17 | did they? |
| 18 | A   **No, we did not.  I take that back.  That's not -- yes,** |
| 19 | **we -- correct, we did not, looking at the dates.** |
| 10:49AM 20 | Q   I want to talk a little bit about your testimony from |
| 21 | last week, if we could.  And I know it was some time ago, but |
| 22 | I'll do my best to go quickly.  There are some points, though, |
| 23 | that I wanted to discuss. |
| 24 | Do you have, by chance, Mr. Bennion, a binder up there |
| 10:49AM 25 | with Exhibit No. 711? |

**UNITED STATES DISTRICT COURT**

**79**

| | |
|---|---|
| 1 | Q   I'm sorry, not your client.  Your franchisees. |
| 2 | A   **Okay.  I would have to check our records and look.** |
| 3 | Q   It's in another binder, but if you look in Exhibit -- at |
| 4 | Exhibit 794. |
| 10:52AM 5 | A   **Okay.  I'm in 794.** |
| 6 | Q   I know this is a large exhibit.  If you could flip |
| 7 | through it and let me know if you recognize the contents that |
| 8 | are reflected in this exhibit. |
| 10:52AM 9 | A   **Yes, uh-huh.** |
| 10 | Q   And what are these documents? |
| 11 | A   **These are the statements sent by Windermere Services in** |
| 12 | **Seattle for fees due.** |
| 13 | Q   And if you look, I just want to be clear, beginning at |
| 14 | Page -- and it's unfortunately just the way that this exhibit |
| 10:52AM 15 | was put together, but starting at Page 63, do you see that? |
| 16 | A   **Page 063?** |
| 17 | Q   Yes. |
| 18 | A   **This page?** |
| 19 | Q   Yeah.  So starting there and going to approximately |
| 10:53AM 20 | Page 110, just kind of flip through that.  Do you recognize |
| 21 | what that is? |
| 22 | A   **Let's see if I can read it.** |
| 23 | Q   It's small, I know. |
| 24 | A   **Yeah.  It looks like office names for our franchisee** |
| 10:53AM 25 | **operation.** |

**UNITED STATES DISTRICT COURT**

**78**

| | |
|---|---|
| 1 | A   **It might be in this one here.  Yes -- wait.  Let's see if** |
| 2 | **I'm looking at the right pages.  Yes, 711.** |
| 3 | Q   And this is a letter from my clients -- Geoff, Jill, and |
| 4 | OB, if you look on the last page, and it's to you and |
| 10:50AM 5 | Mr. Deville? |
| 6 | A   **Yes, uh-huh.** |
| 7 | Q   And if you look on Page 4, it discusses the balloon |
| 8 | payment on the 2009 loan; correct? |
| 9 | A   **Yes, uh-huh.** |
| 10:50AM 10 | Q   And this is the loan that we talked to -- talked about |
| 11 | before that was extended? |
| 12 | A   **Correct, yes.** |
| 13 | Q   And do you understand Mr. Teather was in Southern |
| 14 | California at that time to discuss not only the issues in Jill, |
| 10:51AM 15 | Geoff, and OB's, letter but also the issues that you and |
| 16 | Mr. Deville had raised around that time? |
| 17 | A   **I would have to double-check, but I know he visited** |
| 18 | **Southern California in the spring.** |
| 19 | Q   Do you recall he was working with your attorney, Robert |
| 10:51AM 20 | Sunderland, on some of these issues? |
| 21 | A   **Yes, he was, uh-huh.** |
| 22 | Q   And in addition to the loan payment that was due and |
| 23 | subsequently extended, there were also franchise fees that were |
| 24 | outstanding by your client at that time; isn't that correct? |
| 10:51AM 25 | A   **My client?** |

**UNITED STATES DISTRICT COURT**

**80**

| | |
|---|---|
| 1 | Q   And you gave a deposition in this case, didn't you, |
| 2 | Mr. Bennion? |
| 3 | A   **Yes, I did.** |
| 4 | Q   And my recollection, and you can correct me if I'm wrong, |
| 10:53AM 5 | but my recollection is the way the process worked was the |
| 6 | franchises in Southern California would submit their numbers to |
| 7 | the services entity; correct? |
| 8 | A   **Yes.** |
| 9 | Q   And this is on a monthly basis? |
| 10:53AM 10 | A   **Yeah.  It's report -- they report.** |
| 11 | Q   And Patrick Robinson would compile those numbers in a |
| 12 | spreadsheet? |
| 13 | A   **Yes.** |
| 14 | Q   And forward that to my client in Seattle? |
| 10:54AM 15 | A   **Yes.** |
| 16 | Q   And my client would generate the statements? |
| 17 | A   **I was thinking they were generating the statements on** |
| 18 | **their side comparing to our reports.  But if they compiled them** |
| 19 | **off our reports, I trust you're correct.** |
| 10:54AM 20 | Q   Well, I want to go with what your recollection is, if you |
| 21 | could tell us. |
| 22 | A   **I just know we prepared reports for our franchisees and** |
| 23 | **forwarded those reports to Seattle.** |
| 24 | Q   And that was both the franchisees, the Bennion & Deville |
| 10:54AM 25 | franchisees as well as the others in the area; correct? |

**UNITED STATES DISTRICT COURT**

81

```
 1   A    Yes.  Correct.
 2   Q    And this portion that I've identified, the 40 or so pages
 3   here in the middle of the exhibit, does that look like the
 4   information that was compiled by Mr. Robinson?
10:54AM 5   A    If you're saying these are our reports, then he would have
 6   compiled those.
 7   Q    I'm not saying anything.  Does that look like what he
 8   would compile, though, if you look at it?
 9   A    I'm sure this is the numbers that he purported.  I'm not
10:55AM 10  used to this format.  So he would send me a summary.  So to see
11  it all outlined like this is, you know, different from what I'm
12  used to seeing.  But the sum total may be the same.  Does that
13  make sense?
14   Q    It does.
10:55AM 15        Your Honor, we'd like to move Exhibit 794 into evidence?
16        THE COURT:  Any objection to 794?
17        MR. ADAMS:  Your Honor, foundation objection.
18  They've been discussing 40-some pages and it's a 202-page
19  compilation of many materials.  We don't object to those pages
10:55AM 20  that were addressed with Mr. Bennion though.
21        THE COURT:  I'm not -- I haven't carefully tracked
22  which pages you have discussed, Mr. Feasby.  Do you have those?
23        MR. FEASBY:  Well, we were discussing the -- in
24  particular Pages 63 through 101 -- I'm sorry 110, I believe.
10:56AM 25        THE COURT:  63 through 110 or 101?
```

UNITED STATES DISTRICT COURT

82

```
 1        MR. FEASBY:  That, I believe is the spreadsheet.
 2   And on top of that is the statements that Mr. Bennion
 3   referenced that were generated for the franchisees in Southern
 4   California.  And then underneath that beginning at Page 111,
10:56AM 5   the statements begin again.
 6        THE COURT:  All right 794 will be received.
 7   Objection overruled.
 8        (Exhibit No. 794 received.)
 9   Q    BY MR. FEASBY:  I apologize, Mr. Bennion, this is a long
10:56AM 10  way at getting this, but I wanted to show you some documents in
11  here.  If you look at Exhibit -- sorry, Page No. 7.
12        MR. ADAMS:  Sorry, is it 7?
13        MR. FEASBY:  Yes.
14   Q    This is the statement for -- that's dated February 28,
10:57AM 15  2014.  Do you see that at the top?
16   A    Yes.
17   Q    And at that time as of February 28, there were fees
18  outstanding for December of 2013.  Do you see that?
19   A    Yes, uh-huh.
10:57AM 20   Q    And January of 2014.
21   A    Say the dates again.  I see February -- I see a
22  February 28 statement.  I see December dates, January dates.
23  Is that what you said?
24   Q    That's what I said, yes.
10:57AM 25   A    Yes, I see those dates.
```

UNITED STATES DISTRICT COURT

83

```
 1   Q    And those are the amounts outstanding?
 2   A    He's got the screen over here on the far right?
 3   Q    Yes.
 4   A    Yes.
10:58AM 5        MR. FEASBY:  If we can highlight all of the columns
 6   there, John, that would be great.  That whole table, yeah.
 7   Thank you.
 8   Q    Do you see that there?
 9   A    Yes, uh-huh.
10:58AM 10   Q    Now -- so these are the amounts owed by your branch
11  offices in the Coastal region at that time; correct?
12   A    Correct, uh-huh.
13   Q    And if you look at the license fee there, it's $5,000?
14   A    Yes, I see that.
10:58AM 15   Q    And that's the amount owed for franchise fees for those
16  offices during that period; correct?
17   A    Yes, that would be the total amount per office.
18   Q    And this is the total $5,000 franchise fee; correct?
19   A    Yes.
10:58AM 20   Q    There's no delineation between the amount that your
21  entity was supposed to receive and that my entity was supposed
22  to receive; correct?
23   A    That's the gross amount.
24   Q    And that amount was to be paid to the services company,
10:58AM 25  and then the services company would keep its half and pass the
```

UNITED STATES DISTRICT COURT

84

```
 1   other half on to my client; correct?
 2   A    Yes, correct.
 3   Q    So in or about March of 2014, when Geoff, Jill, and OB
 4   sent their letter, there was a couple months at least that
10:59AM 5   point of fees that hadn't been paid; is that correct?
 6   A    That looks like those were December and January, the fees
 7   in those months, yes.
 8   Q    And if you would flip down with me to Page -- bear
 9   with me here -- Page 17.
10:59AM 10   A    794-017?
11   Q    Yes.  This is the April 30th, 2014 statement.
12   A    Yes.
13   Q    And this reflects that there were fees outstanding for
14  two additional months at this point, in February and March;
11:00AM 15  correct?
16   A    Yes, correct.
17   Q    And do you recall about this time some of the discussions
18  that were ongoing between Mr. Teather and Mr. Sunderland
19  included a reimbursement of expenses that your entities had
11:00AM 20  incurred in conducting their own SCO operations?
21   A    Yes.  I think that was related to the obligations they had
22  under the modification agreement that they would pay for
23  expenses associated with Windermere Watch.
24   Q    And do you recall initially that you had requested a
11:00AM 25  $65,000 reimbursement and that it was subsequently increased to
```

UNITED STATES DISTRICT COURT

85

1 $85,000?

2 A    I'm sorry, I don't.  I know that -- I think Patrick and

3 Eric worked on that.  I don't know if that was exact numbers or

4 if I was out of the loop on that particular piece at that time.

11:01AM 5 Q    Do you recall that my client ultimately agreed to

6 whatever the amount may be to reimburse your entities for that

7 amount?

8 A    I do, yes.

9 Q    And they were -- your client was to take it as a credit

11:01AM 10 on the amounts that were outstanding on the fees that were

11 owed; correct?

12 A    I believe that's what Patrick indicated to me, yes.

13 Q    And your -- you then at that point made a payment to my

14 client of the fees that were owed less the amount that you held

11:01AM 15 out; is that correct?

16 A    I believe that's what happened, yes.

17 Q    And that was more or less when you got current up to June

18 of 2014; is that right?

19 A    Yes, I believe so.

11:01AM 20 Q    I'm going to go back to one of the other binders, but

21 it's Exhibit 739.

22 A    The exhibit is 739?

23 Q    Yes.

24 A    Okay.

11:02AM 25 Q    And this has been admitted into evidence.

UNITED STATES DISTRICT COURT

86

1 A    Yes, I have Exhibit 739.

2 Q    And this is an e-mail that you sent to Mr. Teather

3 summarizing or pointing out some issues that either arose or

4 that you were thinking about after your meeting on October 2nd

11:02AM 5 with him, with he and the owners of Homes & Estates; correct?

6 A    Correct.

7 Q    And during this meeting, you discussed -- one of the

8 items you discussed was the potential sale of -- well, of the

9 Encinitas and Carlsbad office locations to the Homes & Estates?

11:03AM 10 A    I believe it was just Carlsbad only.

11 Q    If you look, the second page, and it's numbered

12 Paragraph 10 --

13 A    Yes.

14 Q    -- it says second -- third sentence:

11:03AM 15       "You need to be very careful how you word

16       your response to them.  I don't think we'll ever

17       agree on a price to sell Carlsbad and Encinitas to

18       them."  Do you see that?

19 A    Yes, uh-huh.

11:03AM 20 Q    Does that refresh your recollection at least at that time

21 you were talking about selling those two branches to them?

22 A    Encinitas, I believe, was not open to sell.  I know they

23 wanted an Encinitas location.  I believe we were in the middle

24 of the build out of Encinitas to sign the lease, because I

11:04AM 25 believe Encinitas opened in May of '14.  So this is October.

UNITED STATES DISTRICT COURT

87

1 So actually it would -- I'm sorry, it would have been open.

2 Q    Do you recall you were discussing at least at that time

3 the possible sale of those two branches to the Homes & Estates

4 franchisors -- I'm sorry -- franchisees?

11:04AM 5 A    My e-mail states that.

6 Q    Mr. Bennion, I want to talk to you briefly about

7 Windermere Watch.

8       THE COURT:  Before we get to Windermere Watch,

9 Mr. Feasby, let's take another short break.  I don't want to

11:04AM 10 turn this afternoon -- this morning into an endurance contest.

11       Ladies and gentlemen, let's take a break until about

12 11:15, a little shorter break since we've already had one this

13 morning.  Don't talk about the case, keep an open mind about

14 the case, follow all of the other admonitions.

11:05AM 15       THE COURTROOM DEPUTY:  All rise.

16       (Recess from 11:05 a.m. to 11:18 a.m.)

17       THE COURT:  Mr. Feasby.

18 Q    BY MR. FEASBY:  Mr. Bennion, after June of 2014, are you

19 aware of any correspondence that you sent to my client

11:18AM 20 regarding Windermere Watch?

21 A    Not I personally, but I believe Bob Deville did in August

22 of 2014.  We had an agent that had an issue.

23 Q    And is that the e-mail that I discussed with Mr. Deville

24 yesterday where he responded to her that he didn't want to put

11:19AM 25 fuel on the issue or something to that effect?

UNITED STATES DISTRICT COURT

88

1 A    He talked about several e-mails.  I'd have to look at it

2 to see if it would help better, to see who the agent was.

3 Q    But in those e-mails there was never a request from

4 Mr. Deville to my client to do anything further regarding

11:19AM 5 Windermere Watch, was there?

6 A    I'd have to read it.  If I could read it, that would help.

7 Q    Now you testified earlier today about there was some

8 confusion regarding the two notices of termination that my

9 client had sent; is that correct?

11:20AM 10 A    The -- well, there's a second one.  The actual second

11 termination was confusing.

12 Q    And I believe your testimony was you didn't feel any need

13 to try to correct the breach identifying Mr. Sirianni's letter,

14 because the agreement was just going to terminate after 180

11:20AM 15 days anyway; is that correct?

16 A    I don't understand that question.  Can you say it a

17 different way or repeat it?

18 Q    Yeah.  Let me ask it a different way.

19       Isn't it true --

11:20AM 20       Let me ask it this way:  Isn't it true, Mr. Bennion, if

21 you had corrected the material breach identified by

22 Mr. Sirianni, then the agreement would not have terminated for

23 cause?

24 A    Yes, it would have been different.

11:21AM 25 Q    And then even if that had happened, the agreement would

UNITED STATES DISTRICT COURT

89

1  still terminate in July as a result of Mr. Drayna's January 27
2  termination letter without cause; is that correct?
3  A     Well, that was confusing to me because there were
4  discussions about them buying our company and the fees had been
11:21AM 5  put on hold and we didn't know if the agreement had been
6  terminated actually back in the fall.  I mean, there was a lot
7  of moving parts.  So I don't know how to answer that with a
8  "yes" or "no."
9  Q     And if it was terminated for cause, my client did not owe
11:21AM 10  the termination obligation to your client; isn't that correct?
11  A     I believe that's what's spelled out in 4 -- Section 4 of
12  the area rep agreement, 4.1 or 4.2.
13  Q     And there were three ways that -- well there's four ways,
14  but at any point in time, both of the parties could agree to
11:22AM 15  mutually terminate it?
16  A     Yes.
17  Q     And either party could terminate without cause on 180
18  days' notice?
19  A     Correct.
11:22AM 20  Q     And that then might trigger the termination obligation;
21  correct?
22  A     With the 180 days' notice.
23  Q     And then the other way we discussed was the termination
24  without cause; correct?
11:22AM 25  A     Correct.

UNITED STATES DISTRICT COURT

90

1  Q     I'm sorry, the termination with cause?
2  A     Yes.
3  Q     And that there was no obligation -- termination
4  obligation with regard to that termination; correct?
11:22AM 5  A     Not for termination with cause.
6  Q     If you turn to Exhibit 10, this is the area
7  representation agreement.  And I'm on Page 7 of that -- it's
8  not Page 7 of the agreement, but Page 7 of the exhibit.
9  A     I'm on Page 7 of Exhibit 10.
11:23AM 10  Q     Under Section 4.2, that's the termination obligation?
11  A     Correct.
12  Q     Do you see the last paragraph of that section?
13  A     Yes.
14  Q     Can you read that for me.
11:23AM 15  A     "There will be no termination obligation if the
16  termination by the terminating party is made in good
17  faith based upon material breach of the obligations
18  of the terminated party under this agreement
19  continuing after reasonable notice and opportunity
11:23AM 20  to cure."
21  Q     And that notice provided in that paragraph does not have
22  to be written notice, does it?
23  A     That is beyond my expertise.
24  Q     Does it say "written notice" in that paragraph?
11:24AM 25  A     Not in this specific paragraph, but it seems like

UNITED STATES DISTRICT COURT

91

1  everything's always done in writing.
2  Q     And then if you look on Page 6.
3  A     Yes.
4  Q     The Paragraph C that deals with the termination for
11:24AM 5  cause; correct?
6  A     Correct.
7  Q     And that provides the start of that sentence that you
8  need to provide 90 days' written notice; correct?
9  A     Correct.  Uh-huh.
11:24AM 10  Q     So the parties, when they wanted to require written
11  notice, they knew how to include that in this contract, didn't
12  they?
13  A     I would imagine the attorneys would.
14  Q     And they didn't include that in the paragraph under the
11:24AM 15  termination obligation, did they?
16  A     I don't see it there, no.
17  Q     Mr. Bennion, you did -- we talked a little bit about your
18  deposition in this case.  You did sit for a deposition in this
19  case?
11:25AM 20  A     Yes, I did.
21  Q     And the deposition is a -- you understand it to be a
22  chance for me to ask you questions under oath?
23  A     Yes.
24  Q     And you have to respond truthfully?
11:25AM 25  A     Yes.

UNITED STATES DISTRICT COURT

92

1  Q     During that deposition we discussed some of the
2  difficulties that you were having in 2014 financially related
3  to the losses you were sustaining on the coast; isn't that
4  correct?
11:25AM 5  A     We were sustaining losses on the coast, yes.
6  MR. FEASBY:  And I would like to play a portion of
7  that deposition, Your Honor, Page 123, Line 8, through
8  Page 124, Line 3.
9  THE COURT:  123, Line 8?
11:25AM 10  MR. FEASBY:  I'm sorry.
11  THE COURT:  123, Line 8?
12  MR. FEASBY:  Yes, to 124, Line 3.
13  MR. ADAMS:  Your Honor, to the extent this addresses
14  that motion in limine issue, we would object.
11:26AM 15  MR. FEASBY:  It does not.
16  THE COURT:  123, Line 8, to 124, Line 3.  The
17  objection is overruled.
18  You may proceed, Mr. Feasby.
19  (Videotape was played, not reported.)
11:27AM 20  Q     BY MR. FEASBY:  And I believe you shared -- we saw an
21  e-mail, Exhibit 330, the e-mail exchange between you and
22  Mr. Teather regarding the fact that you thought you would be
23  able to begin paying fees in December; correct?
24  A     Yes, uh-huh.
11:28AM 25  Q     And, in fact, you testified also in your deposition that

UNITED STATES DISTRICT COURT

93

1 the losses that you were sustaining on the coast resulted in
2 your inability to pay your fees in 2014; isn't that correct?
3 A   Repeat the question exactly.
4 Q   You testified during your deposition that the losses on
5 the coast resulted in your inability to pay your fees in 2014;
6 isn't that correct?
7 A   We were using the desert to pay the -- to support the
8 coast, to pay for the coast.
9 Q   And, in fact, this wasn't the first time that the losses
10 on the coast resulted in you not being able to pay your own
11 fees; isn't that right?
12 A   The coast was only two years old.  I mean, it was getting
13 it up and going.
14 Q   But you remember the modification agreement?
15 A   Yes, we did a modification agreement.
16 Q   And there were fees that were forgiven, a total of 1.15
17 million in fees; correct?
18 A   That's the gross amount.  That would be our share plus
19 Windermere's share.
20 Q   Right.
21 A   When we went into the coast, that is what the franchisor
22 provides.  They provide help with fees and/or loaning money.
23 So that was part of the agreement that we made when we took on
24 going back into the coast.
25       MR. FEASBY:  And then I would like to play, Your

UNITED STATES DISTRICT COURT

94

1 Honor, Page 155, Line 17, through Page 156, Line 13.  Actually,
2 you know what, Your Honor, if I could just play it, I'll do it
3 all at the same time.  Beginning at Page 153, Line 9 --
4       THE COURT:  153, Line 9.
5       MR. FEASBY:  -- through Page 156, Line 13.
6       THE COURT:  Okay.  You may proceed.
7       (Videotape was played, not reported.)
8 Q   BY MR. FEASBY:  So Mr. Bennion, with regard to that
9 testimony, the five- to seven-year horizon that you discussed
10 in your deposition testimony is somewhat different than the
11 two- to three-year estimate that's been provided by you and
12 Mr. Deville in court?
13 A   Yes, uh-huh.
14 Q   And so end of 2014, you did go to my client for
15 assistance with franchise fees; isn't that correct?
16 A   I would have to look at the records to see.
17 Q   And it was at that point that my client said, "No, we're
18 not going to give you any more assistance with franchise fees";
19 isn't that right?
20 A   I don't recall that conversation and us going and asking
21 and them saying "no."  So do you have something that will help
22 my memory.
23 Q   Other than the testimony that you had, I don't.  But the
24 fact of the matter is, after that point, the agreements were
25 terminated; correct?

UNITED STATES DISTRICT COURT

95

1 A   Well, we paid our fees through '14 -- through June 30th of
2 2014, we got that far.  And then we all know what happens next.
3 So --
4 Q   And one of the things that happened next was you asked my
5 client in 2014 -- at the end of 2014 for assistance with your
6 franchise fees, didn't you?
7 A   I don't recall that, but help me remember.
8 Q   Well, you heard the testimony from your deposition;
9 right?
10 A   But that was after two days of depositions and trying to
11 remember the time frames and exactly what was said.
12 Q   Well, you were deposed --
13 A   It's difficult.
14 Q   You were deposed in 2016; correct?
15 A   Correct.
16 Q   Do you think you would remember those events better in
17 2016 or better today?
18 A   Well, it was still two years later and I'm not recalling
19 it, so --
20 Q   I don't have any further questions.
21       THE COURT:  Redirect for Mr. Bennion?
22       MR. ADAMS:  Yes, Your Honor.  Thank you.
23               REDIRECT EXAMINATION
24 BY MR. ADAMS:
25 Q   Just a couple topics to cover Mr. Bennion.

UNITED STATES DISTRICT COURT

96

1       Let's start with this:  Mr. Feasby, Windermere's
2 attorney, asked you some questions about communications after
3 June 3rd, 2014, from your side, Bennion & Deville, to
4 Windermere about Windermere Watch.  Do you remember that line
5 of questioning?
6 A   Yes, uh-huh.
7 Q   And you also remember yesterday similar questions were
8 asked of Mr. Deville?
9 A   Yes, I do.
10 Q   And Mr. Deville was shown Exhibit 269 and 271.  Do you
11 recall that?
12 A   I recall that he was shown exhibits.
13 Q   Okay.  Well you and I are going to look at Exhibit 270,
14 the one right in the middle.
15 A   Right in the middle.
16 Q   Let me know when you're there, sir.
17 A   I am at 270.
18 Q   And Windermere's attorney asked questions of both you and
19 Mr. Deville --
20       MR. FEASBY:  Your Honor, this hasn't been admitted.
21       THE COURT:  270?
22       MR. ADAMS:  Right, it hasn't been admitted yet, Your
23 Honor.
24       Sorry, John, I didn't tell you that.
25 Q   Well, let's start here.  Have you seen this e-mail

UNITED STATES DISTRICT COURT

97

1 exchange before, Mr. Bennion?

2 A   I have, yes.

3 Q   Okay.  And do you understand this to be an e-mail

4 exchange between your attorney and Mr. Teather on or about

11:38AM 5 August 11, 2014?

6 A   Yes, I do.

7        MR. ADAMS:  Your Honor, I'd like to move Exhibit 270

8 into evidence.

9        THE COURT:  Any objection to 270?

11:38AM 10        MR. FEASBY:  No objection.

11        THE COURT:  270 will be received.

12        **(Exhibit No. 270 received.)**

13 Q   BY MR. ADAMS:  And let's go to Page 2.  Go ahead and blow

14 up the middle of the page.

11:38AM 15        Mr. Bennion, there were some questions insinuating that

16 you had not complained to Windermere about Windermere Watch

17 after June 3rd, 2014.  Take a look at this exhibit, 270.

18 A   Yes, uh-huh.

19 Q   First of all, you mentioned Victoria Hyatt.  Can you tell

11:39AM 20 us again what that's all about.

21 A   **Yes.  She was an agent that worked for us and had an issue**

22 **with the Windermere Watch site.  She had been highlighted**

23 **there.**

24 Q   Okay.  And if we look at this e-mail in the middle of the

11:39AM 25 page, do you see that August 11, 2014 e-mail from Mr. Deville?

        UNITED STATES DISTRICT COURT

98

1 A   **Yes.  That's the e-mail he sent saying that we're still**

2 **having serious issues with Windermere Watch.**

3 Q   And can you tell who he's sending this to?

4 A   **It looks like he's sending it to Mike Teather.**

11:39AM 5 Q   Okay.  And were you continuing to have serious issues

6 with Windermere Watch at this time?

7 A   **Yes.**

8 Q   And Windermere knew about it, didn't they?

9 A   **Yes.**

11:39AM 10        MR. FEASBY:  Objection.  Calls for speculation.

11        THE COURT:  Overruled.

12 Q   BY MR. ADAMS:  Now is it your belief that Windermere's

13 obligation to do something about Windermere Watch is only

14 triggered when you tell them Windermere Watch is problematic?

11:40AM 15 A   **No.  I think they have a continuous obligation to do**

16 **something about Windermere Watch.**

17 Q   And doesn't the modification agreement, in fact, state

18 that they have this obligation, this commercially reasonable

19 obligation to combat Windermere Watch?

11:40AM 20 A   **Yes, it's stated in that modification agreement.**

21 Q   Not if you happen to call them or e-mail them; correct?

22 A   **Correct.**

23 Q   Okay.  Now there was also a line of questioning that

24 concerned you as the services provider, retention of

11:40AM 25 non-Bennion & Deville franchise fees after January of 2015.  Do

        UNITED STATES DISTRICT COURT

99

1 you remember that?

2 A   **Yes.  Uh-huh.**

3 Q   And you kept those franchise fees after receiving that

4 notice of termination, didn't you?

11:41AM 5 A   **Yes, we kept our portion.**

6 Q   Now were you of the position that Windermere owed you

7 money at that point in time?

8 A   **Yes.  They owed us for the damages associated with the**

9 **breach in our contracts, and they owed us for services.**

11:41AM 10 Q   And they hadn't paid you that termination obligation, did

11 they?

12 A   **No, they hadn't paid us anything.**

13 Q   And so you kept those fees?

14 A   **Yes, we did.**

11:41AM 15 Q   All right.  Can you tell us, if you can recall, or if

16 there's any documents you can look at that identify the average

17 monthly fee paid by non-Bennion & Deville franchisees during

18 your last month in the system?

19 A   **Yeah.  We -- Patrick and I did some work with the prior**

11:41AM 20 **exhibit where we took the total franchise gross revenue**

21 **receipts collected for the valuation of the termination**

22 **obligation, and we extrapolated from there on an annual and**

23 **monthly fee what we would be owed.**

24 Q   Okay.  And do you know how much these non-Bennion &

11:42AM 25 Deville franchisees were paying during that last year per

        UNITED STATES DISTRICT COURT

100

1 month?

2 A   **On a monthly figure, about $2200 on average per office,**

3 **per month.**

4 Q   And we heard some testimony from Mr. Deville yesterday

11:42AM 5 about these new franchisees that -- or prospective franchisees

6 that could not be brought on board because there was no FDD --

7        MR. FEASBY:  Objection.  Beyond the scope.

8        THE COURT:  Overruled.

9 Q   BY MR. ADAMS:  -- would you expect this $2200 monthly

11:42AM 10 figure to also flow to you from those prospective franchisees

11 had they been able to be signed up?

12 A   **Yes, uh-huh.**

13 Q   And the last item here, we looked at this 202-page

14 document that had a series of statements and invoices and other

11:43AM 15 materials.  Do you recall that?

16 A   **Yes.  Uh-huh.**

17 Q   All right.  And you looked specifically at or referred to

18 it as a statement.  Might not be the technical term, but a

19 statement that showed there were a couple months past due for

11:43AM 20 the months of December 2013 and January 2014.  Do you recall

21 that?

22 A   **Yes, I do.**

23 Q   All right.  Did you pay those amounts ultimately to

24 Windermere?

11:43AM 25 A   **Yes, we did.**

        UNITED STATES DISTRICT COURT

101

1  Okay.  And those amounts are not at issue in this case.

2  At least you're not being sued for them; is that correct?

3  A  **No, they're not at issue.  We're not being sued at least.**

4  Q  Now can you explain for us why those amounts were past

11:43AM 5  due.

6  A  **Well, again, it's the cyclical nature of our company.  It**

7  **was the same thing every year on an annual basis.  You come off**

8  **the slower summer.  You wait to get a new season for your**

9  **revenue to pick up, and then you caught and paid those fees up**

11:43AM 10  **in the spring, early summer of the following year.**

11  Q  And you paid them in the following year?

12  A  **Yes, we did.**

13  Q  And you --

14  A  **And we paid them in the same year.**

11:44AM 15  Q  Thank you.

16  A  **Yes.**

17  Q  And you were caught up through fees through the end of

18  June 2014; correct?

19  A  **Yes, we had paid through June 30th of 2014.**

11:44AM 20  Q  Okay.  And when was your next payment due to Windermere?

21  A  **August 22nd, 2014.**

22  Q  And historically had Windermere always worked with you on

23  this seasonality issue with your business?

24  A  **Yes, since the inception of our company.**

11:44AM 25  Q  And you always had an open dialogue with them on that

102

1  issue?

2  A  **Yes, uh-huh.**

3  Q  And did they ever give you a notice of default from 2008

4  through the -- this notice we see in January of 2015 about

11:44AM 5  these payments?

6  A  **Not that I'm aware of, no.**

7  MR. ADAMS:  No further questions, Your Honor.  But

8  again, we reserve for rebuttal.

9  THE COURT:  Understood.

11:44AM 10  Mr. Feasby, any recross?

11  MR. FEASBY:  Briefly, Your Honor.

12  **RECROSS-EXAMINATION**

13  BY MR. FEASBY:

14  Q  Mr. Bennion, with regard to the statements, can you

11:45AM 15  please take a look at that Exhibit 794.  Turn to Page 3 of that

16  document.

17  A  **Yes, I'm here.**

18  Q  So this is the statement for January -- it's dated

19  January 31st, 2014.  Do you see that?

11:45AM 20  A  **Yes, I do.**

21  Q  Now as of that month, the only fees that were owed were

22  for December of 2013; isn't that correct?

23  A  **That's what this statement says, yes.**

24  Q  So up until that time, you had paid all of the fees

11:46AM 25  during your slow season.  And the only fees outstanding

103

1  the fees for when your busy season begins; correct?

2  A  **Sometimes the market works with us and you can pay more.**

3  Q  And then if you look, turning to Page 17 --

4  A  **17, yes.**

11:46AM 5  Q  -- this is the statement that's dated April 30th, 2014.

6  Do you see that?

7  A  **Yes, I do see that.**

8  Q  So during your busy season, you have managed to accrue

9  outstanding fees for December of 2013, January of 2014,

11:46AM 10  February of 2014, and March of 2014; is that correct?

11  A  **Yes, uh-huh.**

12  Q  With regard to Windermere Watch -- will you please turn

13  to Exhibit 271.

14  A  **Yes.  Yes.**

11:47AM 15  Q  Do you recognize this as the e-mail that we discussed

16  yesterday with Mr. Deville?

17  A  **I do, yes.**

18  Q  And this was, if you look, on the second page of this

19  exhibit at the bottom, this is where Mr. Deville responded to

11:48AM 20  Victoria Hyatt.  Do you see that?

21  A  **I must be in the wrong -- I'm sorry, I'm at 272.  Let's go**

22  **back.**

23  Q  I'm sorry, 271.

24  A  **271, okay.**

11:48AM 25  Q  If I misspoke, I apologize.

104

1  A  **That's okay.**

2  Q  On Page 2, do you see at the bottom, Mr. Deville, his

3  response to Victoria Hyatt?

11:48AM 4  A  **I do see that, yes.**

5  Q  And if you look down towards the bottom, it's the

6  paragraph that begins, "We have looked into a lawsuit

7  concerning this and it is not a smart move."  Do you see that?

8  A  **I do see that.**

9  Q  "It would only fuel the issue"?

11:48AM 10  A  **Yes, I see that.**

11  Q  So this is Mr. Deville responding to Ms. Hyatt that he

12  didn't think a lawsuit would be something that was tenable; is

13  that correct?

14  A  **Correct.**

11:48AM 15  Q  If you turn back to Page 1, this is Mr. Sunderland?

16  A  **Yes, uh-huh.**

17  Q  And in that e-mail, Mr. Sunderland also responds to

18  Ms. Hyatt regarding Windermere Watch; correct?

19  A  **Yes.**

11:49AM 20  Q  And in Paragraph 2, he says:

21  "Dealing with these types of characters is

22  very difficult.  As Bob mentioned, when another

23  broker tried to settle an issue with a similar

24  individual, the issues just continued.  The risk in

11:49AM 25  offering to settle with someone like Mr. Watch or

105

1   suing him would likely be used against Windermere.

2   Mr. Watch would plaster at across his website

3   saying how he was offering hush money or how he was

4   being attacked further energizing his misguided

11:49AM 5   campaign."  Do you see that?

6   A   I do.

7   Q   That's consistent with Mr. Drayna's testimony regarding

8   his concerns about suing or trying to settle with Mr. Kruger;

9   correct?

11:49AM 10   A   Yes, Mr. Drayna expressed those concerns.

11   Q   So Mr. Deville indicated in his e-mail in Exhibit 270

12   that there were still issues, serious issues with Windermere

13   Watch; right?

14   A   Yes, uh-huh.

11:49AM 15   Q   And then he and Mr. Sunderland addressed those issues to

16   Ms. Hyatt; isn't that correct?

17   A   Yes.

18   Q   Now speaking of the modification agreement, it's

19   Exhibit 682.

11:50AM 20       MR. ADAMS:  It's in at 87.

21       MR. FEASBY:  Oh, I'm sorry, it's been admitted as

22   Exhibit 87.  Thank you.

23       THE WITNESS:  Just 87, no 6?

24   Q   BY MR. FEASBY:  Yes.  There's two versions.  It's the 87

11:50AM 25   version, if you don't mind.

UNITED STATES DISTRICT COURT

---

107

1   A   I think he's got it highlighted.  Yes.

2   Q   Can you read that for me.

3   A   "Licensee may not withhold payment of any license

4   or additional fees or any other amount due to WSC or

11:52AM 5   area representative on the grounds of the alleged

6   nonperformance or breach of any obligations of WSC

7   or area representative under this agreement or any

8   related agreement."

9   Q   And you signed this agreement as well?

11:52AM 10   A   Yes, I did.

11       MR. FEASBY:  No further questions.

12       THE COURT:  Any additional questions?

13       MR. ADAMS:  None, Your Honor.

14       THE COURT:  Okay.  Mr. Bennion, you may step down.

11:52AM 15       THE WITNESS:  Thank you.

16       THE COURT:  Mr. Adams, subject to Mr. Wrobel

17   tomorrow morning, do you have any additional witnesses?

18       MR. ADAMS:  We do not, Your Honor.

19       THE COURT:  Okay.  So ladies and gentlemen, we have

11:53AM 20   one more witness for the plaintiffs who is going to be with us

21   first thing tomorrow morning.  And once that's done, then we

22   would basically transition to the defendant's case.  So we're

23   going to do that, I think, now.  But in light of the fact that

24   we're making that change, I'm going to go ahead and we'll take

11:53AM 25   the noon hour just a few minutes early and we'll come back

UNITED STATES DISTRICT COURT

---

106

1   A   Okay.

2   Q   If it would help, you can look at what's on the screen.

3   A   Thank you.

4   Q   On Page 2 --

11:51AM 5   A   Page 2.

6   Q   -- and at the bottom of Paragraph 3A --

7   A   Yes, uh-huh.

8   Q   -- you see the sentence that begins on the right, "B&D

9   acknowledges"?

11:51AM 10   A   I do see that, yes.

11   Q   Can you read that for me?

12   A   "B&D acknowledges that WSC has not and cannot

13   guarantee any particular outcome of the efforts

14   contemplated herein."

11:51AM 15   Q   And you signed this agreement; correct?

16   A   Yes, I did.

17   Q   Can you, in that different binder, I'm sorry,

18   Exhibit 44 -- and this is the -- we can put it on the screen if

19   it would be easier for you, Mr. Bennion.

11:51AM 20   A   Yeah, because I don't -- yes, I don't think I have

21   anything that goes that low.

22   Q   Okay.  And I'm looking at Page 5, at the bottom of the

23   page.  Do you see the sentence, second line from the bottom,

24   "Licensee may not," do you see that sentence?  And it continues

11:52AM 25   on to the next page.

UNITED STATES DISTRICT COURT

---

108

1   at -- I have a conference call at 12:30, so why don't we come

2   back at ten minutes -- well, let's make it a quarter after

3   1:00.  1:15.  And we'll be ready to go at 1:15 with the next

4   witness.

11:53AM 5       Don't -- enjoy your lunch hour, but don't talk about the

6   case.  Keep an open mind about the case and follow all of my

7   other instructions.

8       THE COURTROOM DEPUTY:  All rise.

9       **(Out of the presence of the jury.)**

11:54AM 10       THE COURT:  Mr. Feasby, you'll be ready to proceed

11   at 1:15?

12       MR. FEASBY:  We will, Your Honor.

13       THE COURT:  Okay.  We'll look forward to hearing

14   from whom?

11:54AM 15       MR. FEASBY:  I believe Brian Gooding will be called

16   first.

17       THE COURT:  Okay.  We'll look forward to hearing

18   from Mr. Gooding at 1:15.  I'll try to come out a few minutes

19   early in case anything has come up, but I am talking to very

11:54AM 20   loquacious counsel at 12:30, so I'm going to probably have to

21   tear myself from the phone.

22       MR. FEASBY:  We did have, Your Honor, the issue of

23   the judgment as a matter of law.

24       THE COURT:  Let's wait -- I think you need to wait

11:55AM 25   until Mr. Wrobel testifies and then they will formally rest.  I

UNITED STATES DISTRICT COURT

109

1 just tried to signal the jury we're starting your case in the

2 middle of the plaintiffs' case.

3     MR. FEASBY: Part of that, Your Honor, has to do

4 with an offer that -- or with an opinion that I believe

11:55AM 5 Mr. Wrobel will offer regarding certain lease obligations, and

6 I think there's no evidence or testimony in here that would

7 support those. So we would request that he be precluded from

8 trying to offer that opinion. I can talk about the --

9     THE COURT: Okay.

11:55AM 10     MR. ADAMS: Your Honor, if -- we can make it a

11 little easier. We're not going to be offering that opinion.

12     THE COURT: Okay. If that opinion is not going to

13 be offered, then that takes care of that.

14     MR. ADAMS: And just nuts-and-bolts issue, I had

11:55AM 15 spoken with the expert, and I told him I think tomorrow

16 afternoon would probably make sense in light of who I saw them

17 calling. But if you want him here and insist he be here in the

18 morning, we can do that.

19     THE COURT: Talk to each other. I don't have strong

11:55AM 20 feelings about whether it's morning or afternoon. But if -- if

21 there's issues of scheduling, let's discuss them after lunch.

22     MR. ADAMS: Thank you, Your Honor.

23     THE COURT: But if Mr. Feasby and his team are

24 prepared to take the ball and run with it this afternoon and

11:56AM 25 tomorrow morning, we can take Mr. Wrobel when it's convenient

**UNITED STATES DISTRICT COURT**

110

1 for him. I'm sure he's very busy, and I don't want to

2 inconvenience him.

3     MR. ADAMS: Thank you, Your Honor.

4     THE COURT: We'll see everybody a few minutes after

11:56AM 5 1:00.

6     MR. ROWLETT: Thank you, Your Honor.

7     **(Further proceedings reported by**

8     **Sharon Seffens in Volume II.)**

9     -oOo-

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

111

1     *CERTIFICATE OF OFFICIAL REPORTER*

2

3 COUNTY OF LOS ANGELES )

             )

4 STATE OF CALIFORNIA   )

5     I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

6 COURT REPORTER, in and for the United States District Court for

7 the Central District of California, do hereby certify that

8 pursuant to Section 753, Title 28, United States Code that the

9 foregoing is a true and correct transcript of the

10 stenographically reported proceedings held in the

11 above-entitled matter and that the transcript page format is in

12 conformance with the regulations of the Judicial Conference of

13 the United States.

14

15 *Date: July 18, 2018*

16

17

18

19     */S/ DEBBIE HINO-SPAAN*

20     *Debbie Hino-Spaan, CSR No. 7953*

    *Federal Official Court Reporter*

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

## $

**$2200** [2] - 100:2, 100:9
**$250,000** [2] - 72:14, 72:19
**$250,420** [1] - 46:3
**$2500** [4] - 6:2, 6:4, 44:23, 44:24
**$30,000** [1] - 45:2
**$313,000** [1] - 60:17
**$328,000** [1] - 47:22
**$360,000** [4] - 45:3, 65:12, 66:5, 66:6
**$423,000** [2] - 69:15, 70:5
**$465,000** [1] - 73:13
**$5,000** [4] - 44:20, 44:22, 83:13, 83:18
**$500,000** [1] - 72:8
**$500,084** [1] - 45:25
**$615,000** [1] - 35:10
**$615,075.13** [1] - 35:11
**$639,000** [1] - 72:22
**$65,000** [1] - 84:25
**$750,000** [1] - 26:7
**$7500** [2] - 53:12, 53:25
**$85,000** [1] - 85:1
**$90,000** [1] - 58:16
**$92,000** [1] - 60:19

## '

**'05** [2] - 45:23, 72:18
**'06** [2] - 45:23, 72:18
**'07** [1] - 45:23
**'14** [3] - 53:14, 86:25, 95:1
**'15** [2] - 35:2, 40:20

## /

**/S** [1] - 111:19

## 0

**063** [1] - 79:16

## 1

**1** [5] - 4:20, 4:21, 46:22, 47:6, 104:15
**1-191** [1] - 1:24
**1.15** [1] - 93:16
**10** [5] - 30:12, 30:19, 86:12, 90:6, 90:9
**101** [2] - 81:24, 81:25
**102** [1] - 3:6
**10th** [1] - 28:10
**11** [8] - 3:18, 3:23, 28:2, 28:8, 28:9, 97:5, 97:25
**110** [3] - 79:20, 81:24, 81:25
**111** [1] - 82:4
**11:05** [1] - 87:16
**11:15** [1] - 87:12
**11:18** [1] - 87:16
**12** [13] - 32:12, 33:1, 33:3, 33:6, 34:3, 35:3, 35:19, 44:9, 44:10, 44:25, 45:3, 77:4, 77:15
**12-month** [2] - 32:25, 33:9
**123** [4] - 92:7, 92:9, 92:11, 92:16
**1230** [1] - 2:7
**124** [3] - 92:8, 92:12, 92:16
**12:30** [4] - 15:9, 15:11, 108:1, 108:20
**13** [2] - 94:1, 94:5
**14** [1] - 34:24
**153** [2] - 94:3, 94:4
**155** [1] - 94:1
**156** [2] - 94:1, 94:5
**16** [1] - 3:4
**17** [4] - 84:9, 94:1, 103:3, 103:4

## 2

**2** [13] - 21:18, 26:4, 49:2, 67:4, 67:16, 67:17, 68:15, 69:7, 97:13, 104:2, 104:20, 106:4, 106:5
**2-1/2** [2] - 49:2, 67:5
**20-some** [2] - 40:24, 41:13
**2000** [1] - 28:8
**2001** [1] - 66:21
**2004** [1] - 50:14
**2006** [2] - 45:20, 69:8
**2007** [6] - 46:18, 46:23, 46:24, 47:12, 68:4, 69:11
**2008** [4] - 68:21, 71:20, 73:13, 102:3
**2009** [6] - 70:20, 71:1, 71:3, 71:19, 72:7, 78:8
**2010** [1] - 54:13
**2011** [2] - 71:19, 72:10
**2013** [5] - 54:17, 82:18, 100:20, 102:22, 103:9
**2014** [44] - 3:15, 3:18, 3:23, 8:25, 10:14, 22:16, 22:18, 23:12,

## 18

**18** [3] - 1:14, 4:1, 111:15
**180** [11] - 31:6, 31:10, 36:24, 36:25, 37:16, 38:9, 38:21, 64:8, 88:14, 89:17, 89:22
**180-day** [9] - 30:8, 30:11, 30:22, 31:3, 31:17, 35:1, 38:4, 60:3, 64:6
**19-year** [1] - 42:17
**1:00** [2] - 108:3, 110:5
**1:15** [4] - 108:3, 108:11, 108:18
**1st** [4] - 39:4, 70:20, 71:4, 71:6

25:11, 28:2, 28:8, 51:1, 54:16, 56:4, 58:12, 60:14, 71:4, 82:15, 82:20, 84:3, 84:11, 85:18, 87:18, 87:22, 92:2, 93:2, 93:5, 94:14, 95:2, 95:5, 96:3, 97:5, 97:17, 97:25, 100:20, 101:18, 101:19, 101:21, 102:19, 103:5, 103:9, 103:10
**2015** [15] - 29:20, 34:24, 40:20, 40:21, 52:19, 53:21, 54:4, 58:3, 59:8, 63:14, 64:21, 74:17, 77:5, 98:25, 102:4
**2016** [2] - 95:14, 95:17
**2018** [3] - 1:14, 4:1, 111:15
**202-page** [2] - 81:18, 100:13
**22** [1] - 45:15
**22nd** [2] - 56:5, 101:21
**23** [3] - 3:15, 45:12, 45:16, 45:17
**25** [8] - 46:10, 52:24, 67:22, 68:1, 68:4, 68:7, 68:18, 68:19
**269** [1] - 96:10
**27** [10] - 22:16, 51:1, 51:11, 63:14, 64:4, 64:20, 65:2, 65:3, 74:17, 89:1
**270** [10] - 3:23, 96:13, 96:17, 96:21, 97:7, 97:9, 97:11, 97:12, 97:17, 105:11
**271** [4] - 96:10, 103:13, 103:23, 103:24
**272** [1] - 103:21
**27th** [3] - 51:4, 51:6, 51:9
**28** [5] - 3:18, 82:14, 82:17, 82:22, 111:8
**28th** [1] - 33:4

## 290

**290** [6] - 3:15, 23:4, 23:14, 23:16, 23:18, 23:19
**2nd** [10] - 22:20, 22:21, 24:3, 24:14, 24:17, 26:19, 27:6, 51:9, 52:18, 86:4

## 3

**3** [8] - 3:15, 3:21, 17:3, 17:5, 92:8, 92:12, 92:16, 102:15
**3,000** [1] - 70:19
**30** [1] - 53:21
**307** [1] - 27:23
**30th** [8] - 35:18, 47:12, 54:4, 68:20, 84:11, 95:1, 101:19, 103:5
**31st** [1] - 102:19
**330** [11] - 3:18, 27:12, 27:13, 27:14, 27:20, 28:11, 28:13, 28:15, 28:16, 55:8, 92:21
**34** [1] - 3:21
**367** [1] - 29:22
**370** [3] - 36:6, 59:11, 64:13
**3904b** [1] - 6:23
**3A** [1] - 106:6
**3rd** [6] - 22:17, 22:20, 23:12, 27:6, 96:3, 97:17

## 4

**4** [4] - 2:6, 78:7, 89:11
**4-1/2** [1] - 48:23
**4.1** [8] - 30:9, 30:12, 30:23, 31:3, 36:22, 60:2, 89:12
**4.1B** [1] - 31:16
**4.2** [5] - 31:11, 31:13, 35:3, 89:12, 90:10
**40** [1] - 81:2
**40-some** [1] - 81:18
**411** [1] - 1:24
**423,000** [1] - 69:23

## 44

**44** [1] - 106:18
**45** [1] - 57:5
**465** [1] - 73:1
**465,000** [1] - 72:25
**49** [1] - 3:5
**4:00** [1] - 50:8

## 5

**5** [1] - 106:22
**50** [16] - 10:7, 10:8, 19:8, 19:14, 26:24, 43:15, 44:22, 46:1, 52:21, 62:11, 66:25, 67:7, 77:10, 77:12, 77:13
**501** [1] - 72:12
**501,000** [1] - 72:11
**549** [10] - 3:21, 33:17, 33:20, 33:25, 34:7, 34:12, 34:13, 73:21, 76:21
**5:15-CV-01921-DFM** [1] - 1:7

## 6

**6** [4] - 20:6, 30:24, 91:2, 105:23
**6.9** [2] - 66:20, 66:22
**60** [2] - 57:5, 70:19
**60-day** [1] - 57:7
**600** [2] - 2:12, 2:13
**619-784-3549** [1] - 2:14
**63** [3] - 79:15, 81:24, 81:25
**638** [5] - 67:23, 68:2, 68:17, 69:2, 69:24
**639** [4] - 67:24, 68:2, 70:10, 72:25
**639,000** [1] - 72:24
**682** [1] - 105:19

## 7

**7** [9] - 1:9, 21:15, 31:12, 82:11,

**UNITED STATES DISTRICT COURT**

82:12, 90:7, 90:8, 90:9
**700s** [1] - 50:20
**711** [2] - 77:25, 78:2
**729** [5] - 16:12, 16:16, 16:18, 22:15, 50:18
**739** [3] - 85:21, 85:22, 86:1
**753** [1] - 111:8
**780** [1] - 6:23
**794** [8] - 3:22, 79:4, 79:5, 81:15, 81:16, 82:6, 82:8, 102:15
**794-017** [1] - 84:10
**7953** [2] - 1:23, 111:20

## 8

**8** [5] - 3:14, 92:7, 92:9, 92:11, 92:16
**80** [2] - 58:16, 58:17
**82** [1] - 3:22
**828** [5] - 3:14, 8:7, 8:8, 8:10, 8:11
**87** [4] - 105:20, 105:22, 105:23, 105:24
**8:50** [2] - 1:15, 4:2

## 9

**9** [2] - 94:3, 94:4
**90** [6] - 38:9, 38:21, 60:7, 62:2, 64:9, 91:8
**90-day** [2] - 37:19, 37:22
**92101** [1] - 2:13
**92614** [1] - 2:7
**92701-4516** [1] - 1:24
**945,000** [1] - 69:13
**949-252-9377** [1] - 2:8
**95** [1] - 3:5
**97** [1] - 3:23
**9:00** [2] - 15:8, 50:8
**9:07** [1] - 14:25
**9:12** [1] - 14:25

**9:30** [1] - 15:7
**9:55** [1] - 41:17

## A

**A.M** [2] - 1:15, 4:2
**a.m** [6] - 14:25, 50:8, 87:16
**ability** [3] - 12:17, 37:22, 42:25
**able** [6] - 7:6, 9:12, 9:16, 92:23, 93:10, 100:11
**above-entitled** [1] - 111:11
**accommodate** [1] - 15:10
**accordance** [3] - 5:17, 7:9, 31:22
**according** [3] - 64:18, 68:14, 73:7
**accounting** [2] - 34:6, 50:6
**accrue** [2] - 47:8, 103:8
**accurate** [2] - 35:11, 39:22
**acknowledges** [2] - 106:9, 106:12
**actual** [1] - 88:10
**ADAMS** [70] - 2:5, 4:7, 4:9, 4:13, 4:17, 4:25, 5:10, 5:21, 6:11, 6:14, 6:16, 6:22, 7:11, 7:14, 8:9, 13:12, 13:16, 13:18, 13:22, 14:1, 14:4, 14:7, 14:13, 15:21, 16:4, 16:7, 21:9, 22:15, 23:14, 23:20, 27:21, 27:24, 28:11, 28:17, 30:14, 30:16, 30:20, 33:21, 34:7, 34:14, 36:11, 36:13, 39:18, 41:14, 41:22, 41:25, 42:4, 42:7, 44:24, 45:18, 49:6, 75:13, 81:17, 82:12, 92:13, 95:22, 95:24, 96:22,

97:7, 97:13, 98:12, 100:9, 102:7, 105:20, 107:13, 107:18, 109:10, 109:14, 109:22, 110:3
**Adams** [10] - 3:4, 3:5, 4:5, 7:20, 13:4, 13:11, 15:18, 41:21, 42:3, 107:16
**add** [2] - 12:16, 26:21
**added** [1] - 25:24
**addendum** [9] - 17:5, 17:8, 17:14, 17:17, 17:23, 18:13, 19:10, 20:2, 43:14
**addition** [2] - 21:16, 78:22
**additional** [4] - 84:14, 107:4, 107:12, 107:17
**address** [3] - 10:24, 13:2, 19:17
**addressed** [6] - 33:15, 33:21, 45:19, 46:14, 81:20, 105:15
**addresses** [1] - 92:13
**adequately** [1] - 6:7
**admissions** [1] - 8:24
**admitted** [7] - 7:21, 8:2, 8:4, 85:25, 96:20, 96:22, 105:21
**admonitions** [1] - 87:14
**advance** [1] - 71:23
**affiliate** [1] - 32:14
**affiliates** [2] - 48:2, 48:7
**afford** [5] - 8:25, 9:9, 10:2, 10:3, 10:6
**afforded** [1] - 73:12
**afternoon** [5] - 15:9, 87:10, 109:16, 109:20, 109:24
**agent** [4] -

49:18, 87:22, 88:2, 97:21
**agents** [1] - 50:4
**ago** [7] - 5:2, 7:16, 11:8, 35:13, 40:3, 46:15, 77:21
**agree** [8] - 7:21, 12:9, 21:25, 26:5, 47:2, 70:1, 86:17, 89:14
**agreed** [6] - 20:2, 22:6, 22:7, 31:19, 71:16, 85:5
**agreeing** [3] - 21:10, 21:17, 21:22
**agreement** [99] - 10:5, 17:6, 17:15, 17:18, 18:8, 19:9, 20:7, 20:10, 20:12, 21:3, 21:8, 21:10, 21:14, 21:17, 22:9, 24:5, 30:8, 30:22, 31:5, 31:16, 31:22, 31:23, 32:1, 32:21, 33:22, 34:21, 35:4, 35:7, 36:23, 36:24, 37:3, 37:6, 37:12, 37:16, 37:19, 38:3, 38:23, 39:20, 40:3, 40:9, 42:19, 43:2, 43:4, 43:12, 44:14, 44:21, 45:8, 45:20, 46:17, 46:22, 47:6, 50:10, 51:24, 59:15, 59:16, 59:17, 59:20, 60:9, 60:22, 60:24, 61:5, 61:12, 62:1, 62:14, 62:17, 63:4, 63:20, 64:20, 68:4, 68:9, 68:24, 69:11, 73:4, 73:10, 74:9, 74:13, 76:10, 76:20, 84:22, 88:14, 88:22, 88:25, 89:5, 89:12, 90:7, 90:8, 90:18, 93:14, 93:15, 93:23, 98:17, 98:20, 105:18, 106:15,

107:7, 107:8, 107:9
**agreements** [20] - 21:19, 21:21, 21:22, 22:3, 22:10, 42:22, 42:25, 43:10, 43:13, 51:5, 53:21, 58:2, 63:15, 64:24, 65:16, 65:18, 65:22, 66:3, 66:6, 94:24
**ahead** [8] - 15:5, 26:20, 33:5, 34:14, 41:16, 45:13, 97:13, 107:24
**AL** [1] - 2:3
**al** [1] - 1:5
**ALAN** [1] - 2:11
**alleged** [1] - 107:5
**allocating** [1] - 29:2
**allotting** [1] - 56:23
**alluded** [2] - 5:1
**ALSO** [1] - 2:15
**amend** [1] - 21:18
**amended** [2] - 17:25, 22:4
**amending** [1] - 21:21
**amortization** [1] - 47:23
**amount** [25] - 5:13, 31:20, 32:6, 36:3, 45:25, 46:1, 48:7, 60:16, 65:20, 67:6, 68:25, 69:18, 69:23, 73:1, 73:2, 83:15, 83:17, 83:20, 83:23, 83:24, 85:6, 85:7, 85:14, 93:18, 107:4
**amounts** [9] - 8:15, 33:10, 55:24, 83:1, 83:10, 85:10, 100:23, 101:1, 101:4
**ANA** [3] - 1:15, 1:24, 4:1
**AND** [4] - 1:4, 2:3, 2:9
**ANGELES** [1] -

111:3
**announced** [1] - 47:9
**annual** [2] - 99:22, 101:7
**answer** [7] - 13:20, 55:7, 57:19, 61:8, 75:2, 75:16, 89:7
**anticipate** [2] - 12:23, 40:22
**anticipated** [1] - 9:6
**anyway** [1] - 88:15
**apologize** [4] - 22:23, 55:11, 82:9, 103:25
**APPEARANCES** [1] - 2:1
**appeared** [1] - 29:8
**appraisal** [4] - 76:3, 76:6, 76:14
**appraisers** [2] - 32:7, 32:10
**appreciate** [2] - 13:12, 70:8
**appreciated** [1] - 55:19
**approach** [6] - 27:21, 30:14, 33:18, 36:8, 36:9, 50:21
**approaching** [1] - 24:16
**April** [2] - 84:11, 103:5
**ARA** [6] - 64:4, 74:18, 74:22, 75:6, 75:11, 75:20
**area** [42] - 5:12, 10:5, 18:2, 18:12, 20:10, 20:13, 21:7, 21:17, 22:4, 22:8, 22:9, 23:25, 25:23, 26:21, 30:7, 32:1, 33:22, 34:21, 35:4, 35:7, 37:12, 39:19, 40:9, 43:2, 43:8, 43:11, 44:13, 44:21, 46:2, 50:10, 50:13, 50:15, 59:14, 59:16, 59:19, 62:8, 74:9, 80:25, 89:12, 90:6, 107:5, 107:7

**argue** [1] - 9:9
**arguments** [1] - 5:2
**arise** [1] - 52:5
**arose** [1] - 86:3
**arrangement** [1] - 19:24
**article** [1] - 28:21
**artificial** [1] - 14:15
**aside** [1] - 47:2
**assist** [1] - 67:24
**assistance** [3] - 94:15, 94:18, 95:5
**associate** [1] - 27:21
**associated** [2] - 84:23, 99:8
**assuming** [1] - 60:6
**attacked** [1] - 105:4
**attorney** [10] - 18:22, 20:3, 20:6, 24:15, 26:24, 51:14, 78:19, 96:2, 96:18, 97:4
**attorneys** [1] - 91:13
**Aug** [1] - 3:23
**August** [14] - 22:16, 39:4, 47:12, 51:1, 51:4, 51:9, 51:11, 56:5, 56:7, 60:15, 87:21, 97:5, 97:25, 101:21
**author** [1] - 37:9
**available** [2] - 56:21, 73:18
**average** [2] - 99:16, 100:2
**avoids** [1] - 11:3
**aware** [18] - 25:10, 36:22, 37:20, 46:4, 50:12, 50:25, 52:16, 53:7, 59:14, 59:19, 72:6, 74:21, 75:4, 75:10, 75:19, 76:2, 87:19, 102:6

**B**

**B&D** [3] - 9:12, 106:8, 106:12

**B&D0038285-0038287** [1] - 3:17
**B&D0038495** [1] - 3:20
**balance** [4] - 40:25, 46:3, 69:14, 69:15
**ball** [2] - 14:16, 109:24
**balloon** [4] - 70:23, 71:3, 71:6, 78:7
**Bank** [1] - 47:9
**bankrupted** [1] - 11:10
**based** [5] - 5:3, 7:2, 40:1, 64:16, 90:17
**basis** [2] - 80:9, 101:7
**bear** [1] - 84:8
**bears** [1] - 12:17
**became** [2] - 50:13, 55:5
**become** [1] - 56:9
**becomes** [1] - 6:9
**begin** [4] - 68:20, 68:23, 82:5, 92:23
**beginning** [4] - 29:17, 79:13, 82:4, 94:3
**begins** [4] - 22:25, 103:1, 104:6, 106:8
**behalf** [1] - 25:17
**behind** [2] - 29:10, 39:1
**belief** [2] - 24:10, 98:12
**below** [1] - 69:25
**benefit** [16] - 19:25, 44:12, 44:22, 45:4, 45:7, 46:1, 53:12, 64:17, 65:4, 65:7, 65:11, 65:14, 65:19, 65:23, 67:10, 67:17
**benefits** [1] - 8:15
**BENNION** [4] - 1:4, 2:3, 3:4, 16:5
**Bennion** [59] - 3:16, 3:18, 5:24, 7:3, 8:14, 11:6,

11:8, 14:4, 14:5, 14:6, 14:10, 14:11, 14:20, 15:22, 15:25, 16:8, 17:8, 17:11, 23:21, 28:17, 34:16, 36:13, 36:14, 42:7, 46:12, 48:20, 49:13, 49:15, 50:17, 54:12, 55:18, 57:22, 61:10, 67:3, 73:12, 73:22, 76:21, 77:24, 80:2, 80:24, 81:20, 82:2, 82:9, 87:6, 87:18, 88:20, 91:17, 94:8, 95:21, 95:25, 96:3, 97:1, 97:15, 98:25, 99:17, 99:24, 102:14, 106:19, 107:14
**Bennion's** [3] - 8:23, 10:11, 15:24
**best** [1] - 77:22
**better** [4] - 12:1, 88:2, 95:16, 95:17
**between** [7] - 51:9, 55:8, 77:10, 83:20, 84:18, 92:21, 97:4
**Beyond** [1] - 100:7
**beyond** [1] - 90:23
**big** [2] - 25:25, 58:25
**binder** [5] - 30:17, 67:23, 77:24, 79:3, 106:17
**binders** [5] - 16:12, 16:14, 27:13, 45:14, 85:20
**bit** [6] - 4:20, 9:17, 14:15, 15:5, 77:20, 91:17
**blanche** [2] - 36:9, 50:22
**blind** [1] - 55:1
**blow** [4] - 23:23, 31:14, 34:14, 97:13
**board** [1] - 100:6

**Bob** [3] - 3:16, 3:18, 3:19, 15:22, 26:24, 87:21, 104:22
**Boehme** [2] - 4:8, 14:23
**bolts** [1] - 109:14
**book** [2] - 23:6, 68:3
**bottom** [10] - 46:22, 55:17, 69:22, 70:16, 103:19, 104:2, 104:5, 106:6, 106:22, 106:23
**boy** [1] - 30:13
**branch** [7] - 44:10, 44:13, 44:25, 53:15, 54:1, 54:3, 83:10
**branch-paying** [1] - 53:15
**branches** [3] - 53:22, 86:21, 87:3
**brand** [5] - 5:5, 11:24, 26:2, 41:6, 42:18
**breach** [15] - 37:23, 38:2, 38:16, 60:7, 60:21, 61:3, 61:11, 61:14, 61:20, 64:21, 88:13, 88:21, 90:17, 99:9, 107:6
**breaches** [1] - 63:20
**break** [5] - 32:17, 41:15, 87:9, 87:11, 87:12
**Brian** [1] - 108:15
**brief** [1] - 16:10
**briefly** [4] - 4:9, 41:23, 87:6, 102:11
**broken** [1] - 67:10
**broker** [1] - 104:23
**brought** [1] - 100:6
**build** [6] - 25:24, 26:2, 26:8, 26:20, 27:3, 86:24
**built** [2] - 25:22,

44:2
**bulk** [1] - 49:23
**bunch** [1] - 24:25
**burden** [2] - 4:21, 4:22
**business** [18] - 9:13, 11:15, 20:14, 26:20, 27:4, 30:1, 32:19, 33:7, 33:11, 34:19, 35:21, 40:3, 41:7, 43:25, 44:4, 56:25, 59:7, 101:23
**businesses** [3] - 45:5, 58:15, 68:11
**businessman's** [1] - 11:14
**busy** [4] - 57:2, 103:1, 103:8, 110:1
**but..** [2] - 39:6, 77:3
**buying** [2] - 40:15, 89:4
**BY** [32] - 2:5, 2:11, 3:4, 16:7, 21:9, 22:15, 23:20, 27:24, 28:17, 30:20, 33:21, 36:13, 39:18, 42:7, 44:24, 49:12, 50:25, 57:22, 61:10, 61:19, 75:10, 75:19, 82:9, 87:18, 92:20, 94:8, 95:24, 97:13, 98:12, 100:9, 102:13, 105:24

**C**

**CACI** [3] - 4:18, 6:22, 6:23
**calculated** [1] - 47:18
**calculation** [1] - 35:17
**calendar** [2] - 64:12, 64:17
**California** [21] - 2:7, 2:13, 3:20, 4:19, 18:1, 18:14, 18:16, 26:3, 43:9, 46:9, 50:2, 50:11, 50:14, 53:1,

54:15, 74:4, 78:14, 78:18, 80:6, 82:4, 111:7
**CALIFORNIA** [5] - 1:2, 1:15, 1:24, 4:1, 111:4
**CALLED** [1] - 3:4
**campaign** [1] - 105:5
**cannot** [1] - 106:12
**car** [1] - 25:2
**care** [1] - 109:13
**career** [2] - 40:25, 42:14
**careful** [1] - 86:15
**carefully** [2] - 12:14, 81:21
**Carlsbad** [5] - 25:7, 86:9, 86:10, 86:17
**CARMED** [4] - 71:1, 71:3, 72:7, 72:10
**Carmel** [1] - 52:21
**CARRILLO** [3] - 2:6, 33:18, 36:8
**Carrillo** [1] - 30:14
**carte** [2] - 36:9, 50:22
**case** [25] - 4:18, 4:19, 4:20, 6:1, 11:25, 12:1, 13:9, 14:17, 15:15, 41:18, 48:14, 55:13, 76:18, 80:1, 87:13, 87:14, 91:18, 91:19, 101:1, 107:22, 108:6, 108:19, 109:1, 109:2
**Case** [1] - 1:6
**cash** [13] - 12:7, 29:3, 56:21, 56:23, 57:1, 57:8, 58:12, 58:14, 58:25, 59:6, 71:23, 73:18
**catch** [3] - 36:18, 39:12, 56:14
**caught** [2] - 101:9, 101:17
**causes** [1] - 12:4
**cc'd** [1] - 16:25

**UNITED STATES DISTRICT COURT**

cc'ing [1] - 16:20
cease [1] - 18:13
ceasing [1] - 18:16
CENTRAL [1] - 1:2
Central [1] - 111:7
certain [4] - 12:8, 17:25, 19:2, 109:5
certainly [2] - 12:13, 62:9
CERTIFICATE [1] - 111:1
Certified [1] - 1:5
certify [1] - 111:7
cetera [2] - 14:11, 40:15
chance [4] - 13:20, 49:8, 77:24, 91:22
change [6] - 17:15, 17:18, 60:17, 60:19, 69:15, 107:24
changed [1] - 41:2
Chapter [1] - 26:4
chapters [2] - 25:21, 26:10
characters [1] - 104:21
charge [1] - 54:10
charged [7] - 44:20, 47:24, 53:9, 53:22, 53:23, 54:8, 72:13
chart [4] - 34:14, 34:18, 35:5, 35:14
cheat [1] - 54:20
check [3] - 62:9, 78:17, 79:2
checked [1] - 55:24
checking [2] - 55:23, 59:5
choice [1] - 62:5
chose [1] - 61:14
CHRISTOPHER [1] - 2:11
cited [1] - 4:18

claim [1] - 19:24
Claimant [1] - 1:9
claiming [1] - 8:19
claims [2] - 9:12, 58:11
clarify [1] - 51:20
clear [6] - 23:25, 26:22, 37:25, 72:5, 77:9, 79:13
CLERK [1] - 15:25
client [41] - 10:15, 49:5, 52:1, 52:2, 52:19, 55:22, 56:21, 57:23, 58:1, 58:9, 60:21, 61:4, 62:24, 63:7, 63:21, 65:6, 66:2, 66:14, 70:4, 73:14, 76:3, 76:6, 76:17, 77:14, 78:24, 78:25, 79:1, 80:14, 80:16, 84:1, 85:5, 85:9, 85:14, 87:19, 88:4, 88:9, 89:9, 89:10, 94:14, 94:17, 95:5
client's [7] - 68:9, 74:22, 75:5, 75:11, 75:20, 77:10
clients [3] - 63:11, 71:16, 78:3
clients' [1] - 66:5
close [2] - 12:24, 13:4
closed [1] - 55:2
closes [1] - 13:4
closings [2] - 57:5, 57:8
Coachella [13] - 9:2, 17:12, 17:15, 18:8, 19:12, 25:22, 34:6, 43:14, 50:9, 58:18, 58:23, 60:16
coast [26] - 9:1, 9:17, 19:24, 20:1, 26:4, 26:9, 44:2, 51:23, 52:6, 52:9, 53:6, 53:9, 53:12,

58:15, 58:16, 92:3, 92:5, 93:1, 93:5, 93:8, 93:10, 93:12, 93:21, 93:24
Coastal [1] - 83:11
Code [1] - 111:8
coincides [1] - 6:3
collect [4] - 32:24, 37:13, 62:7, 62:18
collected [5] - 34:2, 48:24, 66:13, 66:24, 99:21
collecting [1] - 62:20
collection [1] - 68:10
color [1] - 55:1
color-blind [1] - 55:1
column [2] - 34:23, 76:22
columns [2] - 77:8, 83:5
combat [1] - 98:19
coming [4] - 12:18, 57:5, 57:7, 76:9
commencing [1] - 70:20
commented [1] - 28:22
comments [1] - 7:8
commercially [1] - 98:18
communicating [2] - 24:12, 25:11
communications [1] - 96:2
companies [1] - 59:1
company [14] - 18:4, 18:5, 49:16, 54:14, 56:19, 65:8, 72:15, 74:8, 83:24, 83:25, 89:4, 101:6, 101:24
COMPANY [2] - 1:8, 2:9
comparing [1] - 80:18
compilation [1] -

- 81:19
compiled [2] - 80:11, 81:8
compiled [3] - 80:18, 81:4, 81:6
complained [1] - 97:16
completely [2] - 40:17, 44:6
complimentary [1] - 28:21
components [1] - 34:17
computation [3] - 5:16, 6:7, 7:4
computed [1] - 6:21
concern [2] - 4:15, 52:4
concerned [2] - 29:15, 98:24
concerning [1] - 104:7
concerns [2] - 105:8, 105:10
conclude [1] - 14:9
concluded [1] - 15:19
concludes [1] - 26:12
conclusion [1] - 22:12
conduct [1] - 9:9
conducting [1] - 84:20
Conference [1] - 111:12
conference [1] - 108:1
conferred [1] - 7:20
conflicts [1] - 15:10
conformance [1] - 111:12
confused [4] - 24:19, 38:5, 52:4, 52:17
confusing [2] - 88:11, 89:3
confusion [1] - 88:8
consider [1] - 7:8
consideration [1] - 32:8
consistent [3] - 21:2, 26:17, 105:7

consists [2] - 4:10, 66:22
constitutes [1] - 30:5
constraints [1] - 9:11
contains [1] - 31:3
contemplate [1] - 7:5
contemplated [2] - 20:22, 106:14
contemplates [1] - 6:24
contents [1] - 79:7
contest [1] - 87:10
continue [8] - 7:8, 8:20, 19:2, 19:12, 24:20, 38:18, 41:12, 70:22
continued [4] - 3:20, 62:7, 62:18, 104:24
continues [1] - 106:24
continuing [3] - 38:20, 90:19, 98:5
continuous [1] - 98:15
contract [5] - 38:15, 38:19, 38:20, 76:13, 91:11
contracts [2] - 43:8, 99:9
contradicts [1] - 10:9
convenient [1] - 109:25
conversation [4] - 24:3, 26:19, 29:11, 94:20
copy [1] - 7:21
corporations [1] - 8:16
correct [194] - 4:12, 10:1, 11:3, 11:20, 12:3, 13:18, 14:12, 16:25, 18:9, 18:20, 19:5, 19:13, 19:15, 19:16, 19:18, 20:3, 20:11, 20:14, 21:11, 21:12, 21:19,

21:23, 21:24, 24:5, 28:18, 28:19, 30:2, 31:17, 31:18, 32:21, 33:7, 33:12, 33:23, 35:10, 35:24, 36:4, 36:5, 36:15, 37:1, 37:2, 37:4, 37:8, 37:13, 37:14, 37:18, 37:23, 37:24, 40:17, 42:12, 43:16, 43:19, 45:1, 45:6, 45:10, 48:16, 49:4, 49:15, 49:19, 49:21, 50:7, 50:14, 50:15, 51:2, 51:18, 51:23, 52:22, 53:2, 53:6, 53:9, 53:13, 53:22, 53:25, 54:2, 54:9, 54:17, 56:4, 56:10, 57:11, 58:3, 58:10, 58:20, 58:23, 59:9, 59:25, 60:4, 60:7, 60:8, 60:11, 60:14, 60:23, 61:14, 61:22, 61:24, 61:25, 62:3, 62:5, 62:11, 62:22, 63:8, 63:17, 64:5, 64:10, 64:25, 65:12, 65:17, 65:20, 66:1, 66:4, 66:7, 66:8, 66:11, 66:23, 68:5, 68:21, 68:22, 69:12, 69:15, 70:6, 70:12, 70:23, 70:24, 71:1, 71:2, 71:5, 71:7, 71:14, 72:9, 72:23, 74:11, 74:14, 76:18, 77:5, 77:11, 77:19, 78:8, 78:12, 78:24, 80:4, 80:7, 80:19, 80:25, 81:1, 83:11, 83:12, 83:16, 83:18, 83:22, 84:1, 84:2, 84:5, 84:15, 84:16, 85:11, 85:15, 86:5, 86:6, 88:9, 88:13,

88:15, 89:2, 89:10, 89:19, 89:21, 89:24, 89:25, 90:4, 90:11, 91:5, 91:6, 91:8, 91:9, 92:4, 92:23, 93:2, 93:6, 93:17, 94:15, 94:25, 95:14, 95:15, 98:21, 98:22, 101:2, 101:18, 102:22, 103:1, 103:10, 104:13, 104:14, 104:18, 105:9, 105:16, 106:15, 111:9

**corrected** [2] - 5:22, 88:21

**correctly** [1] - 46:20

**correspondence** [7] - 74:21, 75:4, 75:10, 75:14, 75:19, 76:2, 87:19

**cost** [2] - 26:8, 44:23

**COUNSEL** [1] - 2:1

**counsel** [2] - 38:23, 108:20

**COUNTER** [1] - 2:3

**COUNTERCLAIMANT** - 2:9

**COUNTY** [1] - 111:3

**couple** [8] - 7:15, 7:16, 13:1, 15:9, 17:2, 84:4, 95:25, 100:19

**course** [3] - 13:23, 49:8, 66:14

**Court** [3] - 6:21, 111:6, 111:20

**court** [1] - 94:12

**COURT** [104] - 1:1, 1:23, 4:5, 4:8, 4:11, 4:15, 4:24, 5:7, 5:14, 6:6, 6:13, 6:15, 6:19, 7:7, 7:12, 7:19, 7:22, 7:25, 8:5, 8:8, 8:10, 8:17, 9:5, 10:16, 10:18, 10:20, 10:25, 11:23, 12:21, 12:25,

13:3, 13:11, 13:14, 13:17, 13:19, 13:25, 14:3, 14:5, 14:9, 14:14, 14:22, 15:2, 15:23, 16:3, 21:6, 22:13, 23:16, 23:18, 27:22, 28:13, 28:15, 30:15, 33:19, 34:9, 34:12, 36:9, 39:12, 39:15, 41:16, 41:21, 41:24, 42:1, 42:3, 42:6, 44:17, 49:8, 50:22, 57:18, 61:2, 61:18, 75:2, 75:15, 81:16, 81:21, 81:25, 82:6, 87:8, 87:17, 92:9, 92:11, 92:16, 94:4, 94:6, 95:21, 96:21, 97:9, 97:11, 98:11, 100:8, 102:9, 107:12, 107:14, 107:16, 107:19, 108:10, 108:13, 108:17, 108:24, 109:9, 109:12, 109:19, 109:23, 110:4, 111:6

**Court's** [1] - 7:10

**COURTROOM** [3] - 41:19, 87:15, 108:8

**cover** [2] - 27:17, 95:25

**credibility** [1] - 12:17

**credit** [1] - 85:9

**critical** [1] - 44:4

**cross** [2] - 14:11, 49:10

**Cross** [1] - 3:5

**CROSS** [1] - 49:11

**Cross-Examination** [1] - 3:5

**cross-examination** [1] - 49:10

**CROSS-EXAMINATION** [1] - 49:11

**crossed** [1] -

11:21

**CRR** [1] - 1:23

**crystal** [1] - 26:22

**CSR** [2] - 1:23, 111:20

**cure** [12] - 37:22, 38:6, 38:9, 38:12, 38:15, 39:7, 39:20, 60:6, 61:11, 61:14, 61:19, 90:20

**cured** [5] - 38:2, 38:7, 38:18, 60:21, 61:3

**cures** [1] - 64:21

**current** [2] - 19:9, 85:17

**cyclical** [1] - 101:6

# D

**daily** [1] - 9:21

**damages** [2] - 6:4, 99:8

**damn** [1] - 26:15

**dark** [1] - 26:5

**Date** [1] - 111:15

**date** [9] - 32:12, 33:4, 34:4, 35:1, 35:18, 47:10, 54:19, 64:3, 64:22

**dated** [4] - 22:16, 82:14, 102:18, 103:5

**dates** [5] - 77:19, 82:21, 82:22, 82:25

**Davey** [9] - 40:16, 63:11, 63:14, 74:18, 74:21, 75:5, 75:11, 75:20, 76:2

**Davey's** [1] - 64:2

**day-to-day** [2] - 50:3, 50:5

**days** [14] - 5:2, 7:16, 11:8, 11:25, 37:16, 38:9, 38:21, 57:5, 60:7, 64:8, 64:10, 88:15, 95:10

**days'** [8] - 31:6, 31:10, 36:24, 36:25, 62:2, 89:18, 89:22,

91:8

**deal** [2] - 47:3, 47:4

**dealing** [1] - 104:21

**deals** [1] - 91:4

**DEBBIE** [3] - 1:23, 111:5, 111:19

**Debbie** [1] - 111:20

**decade** [1] - 46:15

**December** [12] - 46:23, 56:14, 57:11, 57:23, 73:13, 82:18, 82:22, 84:6, 92:23, 100:20, 102:22, 103:9

**decision** [2] - 9:18, 44:5

**default** [2] - 69:7, 102:3

**DEFENDANT** [1] - 2:9

**defendant** [1] - 9:11

**defendant's** [3] - 4:21, 9:9, 107:22

**Defendant/Counter** [1] - 1:9

**DEFENDANTS** [1] - 2:3

**Defendants** [1] - 1:6

**defense** [1] - 6:21

**defer** [1] - 13:8

**deferral** [8] - 45:25, 46:17, 46:19, 46:23, 68:4, 69:11, 71:22, 71:24

**deferred** [1] - 47:8

**deferring** [1] - 47:1

**delay** [1] - 55:11

**delineation** [1] - 83:20

**demand** [1] - 59:8

**demanded** [1] - 73:15

**demanding** [1] - 59:6

**Demonstrative** [1] - 3:21

**department** [1] -

34:6

**departure** [3] - 33:3, 33:13, 34:4

**deposed** [2] - 95:12, 95:14

**deposition** [14] - 8:24, 10:11, 10:18, 10:19, 80:1, 91:18, 91:21, 92:1, 92:7, 92:25, 93:4, 94:10, 95:8

**depositions** [1] - 95:10

**DEPUTY** [3] - 41:19, 87:15, 108:8

**desert** [3] - 29:4, 57:4, 93:7

**Desert** [1] - 57:6

**destroyed** [9] - 39:23, 40:10, 41:7, 43:1, 43:6, 43:11, 43:12, 62:17

**determined** [1] - 32:7

**detrimental** [1] - 42:24

**DEVILLE** [2] - 1:4, 2:3

**Deville** [47] - 3:16, 3:19, 5:25, 7:3, 8:14, 9:15, 10:1, 11:6, 11:8, 13:15, 13:16, 15:19, 17:9, 17:11, 25:10, 26:24, 29:11, 44:8, 48:20, 48:22, 49:15, 50:1, 67:3, 69:4, 69:17, 70:14, 78:5, 78:16, 80:24, 87:21, 87:23, 88:4, 94:12, 96:3, 96:8, 96:10, 96:19, 97:25, 98:25, 99:17, 99:25, 100:4, 103:16, 103:19, 104:2, 104:11, 105:11

**Deville's** [2] - 9:14, 10:10

**dhinospaan@yahoo.com** [1] - 1:25

**dialogue** [1] - 101:25

**Diego** [6] - 2:13, 17:18, 19:17, 22:19, 29:14, 43:19

**different** [12] - 37:4, 37:16, 59:24, 70:25, 71:25, 81:11, 88:17, 88:18, 88:24, 94:10, 106:17

**differentiate** [1] - 77:9

**difficult** [2] - 95:13, 104:22

**difficulties** [1] - 92:2

**difficulty** [1] - 5:15

**Direct** [1] - 3:4

**DIRECT** [1] - 16:6

**directly** [3] - 10:9, 24:18

**disclosed** [2] - 5:17, 6:7

**discount** [23] - 4:12, 4:13, 4:23, 5:23, 5:24, 6:11, 6:14, 6:16, 8:19, 11:7, 11:15, 19:1, 19:5, 19:7, 19:8, 19:11, 19:14, 19:17, 19:25, 20:3, 44:2, 44:22

**discuss** [4] - 7:25, 77:23, 78:14, 109:21

**discussed** [16] - 10:15, 24:4, 28:18, 37:1, 37:10, 44:19, 51:25, 52:2, 81:22, 86:7, 86:8, 87:23, 89:23, 92:1, 94:9, 103:15

**discusses** [1] - 78:7

**discussing** [4] - 59:5, 81:18, 81:23, 87:2

**discussions** [10] - 18:15, 26:17, 40:15, 51:1, 51:3, 51:12, 51:13, 74:19, 84:17, 89:4

**disinclined** [1] - 11:1

**UNITED STATES DISTRICT COURT**

**disingenuous** [1] - 71:11
**dissolve** [1] - 21:10
**dissolving** [1] - 21:16
**distinction** [1] - 11:17
**DISTRICT** [2] - 1:1, 1:2
**District** [2] - 111:6, 111:7
**divesting** [1] - 29:13
**DIVISION** [1] - 1:2
**document** [10] - 16:23, 20:5, 28:1, 28:3, 46:14, 46:16, 59:12, 68:15, 100:14, 102:16
**Document** [1] - 3:14
**documentation** [1] - 39:4
**documents** [6] - 12:19, 40:2, 55:13, 79:10, 82:10, 99:16
**dollar** [2] - 7:1, 56:19
**done** [8] - 13:16, 14:1, 14:10, 15:8, 35:2, 39:5, 91:1, 107:21
**door** [1] - 8:18
**double** [1] - 78:17
**double-check** [1] - 78:17
**doubled** [1] - 43:22
**DOUGLAS** [1] - 1:3
**down** [12] - 9:20, 11:12, 17:22, 20:17, 25:14, 32:4, 32:17, 36:21, 67:10, 84:8, 104:5, 107:14
**downturn** [2] - 25:25, 46:6
**drafted** [1] - 24:5
**Drayna** [12] - 16:20, 22:16, 24:5, 30:1, 30:4, 45:19, 46:15, 50:18, 69:4,

69:17, 74:16, 105:10
**Drayna's** [5] - 31:25, 64:4, 70:12, 89:1, 105:7
**due** [12] - 47:11, 56:5, 56:9, 60:12, 60:15, 76:12, 78:22, 79:12, 100:19, 101:5, 101:20, 107:4
**during** [24] - 5:2, 8:23, 32:11, 32:25, 35:16, 39:20, 46:5, 48:8, 50:1, 55:25, 59:2, 62:7, 65:15, 68:10, 69:14, 77:15, 83:16, 86:7, 92:1, 93:4, 99:17, 99:25, 102:25, 103:8

**E**

**e-mail** [34] - 9:22, 16:19, 22:16, 22:24, 23:3, 23:4, 23:5, 23:9, 23:11, 23:20, 23:22, 23:24, 24:7, 27:7, 28:17, 28:20, 50:18, 55:8, 55:17, 57:24, 86:2, 87:5, 87:23, 92:21, 96:25, 97:3, 97:24, 97:25, 98:1, 98:21, 103:15, 104:17, 105:11
**e-mails** [5] - 28:2, 28:5, 29:8, 88:1, 88:3
**early** [5] - 15:16, 72:21, 101:10, 107:25, 108:19
**early-to-middle** [1] - 15:16
**earning** [1] - 6:17
**easier** [2] - 106:19, 109:11
**EASTERN** [1] - 1:2
**economy** [1] - 46:6
**effect** [5] - 42:24, 43:12,

44:23, 62:14, 87:25
**effort** [1] - 44:5, 61:19
**efforts** [2] - 61:22, 106:13
**either** [8] - 15:9, 28:5, 31:5, 31:15, 36:23, 53:22, 86:3, 89:17
**elects** [1] - 31:15
**eliminate** [1] - 22:4
**eluding** [1] - 6:19
**email** [3] - 3:15, 3:18, 3:23
**Encinitas** [6] - 86:9, 86:17, 86:22, 86:23, 86:24, 86:25
**enclosed** [1] - 70:1
**end** [11] - 13:9, 14:8, 15:12, 15:13, 26:11, 38:9, 53:14, 66:13, 94:14, 95:5, 101:17
**endurance** [1] - 87:10
**energizing** [1] - 105:4
**enjoy** [1] - 108:5
**entered** [4] - 19:10, 19:23, 19:24, 50:9
**enterprise** [1] - 26:25
**entire** [1] - 42:16
**entities** [9] - 50:3, 58:10, 58:15, 58:21, 66:22, 66:24, 73:19, 84:19, 85:6
**entitled** [8] - 8:20, 9:11, 60:22, 61:4, 61:5, 66:9, 74:8, 111:11
**entity** [8] - 9:2, 18:9, 19:12, 67:6, 74:3, 80:7, 83:21
**enumerated** [1] - 59:17
**equal** [1] - 31:20
**equivocal** [1] - 9:17
**Eric** [1] - 85:3
**ESQ** [6] - 2:5,

2:5, 2:6, 2:11, 2:11, 2:12
**essence** [1] - 46:2
**essentially** [1] - 31:4
**established** [2] - 54:1, 54:3
**establishes** [1] - 10:11
**estate** [3] - 49:18, 49:20, 49:24
**ESTATE** [2] - 1:8, 2:9
**Estate** [1] - 3:19
**Estates** [6] - 25:12, 54:15, 54:16, 86:5, 86:9, 87:3
**estimate** [1] - 67:14, 94:11
**ET** [1] - 2:3
**et** [3] - 1:5, 14:11, 40:15
**evaluating** [1] - 25:7
**event** [2] - 31:15, 74:13
**events** [1] - 95:16
**evidence** [17] - 4:16, 7:2, 7:6, 10:10, 12:24, 13:5, 16:17, 23:15, 28:12, 29:23, 34:8, 45:19, 46:11, 81:15, 85:25, 97:8, 109:6
**EVIDENCE** [1] - 3:13
**exact** [4] - 6:3, 6:24, 54:18, 85:3
**exactly** [2] - 93:3, 95:11
**EXAMINATION** [4] - 16:6, 49:11, 95:23, 102:12
**Examination** [4] - 3:4, 3:5, 3:5, 3:6
**examination** [1] - 49:10
**exchange** [7] - 18:25, 27:7, 28:2, 52:20, 92:21, 97:1, 97:4
**exchanged** [1] - 22:24
**exchanges** [1] -

28:18
**exciting** [1] - 26:2
**excuse** [4] - 56:3, 65:8, 74:16, 74:17
**execute** [1] - 70:1
**exercising** [1] - 30:6
**EXHIBIT** [1] - 3:13
**exhibit** [16] - 8:2, 8:6, 16:11, 22:15, 30:24, 72:25, 77:15, 79:6, 79:8, 79:14, 81:3, 85:22, 90:8, 97:17, 99:20, 103:19
**Exhibit** [51] - 8:11, 16:12, 23:4, 23:14, 23:19, 27:12, 28:11, 28:16, 29:22, 30:12, 33:17, 33:25, 34:7, 34:13, 36:6, 45:12, 45:17, 46:10, 50:18, 55:8, 59:11, 64:13, 67:22, 68:4, 68:7, 69:2, 70:10, 73:1, 73:21, 76:21, 77:25, 79:3, 79:4, 81:15, 82:8, 82:11, 85:21, 86:1, 90:6, 90:9, 92:21, 96:10, 96:13, 97:7, 97:12, 102:15, 103:13, 105:11, 105:19, 105:22, 106:18
**exhibits** [5] - 5:25, 6:2, 10:23, 36:10, 96:12
**Exhibits** [1] - 67:23
**EXHIBITS** [1] - 3:11
**existing** [2] - 32:13, 39:23
**exited** [3] - 35:15, 35:16
**expect** [1] - 100:9
**expenditures** [4] - 9:13, 10:24,

11:2, 12:8
**expenses** [2] - 84:19, 84:23
**expensive** [1] - 41:4
**expert** [2] - 14:7, 109:15
**expertise** [1] - 90:23
**expiration** [1] - 64:9
**explain** [2] - 33:25, 101:4
**explained** [1] - 52:10
**expressed** [1] - 105:10
**extended** [6] - 71:8, 71:11, 71:12, 71:14, 78:11, 78:23
**extent** [1] - 92:13
**extrapolated** [1] - 99:22
**extremely** [1] - 41:4

**F**

**fact** [15] - 6:3, 10:1, 10:11, 15:14, 24:9, 58:1, 60:12, 76:6, 76:17, 92:22, 92:25, 93:9, 94:24, 98:17, 107:23
**factor** [1] - 7:4
**factors** [1] - 32:8
**facts** [1] - 12:8
**failed** [2] - 26:14, 39:3
**failure** [1] - 37:13
**fair** [8] - 31:20, 32:5, 42:11, 43:22, 56:22, 63:6, 68:12, 68:13
**faith** [1] - 90:17
**fall** [2] - 39:25, 89:6
**far** [2] - 83:2, 95:2
**Fargo** [1] - 47:9
**FDD** [3] - 39:3, 39:21, 100:6
**fEASBY** [1] - 55:15

**Feasby** [13] - 3:5, 3:6, 14:16, 39:13, 61:9, 81:22, 87:9, 87:17, 92:18, 96:1, 102:10, 108:10, 109:23

**FEASBY** [65] - 2:10, 2:11, 7:15, 7:20, 7:23, 8:3, 8:7, 8:12, 8:18, 9:25, 10:17, 10:19, 10:21, 11:19, 12:16, 12:22, 13:1, 13:10, 14:21, 21:5, 22:11, 23:17, 28:14, 34:10, 39:11, 39:14, 44:15, 49:12, 50:25, 57:16, 57:22, 61:1, 61:10, 61:16, 61:19, 75:1, 75:10, 75:19, 81:23, 82:1, 82:9, 82:13, 83:5, 87:18, 92:6, 92:10, 92:12, 92:15, 92:20, 93:25, 94:5, 94:8, 96:20, 97:10, 98:10, 100:7, 102:11, 102:13, 105:21, 105:24, 107:11, 108:12, 108:15, 108:22, 109:3

**February** [8] - 59:8, 70:22, 82:14, 82:17, 82:21, 82:22, 84:14, 103:10

**Federal** [1] - 111:20

**FEDERAL** [2] - 1:23, 111:5

**fee** [11] - 6:5, 28:23, 46:8, 51:23, 52:5, 72:12, 76:22, 83:13, 83:18, 99:17, 99:23

**feelings** [1] - 109:20

**fees** [119] - 8:25, 9:10, 9:16, 10:8, 10:15, 19:1, 32:24, 33:9, 34:2, 34:3, 34:20,

35:17, 35:20, 35:22, 35:23, 37:13, 43:21, 45:20, 45:25, 46:5, 46:17, 46:23, 47:1, 47:8, 47:10, 47:15, 48:13, 48:19, 48:24, 52:21, 52:25, 53:5, 53:9, 54:8, 55:18, 55:22, 56:3, 56:6, 56:7, 56:8, 56:21, 57:15, 57:22, 58:1, 58:4, 58:23, 59:2, 59:6, 59:9, 60:13, 61:23, 61:24, 62:5, 62:7, 62:18, 62:20, 63:7, 63:9, 63:12, 65:5, 65:20, 65:23, 65:24, 66:2, 66:7, 66:9, 66:13, 66:22, 67:2, 67:7, 67:8, 67:9, 67:20, 68:10, 69:8, 69:13, 71:22, 71:25, 74:7, 77:4, 77:16, 78:23, 79:12, 82:17, 83:15, 84:5, 84:6, 84:13, 85:10, 85:14, 89:4, 92:23, 93:2, 93:5, 93:11, 93:16, 93:17, 93:22, 94:15, 94:18, 95:1, 95:6, 98:25, 99:3, 99:13, 101:9, 101:17, 102:21, 102:24, 102:25, 103:1, 103:9, 107:4

**felt** [8] - 7:2, 27:8, 27:9, 38:23, 39:5, 61:15

**few** [4] - 11:8, 107:25, 108:18, 110:4

**figure** [7] - 6:5, 7:1, 48:1, 53:17, 67:11, 100:2, 100:10

**file** [1] - 76:19

**FILEMON** [1] - 2:6

**fill** [1] - 44:3

**finances** [1] - 8:14

**financial** [4] - 9:11, 25:16, 26:7, 45:22

**financially** [1] - 92:2

**fine** [4] - 11:16, 17:9, 17:11, 49:15

**FINE** [2] - 1:4, 2:3

**finish** [2] - 14:19, 73:8

**finished** [1] - 14:19

**finishing** [1] - 15:15

**first** [12] - 7:15, 14:15, 23:6, 36:21, 37:11, 38:1, 45:24, 69:23, 70:17, 93:9, 107:21, 108:16

**First** [1] - 97:19

**five** [8] - 7:18, 14:23, 41:17, 47:21, 48:3, 58:14, 58:15, 94:9

**fixed** [1] - 7:1

**flesh** [1] - 43:5

**flip** [3] - 79:6, 79:20, 84:8

**flow** [9] - 12:7, 29:3, 57:1, 57:8, 58:12, 58:14, 58:25, 59:6, 100:10

**focus** [2] - 23:21, 40:9

**folks** [1] - 25:12

**follow** [3] - 16:13, 87:14, 108:6

**following** [3] - 23:5, 101:10, 101:11

**follows** [1] - 28:17

**fool** [1] - 26:13

**FOR** [2] - 2:3, 2:9

**forced** [2] - 59:4, 73:15

**forego** [1] - 68:10

**foregoing** [1] - 111:9

**forgiven** [2] - 73:9, 93:16

**forgiveness** [1] - 45:20

**formal** [1] - 30:5

**formally** [1] - 108:25

**format** [2] - 81:10, 111:11

**forth** [4] - 60:16, 63:19, 64:4, 64:10

**forward** [5] - 19:15, 29:9, 80:14, 108:13, 108:17

**forwarded** [1] - 80:23

**foundation** [3] - 44:15, 44:17, 81:17

**foundational** [1] - 34:10

**four** [11] - 47:22, 53:1, 53:16, 53:18, 58:21, 58:25, 71:23, 72:1, 72:5, 89:13

**FOURTH** [1] - 1:24

**fourth** [5] - 47:23, 54:1, 72:7, 72:17, 72:18

**frame** [2] - 35:16, 54:19

**frames** [1] - 95:11

**franchise** [50] - 5:11, 6:5, 17:5, 17:15, 17:18, 18:8, 19:1, 19:18, 21:18, 21:21, 22:3, 22:10, 34:2, 34:20, 35:21, 42:22, 42:25, 43:2, 45:4, 46:5, 46:17, 50:10, 53:21, 54:16, 58:2, 58:23, 63:12, 63:15, 64:23, 65:5, 65:15, 65:22, 66:7, 67:7, 67:9, 67:10, 67:19, 67:20, 76:22, 77:4, 77:16, 78:23, 83:15, 83:18, 94:15, 94:18, 95:6, 98:25, 99:3, 99:20

**franchisee** [11] -

17:12, 17:13, 18:8, 39:24, 43:4, 43:12, 44:13, 54:13, 79:24

**franchisees** [30] - 6:4, 9:12, 9:18, 18:5, 18:6, 18:14, 21:13, 32:25, 33:10, 34:21, 35:14, 35:23, 39:1, 55:6, 62:8, 67:3, 74:4, 77:16, 79:1, 80:22, 80:24, 80:25, 82:3, 87:4, 99:17, 99:25, 100:5, 100:10

**franchises** [14] - 20:24, 20:25, 21:12, 26:21, 27:3, 40:8, 43:19, 52:22, 52:25, 60:12, 63:17, 64:3, 66:24, 80:6

**franchising** [5] - 24:11, 24:13, 25:1, 27:4

**franchisor** [6] - 20:13, 26:20, 27:5, 30:6, 71:24, 93:21

**franchisors** [2] - 26:16, 87:4

**Friday** [4] - 15:8, 15:11, 15:12, 15:13

**front** [10] - 9:15, 16:12, 27:17, 27:24, 29:23, 45:14, 46:12, 50:4, 54:21, 55:9

**fuel** [2] - 87:25, 104:9

**full** [11] - 15:6, 15:7, 26:20, 35:19, 47:24, 48:11, 49:20, 49:22, 68:25, 69:23, 72:21

**full-time** [2] - 49:20, 49:22

**fully** [2] - 72:23, 73:2

**fundamentally** [1] - 12:3

**future** [2] - 24:11, 24:13

**G**

**game** [1] - 15:5

**generally** [2] - 29:18, 29:19

**generate** [1] - 80:16

**generated** [1] - 82:3

**generating** [2] - 58:19, 80:17

**gentleman** [1] - 22:18

**gentlemen** [4] - 15:2, 41:16, 87:11, 107:19

**Geoff** [3] - 78:3, 78:15, 84:3

**Gilbert** [1] - 4:19

**given** [4] - 5:17, 12:7, 43:15, 51:5

**Gooding** [3] - 25:5, 108:15, 108:18

**great** [3] - 16:19, 25:24, 83:6

**gross** [14] - 32:10, 32:20, 32:22, 33:6, 34:18, 35:3, 35:6, 77:6, 77:7, 77:12, 77:13, 83:23, 93:18, 99:20

**grounds** [2] - 34:10, 107:5

**growth"** [1] - 3:20

**guarantee** [1] - 106:13

**guard** [1] - 36:18

**guess** [3] - 4:15, 15:19, 30:18

**H**

**half** [4] - 46:1, 67:1, 83:25, 84:1

**hand** [5] - 4:8, 12:2, 34:23, 43:10

**handled** [1] - 50:6

**handy** [2] - 27:19, 67:24

**hang** [1] - 11:6

**happy** [4] - 9:21, 9:23, 10:12, 10:22

**hard** [1] - 41:13

**head** [3] - 13:8,

24:17, 25:4
**hear** [4] - 14:14, 26:23, 26:24, 26:25
**heard** [6] - 12:4, 40:14, 40:15, 51:3, 95:8, 100:4
**hearing** [2] - 108:13, 108:17
**held** [2] - 85:14, 111:10
**help** [10] - 36:10, 53:17, 58:19, 73:22, 88:2, 88:6, 93:22, 94:21, 95:7, 106:2
**helping** [1] - 54:22
**hereby** [1] - 111:7
**herein** [1] - 106:14
**highlight** [1] - 83:5
**highlighted** [3] - 14:17, 97:22, 107:1
**highlights** [2] - 51:6, 51:8
**highly** [1] - 11:4
**HINO** [3] - 1:23, 111:5, 111:19
**Hino** [1] - 111:20
**HINO-SPAAN** [3] - 1:23, 111:5, 111:19
**Hino-Spaan** [1] - 111:20
**hired** [1] - 74:19
**historically** [1] - 101:22
**history** [4] - 5:3, 42:17, 48:8, 48:20
**hit** [2] - 25:24, 45:24
**hold** [2] - 39:12, 89:5
**hole** [1] - 26:6
**home** [1] - 45:24
**homes** [3] - 17:9, 17:11, 49:15
**HOMES** [2] - 1:4, 2:3
**Homes** [6] - 25:12, 54:15, 54:16, 86:5, 86:9, 87:3
**honest** [1] -

62:16
**Honor** [61] - 4:7, 4:9, 4:14, 4:17, 5:11, 5:21, 6:22, 7:6, 7:11, 7:15, 8:9, 8:12, 10:4, 11:20, 12:17, 12:22, 13:12, 13:18, 14:2, 14:13, 14:21, 15:21, 16:4, 23:14, 27:21, 28:11, 30:14, 33:18, 34:7, 34:11, 36:8, 36:11, 41:14, 41:22, 42:4, 49:6, 50:21, 50:23, 57:16, 75:13, 81:15, 81:17, 92:7, 92:13, 94:1, 94:2, 95:22, 96:20, 96:23, 97:7, 102:7, 102:11, 107:13, 107:18, 108:12, 108:22, 109:3, 109:10, 109:22, 110:3, 110:6
**HONORABLE** [1] - 1:3
**hope** [1] - 23:7
**hopefully** [1] - 42:7
**horizon** [1] - 94:9
**horse's** [1] - 27:1
**hour** [2] - 107:25, 108:5
**hush** [1] - 105:3
**Hyatt** [6] - 97:19, 103:20, 104:3, 104:11, 104:18, 105:16

---

**I**

**idea** [1] - 25:7
**identified** [8] - 6:1, 6:2, 34:16, 35:6, 37:23, 40:6, 81:2, 88:21
**identifies** [1] - 27:17
**identify** [6] - 4:21, 4:22, 5:3, 7:1, 7:4, 99:16
**identifying** [3] - 22:25, 39:7,

88:13
**II** [1] - 110:8
**imagine** [1] - 91:13
**impacted** [1] - 9:18
**implication** [1] - 71:13
**imply** [1] - 54:22
**important** [1] - 20:1
**improper** [4] - 74:23, 75:6, 75:12, 75:21
**IN** [1] - 3:13
**in-person** [1] - 26:19
**inability** [4] - 9:20, 11:14, 93:2, 93:5
**INC** [2] - 2:3, 2:10
**Inc** [3] - 17:9, 17:11, 18:1
**inception** [1] - 66:20, 101:24
**incidentally** [1] - 73:12
**include** [11] - 20:23, 33:9, 35:14, 35:17, 35:19, 35:21, 51:22, 53:5, 77:12, 91:11, 91:14
**included** [2] - 52:24, 84:19
**includes** [1] - 69:10
**incoming** [1] - 56:18
**inconvenience** [1] - 110:2
**increased** [1] - 84:25
**incurred** [1] - 84:20
**indicate** [1] - 57:10
**indicated** [6] - 24:15, 52:8, 52:12, 57:23, 85:12, 105:11
**indicating** [5] - 29:4, 74:22, 75:5, 75:11, 75:20
**individual** [1] - 104:24
**information** [2] - 20:18, 39:22,

81:4
**inquiring** [1] - 28:23
**insinuating** [1] - 97:15
**insist** [1] - 109:17
**installment** [2] - 56:5, 70:1
**instruct** [1] - 18:22
**instructed** [1] - 63:1
**Instruction** [1] - 6:22
**instructions** [5] - 4:11, 4:18, 6:24, 7:5, 108:7
**intend** [1] - 10:23
**intent** [1] - 42:21
**intention** [3] - 5:5, 5:6, 5:9
**interest** [12] - 25:8, 31:21, 32:6, 47:8, 47:15, 47:19, 47:22, 47:24, 48:12, 48:13, 71:21, 72:21
**investment** [1] - 42:18
**invoices** [1] - 100:14
**irrelevant** [1] - 44:16
**Irvine** [1] - 2:7
**issue** [23] - 9:6, 9:7, 9:13, 11:3, 11:22, 12:22, 14:17, 14:18, 48:14, 51:21, 58:12, 87:22, 87:25, 92:14, 97:21, 101:1, 101:3, 101:23, 102:1, 104:9, 104:23, 108:22, 109:14
**issues** [18] - 7:12, 7:15, 8:12, 13:1, 50:6, 51:17, 75:25, 78:14, 78:15, 78:20, 86:3, 98:2, 98:5, 104:24, 105:12, 105:15, 109:21
**item** [2] - 51:25, 100:13
**items** [2] - 17:2,

86:8
**itself** [1] - 19:3

---

**J**

**Jacobi** [1] - 72:19
**Jacobi's** [1] - 72:15
**JAMES** [1] - 2:5
**January** [17] - 29:20, 46:23, 52:19, 53:24, 57:7, 64:4, 74:17, 82:20, 82:22, 84:6, 89:1, 98:25, 100:20, 102:4, 102:18, 102:19, 103:9
**JEFFREY** [1] - 2:11
**Jill** [3] - 78:3, 78:14, 84:3
**job** [2] - 49:20, 50:8
**jobs** [1] - 49:22
**John** [6] - 31:14, 36:7, 46:11, 55:15, 83:6, 96:24
**JOHN** [1] - 2:12
**john** [2] - 2:16, 23:23
**Johnson** [1] - 25:5
**JUDGE** [1] - 1:3
**judgment** [3] - 12:23, 14:18, 108:23
**Judicial** [1] - 111:12
**July** [6] - 33:4, 56:6, 56:7, 57:9, 89:1, 111:15
**JULY** [2] - 1:14, 4:1
**jumping** [1] - 33:5
**June** [10] - 56:3, 60:14, 68:20, 85:17, 87:18, 95:1, 96:3, 97:17, 101:18, 101:19
**jury** [16] - 4:4, 6:24, 7:1, 7:5, 8:21, 9:3, 10:12, 11:5, 12:5, 14:23, 15:1, 16:11, 41:20, 42:2, 108:9, 109:1

**JURY** [1] - 1:14

---

**K**

**keep** [7] - 27:19, 33:14, 49:3, 58:25, 83:25, 87:13, 108:6
**kept** [5] - 62:11, 62:22, 99:3, 99:5, 99:13
**KEVIN** [1] - 2:5
**kind** [5] - 11:11, 11:21, 29:18, 73:18, 79:20
**king** [2] - 35:18, 55:6
**King** [1] - 54:13
**king's** [1] - 35:17
**knowing** [1] - 19:25
**knowledge** [1] - 29:12
**known** [1] - 41:5
**Kruger** [1] - 105:8

---

**L**

**Lacks** [1] - 44:15
**ladies** [4] - 15:2, 41:16, 87:11, 107:19
**lag** [1] - 57:7
**language** [6] - 13:7, 13:8, 19:11, 22:2, 33:21, 59:14
**large** [4] - 42:17, 44:3, 79:6
**last** [14] - 9:22, 10:16, 22:17, 32:17, 38:1, 56:2, 56:3, 64:18, 77:21, 78:4, 90:12, 99:18, 99:25, 100:13
**law** [4] - 4:18, 12:23, 14:18, 108:23
**lawsuit** [3] - 16:23, 104:6, 104:12
**Leading** [1] - 39:11
**leading** [2] - 39:14, 39:16
**lease** [2] - 86:24, 109:5

**leases** [1] - 26:8
**least** [12] -
53:24, 54:3,
56:20, 60:13,
62:13, 64:18,
65:5, 84:4, 86:20,
87:2, 101:2,
101:3
**leave** [1] - 12:20
**lees** [1] - 54:18
**Lees** [1] - 55:5
**left** [6] - 6:17,
9:9, 34:23, 35:18,
42:8, 44:4
**left-hand** [1] -
34:23
**legal** [2] - 22:12,
38:23
**lengthy** [1] -
23:20
**lent** [1] - 47:21
**less** [2] - 85:14,
85:17
**letter** [31] -
29:21, 29:25,
30:5, 37:3, 37:6,
38:17, 38:21,
60:9, 60:16,
61:12, 62:2,
63:19, 63:23,
64:2, 64:4, 64:6,
64:10, 64:16,
64:25, 69:4,
69:17, 70:12,
74:17, 74:20,
75:8, 75:22, 78:3,
78:15, 84:4,
88:13, 89:2
**letters** [1] -
63:14
**license** [6] -
9:16, 17:5, 17:24,
19:1, 83:13,
107:3
**licensee** [3] -
17:25, 18:25,
107:3
**Licensee** [1] -
106:24
**licensees** [2] -
32:13, 33:10
**lies** [1] - 24:11
**life** [2] - 41:1,
65:15
**light** [3] - 7:5,
107:23, 109:16
**likely** [1] - 105:1
**limine** [4] - 8:13,
9:5, 11:2, 92:14
**line** [3] - 96:4,

98:23, 106:23
**Line** [12] - 92:7,
92:8, 92:9, 92:11,
92:12, 92:16,
94:1, 94:3, 94:4,
94:5
**listening** [1] -
12:14
**LLP** [1] - 2:4
**loan** [22] - 7:17,
47:23, 47:24,
48:13, 71:1, 71:3,
71:8, 71:19,
71:20, 72:7,
72:10, 72:12,
72:14, 72:15,
72:17, 72:19,
78:8, 78:10,
78:22
**loaned** [1] - 48:7
**loaning** [1] -
93:22
**loans** [11] - 26:7,
47:19, 47:22,
48:1, 48:14,
71:10, 71:23,
72:1, 72:5
**location** [2] -
54:8, 86:23
**locations** [1] -
86:9
**look** [61] - 6:23,
9:23, 9:24, 17:2,
17:22, 20:5,
20:16, 23:21,
27:12, 29:22,
30:11, 32:10,
36:6, 36:20, 38:1,
45:12, 46:10,
46:22, 54:20,
55:7, 63:25,
64:11, 64:13,
64:18, 67:15,
67:23, 68:15,
69:2, 69:22,
70:10, 70:16,
73:21, 73:23,
75:25, 76:25,
77:2, 78:4, 78:7,
79:2, 79:3, 79:13,
81:3, 81:7, 81:8,
82:11, 83:13,
86:11, 88:1, 91:2,
94:16, 96:13,
97:17, 97:24,
99:16, 102:15,
103:3, 103:18,
104:5, 106:2,
108:13, 108:17
**looked** [5] -

40:2, 59:11,
100:13, 100:17,
104:6
**looking** [10] -
22:16, 24:7,
46:15, 56:18,
57:15, 64:14,
68:6, 77:19, 78:2,
106:22
**looks** [4] -
56:13, 79:24,
84:6, 98:4
**loop** [1] - 85:4
**loquacious** [1] -
108:20
**LOS** [1] - 111:3
**losing** [2] -
11:10, 58:16
**losses** [8] - 8:25,
58:19, 58:21,
92:3, 92:5, 93:1,
93:4, 93:9
**low** [1] - 106:21
**lower** [1] - 65:19
**loyal** [1] - 41:11
**lump** [2] - 67:8,
73:13
**lunch** [2] -
108:5, 109:21

## M

**magic** [2] - 13:7,
13:8
**MAGISTRATE**
[1] - 1:3
**mail** [34] - 9:22,
16:19, 22:16,
22:24, 23:3, 23:4,
23:5, 23:9, 23:11,
23:20, 23:22,
23:24, 24:7, 27:7,
28:17, 28:20,
50:18, 55:8,
55:17, 57:24,
86:2, 87:5, 87:23,
92:21, 96:25,
97:3, 97:24,
97:25, 98:1,
98:21, 103:15,
104:17, 105:11
**mails** [5] - 28:2,
28:5, 29:8, 88:1,
88:3
**main** [1] - 40:8
**manage** [1] -
29:2, 58:25
**managed** [1] -
103:8
**managing** [2] -

56:24, 58:14
**maps** [1] -
54:24, 54:25,
55:2
**March** [13] -
63:14, 64:25,
65:1, 65:2, 65:3,
70:20, 70:23,
71:4, 71:6, 74:17,
84:3, 84:14,
103:10
**market** [5] -
29:14, 31:21,
32:5, 45:24,
103:2
**marketing** [1] -
50:7
**markets** [1] -
45:24
**material** [2] -
88:21, 90:17
**materials** [2] -
81:19, 100:15
**math** [2] - 35:10,
53:18
**matter** [5] -
12:23, 14:18,
94:24, 108:23,
111:11
**McCORMICK**
[1] - 1:3
**mean** [12] - 5:18,
6:8, 11:1, 24:18,
32:23, 43:1, 43:7,
47:1, 52:15,
54:21, 89:6,
93:12
**means** [1] - 47:2
**meant** [1] -
68:18
**meet** [1] - 25:5
**meeting** [13] -
22:18, 24:15,
24:17, 25:3, 27:6,
27:8, 27:10,
28:18, 51:10,
52:14, 52:18,
86:4, 86:7
**meeting"** [1] -
3:17
**meltdown** [1] -
45:23
**memory** [1] -
94:22
**mention** [2] -
6:1, 63:23
**mentioned** [5] -
33:4, 35:13, 40:7,
97:19, 104:22
**met** [1] - 24:14

**Michael** [1] -
2:16
**mid** [3] - 56:14,
57:11, 57:23
**mid-December**
[2] - 56:14, 57:11
**middle** [10] -
15:16, 20:16,
50:16, 81:3,
86:23, 96:14,
96:15, 97:14,
97:24, 109:2
**might** [5] -
76:11, 76:15,
78:1, 89:20,
100:18
**million** [9] -
47:21, 48:3,
48:23, 49:2,
66:20, 67:4,
67:16, 67:17,
93:17
**mind** [5] - 29:10,
33:14, 87:13,
105:25, 108:6
**minutes** [6] -
14:23, 41:17,
107:25, 108:2,
108:18, 110:4
**misguided** [1] -
105:4
**missed** [2] -
12:13, 12:14
**missing** [1] -
51:24
**misspoke** [2] -
22:23, 103:25
**model** [1] - 41:7
**modeled** [1] -
5:16
**modification** [8]
- 73:4, 73:9,
84:22, 93:14,
93:15, 98:17,
98:20, 105:18
**modify** [1] -
17:14
**moment** [1] -
35:13
**moments** [1] -
40:3
**money** [13] -
8:22, 10:14,
12:19, 24:25,
25:1, 27:5, 57:6,
58:22, 58:24,

73:17, 93:22,
99:7, 105:3
**month** [14] - 6:3,
12:6, 37:11,
44:23, 45:2,
53:12, 53:25,
56:3, 58:16,
70:19, 99:18,
100:1, 100:3,
102:21
**monthly** [6] -
44:12, 80:9,
99:17, 99:23,
100:2, 100:9
**months** [16] -
32:12, 33:2, 33:3,
33:6, 34:3, 35:3,
35:19, 56:2, 77:4,
77:15, 77:16,
84:4, 84:7, 84:14,
100:19, 100:20
**morning** [12] -
16:8, 16:9, 16:10,
49:13, 49:14,
87:10, 87:13,
107:17, 107:21,
109:18, 109:20,
109:25
**most** [1] - 50:2
**mostly** [1] - 50:6
**motion** [4] -
8:13, 9:5, 11:2,
92:14
**motions** [1] -
13:6
**mouth** [1] - 27:1
**move** [11] -
12:23, 23:14,
28:11, 34:7,
57:17, 61:1,
61:16, 75:1,
81:15, 97:7,
104:7
**moving** [2] -
29:9, 89:7
**MR** [138] - 4:7,
4:9, 4:13, 4:17,
4:25, 5:10, 5:21,
6:11, 6:14, 6:16,
6:22, 7:11, 7:14,
7:15, 7:20, 7:23,
8:3, 8:7, 8:9,
8:12, 8:18, 9:25,
10:17, 10:19,
10:21, 11:19,
12:16, 12:22,
13:1, 13:10,
13:12, 13:16,
13:18, 13:22,
14:1, 14:4, 14:7,

14:13, 14:21, 15:21, 16:4, 16:7, 21:5, 21:9, 22:11, 22:15, 23:14, 23:17, 23:20, 27:21, 27:24, 28:11, 28:14, 28:17, 30:14, 30:16, 30:20, 33:18, 33:21, 34:7, 34:10, 34:14, 36:8, 36:11, 36:13, 39:11, 39:14, 39:18, 41:14, 41:22, 41:25, 42:4, 42:7, 44:15, 44:24, 45:18, 49:6, 49:12, 50:21, 50:23, 50:25, 55:15, 57:16, 57:22, 61:1, 61:10, 61:16, 61:19, 75:1, 75:10, 75:13, 75:19, 81:17, 81:23, 82:1, 82:9, 82:12, 82:13, 83:5, 87:18, 92:6, 92:10, 92:12, 92:13, 92:15, 92:20, 93:25, 94:5, 94:8, 95:22, 95:24, 96:20, 96:22, 97:7, 97:10, 97:13, 98:10, 98:12, 100:7, 100:9, 102:7, 102:11, 102:13, 105:20, 105:21, 105:24, 107:11, 107:13, 107:18, 108:12, 108:15, 108:22, 109:3, 109:10, 109:14, 109:22, 110:3, 110:6
**MULCAHY** [2] - 2:4, 2:5
**Mulcahy** [2] - 5:22, 13:4
**must** [1] - 103:21
**mutually** [1] - 89:15

# N

**names** [1] - 79:24

**nature** [1] - 101:6
**necessary** [2] - 13:24, 49:7
**need** [15] - 7:25, 8:1, 8:3, 11:12, 12:15, 14:12, 14:14, 14:16, 41:22, 86:15, 88:12, 91:8, 108:24
**needed** [1] - 11:12
**negotiating** [2] - 52:9, 76:8
**negotiations** [2] - 51:3, 52:16
**net** [1] - 53:24
**never** [15] - 22:6, 22:7, 24:4, 43:18, 54:8, 58:1, 61:24, 62:24, 63:9, 72:23, 73:2, 76:6, 76:8, 76:14, 88:3
**new** [6] - 11:24, 20:24, 46:7, 58:15, 100:5, 101:8
**next** [14] - 14:3, 15:14, 15:16, 15:20, 25:4, 28:23, 29:5, 31:11, 56:5, 95:2, 95:4, 101:20, 106:25, 108:3
**night** [1] - 9:22
**non** [6] - 9:13, 67:3, 75:1, 98:25, 99:17, 99:24
**non-Bennion** [1] - 67:3, 98:25, 99:17, 99:24
**non-business** [1] - 9:13
**non-responsive** [1] - 75:1
**none** [4] - 7:14, 35:22, 48:14, 107:13
**nonlegal** [1] - 11:18
**nonpayment** [1] - 69:8
**nonperformance** [1] - 107:6
**nonresponsive** [4] - 57:17, 57:19, 61:7, 61:17
**noon** [2] - 15:9,

107:25
**north** [1] - 67:5
**note** [9] - 7:17, 70:2, 70:11, 70:25, 71:22, 71:24, 72:22, 73:16
**notes** [2] - 71:18, 76:25
**nothing** [1] - 12:3, 43:20, 52:8
**notice** [34] - 30:4, 30:5, 30:8, 30:11, 30:21, 30:22, 31:6, 31:10, 31:17, 31:25, 35:1, 36:14, 36:17, 36:20, 36:24, 36:25, 37:11, 37:15, 40:11, 42:21, 60:4, 62:2, 63:11, 89:18, 89:22, 90:19, 90:21, 90:22, 90:24, 91:8, 91:11, 99:4, 102:3, 102:4
**notices** [1] - 88:8
**Nov** [1] - 3:18
**November** [10] - 28:2, 28:8, 28:9, 28:10, 29:3, 29:17, 57:3, 57:4, 57:6
**number** [5] - 5:25, 6:7, 6:10, 66:17, 76:24
**numbered** [1] - 86:11
**numbers** [7] - 8:2, 30:13, 35:9, 80:6, 80:11, 81:9, 85:3
**numeric** [1] - 16:13
**numerous** [2] - 5:25, 6:2
**nuts** [1] - 109:14
**nuts-and-bolts** [1] - 109:14

# O

**oath** [2] - 16:1, 91:22
**OB** [2] - 78:4, 84:3
**OB's** [1] - 78:15

**object** [4] - 34:10, 75:13, 81:19, 92:14
**objection** [26] - 8:8, 21:5, 22:11, 23:16, 23:17, 28:13, 28:14, 34:9, 39:11, 39:13, 44:15, 44:18, 57:16, 61:1, 61:7, 61:16, 81:16, 81:17, 82:7, 92:17, 97:9, 97:10, 98:10, 100:7
**obligation** [24] - 31:13, 33:22, 34:17, 35:7, 62:10, 71:1, 74:12, 76:4, 76:7, 76:11, 76:15, 89:10, 89:20, 90:3, 90:4, 90:10, 90:15, 91:15, 98:13, 98:15, 98:18, 98:19, 99:10, 99:22
**obligations** [4] - 84:21, 90:17, 107:6, 109:5
**obviously** [2] - 11:24, 28:21
**occurred** [1] - 64:3
**Oct** [1] - 3:15
**October** [17] - 22:17, 22:20, 22:21, 23:12, 24:3, 24:14, 24:17, 26:19, 27:6, 34:24, 51:9, 52:18, 56:8, 86:4, 86:25
**OF** [6] - 1:2, 1:13, 2:1, 111:1, 111:3, 111:4
**offer** [11] - 52:5, 52:7, 52:20, 52:24, 53:3, 53:5, 53:2, 70:4, 109:4, 109:5, 109:8
**offered** [3] - 43:18, 62:24, 109:13
**offering** [3] - 104:25, 105:3, 109:11
**office** [12] - 6:3, 6:5, 25:7, 44:20,

53:16, 54:1, 54:3, 58:19, 79:24, 83:17, 86:9, 100:2
**offices** [17] - 5:24, 24:10, 25:8, 25:23, 26:6, 44:8, 44:10, 44:13, 44:25, 46:8, 48:20, 48:22, 53:9, 53:15, 83:11, 83:16
**OFFICIAL** [3] - 1:23, 111:1, 111:5
**Official** [1] - 111:20
**old** [1] - 93:12
**once** [7] - 14:10, 38:17, 65:4, 65:14, 65:18, 65:22, 107:21
**one** [4] - 7:17, 7:23, 7:24, 8:12, 9:6, 11:17, 11:23, 12:2, 12:4, 16:16, 17:20, 25:21, 27:12, 35:16, 45:12, 45:14, 46:20, 50:1, 51:24, 53:15, 53:16, 58:11, 59:5, 59:16, 63:1, 63:3, 63:10, 63:17, 64:13, 68:1, 68:6, 71:3, 72:10, 72:14, 74:24, 78:1, 85:20, 86:7, 87:12, 88:10, 95:4, 96:14, 107:20
**one's** [1] - 61:18
**ones** [2] - 18:5, 48:22
**ongoing** [5] - 19:1, 20:24, 51:12, 51:13, 84:18
**oOo** [1] - 110:9
**open** [5] - 86:22, 87:1, 87:13, 101:25, 108:6
**opened** [8] - 8:18, 53:14, 53:19, 54:5, 54:7, 55:3, 86:25
**operate** [5] - 10:6, 39:8, 39:9, 39:19, 42:25

**operated** [1] - 5:24
**operating** [2] - 44:8, 62:14
**operation** [4] - 17:13, 43:25, 58:15, 79:25
**operations** [7] - 5:12, 8:20, 11:7, 18:16, 50:3, 52:6, 84:20
**opinion** [5] - 35:5, 109:4, 109:8, 109:11, 109:12
**opportunity** [1] - 90:19
**options** [1] - 69:18
**OR** [1] - 3:13
**order** [3] - 7:10, 16:14, 58:19
**original** [5] - 17:24, 18:8, 21:7, 45:13, 45:14
**otherwise** [5] - 7:9, 12:20, 15:7, 63:1, 65:6
**ourselves** [1] - 29:13
**outcome** [1] - 106:13
**outlined** [2] - 61:11, 81:11
**outstanding** [8] - 55:21, 78:24, 82:18, 83:1, 84:13, 85:10, 102:25, 103:9
**overruled** [12] - 21:6, 22:13, 34:12, 39:16, 44:18, 44:19, 61:18, 75:15, 82:7, 92:17, 98:11, 100:8
**overview** [1] - 52:7
**owe** [1] - 89:9
**owed** [14] - 55:22, 56:21, 57:15, 58:4, 61:23, 83:10, 83:15, 85:11, 85:14, 99:6, 99:8, 99:9, 99:23, 102:21
**own** [5] - 24:9, 35:21, 40:2, 84:20, 93:10

**owned** [3] - 18:5, 48:23, 65:9
**owner** [2] - 26:25, 49:15
**owners** [6] - 5:2, 34:20, 44:4, 46:7, 50:4, 86:5

**P**

**packet** [1] - 4:10
**Page** [36] - 6:23, 17:3, 17:5, 20:6, 21:15, 30:24, 31:12, 68:15, 78:7, 79:14, 79:15, 79:16, 79:20, 82:4, 82:11, 84:8, 84:9, 90:7, 90:8, 90:9, 91:2, 92:7, 92:8, 94:1, 94:3, 94:5, 97:13, 102:15, 103:3, 104:2, 104:15, 106:4, 106:5, 106:22
**page** [17] - 20:5, 20:7, 20:17, 21:18, 28:1, 31:11, 64:18, 69:22, 78:4, 79:18, 86:11, 97:14, 97:25, 103:18, 106:23, 106:25, 111:11
**PAGE** [1] - 3:3
**pages** [7] - 7:18, 78:2, 81:2, 81:18, 81:19, 81:22
**Pages** [1] - 81:24
**paid** [42] - 12:9, 31:20, 31:25, 32:7, 33:10, 35:14, 35:23, 36:3, 47:19, 47:21, 47:24, 48:10, 48:11, 48:19, 48:23, 48:25, 56:3, 56:7, 56:8, 58:1, 59:2, 60:13, 61:24, 63:7, 66:23, 67:8, 69:1, 69:13, 69:14, 74:13, 83:24, 84:5, 95:1, 99:10, 99:12, 99:17, 101:9, 101:11, 101:14, 101:19, 102:24

**paragraph** [18] - 17:22, 23:22, 25:14, 26:11, 32:3, 36:21, 36:22, 38:1, 60:1, 70:17, 77:6, 90:12, 90:21, 90:24, 90:25, 91:14, 104:6
**Paragraph** [15] - 21:18, 30:9, 30:12, 30:23, 31:3, 35:3, 46:22, 47:6, 60:2, 69:7, 86:12, 91:4, 104:20, 106:6
**Park** [1] - 2:6
**parking** [1] - 25:2
**parsing** [1] - 11:16
**part** [8] - 15:16, 43:16, 44:4, 55:1, 71:25, 73:9, 93:23, 109:3
**parted** [1] - 44:7
**particular** [6] - 4:19, 8:14, 9:23, 81:24, 85:4, 106:13
**parties** [7] - 7:21, 20:12, 31:11, 48:25, 51:17, 89:14, 91:10
**parties'** [1] - 50:1
**partner** [1] - 26:23
**parts** [1] - 89:7
**party** [17] - 17:8, 21:22, 22:10, 31:6, 31:7, 31:9, 31:15, 31:19, 31:20, 32:14, 36:23, 38:15, 59:15, 59:20, 89:17, 90:16, 90:18
**party's** [2] - 31:21, 32:6
**pass** [2] - 62:10, 83:25
**passed** [2] - 52:23, 67:1
**passing** [1] - 62:21
**past** [2] - 100:19, 101:4
**Patrick** [5] -

34:1, 80:11, 85:2, 85:12, 99:19
**pay** [25] - 8:25, 9:10, 9:13, 9:16, 10:14, 47:15, 56:21, 56:25, 58:5, 58:6, 58:22, 59:6, 59:9, 62:5, 65:6, 65:24, 77:16, 84:22, 93:2, 93:5, 93:7, 93:8, 93:10, 100:23, 103:2
**paying** [13] - 8:15, 53:8, 53:15, 56:13, 57:11, 57:13, 57:18, 57:22, 65:20, 66:2, 68:25, 92:23, 99:25
**payment** [11] - 28:24, 60:15, 70:23, 71:4, 71:6, 73:13, 78:8, 78:22, 85:13, 101:20, 107:3
**payments** [12] - 9:19, 29:5, 68:20, 68:23, 69:10, 70:1, 70:4, 70:19, 73:4, 74:3, 102:5
**pays** [1] - 19:2
**people** [3] - 38:25, 57:3, 57:5
**people's** [1] - 25:18
**per** [14] - 5:13, 6:2, 6:3, 6:4, 6:5, 44:20, 44:23, 45:2, 53:12, 53:25, 83:17, 99:25, 100:2, 100:3
**perceived** [2] - 63:20, 65:5
**percent** [17] - 10:7, 10:8, 19:8, 19:14, 26:25, 43:15, 44:22, 46:1, 52:21, 52:25, 62:11, 66:25, 67:7, 77:10, 77:13, 77:14
**PEREZ** [1] - 2:10
**performance** [1] - 9:17
**perhaps** [1] - 9:16
**period** [13] - 7:2,

24:12, 32:25, 34:25, 39:7, 39:20, 46:19, 53:1, 53:20, 55:25, 68:11, 69:14, 83:16
**periodically** [1] - 56:1
**person** [4] - 24:3, 24:14, 26:19, 52:17
**personally** [2] - 26:23, 87:21
**perspective** [1] - 40:1
**PHIL** [1] - 2:6
**phone** [1] - 108:21
**pick** [4] - 29:3, 42:7, 57:3, 101:9
**piece** [1] - 85:4
**pin** [2] - 9:20, 11:12
**place** [2] - 44:14, 66:6
**PLAINTIFF** [1] - 16:5
**plaintiff's** [2] - 4:22, 12:24
**PLAINTIFFS** [2] - 2:3, 3:4
**plaintiffs** [4] - 7:14, 9:8, 9:10, 107:20
**Plaintiffs** [1] - 15:21
**plaintiffs'** [1] - 109:2
**Plaintiffs/ Counter** [1] - 1:6
**plan** [7] - 5:10, 15:5, 15:8, 15:13, 15:15, 41:10, 41:11
**planned** [1] - 41:11
**planning** [1] - 5:2
**plaster** [1] - 105:2
**play** [5] - 10:12, 10:21, 92:6, 93:25, 94:2
**played** [2] - 92:19, 94:7
**Plaza** [1] - 2:6
**plug** [1] - 26:5
**plus** [3] - 66:24, 67:9, 93:18
**point** [26] - 4:20,

6:19, 6:20, 10:4, 11:7, 11:18, 11:24, 12:12, 12:18, 14:12, 25:11, 33:1, 53:24, 54:4, 56:7, 56:20, 60:13, 62:13, 70:5, 84:5, 84:14, 85:13, 89:14, 94:17, 94:24, 99:7
**pointblank** [1] - 52:15
**pointedly** [1] - 26:22
**pointing** [1] - 86:3
**points** [1] - 77:22
**poised** [1] - 3:20
**portion** [12] - 23:21, 60:24, 62:22, 62:24, 66:7, 67:10, 67:20, 68:15, 74:7, 81:2, 92:6, 99:5
**position** [1] - 99:6
**possible** [1] - 87:3
**possibly** [2] - 19:11, 25:6
**post** [2] - 51:4, 51:6
**potential** [1] - 86:8
**potentially** [1] - 11:4
**preceding** [2] - 32:12, 77:5
**precluded** [1] - 109:7
**prefer** [1] - 10:21
**prejudicial** [1] - 11:4
**preliminary** [1] - 20:18
**premise** [1] - 44:1
**prepare** [3] - 18:19, 18:21, 18:22
**prepared** [4] - 13:8, 20:6, 80:22, 109:24
**presence** [5] - 4:4, 15:1, 41:20, 42:2, 108:9
**PRESENT** [1] -

2:15
**present** [5] - 4:13, 4:16, 4:22, 4:23, 7:4
**presented** [2] - 17:20, 29:16
**preserve** [2] - 13:23, 14:18
**presumably** [1] - 13:15
**prevent** [1] - 12:18
**prevents** [2] - 59:15, 59:20
**previously** [1] - 17:24
**price** [1] - 86:17
**primary** [1] - 45:24
**prime** [1] - 47:9
**principal** [1] - 5:8
**principals** [1] - 12:9
**probative** [1] - 11:4
**problem** [4] - 5:8, 19:20, 42:1, 43:24
**problematic** [1] - 98:14
**proceed** [6] - 7:9, 11:14, 12:6, 92:18, 94:6, 108:10
**proceeding** [1] - 11:15
**proceedings** [2] - 110:7, 111:10
**process** [2] - 29:6, 80:5
**profitable** [1] - 49:5
**profits** [1] - 44:23
**progress** [2] - 15:4, 15:15
**project** [1] - 6:8
**projecting** [1] - 56:25
**promissory** [7] - 7:17, 70:2, 70:10, 70:11, 70:25, 71:24, 72:22
**proposal** [2] - 51:22, 52:13
**propose** [2] - 52:11, 52:12
**proposed** [9] - 17:8, 17:14,

17:17, 17:23, 18:12, 18:25, 19:10, 20:9, 20:12
**prospective** [2] - 100:5, 100:10
**proudly** [1] - 41:6
**prove** [1] - 12:19
**provide** [5] - 18:4, 18:9, 19:2, 91:8, 93:22
**provided** [8] - 5:17, 17:25, 31:16, 62:2, 73:22, 74:2, 90:21, 94:11
**provider** [8] - 18:7, 18:17, 20:23, 24:21, 24:22, 45:5, 48:25, 98:24
**provides** [5] - 36:23, 70:16, 70:19, 91:7, 93:22
**providing** [2] - 18:13, 20:24
**provision** [13] - 30:8, 30:11, 30:22, 31:3, 31:9, 31:17, 32:19, 37:16, 37:17, 37:20, 37:22, 38:4, 59:19
**provisions** [1] - 31:22
**pulled** [1] - 73:19
**purchase** [1] - 25:6
**purported** [4] - 30:21, 39:20, 40:2, 81:9
**purporting** [3] - 30:1, 59:21, 74:5
**purports** [3] - 31:9, 37:3, 37:6
**purpose** [2] - 38:12, 55:2
**pursuant** [8] - 30:8, 30:22, 31:10, 32:19, 37:19, 38:3, 68:24, 111:8
**put** [13] - 8:1, 8:3, 13:6, 16:12, 26:6, 34:1, 40:1, 46:11, 55:15, 79:15, 87:24,

89:5, 106:18
**putting** [1] - 11:22

## Q

**quantified** [1] - 65:11
**quantify** [2] - 67:12
**quarter** [2] - 9:6, 108:2
**questioning** [3] - 74:25, 96:5, 98:23
**questions** [11] - 13:21, 49:6, 91:22, 95:20, 96:2, 96:7, 96:18, 97:15, 102:7, 107:11, 107:12
**quick** [1] - 15:3
**quickly** [2] - 66:12, 77:22
**quite** [1] - 39:12

## R

**raise** [1] - 9:3
**raised** [1] - 78:16
**range** [1] - 27:17
**rate** [5] - 4:12, 4:13, 4:23, 47:9, 47:12
**rather** [5] - 9:2, 19:3, 23:20, 70:5, 76:17
**re** [3] - 3:16, 3:19, 3:24
**read** [13] - 10:13, 18:24, 32:3, 69:19, 72:25, 75:8, 76:13, 79:22, 88:6, 90:14, 106:11, 107:2
**reading** [1] - 47:7
**reads** [4] - 17:23, 20:17, 20:21, 31:15
**ready** [2] - 108:3, 108:10
**REAL** [2] - 1:8, 2:9
**Real** [1] - 3:19
**real** [3] - 49:18, 49:20, 49:23
**really** [7] - 8:21,

9:19, 9:20, 11:13, 12:4, 53:16, 66:12
**REALTIME** [1] - 111:5
**reap** [1] - 25:18
**reason** [2] - 37:4, 58:9
**reasonable** [2] - 90:19, 98:18
**rebrand** [1] - 41:5
**rebuild** [1] - 26:8
**rebut** [1] - 9:11
**rebuttal** [3] - 13:24, 49:7, 102:8
**recalling** [1] - 95:18
**receipts** [6] - 35:3, 77:6, 77:7, 77:12, 77:13, 99:21
**receive** [6] - 42:21, 52:24, 53:11, 74:9, 83:21, 83:22
**received** [32] - 8:10, 8:11, 23:11, 23:18, 23:19, 28:6, 28:15, 28:16, 29:21, 29:25, 31:25, 32:11, 32:21, 33:6, 34:12, 34:13, 34:18, 35:6, 36:14, 37:11, 38:21, 40:11, 48:1, 65:15, 67:6, 67:9, 74:3, 77:7, 82:6, 82:8, 97:11, 97:12
**receiving** [6] - 10:7, 19:8, 23:24, 65:19, 65:23, 99:3
**Recess** [2] - 14:25, 87:16
**recess** [2] - 13:5, 14:12
**recession** [1] - 68:12
**recital** [2] - 18:11, 21:2
**Recital** [1] - 20:16
**recitals** [4] - 17:23, 20:16, 20:19, 40:6

**recognize** [10] - 16:23, 23:9, 28:3, 46:16, 59:12, 69:5, 73:25, 79:7, 79:20, 103:15
**recognized** [1] - 11:21
**recollection** [4] - 80:4, 80:5, 80:20, 86:20
**recommence** [1] - 13:14
**record** [5] - 8:1, 8:4, 10:13, 13:6, 13:23
**records** [4] - 55:7, 67:15, 79:2, 94:16
**recross** [1] - 102:10
**Recross** [1] - 3:6
**RECROSS** [1] - 102:12
**Recross-Examination** [1] - 3:6
**RECROSS-EXAMINATION** [1] - 102:12
**REDIRECT** [1] - 95:23
**redirect** [5] - 13:15, 13:17, 14:11, 49:9, 95:21
**Redirect** [1] - 3:5
**reduce** [1] - 53:5
**reduction** [5] - 43:16, 51:23, 52:5, 52:21, 53:11
**refer** [1] - 5:23
**reference** [1] - 22:4
**referenced** [2] - 82:3
**referred** [2] - 70:12, 100:17
**referring** [4] - 18:3, 25:20, 26:9, 72:6
**refers** [1] - 19:5
**reflect** [4] - 32:20, 34:18, 34:24, 74:5
**reflected** [2] - 77:15, 79:8
**reflects** [4] - 35:5, 74:2, 77:6,

84:13
**refresh** [1] - 86:20
**regard** [7] - 12:12, 65:19, 66:13, 90:4, 94:8, 102:14, 103:12
**regarding** [12] - 8:13, 10:23, 51:1, 55:18, 63:11, 87:20, 88:4, 88:8, 92:22, 104:18, 105:7, 109:5
**region** [4] - 21:1, 22:3, 39:22, 83:11
**register** [1] - 39:3
**registered** [2] - 39:4, 39:21
**regularly** [1] - 55:24
**regulations** [1] - 111:12
**reimburse** [1] - 85:6
**reimbursement** [2] - 84:19, 84:25
**REJECTED** [1] - 3:13
**related** [5] - 4:21, 65:23, 84:21, 92:2, 107:8
**relates** [1] - 4:25
**relationship** [15] - 19:23, 27:7, 29:7, 29:18, 29:20, 39:2, 39:23, 40:16, 40:21, 43:1, 43:6, 48:21, 50:2, 65:7, 66:14
**relationships** [1] - 44:6
**relatively** [1] - 16:10
**relevance** [1] - 44:18
**relief** [1] - 65:23
**relying** [1] - 19:3
**remain** [3] - 19:14, 32:13, 42:15
**remained** [4] - 33:10, 35:25, 36:1, 66:6
**remaining** [1] - 34:20
**remember** [17] -

8:5, 13:7, 45:23, 46:20, 53:3, 54:24, 54:25, 66:15, 71:4, 75:24, 93:14, 95:7, 95:11, 95:16, 96:4, 96:7, 99:1
**remind** [2] - 15:25, 72:7
**remit** [1] - 37:13
**remitted** [1] - 66:14
**remove** [1] - 21:22
**rep** [16] - 21:7, 25:23, 26:21, 32:1, 33:22, 34:21, 35:4, 35:7, 40:9, 43:2, 43:8, 43:11, 44:21, 46:2, 50:15, 89:12
**repaid** [4] - 71:20, 72:20, 72:23, 73:2
**repay** [1] - 69:18
**repayment** [1] - 68:15
**repeat** [6] - 39:17, 59:18, 63:13, 75:17, 88:17, 93:3
**report** [3] - 55:18, 80:10
**reported** [4] - 92:19, 94:7, 110:7, 111:10
**REPORTER** [3] - 1:23, 111:1, 111:6
**Reporter** [1] - 111:20
**REPORTER'S** [1] - 1:13
**reports** [5] - 80:18, 80:19, 80:22, 80:23, 81:5
**represent** [1] - 77:8
**representation** [14] - 10:5, 20:10, 21:17, 22:9, 24:1, 30:7, 39:19, 44:14, 59:14, 59:16, 59:19, 65:8, 74:9, 90:7
**representations** [1] - 12:5

**representative** [11] - 2:16, 5:12, 18:2, 18:12, 20:13, 22:5, 22:9, 50:10, 50:13, 107:5, 107:7
**representative's** - 37:13
**represents** [1] - 11:13
**request** [3] - 71:9, 88:3, 109:7
**requested** [3] - 71:13, 76:14, 84:24
**requesting** [1] - 55:21
**requests** [1] - 55:17
**require** [1] - 91:10
**required** [2] - 8:19, 18:7
**researching** [1] - 74:25
**reserve** [3] - 49:7, 58:25, 102:8
**reserves** [1] - 56:23
**resources** [1] - 56:24
**respect** [2] - 23:25, 29:6
**respond** [1] - 91:24
**responded** [4] - 28:25, 29:1, 87:24, 103:19
**responding** [1] - 104:11
**responds** [1] - 104:17
**response** [4] - 27:2, 28:9, 86:16, 104:3
**responsive** [2] - 61:18, 75:1
**rest** [1] - 108:25
**restake** [1] - 19:23
**restaking** [1] - 20:1
**restate** [1] - 65:21
**restroom** [1] - 41:23
**result** [4] - 43:21, 68:9, 74:20, 89:1

**resulted** [3] - 93:1, 93:5, 93:10
**resume** [3] - 14:5, 15:23, 41:18
**RESUMED** [1] - 16:5
**Resumed** [1] - 3:4
**retain** [1] - 63:6
**retained** [1] - 74:18
**retention** [1] - 98:24
**retiring** [1] - 41:1
**return** [1] - 13:14
**revenue** [10] - 4:16, 4:25, 5:11, 5:15, 5:23, 6:8, 6:20, 58:18, 99:20, 101:9
**Revenue** [1] - 3:21
**revenues** [7] - 32:11, 32:21, 32:22, 33:6, 34:18, 35:6, 35:14
**review** [4] - 7:7, 7:13, 10:22, 75:22
**reviewed** [1] - 9:5
**reward** [1] - 25:18
**Rich** [1] - 54:13
**ride** [1] - 40:25
**rights** [15] - 21:2, 21:10, 21:16, 24:1, 38:18, 38:20, 39:8, 39:21, 39:25, 40:6, 40:9, 40:12, 43:3, 61:15, 61:21
**rise** [3] - 41:19, 87:15, 108:8
**risk** [5] - 25:17, 25:24, 26:7, 26:8, 104:24
**risks** [2] - 25:19, 26:14
**Riverside** [1] - 54:18
**road** [1] - 14:8
**ROBERT** [2] - 3:4, 16:5
**Robert** [2] -

3:23, 78:19
**Robinson** [4] - 34:1, 34:5, 80:11, 81:4
**role** [2] - 20:22
**roll** [1] - 29:15
**rolled** [1] - 73:16
**ROOM** [1] - 1:24
**rounded** [1] - 72:12
**rowlett** [1] - 67:24
**ROWLETT** [4] - 2:11, 50:21, 50:23, 110:6
**rub** [1] - 22:25
**rule** [1] - 7:9
**ruled** [1] - 5:20
**rules** [2] - 5:17, 63:4
**ruling** [7] - 8:13, 9:8, 11:2, 11:19, 11:22, 11:23, 12:3
**rulings** [1] - 9:6
**run** [2] - 41:23, 109:24
**runs** [1] - 57:8

## S

**salaries** [2] - 9:13, 12:9
**sale** [2] - 86:8, 87:3
**sales** [4] - 56:18, 57:3, 57:4
**San** [6] - 2:13, 17:18, 19:17, 22:19, 29:14, 43:19
**SANTA** [3] - 1:15, 1:24, 4:1
**sat** [1] - 11:25
**satellite** [1] - 53:17
**saved** [1] - 65:5
**savings** [3] - 10:7, 10:8, 53:24
**saw** [8] - 9:22, 22:24, 25:23, 28:21, 43:14, 54:10, 92:20, 109:16
**scenes** [1] - 29:10
**schedule** [2] - 46:8, 47:23
**scheduling** [1] - 109:21

**Schuster** [2] - 25:5, 29:11
**SCO** [1] - 84:20
**scope** [1] - 100:7
**screen** [5] - 73:23, 76:21, 83:2, 106:2, 106:18
**season** [7] - 29:2, 56:15, 57:2, 101:8, 102:25, 103:1, 103:8
**seasonal** [1] - 56:24
**seasonality** [1] - 101:23
**Seattle** [13] - 19:9, 25:25, 43:9, 44:7, 47:10, 49:18, 49:20, 49:23, 62:10, 66:25, 79:12, 80:14, 80:23
**Second** [1] - 69:25
**second** [16] - 17:22, 22:2, 23:22, 24:8, 33:1, 36:14, 36:17, 36:20, 36:21, 45:23, 86:11, 86:14, 88:10, 103:18, 106:23
**Section** [4] - 31:11, 89:11, 90:10, 111:8
**section** [3] - 31:16, 60:2, 90:12
**see** [58] - 4:11, 16:21, 17:6, 17:9, 20:7, 30:9, 30:13, 31:7, 31:8, 31:23, 32:14, 34:23, 43:5, 55:19, 56:15, 57:5, 60:17, 60:19, 64:22, 69:8, 70:2, 70:20, 75:25, 78:1, 79:15, 79:22, 81:10, 82:15, 82:18, 82:21, 82:22, 82:25, 83:8, 83:14, 86:18, 88:2, 90:12, 91:16, 94:16, 97:25, 102:4, 102:19, 103:6,

103:7, 103:20, 104:2, 104:4, 104:7, 104:8, 104:10, 105:5, 106:8, 106:10, 106:23, 106:24, 110:4
**seeing** [1] - 81:12
**seeking** [2] - 37:12, 59:15
**seeks** [3] - 6:4, 37:15, 37:19
**Seffens** [1] - 110:8
**sell** [5] - 21:12, 26:21, 40:8, 86:17, 86:22
**selling** [4] - 20:24, 49:20, 49:23, 86:21
**send** [1] - 81:10
**sending** [3] - 62:20, 98:3, 98:4
**sense** [5] - 9:15, 38:8, 49:3, 59:17, 81:13, 109:16
**sensibility** [1] - 11:15
**sent** [16] - 20:2, 24:5, 24:15, 28:5, 28:9, 51:5, 63:11, 63:15, 74:16, 75:8, 79:11, 84:4, 86:2, 87:19, 88:9, 98:1
**sentence** [12] - 19:5, 20:17, 22:2, 24:8, 32:17, 36:21, 38:1, 86:14, 91:7, 106:8, 106:23, 106:24
**sentences** [2] - 25:14, 32:4
**separate** [2] - 72:2, 72:3
**September** [11] - 34:24, 35:2, 35:18, 38:24, 40:20, 40:21, 53:21, 54:4, 56:8, 58:2, 77:5
**series** [2] - 28:5, 100:14
**serious** [3] - 98:2, 98:5, 105:12
**service** [2] - 18:4, 38:25

**services** [45] - 3:22, 17:25, 18:4, 18:7, 18:9, 18:13, 18:17, 19:2, 19:4, 20:23, 20:25, 21:22, 24:16, 24:19, 24:21, 25:12, 29:13, 30:1, 33:7, 33:11, 34:18, 39:2, 40:3, 42:19, 42:24, 45:5, 45:7, 48:25, 49:16, 51:2, 52:1, 52:3, 52:17, 52:20, 54:14, 65:8, 67:6, 74:3, 74:8, 80:7, 83:24, 83:25, 98:24, 99:9
**Services** [4] - 18:1, 43:8, 43:9, 79:11
**SERVICES** [2] - 1:8, 2:9
**servicing** [1] - 38:25
**serving** [2] - 5:12, 45:5
**set** [5] - 47:2, 60:16, 63:19, 64:4, 64:10
**settle** [3] - 104:23, 104:25, 105:8
**seven** [1] - 94:9
**seven-year** [1] - 94:9
**seventh** [1] - 15:3
**sever** [1] - 40:21
**several** [3] - 5:2, 49:22, 88:1
**severed** [2] - 40:17, 44:7
**shall** [3] - 22:3, 32:10, 47:8
**share** [4] - 66:5, 67:7, 93:18, 93:19
**shared** [1] - 92:20
**Sharon** [1] - 110:8
**sheet** [2] - 54:20, 54:22
**short** [4] - 13:5, 41:14, 48:23, 87:9
**shorter** [1] - 87:12

**shortly** [1] - 15:12

**show** [8] - 8:21, 12:8, 23:3, 23:4, 24:25, 27:4, 55:2, 82:10

**showed** [1] - 100:19

**showing** [1] - 9:12

**shown** [2] - 96:10, 96:12

**sic** [1] - 72:22

**side** [4] - 50:4, 50:5, 80:18, 96:3

**sidebar** [3] - 9:3, 10:22, 10:25

**sides** [1] - 2:16

**sign** [2] - 21:14, 86:24

**signal** [1] - 109:1

**signed** [11] - 21:9, 24:4, 54:12, 54:14, 54:16, 70:11, 70:14, 71:19, 100:11, 106:15, 107:9

**similar** [5] - 17:17, 25:9, 52:20, 96:7, 104:23

**simply** [2] - 8:1, 12:6

**single** [1] - 28:1

**single-page** [1] - 28:1

**Sirianni** [5] - 37:9, 38:2, 59:9, 64:15, 88:22

**Sirianni's** [5] - 60:9, 61:11, 62:2, 64:10, 88:13

**sit** [2] - 75:23, 91:18

**site** [1] - 97:22

**situation** [2] - 6:24, 12:7

**six** [1] - 11:25

**slow** [2] - 29:1, 102:25

**slower** [1] - 101:8

**small** [1] - 79:23

**smart** [1] - 104:7

**so..** [2] - 53:19, 62:17

**SoCal** [2] - 49:16, 64:21

**soldiers** [1] -

41:11

**someone** [1] - 104:25

**sometime** [1] - 51:9

**sometimes** [1] - 103:2

**somewhat** [1] - 94:10

**sorry** [29] - 5:21, 22:21, 27:15, 39:17, 41:23, 42:4, 48:5, 59:18, 63:13, 68:1, 68:18, 72:25, 73:8, 75:18, 75:22, 79:1, 81:24, 82:11, 82:12, 85:2, 87:1, 87:4, 90:1, 92:10, 96:24, 103:21, 103:23, 105:21, 106:17

**sort** [1] - 65:19

**sound** [2] - 35:11, 72:11

**sounds** [1] - 14:22

**Southern** [16] - 3:19, 18:1, 18:14, 18:16, 26:3, 43:9, 46:8, 50:2, 50:11, 50:13, 52:25, 54:14, 78:13, 78:18, 80:6, 82:3

**Spaan** [1] - 111:20

**SPAAN** [3] - 1:23, 111:5, 111:19

**span** [2] - 41:1, 42:14

**speaking** [1] - 105:18

**specific** [3] - 10:1, 39:22, 90:25

**specifically** [3] - 10:3, 55:5, 100:17

**speculation** [3] - 21:5, 22:11, 98:10

**speculative** [1] - 32:8

**spelled** [1] - 89:11

**spend** [1] - 49:23

**spending** [1] -

8:22

**spoken** [1] - 109:15

**spot** [1] - 9:23

**spreadsheet** [2] - 80:12, 82:1

**spring** [2] - 78:18, 101:10

**squished** [1] - 11:18

**STAND** [1] - 16:5

**stand** [4] - 6:10, 7:23, 15:22, 22:17

**start** [17] - 14:16, 15:3, 15:7, 15:8, 16:10, 29:3, 41:8, 56:13, 57:2, 57:4, 57:10, 57:13, 57:18, 57:22, 91:7, 96:1, 96:25

**started** [2] - 57:3, 57:14

**starting** [3] - 79:15, 79:19, 109:1

**starts** [1] - 57:6

**state** [3] - 18:11, 32:9, 98:17

**STATE** [1] - 111:4

**statement** [12] - 11:13, 11:14, 56:22, 68:12, 82:14, 82:22, 84:11, 100:18, 100:19, 102:18, 102:23, 103:5

**statements** [9] - 3:22, 54:10, 79:11, 80:16, 80:17, 82:2, 82:5, 100:14, 102:14

**states** [4] - 37:10, 47:7, 60:24, 87:5

**STATES** [1] - 1:1

**States** [3] - 111:6, 111:8, 111:13

**stating** [2] - 5:8, 38:17

**status** [3] - 28:23, 55:18, 55:21

**stay** [1] - 42:10

**stayed** [3] - 6:18, 7:3, 40:22

**staying** [3] - 5:5, 5:6, 5:9

**steam** [1] - 26:20

**stemmed** [1] - 45:22

**stenographically** [1] - 111:10

**step** [2] - 26:1, 107:14

**still** [19] - 12:2, 12:3, 16:1, 22:9, 29:9, 38:3, 38:7, 38:10, 38:11, 39:4, 39:8, 62:14, 62:18, 63:6, 89:1, 95:18, 98:1, 105:12

**stood** [1] - 23:25

**stop** [1] - 27:23

**stores** [1] - 18:5

**story** [1] - 25:21

**stream** [6] - 4:16, 4:25, 5:11, 5:15, 6:8, 6:20

**STREET** [1] - 1:24

**Street** [1] - 2:12

**stricken** [3] - 57:20, 61:7, 75:2

**strike** [4] - 57:17, 61:1, 61:16, 75:1

**strong** [1] - 109:19

**study** [2] - 75:9, 75:24

**studying** [2] - 56:12, 56:17

**subject** [1] - 107:16

**submit** [1] - 80:6

**subparagraph** [1] - 31:4

**subsequently** [4] - 52:19, 68:14, 78:23, 84:25

**subsidize** [1] - 58:19

**subsidized** [1] - 58:21

**subsidizing** [1] - 9:1

**succeed** [1] - 26:16

**success** [1] - 20:1

**sued** [4] - 48:17, 76:17, 101:2, 101:3

**suffering** [1] - 68:11

**steam** [1] - 26:20

**suggest** [1] - 9:8

**suggests** [1] - 15:15

**suing** [3] - 58:10, 105:1, 105:8

**suit** [1] - 76:19

**Suite** [2] - 2:7, 2:13

**sum** [2] - 73:13, 81:12

**summarizing** [1] - 86:3

**summary** [3] - 73:21, 74:2, 81:10

**summer** [3] - 29:2, 101:8, 101:10

**Sunderland** [15] - 3:24, 16:20, 50:19, 51:5, 51:14, 52:7, 52:10, 52:11, 52:12, 52:23, 78:20, 84:18, 104:15, 104:17, 105:15

**support** [6] - 21:12, 26:21, 39:24, 40:8, 93:7, 109:7

**supportive** [1] - 26:1

**suppose** [1] - 6:6

**supposed** [5] - 68:20, 69:10, 70:22, 83:21

**sustained** [1] - 75:2

**sustaining** [4] - 9:1, 92:3, 92:5, 93:1

**system** [9] - 5:4, 10:6, 18:6, 21:13, 35:15, 42:11, 49:4, 99:18

**T**

**table** [4] - 6:22, 6:23, 24:23, 83:6

**talks** [1] - 4:20

**target** [1] - 15:16

**task** [2] - 26:5, 44:3

**tasked** [1] - 51:16

**team** [1] -

109:23

**tear** [1] - 108:21

**Teather** [28] - 2:16, 3:16, 3:18, 3:24, 16:20, 22:18, 22:24, 23:5, 23:11, 23:24, 24:18, 25:11, 25:15, 26:18, 28:6, 29:12, 51:10, 51:17, 52:9, 52:10, 52:14, 55:9, 78:13, 84:18, 86:2, 92:22, 97:4, 98:4

**Teather's** [2] - 24:7, 55:17

**tech** [5] - 34:3, 66:9, 67:9, 74:7

**technical** [1] - 100:18

**technician** [1] - 2:16

**ten** [3] - 41:1, 42:14, 108:2

**tenable** [1] - 104:12

**tender** [1] - 69:23

**tension** [1] - 27:10

**term** [3] - 11:18, 53:3, 100:18

**terminate** [28] - 30:1, 30:7, 30:21, 31:10, 31:16, 36:23, 37:3, 37:6, 37:12, 37:15, 37:19, 38:3, 42:22, 59:15, 59:21, 59:23, 60:22, 61:4, 61:5, 61:12, 62:1, 63:15, 64:20, 76:9, 88:14, 89:1, 89:15, 89:17

**terminated** [28] - 10:5, 22:8, 31:5, 31:19, 31:21, 32:1, 32:5, 32:14, 38:7, 38:24, 39:5, 42:19, 43:2, 43:3, 43:11, 45:8, 63:3, 64:23, 65:18, 65:22, 66:3, 74:13, 76:10, 88:22, 89:6, 89:9, 90:18, 94:25

**terminating** [7] -

21:16, 59:20, 60:9, 64:4, 74:17, 76:19, 90:16
**termination** [62] - 5:13, 20:7, 20:10, 20:12, 21:9, 24:4, 29:21, 30:21, 31:13, 32:12, 33:11, 33:22, 34:3, 34:17, 35:1, 35:6, 35:25, 36:2, 36:15, 36:17, 36:20, 37:11, 38:6, 40:3, 42:11, 42:24, 43:16, 43:21, 53:20, 58:2, 60:3, 63:11, 64:2, 64:3, 74:12, 74:22, 75:5, 75:8, 75:11, 75:20, 76:4, 76:7, 76:11, 76:15, 88:8, 88:11, 89:2, 89:10, 89:20, 89:23, 90:1, 90:3, 90:4, 90:5, 90:10, 90:15, 90:16, 91:4, 91:15, 99:4, 99:10, 99:21
**terms** [3] - 8:22, 11:22, 52:1
**territory** [1] - 63:5
**test** [1] - 8:21
**testified** [12] - 22:17, 50:25, 51:20, 51:21, 56:2, 65:4, 67:2, 71:18, 74:10, 88:7, 92:25, 93:4
**testifies** [1] - 108:25
**testify** [2] - 5:11, 10:2
**testifying** [1] - 42:10
**testimony** [27] - 8:23, 9:14, 10:10, 10:12, 11:5, 11:11, 12:1, 12:11, 12:18, 15:24, 39:8, 39:15, 39:18, 40:15, 59:3, 66:12, 66:15, 71:21, 77:20, 88:12, 94:9, 94:10, 94:23, 95:8, 100:4,

105:7, 109:6
**testing** [1] - 64:11
**Thanksgiving** [1] - 29:4
**THE** [123] - 2:3, 2:9, 3:4, 4:5, 4:8, 4:11, 4:15, 4:24, 5:7, 5:14, 6:6, 6:13, 6:15, 6:19, 7:7, 7:12, 7:19, 7:22, 7:25, 8:5, 8:8, 8:10, 8:17, 9:5, 10:16, 10:18, 10:20, 10:25, 11:23, 12:21, 12:25, 13:3, 13:11, 13:14, 13:17, 13:19, 13:25, 14:3, 14:5, 14:9, 14:14, 14:22, 15:2, 15:23, 15:25, 16:2, 16:3, 16:5, 21:6, 21:7, 22:13, 22:14, 23:16, 23:18, 27:22, 27:23, 28:13, 28:15, 30:15, 30:17, 33:19, 33:20, 34:9, 34:12, 36:9, 36:12, 39:12, 39:15, 39:17, 41:16, 41:19, 41:21, 41:24, 42:1, 42:3, 42:6, 44:17, 44:20, 49:8, 50:22, 50:24, 57:18, 61:2, 61:18, 75:2, 75:7, 75:15, 75:17, 81:16, 81:21, 81:25, 82:6, 87:8, 87:15, 87:17, 92:9, 92:11, 92:16, 94:4, 94:6, 95:21, 96:21, 97:9, 97:11, 98:11, 100:8, 102:9, 105:23, 107:12, 107:14, 107:15, 107:16, 107:19, 108:8, 108:10, 108:13, 108:17, 108:24, 109:9, 109:12, 109:19, 109:23, 110:4
**themselves** [2] - 8:15, 8:22

**then-existing** [1] - 32:13
**theory** [3] - 10:4, 38:22, 62:4
**they've** [2] - 8:18, 81:18
**thinking** [2] - 80:17, 86:4
**third** [3] - 48:25, 72:14, 86:14
**three** [12] - 7:18, 33:14, 34:16, 36:1, 43:8, 47:22, 53:9, 53:18, 71:19, 72:6, 89:13, 94:11
**three-year** [1] - 94:11
**threshold** [1] - 11:21
**throughout** [1] - 53:20
**tied** [2] - 43:3, 43:6
**Tisa** [1] - 2:16
**Title** [1] - 111:8
**titled** [2] - 20:7, 31:13
**today** [7] - 14:10, 14:20, 15:6, 16:13, 75:23, 88:7, 95:17
**together** [7] - 15:4, 26:15, 34:2, 43:3, 43:6, 43:10, 79:15
**tomorrow** [7] - 14:8, 14:18, 15:6, 107:17, 107:21, 109:15, 109:25
**took** [6] - 25:23, 25:24, 38:24, 71:10, 93:23, 99:20
**top** [7] - 13:7, 21:18, 34:15, 66:9, 68:16, 82:2, 82:15
**topics** [1] - 95:25
**total** [15] - 34:2, 35:10, 47:18, 47:25, 48:1, 48:7, 48:19, 66:18, 76:22, 77:4, 81:12, 83:17, 83:18, 93:16, 99:20
**total's** [1] - 77:2

**totaled** [1] - 35:9
**totalled** [1] - 76:24
**touched** [1] - 29:19
**towards** [1] - 104:5
**track** [3] - 27:9, 27:11, 29:9
**tracked** [1] - 81:21
**transaction** [1] - 32:11
**Transcript** [1] - 1:5
**transcript** [3] - 9:14, 111:9, 111:11
**TRANSCRIPT** [1] - 1:13
**transition** [1] - 107:22
**trial** [1] - 7:8
**TRIAL** [1] - 1:14
**tried** [2] - 104:23, 109:1
**trigger** [1] - 89:20
**triggered** [2] - 31:9, 98:14
**true** [7] - 12:8, 29:14, 54:12, 65:14, 88:19, 88:20, 111:9
**trust** [2] - 63:25, 80:19
**truthfully** [1] - 91:24
**try** [5] - 15:10, 26:2, 40:1, 88:13, 108:18
**trying** [4] - 29:15, 95:10, 105:8, 109:8
**turn** [12] - 15:18, 17:2, 21:15, 30:12, 30:23, 31:11, 33:17, 87:10, 90:6, 102:15, 103:12, 104:15
**turning** [1] - 103:3
**two** [27] - 8:12, 16:12, 25:14, 25:21, 26:10, 27:13, 32:3, 40:6, 40:9, 45:13, 45:14, 53:15, 53:18, 59:23,

64:3, 69:18, 71:25, 77:7, 84:14, 86:21, 87:3, 88:8, 93:12, 94:11, 95:10, 95:18, 105:24
**type** [1] - 41:2
**types** [1] - 104:21

### U

**U.S** [1] - 1:3
**ultimately** [4] - 40:14, 40:16, 85:5, 100:23
**unable** [3] - 9:9, 9:10, 39:24
**under** [28] - 16:1, 17:22, 17:24, 18:7, 18:12, 19:9, 21:2, 32:11, 32:21, 34:21, 37:15, 38:18, 38:20, 39:19, 41:5, 42:25, 43:3, 60:2, 62:1, 66:24, 69:11, 74:9, 84:22, 90:10, 90:18, 91:14, 91:22, 107:7
**undermine** [1] - 39:2
**underneath** [1] - 82:4
**understood** [6] - 14:13, 17:14, 20:9, 32:20, 59:6, 102:9
**undertaking** [1] - 41:3
**unequivocal** [4] - 10:14, 10:17, 11:9, 12:11
**unfortunately** [2] - 55:12, 79:14
**UNITED** [1] - 1:1
**United** [3] - 111:6, 111:8, 111:13
**unless** [2] - 11:10, 64:21
**unprecedented** [1] - 63:5
**unravel** [1] - 57:14
**unwind** [1] - 5:4
**up** [51] - 6:8, 6:10, 23:23, 24:2,

24:16, 24:19, 25:22, 29:3, 29:13, 31:14, 34:14, 38:16, 39:2, 42:7, 46:2, 46:3, 46:11, 51:2, 52:1, 52:3, 52:16, 52:20, 53:20, 54:12, 54:14, 54:15, 54:23, 55:15, 56:14, 57:3, 58:1, 59:4, 63:4, 64:8, 70:5, 72:12, 73:16, 73:23, 76:22, 76:24, 77:24, 85:17, 93:13, 97:14, 100:11, 101:9, 101:17, 102:24, 108:19
**update** [3] - 15:3, 15:13, 55:21

### V

**vacating** [1] - 26:6
**vague** [1] - 75:13
**valley** [1] - 52:21
**Valley** [13] - 9:2, 17:12, 17:15, 18:9, 19:12, 25:22, 34:6, 43:14, 50:9, 58:18, 58:23, 60:17
**valuation** [2] - 32:20, 99:21
**value** [13] - 4:13, 4:22, 4:23, 5:22, 5:24, 6:12, 6:14, 6:16, 7:4, 11:4, 31:21, 32:5, 32:19
**various** [2] - 51:17, 63:20
**VAUGHN** [2] - 2:10, 2:12
**verbiage** [1] - 5:22
**version** [1] - 105:25
**versions** [1] - 105:24
**versus** [1] - 7:18
**Victoria** [3] - 97:19, 103:20, 104:3

**Videotape** [2] - 92:19, 94:7
**view** [1] - 9:20
**visited** [1] - 78:17
**void** [1] - 44:3
**Volume** [2] - 1:9, 110:8
**vs** [1] - 1:7

## W

**wait** [4] - 78:1, 101:8, 108:24
**Washington** [4] - 7:16, 47:10, 72:15, 72:19
**Watch** [18] - 63:23, 84:23, 87:7, 87:8, 87:20, 88:5, 96:4, 97:16, 97:22, 98:2, 98:6, 98:13, 98:14, 98:16, 98:19, 103:12, 104:18, 105:13
**watch** [2] - 104:25, 105:2
**WAYNE** [1] - 2:11
**ways** [5] - 44:7, 59:17, 59:24, 89:13
**website** [1] - 105:2
**WEDNESDAY** [2] - 1:14, 4:1
**week** [3] - 15:14, 15:16, 77:21
**well-known** [1] - 41:5
**Wells** [1] - 47:9
**WEST** [1] - 1:24
**whole** [5] - 10:4, 12:1, 41:7, 44:1, 83:6
**willing** [4] - 52:1, 52:3, 69:25, 70:4
**willingness** [1] - 68:10
**Wilson** [1] - 4:19
**Windermere** [68] - 3:19, 3:22, 5:3, 6:1, 6:4, 10:6, 17:20, 18:1, 18:14, 18:15, 19:3, 19:9, 20:13, 20:25, 22:8, 25:17, 25:25,

29:7, 29:21, 30:6, 33:11, 35:25, 37:10, 40:16, 40:23, 41:6, 41:12, 42:15, 43:8, 43:9, 44:7, 44:8, 46:2, 46:4, 47:20, 48:6, 48:8, 48:20, 49:1, 49:3, 63:3, 63:23, 79:11, 84:23, 87:7, 87:8, 87:20, 88:5, 96:4, 97:16, 97:22, 98:2, 98:6, 98:8, 98:13, 98:14, 98:16, 98:19, 99:6, 100:24, 101:20, 101:22, 103:12, 104:18, 105:1, 105:12
**WINDERMERE** [2] - 1:8, 2:9
**Windermere's** [9] - 20:6, 40:2, 42:21, 48:1, 66:25, 93:19, 96:1, 96:18, 98:12
**WITHDRAWN** [1] - 3:12
**withhold** [1] - 107:3
**witness** [6] - 7:23, 8:1, 15:20, 36:10, 107:20, 108:4
**WITNESS** [14] - 16:2, 21:7, 22:14, 27:23, 30:17, 33:20, 36:12, 39:17, 44:20, 50:24, 75:7, 75:17, 105:23, 107:15
**witnesses** [1] - 107:17
**WITNESSES** [1] - 3:3
**word** [1] - 86:15
**works** [1] - 103:2
**worries** [1] - 42:6
**writes** [2] - 25:15, 30:4
**writing** [1] - 91:1
**written** [5] - 31:6, 90:22, 90:24, 91:8,

91:10
**Wrobel** [6] - 14:15, 14:19, 107:16, 108:25, 109:5, 109:25
**WSC** [4] - 19:9, 106:12, 107:4, 107:6
**WSC026842-026844** [1] - 3:24

## Y

**year** [12] - 5:13, 45:3, 46:20, 65:12, 66:7, 94:9, 94:11, 99:25, 101:7, 101:10, 101:11, 101:14
**yearly** [1] - 56:25
**years** [11] - 5:6, 5:9, 7:2, 40:24, 41:1, 41:6, 41:13, 42:14, 53:1, 93:12, 95:18
**yesterday** [9] - 4:6, 5:1, 7:10, 9:6, 11:8, 87:24, 96:7, 100:4, 103:16

## "

**"Urgent"** [1] - 3:24
**"Yesterday's** [1] - 3:16

# EXHIBIT B



**1 — Page 1**

```
                    UNITED STATES DISTRICT COURT

                   CENTRAL DISTRICT OF CALIFORNIA

                         SOUTHERN DIVISION

                            – – –

 THE HONORABLE DOUGLAS F. McCORMICK, MAGISTRATE JUDGE

 PRESIDING


        BENNION & DEVILLE FINE HOMES   }
             INC., et al.,             }
                          Plaintiffs,  }
                    vs.                 }
        WINDERMERE REAL ESTATE         } EDCV-15-01921-DFM
        SERVICES COMPANY,              }  Day 8, Volume II
                          Defendant.   }


                REPORTER'S TRANSCRIPT OF PROCEEDINGS

                       Santa Ana, California

                         July 19, 2018


                   SHARON A. SEFFENS, RPR
                   United States Courthouse
                   411 West 4th Street, Suite 1-1053
                   Santa Ana, CA  92701
                   (714) 543-0870
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

---

**2 — Page 2**

APPEARANCES OF COUNSEL:

FOR PLAINTIFFS/COUNTER DEFENDANTS BENNION AND DEVILLE FINE HOMES, INC., ET AL.:

```
        James M. Mulcahy
        MULCAHY LLP
        4 Park Plaza
        Suite 1230
        Irvine, California 92614
        949-252-9377
        jmulcahy@mulcahyllp.com

        Kevin A. Adams
        MULCAHY LLP
        4 Park Plaza
        Suite 1230
        Irvine, California 92614
        949-252-9377
        kadams@mulcahyllp.com

        Filemon "Phil" Carrillo
        MULCAHY LLP
        4 Park Plaza
        Suite 1230
        Irvine, California 92614
        949-252-9377
        fcarrillo@mulcahyllp.com
```

FOR DEFENDANT/COUNTER CLAIMANT WINDERMERE REAL ESTATE SERVICES COMPANY:

```
        John D. Vaughn
        PEREZ VAUGHN AND FEASBY INC
        600 B Street
        Suite 2100
        San Diego, California 92101
        619-702-8044
        vaughn@pvflaw.com

        Christopher Wayne Rowlett
        PEREZ VAUGHN AND FEASBY INC
        600 B Street
        Suite 600
        San Diego, California 92101
        619-784-3549
        rowlett@pvflaw.com
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

---

**3 — Page 3**

FOR DEFENDANT/COUNTER CLAIMANT WINDERMERE REAL ESTATE

SERVICES COMPANY (Continued):

```
        Jeffrey Alan Feasby
        PEREZ VAUGHN AND FEASBY INC
        600 B Street, Suite 2100
        San Diego, California 92101
        619-702-8044
        feasby@pvflaw.com
```

ALSO PRESENT:

```
        John Tisa, technician for both sides
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

---

**4 — Page 4**

I-N-D-E-X

| PLAINTIFFS' WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| (None) | | | | |

| PLAINTIFFS' EXHIBITS: | | | MARKED | RECEIVED |
|---|---|---|---|---|
| (None) | | | | |

| DEFENSE WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MICHAEL TEATHER (Continued) | 5 | 50 | 106 | |

| DEFENSE EXHIBITS: | MARKED | RECEIVED |
|---|---|---|
| Exhibit 333 | | 12 |
| Exhibit 755 | | 16 |
| Exhibit 341 | | 16 |
| Exhibit 773 | | 28 |
| Exhibit 772 | | 31 |
| Exhibit 489 | | 65 |
| Exhibit 758 | | 99 |
| Exhibit 411 | | 104 |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

5

```
01:34  1    SANTA ANA, CALIFORNIA; THURSDAY, JULY 19, 2018; 1:34 P.M.    01:36
01:34  2              (Jury present.)                                    01:36
01:34  3         THE COURT:  Mr. Feasby, you may resume.                 01:36
01:34  4         MR. FEASBY:  Thank you, Your Honor.                     01:36
01:34  5    MICHAEL TEATHER, DEFENDANT'S WITNESS, PREVIOUSLY SWORN       01:36
01:34  6              DIRECT EXAMINATION (Continued)                     01:36
01:34  7    BY MR. FEASBY:                                               01:36
       8    Q    Mr. Teather, could you turn back to Exhibit 321 — I'm   01:36
01:35  9    sorry.                                                       01:36
01:35 10              (Counsel conferring)                               01:36
01:35 11         MR. FEASBY:  Exhibit 321 is in evidence.                01:36
01:35 12    BY MR. FEASBY:                                               01:36
01:35 13    Q    And if you look at the second e-mail down.              01:36
01:35 14    A    Hold on.  Okay.  Yes, I've got it.                      01:37
01:35 15    Q    November 7th, 2014, do you see that, from you to        01:37
01:35 16    Mr. Deville?                                                 01:37
01:35 17    A    Yes.                                                    01:37
01:35 18    Q    And what are you expressing in this portion of the      01:37
01:35 19    e-mail?                                                      01:37
01:35 20    A    (No response)                                           01:37
01:35 21    Q    Let me back up.  This e-mail relates to a conference    01:37
01:35 22    call that you had scheduled for November 7th with            01:37
01:35 23    Mr. Gooding and Johnson and Mr. Deville?                     01:37
01:36 24    A    Yes.                                                    01:37
01:36 25    Q    And Mr. Schuster canceled that e-mail at the last       01:37
```

6

```
      1    minute because the Real Living offices were closing?
01:36  2    A    Yes.  In this e-mail it appears I'm expressing
01:36  3    frustration for not being able to have that call.  We were
01:36  4    trying to decide what to do with the Fallbrook office.  I
01:36  5    was trying to figure out how he'd started delivering some of
01:36  6    our services down there, and I probably didn't show the type
01:36  7    of patience I should have.  I should have recognized that
01:36  8    that Real Living was a busy thing.  So I don't love it.
01:36  9    Q    Could you skip ahead, then, to Exhibit No. 330.
01:36 10    A    Got it.  Yes.
01:36 11    Q    This e-mail is in evidence.  We looked at it yesterday,
01:36 12    I believe.  At the bottom is an e-mail from you to
01:36 13    Mr. Bennion and Mr. Deville dated November 10th, 2014.  Do
01:36 14    you see that?
01:37 15    A    Yes, I do.
01:37 16    Q    So this is one day after the e-mail that we were
01:37 17    reviewing before lunch from Mr. Schuster that forwarded the
01:37 18    Union Tribune article.  Do you recall that?
01:37 19    A    Yes.
01:37 20    Q    And what are you saying to Mr. Bennion and Mr. Deville
01:37 21    in your e-mail here?
01:37 22    A    I'm saying that they made Windermere look vibrant and
01:37 23    growing with that advertorial that they ran.
01:37 24    Q    Did you believe that?
01:37 25    A    Yes.  It certainly was great for Windermere as a brand.
```

7

```
01:37  1    It was bad for Gooding and Johnson.
01:37  2    Q    At that time did you have any concerns regarding their
01:37  3    ability to operate as the servicer for Windermere in
01:37  4    Southern California?
01:37  5    A    I think I was trying very hard to be fair.  At that
01:37  6    time — earlier in my testimony we had expressed, we saw
01:38  7    that Mr. Deville wasn't happy with the idea of new offices
01:38  8    or the other examples he went through.  And you showed me a
01:38  9    series of e-mails that all came one night.
01:38 10              So that would make you feel like you wouldn't be
01:38 11    encouraged, but I don't know.  What I was thinking is this
01:38 12    is a big adjustment.  Mr. Deville was not used to working
01:38 13    with others and doing the other things.  So I think from
01:38 14    these e-mails I'm trying to still remain positive.
01:38 15              In my own head I was remaining positive, but the
01:38 16    evidence that had been presented to me so far did not make
01:38 17    it look like they were passionate about running a servicing
01:38 18    company.
01:38 19    Q    And you say here then later in the e-mail:  Your
01:38 20    attempts to reach out to our affiliates over the past month
01:38 21    or so are very much appreciated.  Did you appreciate their
01:38 22    efforts at that point?
01:38 23    A    Yes.  I don't recall exactly what they were, but that's
01:38 24    the type of behavior that I was trying to motivate.
01:38 25    Q    And the last sentence in that paragraph:  Mr. Bennion,
```

8

```
      1    status report regarding fees would be much appreciated.
01:39  2    A    I would always try to sneak that in.  So I answer to
01:39  3    people in Seattle, too.  So whenever I'm talking with them,
01:39  4    they're saying, hey, what about the fees, Mike?  You're
01:39  5    supposed to be getting them to pay.  So I would try to
01:39  6    include that.
01:39  7    Q    Were those ongoing discussions that you had with both
01:39  8    Mr. Bennion and Mr. Deville?
01:39  9    A    I think that Mr. Bennion and Mr. Deville made one
01:39 10    catch-up payment where they took the credit, the 80 whatever
01:39 11    thousand dollars for the SEO efforts.  I do not believe we
01:39 12    ever received another payment from them.
01:39 13    Q    And the last month for which you did receive fees was
01:39 14    June of 2014; is that correct?
01:39 15    A    I assume so, if we're talking about the same payment.
01:39 16    Q    So if that was the last payment, then, June fees would
01:39 17    be due when under the franchise agreement?
01:40 18    A    That's easy to do the math.  So the fees that are due
01:40 19    are due the next month.  So June fees are due in July.  July
01:40 20    fees are due in August, and so on around the calendar.
01:40 21    Q    And when are they late as of?
01:40 22    A    I'm not sure.  I think they're due the 15th, late the
01:40 23    25th, but I might be confusing that with franchise fees.  So
01:40 24    obviously the franchises have to pay the franchisor, and the
01:40 25    franchisor then pays us.  I don't know that I was worried
```

10

```
01:40   1    about due dates.  I'd take a check anytime.
01:40   2    Q    And by November of 2014, do you recall whether or not
01:40   3    it had been some months since you had received a payment?
01:40   4    A    Yes, of course.
01:40   5    Q    And in your discussions with Mr. Bennion up to that
01:40   6    point, did he tell you anything regarding why those payments
01:40   7    hadn't been made?
01:41   8    A    The only thing I remember is occasionally I would hear
01:41   9    seasonal, you know, like it's too hot for people to buy
01:41  10    houses.  So as soon as it gets cooler, they'll start buying
01:41  11    houses and we'll start paying.  So, yeah, I did hear that
01:41  12    explanation at some point.
01:41  13    Q    Did you hear that from Mr. Deville as well?
01:41  14    A    I either heard it from Mr. Deville or from
01:41  15    Mr. Sunderland, who spoke on his behalf.
01:41  16    Q    Did either of Mr. Bennion or Mr. Deville or
01:41  17    Mr. Sunderland tell you that the Bennion & Deville
01:41  18    franchises in Southern California were withholding their
01:41  19    fees because of Windermere Watch?
01:41  20    A    No, that was never said to me.
01:41  21    Q    Did anyone — Mr. Bennion, Mr. Deville, or
01:41  22    Mr. Sunderland — ever tell you that they were withholding
01:42  23    fees because they were concerned about issues relating to
01:42  24    their servicing rights in Southern California during the
01:42  25    fall of 2014?
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

10

```
01:42   1    A    I'm certain on the Windermere Watch because I
01:42   2    think that's the only issue I actually resolved in all the
01:42   3    things I was working on.  As of June 3rd we'd resolved the
01:42   4    Windermere Watch issue.
01:42   5            In terms of them giving up their rights to service
01:42   6    the territory, that was a discussion that didn't involve
01:42   7    them not having to pay fees.  It was just what their
01:42   8    responsibilities were going to be vis-a-vis the services
01:42   9    provided in Southern California.
01:42  10    Q    Do you remember Mr. Bennion's testimony to the effect
01:42  11    yesterday that he considered the area rep agreement canceled
01:42  12    or terminated as of the fall of 2014 because he believed
01:42  13    that Windermere was in breach of that agreement?
01:43  14    A    Yes, I heard his testimony to that effect.
01:43  15    Q    Did he ever express to you during that time or any
01:43  16    other time that he felt that the ARA was terminated by
01:43  17    virtue of Windermere's breach of that agreement?
01:43  18    A    No.
01:43  19    Q    Did the Bennion & Deville area representative in
01:43  20    Southern California continue to collect fees from the other
01:43  21    franchisees in Southern California throughout the fall of
01:43  22    2014?
01:43  23    A    Yes.  I am certain that they continued to collect from
01:43  24    the other franchisees.
01:43  25    Q    And what about through September 30th, 2015, when the
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11

```
01:43   1    area representation agreement was terminated —
01:43   2    A    Yes.
01:43   3    Q    — did they continue to collect fees from the other
01:43   4    franchisees through that time?
01:43   5    A    Yes, they did.
01:43   6    Q    And do you know whether they retained their 50 percent
01:43   7    of those franchise fees throughout that time?
01:43   8    A    Yes, they retained their 50 percent of those fees.
01:44   9    Q    At the top of this Exhibit 330, there is an e-mail from
01:44  10    Mr. Bennion.  Do you see that?
01:44  11    A    Yes.
01:44  12    Q    And he says:  Thank you, Mike.  I have been studying it
01:44  13    and it looks like we can start paying in mid December and
01:44  14    catch them all up through our season.  Fingers crossed.
01:44  15    Thanks.  Bob.
01:44  16            Is that consistent with your recollection
01:44  17    regarding the slow times, the cyclical market that they went
01:44  18    through in the desert?
01:44  19    A    Yes.
01:44  20    Q    Did they make any payments of those franchise fees at
01:44  21    any point after November 11th, 2014?
01:44  22    A    No, they did not.
01:44  23    Q    Turn to Exhibit 333 in front of you there.  This has
01:44  24    not been admitted.
01:44  25            Do you recognize this e-mail, Mr. Teather?
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

12

```
01:44   1    A    I see an e-mail from myself to Paige Tyley, P-a-i-g-e,
01:44   2    T-y-l-e-y.
01:45   3            MR. FEASEY:  Your Honor, we'd request that
01:45   4    Exhibit 333 be admitted into evidence.
01:45   5            THE COURT:  Any objection to 333?
01:45   6            MR. MULCAHY:  No, Your Honor.
01:45   7            THE COURT:  333 will be received.
01:45   8            (Exhibit 333 received in evidence)
01:45   9    BY MR. FEASEY:
01:45  10    Q    Do you remember what was going on at the time that this
01:45  11    e-mail was sent?
01:45  12    A    I believe this refers to the Fallbrook office, and I
01:45  13    think the difficulty with the Fallbrook office is they were
01:45  14    wanting to open an office quickly and we were trying to make
01:45  15    sure that the proper process was followed to open such an
01:45  16    office.
01:45  17    Q    And that's reflected — if you go down to the second
01:45  18    page, page 2 of that exhibit, do you see on November 11th
01:45  19    Mr. Deville sent you an e-mail about this?
01:46  20    A    Yes.
01:46  21    Q    And you responded to Mr. Deville that I told them that
01:46  22    they could open after discussing it with you.  Do you see
01:46  23    that?
01:46  24    A    Yes.
01:46  25    Q    And is that what you told Mr. Gooding and Mr. Johnson?
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

13

```
01:46   1    A    Yes.
01:46   2    Q    And then if you go back to the first page, there is
01:46   3    e-mail from Mr. Deville to you and copying Ms. Tyley and
01:46   4    Mr. Bennion asking for details?
01:46   5    A    Is that where it says, Paige, please explain in detail?
01:46   6    Q    Yes.
01:46   7    A    Yes.
01:46   8    Q    And then up above that, it looks like Ms. Tyley has
01:46   9    done that?
01:46  10    A    Yes.
01:46  11    Q    Do you recall at that time whether Mr. Gooding and
01:46  12    Mr. Johnson were not following the process with regard to
01:46  13    this Fallbrook location?
01:46  14    A    It's not a question of someone's intent to follow it or
01:46  15    not to follow it.  I was just making sure the steps were
01:46  16    taken.  So I don't know whether they were or weren't, or
01:46  17    whether they didn't know them or what was going on.  So I
01:47  18    was trying to work with Paige and make sure that onboarding
01:47  19    this office was done in a way that was proper.
01:47  20    Q    Were you frustrated at all during this time regarding
01:47  21    the requests that were coming in from Mr. Gooding and
01:47  22    Mr. Johnson to open additional branch offices?
01:47  23    A    I wouldn't say frustrated, but I wanted to be cautious
01:47  24    and make sure we had a chance to collaborate and discuss all
01:47  25    office openings together.
```

14

```
01:47   1         I think if I was frustrated, it was more that we
01:47   2    didn't have a good venue to have those kinds of discussions.
01:47   3    At one time Mr. Deville said just deal with them, but then
01:47   4    at other times he wants to be intimately involved in it.
01:47   5    Mr. Drayna tells me we have the right as the franchisor to
01:47   6    just do it ourself, but I'm still trying to say how can we
01:47   7    work with them and try to build it.
01:47   8         So my frustration I think is the sum of all of
01:47   9    those things where here we're doing something as simple as a
01:47  10    relatively new client to us who we like.  They seem to like
01:47  11    us.  They want to open an office, and we're just having
01:47  12    trouble getting on the same page about is it a good idea, is
01:48  13    it a bad idea, and what happens next.
01:48  14    Q    Were you concerned at that time with the rate at which
01:48  15    the Homes and Estates franchise was growing?
01:48  16    A    Perhaps.  I mean, that's always a concern that I have.
01:48  17    Q    Can you turn to Exhibit No. 341.  This has not been
01:48  18    admitted into evidence.
01:48  19         Tell me, Mr. Teather, do you recognize this
01:48  20    e-mail?
01:48  21    A    I see that I wrote an e-mail to Mr. Schuster.
01:48  22    Q    And that's dated November 25th, 2014?
01:48  23    A    Yes.
01:48  24    Q    If you turn to the second page of that document, there
01:48  25    is another e-mail from you, a prior e-mail from you to
```

15

```
01:48   1    Mr. Schuster.  Do you see that?
01:48   2    A    Yes.
01:48   3    Q    And you reference financials that he provided.  Do you
01:48   4    recall what those financials were?
01:49   5    A    Yeah, I think that might go in the same issue, which is
01:49   6    if — yes, I do recognize the financials that were provided.
01:49   7    Q    And what were those financials?
01:49   8    A    They're financials for their company.
01:49   9    Q    And are these similar to the financials that you had
01:49  10    requested from Mr. Bennion and Mr. Deville?
01:49  11    A    Yes.  They would be composed of the profit and loss and
01:49  12    the balance sheets for the company.
01:49  13    Q    At the point in time, November 25th, 2014, had you
01:49  14    received any financial statements from either Mr. Bennion or
01:49  15    Mr. Deville?
01:49  16    A    No, I had not.  In fairness to them, I don't know that
01:49  17    I had renewed my request in the last month or so either.
01:49  18    Q    Can you turn to Exhibit No. 755.
01:49  19    A    Yes.
01:49  20    Q    I don't believe this has been admitted yet.
01:49  21         Do you recognize this document, Mr. Teather?
01:49  22    A    Yes, I do.  I recognize this document.
01:50  23         MR. FEASBY:  Your Honor, I'd request that Exhibit
01:50  24    No. 755 be admitted into evidence.
01:50  25         THE COURT:  Any objection to 755?
```

16

```
01:50   1         MR. MULCAHY:  No, Your Honor.
01:50   2         THE COURT:  755 will be received.
01:50   3         (Exhibit 755 received in evidence)
01:50   4         MR. FEASBY:  Your Honor, I don't recall.  Did I
01:50   5    request to move in Exhibit No. 341?
01:50   6         THE COURT:  I don't believe you did.
01:50   7         Any objection to 341?
01:50   8         MR. MULCAHY:  No, Your Honor.
01:50   9         THE COURT:  341 is received.
01:50  10         (Exhibit 341 received in evidence)
01:50  11         MR. FEASBY:  Thank you, Your Honor.
01:50  12    BY MR. FEASBY:
01:50  13    Q    Mr. Teather, tell me about this e-mail.
01:50  14    A    This is Brent Lee.  We haven't talked very much about
01:50  15    Brent Lee.  He had at that time a pretty small office in
01:50  16    Riverside, California, and he was given notification by
01:50  17    Mr. Deville that they were being taken off of the Windermere
01:50  18    SoCal technology system.  I assume someone is forwarding it
01:50  19    to me.
01:51  20    Q    And what was your reaction to this?
01:51  21    A    I was surprised, of course, that they would take them
01:51  22    off their system.
01:51  23    Q    Had you had any discussions with Mr. Deville prior to
01:51  24    that time requesting that he take them off of his Southern
01:51  25    California system?
```

17

1  A  Again, I'm never certain whether I was discussing with
2  Mr. Deville or Mr. Sunderland, but I'm certain that I'd had
3  discussions with one or the other and Mr. Forsberg about
4  combining and having our systems go together.
5      I never contemplated the fact that they would kick
6  the affiliates that aren't Bennion & Deville off of the
7  technology system.
8  Q  And did Mr. Deville or anyone else from Bennion &
9  Deville, either of the entities, tell you that that was
10 going to happen before November 28th?
11 A  I believe that the first time I knew about it was Brent
12 Lee's e-mail to me.  Obviously afterwards I heard from a lot
13 of people that this had occurred.
14 Q  Was this what you contemplated on October 2nd at the
15 meeting when you discussed merging technology and marketing
16 efforts?
17 A  No.
18 Q  Did this event, the taking the other Southern
19 California owners off of their technology platform, did this
20 have any effect on your outlook regarding whether or not
21 Mr. Bennion and Mr. Deville would be able to successfully
22 service the other owners in Southern California?
23 A  Yes, it did.
24 Q  What was the effect that it had?
25 A  My thinking at that time had transitioned.  Before, I

18

1  remained hopeful.  Actually probably about to this day I was
2  hopeful that they could work — that they're going to get it
3  at some point.  If you actually help other people, something
4  good happens to you.  So I had heard talk that it would
5  happen.  The actions didn't match the talk.
6      So then at some point you have to ask yourself the
7  question:  Is someone telling me something they don't really
8  believe?  And I'm quite certain when I saw a move this
9  dramatic that I became convinced that they were not sincere
10 in their desire to help others through a servicing company.
11 Q  Did you make any decision around that time regarding
12 whether or not you intended to keep Bennion & Deville
13 servicing the owners in Southern California?
14 A  I personally thought that I wasn't going to be
15 successful in that job, but the decision what to do with
16 them would have been in consultation with the rest of my
17 colleagues.
18 Q  Did you have a recommendation for the rest of your
19 colleagues at that time?
20 A  Yes.  I didn't think we would be successful.
21 Q  Can you turn to Exhibit No. 759.
22 A  Yes.
23 Q  This is in evidence.  I'm sorry — 756 I want to talk
24 about just briefly beforehand if we could.  This is also in
25 evidence.

19

1      I discussed this e-mail with Mr. Deville.  If you
2  look at the bottom, this is an e-mail from you to Bob and
3  Bob.  Do you see that?
4  A  Yes.
5  Q  And there is a reference at the end of the second to
6  the last sentence.  It says:  "And as of today, the 24th, we
7  have yet to see the promised December catch-up payment."
8      Do you see that?
9  A  Yes.
10 Q  Which catch-up payment are you referring to?
11 A  Fees.
12 Q  Is that the same fees that Mr. Bennion had indicated he
13 thought he'd be able to make a catch-up payment in
14 December —
15 A  Yes.
16 Q  — in the prior e-mail that we looked at?
17 A  Yes.
18 Q  Did you ever receive that catch-up payment?
19 A  No, we did not.
20 Q  And if you look up above, Mr. Deville responded and the
21 last sentence says:  "Payment plan soon as we are now
22 entering our busy season."  Do you see that?
23 A  Yes.
24 Q  But there was no payment that was ever made; isn't that
25 right?

20

1  A  That is correct.
2  Q  Now, take a look at Exhibit 759.
3  A  Okay.
4  Q  Do you recognize this document?
5  A  It appears to be a longer e-mail from myself to
6  Mr. Bennion and Mr. Deville.
7  Q  Are you familiar with this e-mail?
8  A  Yes.
9  Q  What was your purpose in sending this e-mail?
10 A  To give sort of a state of where we were at that time,
11 and I felt like I should articulate what I'm thinking, where
12 we're making it and where we're not.
13 Q  And you outlined that in this e-mail here?
14 A  Yes.
15 Q  And do you see in the first paragraph in quotes, "the
16 shot over the bow," to quote Mr. Bennion?  What is that
17 referring to?
18 A  Now things had changed and there was a certain level of
19 hostility in the discussions.  So now what had previously
20 been discussions about whether or not they would terminate
21 their area rep rights voluntarily are now being interpreted
22 as a shot over the bow.  And I couldn't speak beyond that to
23 Mr. Bennion's motive.
24 Q  And then you see after that, starting with the word
25 "Rather:  "Rather it is clear that despite our cordial

21

```
01:56  1   relations, we are not working cooperatively to provide
01:56  2   services to our Southern California affiliates, and we are
01:56  3   not making progress towards working together."  Do you see
01:56  4   that?
01:56  5   A   Yes.
01:56  6   Q   And is that what you felt at the time?
01:56  7   A   Yes, that's exactly what I felt like we were talking.
01:57  8   For example, Mr. Sunderland and I, I enjoyed talking with
01:57  9   him.  It was always great.  But every single time we would
01:57 10   set a task and try to accomplish besides Windermere Watch,
01:57 11   we I don't think had success on anything.
01:57 12   Q   And if you look in the second paragraph down, you're
01:57 13   referencing outstanding fees again.  That's an ongoing
01:57 14   concern of yours?
01:57 15   A   Yes.
01:57 16   Q   Again, what was your concern with regard to the fact
01:57 17   that they had not paid fees at that point in time?
01:57 18   A   Well, again, if your ongoing discussions are, hey,
01:57 19   where do we agree and what are the things that we can commit
01:57 20   to each other that we will do, fees were one of those
01:57 21   things.  And from time to time I would send a note saying,
01:57 22   hey, what about the fees?
01:57 23           I would always hear back, you know, the check's in
01:57 24   the mail.  We think we can do it soon.  But the truth is
01:57 25   except for the one payment, they didn't pay anything.
```

22

```
01:57  1   Q   And it goes on to say:  "I know that you face many
01:58  2   challenges growing your operations in the San Diego region,
01:58  3   and we are thankful for your efforts to preserve our brand
01:58  4   in this region where others have failed.  But despite loans,
01:58  5   discounted fees, and forgiven fees for many years now, cash
01:58  6   flow issues remain.  I do not mention the money that you owe
01:58  7   to be spiteful but rather I think it's illustrative of the
01:58  8   ongoing challenges that your brokerage business faces."
01:58  9   A   Yes.  That's just — it's not great to be a bill
01:58 10   collector, right?  I just feel like it's a difficult
01:58 11   position to be in.
01:58 12           Again, I wasn't trying to be spiteful.  It's
01:58 13   trying to be illustrative that what we're saying to each
01:58 14   other and what's actually happening aren't the same thing.
01:58 15   Q   You say in the next paragraph:  "My attempts to
01:58 16   negotiate for the return of our servicing rights is not
01:58 17   meant to be an ultimatum, nor is it intended to be hostile
01:59 18   in any way.  To the contrary, it is my sincere belief that
01:59 19   by freeing you from your obligation to manage other
01:59 20   affiliates, you will have more resources to dedicate to your
01:59 21   brokerage business."  Do you see that?
01:59 22   A   Yes.
01:59 23   Q   Was that your belief at that time?
01:59 24   A   Of course.
01:59 25   Q   And can you explain to the jury why you believed that?
```

23

```
01:59  1   A   Well, it probably makes sense because I remember when
01:59  2   Mr. Sunderland testified, we had different ideas.  But I had
01:59  3   a general belief that the capacity for leadership in the
01:59  4   organization to run offices on the coast, in the Coachella
01:59  5   Valley, and run a services company that could adequately
01:59  6   service their offices, other offices, and grow the network,
01:59  7   there wasn't that much capacity.
01:59  8           Also, although I would observe it growing in
01:59  9   scale, it didn't seem to be a self-sustaining entity that
01:59 10   could live without some type of additional cash, be it from
02:00 11   us or, like Mr. Bennion said, other entities they owned.
02:00 12           So in my view the solution was to contract one of
02:00 13   the entities.  The idea of having offices on the coast sell
02:00 14   and go away never got any traction.  But I did still have
02:00 15   belief, and that's where we in fact had the power if we
02:00 16   wanted to that if they got out of the servicing business,
02:00 17   that would give them the capacity to be successful in
02:00 18   Coachella Valley in particular.
02:00 19   Q   And then if you go down to — skip two paragraphs down,
02:00 20   the one that begins "To this end."
02:00 21   A   Yes.
02:00 22   Q   Now, here you're making an offer to them.  Is that what
02:00 23   you're doing?
02:00 24   A   I'm not sure I'm doing that.  It seems like that my —
02:00 25   at that point my attempts to negotiate that were being
```

24

```
       1   interpreted as an ultimatum, I think I'm trying to walk that
02:01  2   back.  It's not an ultimatum.  It's what I believe is the
02:01  3   correct thing to do.
02:01  4   Q   And what were you offering at that time to Mr. Bennion
02:01  5   and Mr. Deville in exchange for them focusing on their
02:01  6   franchise business and giving up the servicing business?
02:01  7   A   I think at that time we were offering them half fees in
02:01  8   the Coachella Valley, all of it, and I think at that point
02:01  9   we also had offered 25 percent of the fees from other
02:01 10   entities on the coast.
02:01 11   Q   If you look — in fact, if you look at the third
02:01 12   paragraph from the bottom there, do you see that?
02:01 13   A   (Witness nods.)
02:01 14   Q   That's your proposal to them in writing; isn't it?
02:01 15   A   Yes.  You could have told me that earlier.
02:02 16   Q   I was trying.  Do you see that there?
02:02 17   A   Yes, I do.
02:02 18   Q   Why at this point did you make this offer to them
02:02 19   rather than just terminate the area representation agreement
02:02 20   without cause?
02:02 21   A   It might have been a mistake, but the real reason we
02:02 22   did it is in truth they did originally plant our flag in the
02:02 23   Coachella Valley, and they had grown our network.
02:02 24           And I had not been successful in finding a way for
02:02 25   us to work together to manage other affiliates and to manage
```



25

```
02:02  1    other things, but what I was thinking is, what is fair?
02:02  2    Gooding and Johnson are with us at least in some reason.
02:02  3    Early on I don't think they had these complaints.  So what
02:02  4    is fair?  And I thought maybe in the Coachella Valley, it's
02:02  5    fair to let them pay discounted fees and then half of those
02:03  6    discounted fees.
02:03  7           And maybe in the coast it would be fair to share
02:03  8    because they had participated in growing some of those
02:03  9    things.  So that seemed to me the fair thing to do.
02:03 10    Q    And then this offer includes the additional 25 percent
02:03 11    of the franchise fees from the other owners for the period
02:03 12    of four years?
02:03 13    A    Yes.
02:03 14    Q    That's an additional term that wasn't discussed between
02:03 15    you and Mr. Sunderland when you were talking about that in
02:03 16    July and August and September earlier in the prior year?
02:03 17    A    I'm pretty sure in my conversation with my colleagues,
02:03 18    we — sort of at the point then we say are we going to throw
02:03 19    in the towel in terms of them being an area representation,
02:03 20    or can we still find a negotiated solution that maintains
02:03 21    our relationship?
02:03 22           So I think that that term was added to it in a
02:03 23    hope that we could avoid something that was more
02:04 24    confrontational.
02:04 25    Q    And did you ever receive a response to this proposal?
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

26

```
02:04  1    A    I don't know whether I received a response from
02:04  2    Mr. Bennion and Mr. Deville.  I thought I heard from a
02:04  3    lawyer at some point.
02:04  4    Q    Did they accept this proposal?
02:04  5    A    Oh, no.  No.
02:04  6    Q    And if you'd take a look at Exhibit 367.
02:04  7           MR. FEASEY:  I believe it's in evidence, but let
02:04  8    me make sure.
02:04  9           THE WITNESS:  My list goes to 363, next 364, 366.
02:04 10    BY MR. FEASEY:
02:04 11    Q    Keep going.  It's down a little bit further.  I skipped
02:04 12    over quite a few.  367 is in evidence.  The date is
02:04 13    January 28th, if that helps you.  They should be in
02:04 14    chronological order.
02:04 15           MR. ROWLETT:  May I approach, Your Honor?
02:04 16           THE COURT:  Yes.
02:04 17           MR. ROWLETT:  Thank you.
02:04 18           MR. FEASEY:  That's my copying, and I apologize
02:04 19    for that.
02:04 20           THE WITNESS:  That's all right.  The stack looks
02:04 21    pretty thin behind this, by the way.
02:04 22    BY MR. FEASEY:
02:04 23    Q    Do you recognize this document, Mr. Teather?
02:04 24    A    Yes, I do recognize this.
02:04 25    Q    Did you ask Mr. Drayna to prepare this document to send
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

27

```
02:06  1    to Mr. Deville?
02:06  2    A    I wouldn't have asked Mr. Drayna that alone.  That
02:06  3    decision was made between myself and Mr. Wood and I think
02:06  4    with the consultation of Mr. Drayna as well.
02:06  5    Q    And this is the termination of the area representation
02:06  6    agreement without cause?
02:06  7    A    Yes.
02:06  8    Q    And pursuant to the area representation agreement, you
02:06  9    were required to give 180 days' notice if you were going to
02:06 10    terminate without cause.  Is that your understanding?
02:06 11    A    That is correct.
02:06 12    Q    So according to Mr. Drayna's letter, the ARA or area
02:06 13    representation agreement will terminate on July 28th, 2015;
02:06 14    is that right?
02:06 15    A    That is correct.
02:06 16    Q    Now, this termination without cause is something that
02:06 17    you could have done at any time; is that right?
02:07 18    A    My understanding is at any time we could have
02:07 19    terminated them without cause; or at any time they owed
02:07 20    money, they could have been terminated with cause.
02:07 21    Q    So if you wanted to, in August of 2014 you could have
02:07 22    had Mr. Drayna send a letter like this rather than send the
02:07 23    proposal and the written documents he prepared, the
02:07 24    termination agreement and the addendum to the Coachella
02:07 25    Valley agreement?
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

28

```
02:07  1    A    Yes, but that wasn't our intent.  We were trying to fix
02:07  2    something, not to blow it up.
02:07  3    Q    Can you turn to Exhibit 773.
02:07  4    A    Do I go back to the original binder?
02:07  5    Q    Yes, please.
02:07  6           MR. FEASEY:  I don't think this is in evidence.
02:07  7           THE WITNESS:  I have 773 in front of me.
02:07  8    BY MR. FEASEY:
02:07  9    Q    Do you recognize this document?
02:07 10    A    Yes, I do.
02:07 11    Q    What is this document here?
02:08 12           MR. FEASEY:  I'm sorry.  Your Honor, I'd request
02:08 13    that Exhibit 773 be admitted into evidence.
02:08 14           THE COURT:  Any objection to 773?
02:08 15           MR. MULCAHY:  No, Your Honor.
02:08 16           THE COURT:  773 is received.
02:08 17           (Exhibit 773 received in evidence)
02:08 18    BY MR. FEASEY:
02:08 19    Q    This is an e-mail from you to Mr. Bennion and
02:08 20    Mr. Deville?
02:08 21    A    Yes.
02:08 22    Q    And it's copied to Geoff, Jill, and CB?
02:08 23    A    Yes.
02:08 24    Q    Why did you send this e-mail?
02:08 25    A    There was some e-mail from Mr. Deville sent on 1/26.
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER



29

```
02:08  1   This would have been my reply.
02:08  2   Q   And what is your reply to that e-mail that you received
02:08  3   from Mr. Deville?
02:08  4   A   So I believe after they received the termination notice
02:08  5   from Mr. Drayna, we got e-mails saying, you know, this was
02:08  6   sudden or rash or too quick and that we hadn't had time to
02:08  7   consider your offer to by agreement transfer the area
02:08  8   representative rights.
02:09  9          So I think what I'm trying to do here is saying if
02:09 10   there really is something to talk about, meaning we can
02:09 11   really do something, let's have a meeting and have
02:09 12   Mr. Sunderland present who I felt had always been an easy
02:09 13   representative to talk to.
02:09 14   Q   So you say:  "Having reread the 1/26/15 e-mail to Bob
02:09 15   Deville several times, I am saddened that our views
02:09 16   regarding the relationship between ourselves and our
02:09 17   companies are so divergent"?
02:09 18   A   Yes.
02:09 19   Q   Were you saddened by that?
02:09 20   A   Well, yes.
02:09 21   Q   Why is that?
02:09 22   A   Well, I hadn't actually been a great personal success
02:09 23   in my life.  My job was to go and try to find a way to
02:09 24   repair what were bad feelings between their company, our
02:10 25   company, themselves, our affiliates, and I had not been
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

30

```
02:10  1   successful.  So I viewed that as something to be sad about.
02:10  2   Q   So you proposed a meeting between you and Mr. Deville
02:10  3   and Mr. Bennion with Mr. Sunderland as a go-between?
02:10  4   A   Yes.
02:10  5   Q   And you say at the end:  I am happy to travel to any
02:10  6   place convenient to both of you.  Just let me know what
02:10  7   works with your schedules.
02:10  8   A   Yes.
02:10  9   Q   Were you willing to do that?
02:10 10   A   Of course.
02:10 11   Q   Mr. Teather, did you send this e-mail as a part of a
02:10 12   conspiracy to force Mr. Bennion and Mr. Deville out of the
02:10 13   area representative role in Southern California?
02:10 14   A   No, I did not.
02:10 15   Q   Was it ever your goal to force Mr. Bennion and
02:10 16   Mr. Deville out of the area representative role in Southern
02:10 17   California?
02:10 18   A   Quite the contrary.  They could have been removed from
02:10 19   their role at any time.  My job was to try to fix the
02:10 20   problem.
02:11 21   Q   Can you turn to Exhibit 772.
02:11 22   A   Yes.  I'm there.
02:11 23          MR. FEASEY:  This has not been admitted.
02:11 24   BY MR. FEASEY:
02:11 25   Q   I'll ask if you recall this e-mail.
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

31

```
02:11  1   A   Yes.
02:11  2   Q   What is this e-mail?
02:11  3   A   This starts with an e-mail from myself to Mr. Deville,
02:11  4   Mr. Deville's response, and then my response back to
02:11  5   Mr. Deville.
02:11  6          MR. FEASEY:  Your Honor, I would move that
02:11  7   Exhibit 772 be admitted into evidence.
02:11  8          THE COURT:  Any objection?
02:11  9          MR. MULCAHY:  No, Your Honor.
02:11 10          THE COURT:  772 is received.
02:11 11          (Exhibit 772 received in evidence)
02:11 12   BY MR. FEASEY:
02:11 13   Q   Mr. Teather, do you recall ever receiving a response to
02:11 14   your February 3rd, 2015, proposal to sit down with
02:11 15   Mr. Bennion and Mr. Deville to further discuss these issues?
02:11 16   A   No, I do not.
02:11 17   Q   On February 6th, the e-mail at the bottom, you sent
02:11 18   another e-mail to Mr. Bennion and Mr. Deville with a copy to
02:11 19   Bob Sunderland and Geoff Wood.  Do you see that?
02:11 20   A   Yes.
02:11 21   Q   And what are you proposing in this e-mail?
02:11 22   A   There must have been some type of an industry event
02:12 23   going on in Las Vegas that I was assuming that Mr. Bennion
02:12 24   and Mr. Deville be attending, and I'm trying to see if
02:12 25   that's a good time to have a meeting.
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

32

```
02:12  1   Q   Were you still hopeful at that point in time you would
02:12  2   be able to set something up?
02:12  3   A   Yes.  I wouldn't ask for a meeting that I didn't intend
02:12  4   to have.
02:12  5   Q   That says:  "Geoff and I would be glad to make
02:12  6   ourselves available at your convenience on Monday, Tuesday,
02:12  7   or Wednesday"?
02:12  8   A   Yes.
02:12  9   Q   Were you willing to do that?
02:12 10   A   I think both myself and Mr. Wood were willing to do
02:12 11   that.
02:12 12   Q   Mr. Teather, did you send this e-mail as part of some
02:12 13   plan to force Mr. Bennion and Mr. Deville out of their area
02:12 14   representative role in Southern California?
02:12 15   A   No, of course not.
02:12 16   Q   And if you look above, Mr. Deville indicates that he
02:12 17   and Mr. Bennion have canceled their plans.  Do you see that
02:12 18   there?
02:12 19   A   Yes.  "Unfortunately Bob Bennion and I have canceled
02:12 20   our plans to attend.  We have some pressing matters that
02:12 21   need our attention."
02:12 22   Q   What is your response then to Mr. Deville's e-mail?
02:13 23   A   Simply:  "That's too bad.  Please let me know when you
02:13 24   will be available in the valley."
02:13 25   Q   Can you turn to Exhibit No. 370?
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

33

```
02:13    1    A    Yes.
02:13    2         MR. FEASEY:  Let me just confirm, but I'm pretty
02:13    3    sure this is in.
02:13    4         MR. ROWLETT:  Yes.
02:13    5    BY MR. FEASEY:
02:13    6    Q    Mr. Teather, do you recognize this document?
02:13    7    A    Yes.
02:13    8    Q    And we've had some testimony about this document in
02:13    9    this case, right?
02:13   10    A    Yes, we have.
02:13   11    Q    Is this the termination letter from Windermere Seattle
02:13   12    terminating the area representative agreement for cause?
02:13   13    A    Yes, it is.
02:13   14    Q    And how did this letter come about?
02:14   15    A    I'm not sure I'm correct on the timeline.  I thought we
02:14   16    also had received a letter from the lawyer they had who came
02:14   17    here and testified at some time before this.
02:14   18         But what really happened is I realized that aside
02:14   19    from Windermere Watch, I hadn't been successful in anything,
02:14   20    and we were not going to find a way to either share area rep
02:14   21    rights or be able to trust them for the area rep rights.
02:14   22         We had not been successful in creating a
02:14   23    relationship where they would pay their fees, so we also
02:14   24    thought we should temper that and we should talk to outside
02:14   25    counsel and see what outside counsel would recommend that we
```

34

```
02:14    1    do.
02:14    2         So because I was very close to the situation, I
02:14    3    welcomed that idea.  I think Mr. Wood wanted a third party,
02:14    4    and of course Mr. Drayna wanted to hear another lawyer
02:15    5    either support or not support his interpretation of whatever
02:15    6    mechanism they use to terminate people.
02:15    7         So Mr. Sirianni had represented us in matters in
02:15    8    the past, so we sought counsel of he and his son Charles.
02:15    9    Q    And did they provide you with a recommendation on what
02:15   10    you should do at that point in time with regard to
02:15   11    Mr. Bennion and Mr. Deville's servicing company in Southern
02:15   12    California?
02:15   13    A    Yes.  When we met with them, what we did is we told
02:15   14    them briefly — shorter than this, believe me — what had
02:15   15    happened between us, showed them the documents, sort of gave
02:15   16    them a timeline of the things we had tried to do, what our
02:15   17    expectations were for area representatives, what our
02:15   18    expectations were for payment.
02:15   19         We showed them the history of our relationship
02:15   20    going back, and quite frankly they called us — they said:
02:15   21    You guys are idiots.  You should terminate them for cause.
02:15   22    They have not lived up to their obligations.
02:15   23         And they gave us that recommendation, and we
02:15   24    followed that recommendation and instructed them to write
02:15   25    this letter.
```

35

```
02:16    1    Q    And what obligation was it that you identified in this
02:16    2    letter as them having not fulfilled?
02:16    3    A    Specifically Windermere SoCal has breached paragraphs
02:16    4    three, 10, and 11 of the agreement by failing to collect
02:16    5    and/or remit license and technology fees from licensees in
02:16    6    Windermere SoCal's area representative region currently —
02:16    7    and then it summarizes money that was owed at that time.
02:16    8    Q    At that time the Coachella Valley franchise owed
02:16    9    $313,746.74?
02:16   10    A    Yes.
02:16   11    Q    And if you turn to the next page, San Diego franchise
02:17   12    owed $92,159.02.
02:17   13    A    That was the math.
02:17   14    Q    And are those outstanding fees to that point and any
02:17   15    fees that were accrued or incurred through September 30th,
02:17   16    2015, are those the fees that you're seeking to recover in
02:17   17    this action?
02:17   18    A    Yes, they are.
02:17   19    Q    And is there an additional component to those damages
02:17   20    that you're requesting related to the modification
02:17   21    agreement?
02:17   22    A    Yes, there was — or there is.
02:17   23    Q    And what is that component of damages?
02:17   24    A    In the modification agreement — before the
02:17   25    modification agreement, they had not been paying fees for
```

36

```
02:17    1    some time.  So again at that point is when we decided:  Is
02:17    2    there a way we can make this relationship work between us?
02:17    3    So in the modification agreement, what we said is we will
02:17    4    forgive a certain amount of fees if you do not stay five years
02:18    5    and work on these problems with us, or whatever.
02:18    6         But the commitment was to stay five years.  The
02:18    7    modification agreement also said if you do not stay five
02:18    8    years, you lose the benefit of those forgiven fees and
02:18    9    whatever is still owed.
02:18   10         For example, if they stayed one of the five years,
02:18   11    that means they stayed 20 percent of time, so they would
02:18   12    have 20 percent of what was due on that date forgiven and
02:18   13    they would owe the other 80 percent.  I believe that's how
02:18   14    it worked.
02:18   15    Q    In addition to the failure to collect fees, in your
02:18   16    mind were there any other services that Mr. Bennion and
02:18   17    Mr. Deville were to provide under the area representation
02:18   18    agreement that you believe they had not provided up until
02:18   19    that time?
02:18   20    A    Yes.  In my view they had failed to act in good faith
02:19   21    in the area representative capacity in being of service to
02:19   22    others.
02:19   23    Q    Throughout the fall of 2014 did you have discussions
02:19   24    with Mr. Bennion or Mr. Deville or Mr. Sunderland regarding
02:19   25    your concerns in that regard?
```



**37**

1   A   Yes.

2   Q   Did you tell them during those discussions what your

3   expectations were if they were going to act as the area

4   representative in Southern California?

5   A   Yes.  You recall we had a meeting.  We actually sort of

6   laid that out, the things we were trying to cooperate with,

7   and we did not have success with any of those things.

8       So in terms of getting people better situated with

9   our technology, the people that weren't Bennion & Deville

10  got removed.  Instead of cooperating with advertising, they

11  ran advertisements that excluded other people.

12      Instead of cooperating to find the best locations

13  for offices to the benefit of all parties, they consistently

14  did not want anybody to open anything as far as I could

15  tell.

16  Q   Mr. Teather, can you turn to Exhibit No. 379.

17  A   I'm at 379.

18      MR. FEASEY:  And this is admitted into evidence.

19  BY MR. FEASEY:

20  Q   Do you recognize this document, Mr. Teather?

21  A   Yeah.  That's the letter that their attorney,

22  Mr. Davey, wrote to our lawyers, I guess, Mr. Drayna and the

23  ones that we had hired, Charles Sirianni.

24  Q   And what is your understanding of the significance of

25  this document?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**38**

1   A   I'm not sure I know what you're driving at.

2   Q   If you look on page 2 —

3   A   Yes.

4   Q   — second paragraph down.

5   A   Oh, this is a letter where they are giving us notice

6   that they are going to terminate their — they had two

7   companies, right?  They're a franchisor, and then they have

8   a company that owns a bunch of real estate companies.  So

9   those real estate companies were all going to leave.

10  Q   And this was terminating the franchises as well?

11  A   Yes.  That's how Mr. Drayna would have said it.

12  Q   And if you look at the end of that paragraph, the

13  effective date of that termination would be September 30th,

14  2015?

15  A   Yes.

16  Q   And subsequently then the termination of the area

17  representation agreement was extended to coincide with that

18  date as well, correct?

19  A   I believe so.

20  Q   Mr. Teather, after June of 2014 did Mr. Bennion,

21  Mr. Deville, or Mr. Sunderland ever express to you their

22  belief that Windermere Seattle had not engaged in

23  commercially reasonable efforts to combat Windermere Watch?

24  A   Did you say after June 3rd?

25  Q   After June 3rd of 2014.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**39**

1   A   No.  The matter was settled on June 3rd.  After

2   June 3rd nobody said to me that the matter had become

3   unsettled.

4   Q   And if you look at Mr. Davey's letter, the third

5   paragraph, he lists a number of things that he contends

6   violated the parties' contracts and franchise and other

7   laws.  Do you see that?

8   A   Yes.

9   Q   Does he indicate anywhere in here that Windermere Watch

10  or more precisely Windermere Seattle's failure to use

11  commercially reasonable efforts to combat Windermere Watch

12  was a breach of any of those agreements?

13  A   No, he does not.

14  Q   Mr. Teather, there is a binder — and it's probably

15  going to be behind you on the floor — that on the spine

16  it's going to say Trial Exhibits 746 through 819.

17      MR. ROWLETT:  May I approach, Your Honor?

18      THE COURT:  You may.

19      MR. ROWLETT:  Which one do you need?

20      MR. FEASEY:  824.  824 is not in evidence.  Oh,

21  I'm sorry.  We did have a stipulation.

22  BY MR. FEASEY:

23  Q   Mr. Teather, do you recognize this document?

24  A   Yes, I do.

25      MR. FEASEY:  And we have stipulated with Mr. Adams

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**40**

1   and Mr. Mulcahy that this will be admitted into evidence,

2   Your Honor.

3       THE COURT:  Okay.

4       MR. FEASEY:  John, could you display that?

5   BY MR. FEASEY:

6   Q   Mr. Teather, what does this document reflect?

7   A   The accounting people at the company were tasked with

8   the job of figuring out what was owed to us in outstanding

9   fees and in what was owed to us as a consequence of them not

10  staying five years pursuant to the modification agreement we

11  tried to enter into.  And then they were tasked to put it

12  all in a table, and I guess shortly it's how much money they

13  owe us.

14  Q   And if you look at the first item there listed, it says

15  2012 agreement to forgive fees in exchange for five-year

16  term?

17  A   Yes.

18  Q   And is it your understanding that the balance reflected

19  there, $493,306.26, is the amount that Windermere is seeking

20  for that breach?

21  A   Yes.  This describes the process, which, we took the

22  total amount, subtracted the days that they stayed with us,

23  and what was remaining is what's owed.  And that total is

24  $493,306.26.

25  Q   Now, this portion of the sheet here reflects an

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER



41

02:25 1   interest component.  Do you see that, $107,249.69?
02:25 2   A   Yes, I see that.
02:25 3   Q   Do you remember Mr. Drayna's testimony regarding the
02:25 4   interest on the early termination portion of the damages?
02:25 5   A   Yes, I do.
02:25 6   Q   And would you have any independent knowledge regarding
02:25 7   the propriety of that component?
02:25 8   A   Yes.  It was our opinion -- there is somewhere in that
02:26 9   document that says that while they're paying it off and with
02:26 10  us, it doesn't accrue interest.  And it was our opinion that
02:26 11  once they broke that agreement and left, the interest would
02:26 12  start to accrue again from that date on the balance on that
02:26 13  date.  And this number reflects that interest.
02:26 14  Q   Now, I want to make sure that I understand correctly.
02:26 15  The total forgiven amount --
02:26 16  A   Yes.
02:26 17  Q   -- is the $477,503.43?  Do you see that there?
02:26 18  A   Yes.
02:26 19  Q   Is that the amount that's left over from the $863,560
02:26 20  after you deduct the amount of time that Bennion & Deville
02:26 21  did remain as franchisees after the execution of the
02:26 22  modification agreement?
02:26 23  A   Yes.
02:26 24  Q   And is there any interest on that amount?
02:27 25  A   No, there is no interest on that amount.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

42

02:27 1   Q   And then the interest that is reflected, that's from
02:27 2   the date the termination of the franchise agreements became
02:27 3   effective?
02:27 4   A   Yes.
02:27 5   Q   And it says -- I believe it says at the top there as of
02:27 6   7/10/2018.  That's the first day of trial in this matter?
02:27 7   A   Yes.
02:27 8   Q   Take a look, then, at the second component of damages
02:27 9   set forth there in that sheet.
02:27 10  A   Yes.
02:27 11  Q   What's your understanding of this component of the
02:27 12  damages?
02:27 13  A   Again, the accounting department was told to compute
02:27 14  the amount of license fees that were owed, the amount of
02:27 15  tech fees that were owed, and the amount of late fees.  Our
02:27 16  contracts say if you don't pay your money, you are subject
02:27 17  to incur some late fees and some interest, and that is the
02:27 18  total of all of the delinquent license fees, franchise fees,
02:27 19  and the late fees, and interest on that money for the
02:27 20  Coachella Valley entity.
02:27 21  Q   And that's one of the amounts that Windermere Seattle
02:27 22  is seeking in this action?
02:27 23  A   Yes, it is.
02:27 24  Q   And then the last kind of big block down there, what is
02:27 25  that component of damages?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

43

02:28 1   A   That's the exact same calculation done for the SoCal or
02:28 2   the San Diego offices as was done above for the Coachella
02:28 3   Valley where license fees, tech fees, and the corresponding
02:28 4   late fees and interest are tabulated and totaled.
02:28 5   Q   And that total amount there, $257,915.77, that's the
02:28 6   amount that Windermere is seeking to recover for that
02:28 7   component of damages?
02:28 8   A   Yes.  From the coast we're asking for $257,915.77.
02:29 9   Q   Now, Mr. Rowlett has rightly corrected me that the
02:29 10  first component I didn't fully understand and I explained it
02:29 11  wrong, and I think I might have -- I might not have led you
02:29 12  through that correctly.  So let's go back up to the top
02:29 13  there.
02:29 14  A   Okay.
02:29 15  Q   The total amount forgiven, this is the modification
02:29 16  agreement.  Do you remember how much both the two entities
02:29 17  forgave as a part of that modification agreement?  By those
02:29 18  two entities, I mean Windermere Seattle and Mr. Bennion and
02:29 19  Mr. Deville's services company.
02:29 20  A   You would have to refresh my recollection.  I remember
02:29 21  it being around a million dollars.
02:29 22  Q   If you look at Exhibit No. 87 -- and I'm sorry for
02:29 23  making you jump around here.  I'm almost done.
02:30 24  A   The chance of me finding 87 in the next five minutes is
02:30 25  pretty low.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

44

02:30 1        MR. ROWLETT:  May I approach, Your Honor?
02:30 2        THE COURT:  Yes.
02:30 3        (Counsel assisting the witness)
02:30 4        THE WITNESS:  Okay.
02:30 5   BY MR. FEASBY:
02:30 6   Q   If you look on page -- the bottom of page 2 and on to
02:30 7   page 3, it talks about waiver of unpaid franchise and
02:30 8   technology fees.  And then it indicates under there that
02:30 9   WSC, which is Windermere Seattle; is that correct?
02:30 10  A   Hang on a second.  The one I'm looking at is
02:30 11  Exhibit No. 11.
02:30 12  Q   It should be back further in there.
02:30 13  A   Page number 11.  So you're looking for page number 2?
02:30 14  Q   Are you in Exhibit 87?  At the bottom does it say 087
02:30 15  dash some number?
02:31 16  A   Dash 2, yes.
02:31 17  Q   You're there.
02:31 18  A   Okay.
02:31 19  Q   Again, at the bottom, "Waiver of Unpaid Franchise and
02:31 20  Technology Fees"?
02:31 21  A   Yes.
02:31 22  Q   "WSC and area representative hereby agree to waive,"
02:31 23  and then it goes on to say, "certain fees" -- and if you
02:31 24  turn on to the other page -- "in the amount of $1,151,060."
02:31 25  A   That was the number that I couldn't remember precisely,

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

45

```
02:31  1   yes.
02:31  2   Q    And that's both the total amount that both entities are
02:31  3   forgiven, correct?
02:31  4   A    Yes.
02:31  5   Q    And then it goes on to say that a breakdown of those is
02:31  6   in Exhibit A.  Do you see that?
02:31  7   A    Yes.
02:31  8   Q    Can you turn to Exhibit A?
02:31  9   A    Can you give me a page number, please?
02:31 10   Q    Page 11.
02:31 11   A    Yes, I can view Exhibit A.
02:32 12   Q    And if you look in the first column under the WSC
02:32 13   column there at the bottom or midway through the page,
02:32 14   "Total Fees to be Waived."  Do you see that?
02:32 15   A    Yes.
02:32 16   Q    So $863,560 of that $1.1 million was being waived by
02:32 17   Windermere Seattle?
02:32 18   A    That's correct.
02:32 19   Q    And then if you look at page 4, and I'm looking under
02:32 20   paragraph F that's entitled "Liquidated Damages Clause" —
02:32 21   A    Yes, I see that.
02:32 22   Q    — is that the ratio that you're referring to?
02:32 23   A    Yeah, that's the part I'm talking about that each day
02:33 24   they stay on, the total amount they owe goes down
02:33 25   proportionally.
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

46

```
02:33  1   Q    So if we go back to Exhibit 824 —
02:33  2   A    Yes.
02:33  3   Q    — do you see the $863,560 number there?
02:33  4   A    Yes.
02:33  5   Q    And then the $471.38, that's how much it goes down per
02:33  6   day that they stay?
02:33  7   A    Yes.
02:33  8   Q    And then it has the number of days between December
02:33  9   21st, 2012, and —
02:33 10   A    Yes.  The total of $863,560 was reduced by $471.38 for
02:33 11   each day that they remained with us.  The total number of
02:33 12   days since that agreement was reached and the time that they
02:33 13   left was 1,013.  So I'm with you there.
02:34 14   Q    And so if you take that $471.38 number and multiply it
02:34 15   by 1,013, presumably then you come up with the $477,503.43.
02:34 16   Is that what happens there?
02:34 17   A    Correct.
02:34 18   Q    And then that number is subtracted from $863,560?
02:34 19   A    Right.  That's the amount that's forgiven.  So you take
02:34 20   that from 863,540, add the interest, and you get
02:34 21   $493,306.26.
02:34 22   Q    Thank you.
02:34 23        Can you go to the bottom of that document?
02:34 24   A    Yes.
02:34 25   Q    There's a row there, total franchise fees and other
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

47

```
02:34  1   fees due, $1.588 million.  Do you see that?
02:34  2   A    Yes.  That's a gross number, $1,588,545.39.
02:34  3   Q    And then you have a number coming out of there,
02:34  4   $13,755.09?
02:34  5   A    Yes.
02:34  6   Q    What is that amount?
02:34  7   A    I believe that we are holding some money that was paid
02:34  8   to us, and we're holding it as offset against fees that are
02:35  9   owed to them.  So we credit that back to them.  And then the
02:35 10   next number is a number that we would be asking this jury
02:35 11   for.
02:35 12   Q    And the amounts that you're holding, where do those
02:35 13   come from?
02:35 14   A    They came from two former affiliates that had left,
02:35 15   Kirksey and King.
02:35 16   Q    Does that include any amount that Windermere Seattle
02:35 17   received out of the Loscher Browne bankruptcy?
02:35 18   A    I don't believe it does.
02:35 19   Q    And do you know why that wasn't included?
02:35 20   A    No, I don't.
02:35 21   Q    So then the total number of damages Windermere Seattle
02:35 22   is seeking is $1,574,790.30; is that correct?
02:35 23   A    Yes.  The total money damages we are seeking are
02:35 24   $1,574,790.30?
02:35 25        MR. FEASBY:  No further questions at this time,
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

48

```
       1   Your Honor.
02:36  2        THE COURT:  Ladies and gentlemen, let's go ahead
02:36  3   and take our afternoon break before we begin Mr. Teather's
       4   cross-examination.
02:36  5        In the meantime I will ask you not to talk about
02:36  6   the case or form any opinions about the case.  And we will
02:36  7   look for you at about 2:50.
       8            (Recess taken at 2:36 p.m.;
02:36  9            proceedings resumed at 2:52 p.m.)
02:36 10            (Jury not present)
02:52 11        THE COURT:  Before we get the jury, let's quickly
02:53 12   touch on scheduling.
02:53 13        Mr. Mulcahy is going to cross-examine Mr. Teather,
02:53 14   correct?
02:53 15        MR. MULCAHY:  Yes, Your Honor.
02:53 16        THE COURT:  Okay.  And there may or may not be
02:53 17   some redirect?
02:53 18        MR. FEASBY:  I think that's correct.
02:53 19        THE COURT:  Okay.  After that what would be next
02:53 20   from your side, Mr. Feasby?
02:53 21        MR. FEASBY:  York Baur, and then the deposition
02:53 22   testimony we —
02:53 23        THE COURT:  Okay.  And how long do you think
02:53 24   Mr. Baur will be?
02:53 25        MR. FEASBY:  I'm horrible at making those
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

49

```
02:53  1    estimates, but I'm guessing 30 to 45 minutes.
02:53  2         THE COURT:  Okay.  All right.  Well, my guess is
02:53  3    we don't finish all of that today.  In fact, we probably
02:53  4    would have quite a bit to do in the morning.
02:53  5         I was somewhat worried -- I don't want to be in a
02:53  6    position where we finish today, we have the jury come in
02:53  7    tomorrow and, you know, we do, like, 15 or 20 minutes and
02:53  8    then say:  Thanks for coming in.  We're all done.
02:53  9         MR. ADAMS:  And we will have a couple rebuttal
02:53 10    witnesses as well, Your Honor.
02:54 11         THE COURT:  Okay.  So it sounds like we may have a
02:54 12    full morning tomorrow morning, which is fine.  I just wanted
02:54 13    to be sure that I didn't look like a -- fill in the blank --
02:54 14    when we were done tomorrow at 9:08, particularly if we had
02:54 15    knocked off today at, you know, 4:25 and could have stayed
02:54 16    ten minutes and finished up.
02:54 17         All right.  Let's do it.
02:54 18         MR. FEASEY:  Real quick, Your Honor.
02:54 19         THE COURT:  Yes.  I'm sorry.
02:54 20         MR. FEASEY:  If Mr. Wrobel isn't going to testify
02:54 21    and plaintiffs have rested, then I will just make my motion
02:54 22    now on the record.
02:54 23         THE COURT:  Let's do that at the end of the day.
02:54 24         MR. FEASEY:  Got it.
02:54 25         THE COURT:  Okay.  I'll confirm at that point in
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

50

```
02:54  1    time that he's not going to testify and that plaintiffs have
02:54  2    rested.  We'll take care of that business then.
02:54  3         MR. FEASEY:  Thank you.
02:54  4         THE COURT:  I'll probably actually need to go get
02:54  5    my judgment as a matter of law stuff.  You know, we only do
02:54  6    this a couple times a year.  You've got to keep it all in
02:54  7    the front of your mind.
02:55  8         All right, Ms. Boehme.
02:55  9         MR. ADAMS:  Your Honor, there's a couple of
02:55 10    binders in front of you that we placed there for this
02:55 11    witness.
02:55 12         THE COURT:  Okay.  Thank you.
02:55 13         (Jury present)
02:55 14         THE COURT:  Mr. Mulcahy, your cross-examination of
02:55 15    Mr. Teather.
02:55 16         MR. MULCAHY:  Thank you, Your Honor.
02:56 17              CROSS-EXAMINATION
02:56 18    BY MR. MULCAHY:
02:56 19    Q    Mr. Teather, why don't we start with these last couple
02:56 20    of exhibits, and then we'll circle back to the beginning.
02:56 21    Okay?
02:56 22    A    I'm sorry.  Which last couple of exhibits?
02:56 23    Q    Well, Exhibit 370 for starters.
02:56 24    A    Was that one of the ones that I used with Mr. Feasey,
02:56 25    or is that in --
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

51

```
02:56  1    Q    You did.
02:56  2    A    I'm sorry.  I no longer have my exhibit book.
02:56  3         MR. ADAMS:  Your Honor, may I approach?
02:56  4         THE COURT:  You may.
02:56  5         THE WITNESS:  I can just grab that one.
02:56  6         Okay.  And you're looking for 370, correct?
02:57  7    BY MR. MULCAHY:
02:57  8    Q    Yes.  This is the letter that you said Windermere had
02:57  9    its outside lawyer send to Mr. Bennion and Mr. Deville's
02:57 10    lawyer, Gerry Davey, correct?
02:57 11    A    Yes, sir.
02:57 12    Q    And this a letter that purports to communicate that
02:57 13    Windermere is giving Bennion & Deville the opportunity to
02:57 14    pay franchise fees or else, correct?
02:57 15    A    No, sir.
02:57 16    Q    Go ahead.  Tell us.
02:57 17    A    Oh, I'm sorry.  You say purports to.  I believe this
02:57 18    letter in fact terminates the relationship and gives them an
02:57 19    opportunity to cure within a certain period of time.
02:58 20    Q    Well, that's what it says, correct?
02:58 21    A    Yes.
02:58 22    Q    Okay.  That's what you mean.  I say it purports to say
02:58 23    that, and you say it says it, but we're on the same page;
02:58 24    aren't we?
02:58 25    A    We're close.
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

52

```
02:58  1    Q    Now, this letter talks about the fact that fees have
02:58  2    not been collected by the area representative, correct?
02:58  3    A    That is correct.
02:58  4    Q    And these are fees that were owed by the franchisees
02:58  5    pursuant to the franchise license agreements purportedly,
02:58  6    correct?
02:58  7    A    That is correct.  The duty of the franchisor,
02:58  8    Windermere Services Southern California, was to collect and
02:58  9    remit fees.
02:58 10    Q    But if you go to the bottom, it is the franchisees who
02:58 11    purportedly were required to pay these fees in the first
02:58 12    instance, correct?
02:58 13    A    The franchisor and the area representative collect the
02:58 14    fees.  The franchisee pays the fees, yes.
02:59 15    Q    Okay.  These are the fees that the franchisee according
02:59 16    to Windermere should have paid to the area rep, correct?
02:59 17    A    The fees the area rep is to collect is the fees that
02:59 18    this refers to.  This isn't the letter that --
02:59 19    Q    Well, the area rep can't collect the fees unless the
02:59 20    franchisee pays them; isn't that right?
02:59 21    A    That's normally correct.  In this case the
02:59 22    franchisee --
02:59 23         MR. MULCAHY:  Excuse me, Your Honor.  I'd move to
02:59 24    strike after that's normally correct.
02:59 25         THE COURT:  Sustained.
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

```
02:59   1           Next question, please.
02:59   2   BY MR. MULCAHY:
02:59   3   Q   Now, there is nothing in this letter to suggest that
03:00   4   Mr. Bennion and Mr. Deville failed to perform their
03:00   5   obligations under the services agreement other than what we
03:00   6   have just talked about in terms of royalties, correct?
03:00   7   A   Can I read the letter?
03:00   8   Q   Of course.
03:00   9   A   Thank you.  (Witness reading document)
03:00  10           That is correct.
03:00  11   Q   All right.  Now, to take that a little further, there
03:00  12   isn't a single piece of paper in the entire universe that
03:00  13   has for its content the idea that Bennion & Deville failed
03:01  14   to perform their responsibilities under the service
03:01  15   agreement; isn't that correct?
03:01  16       MR. FEASBY:  Objection.  Calls for speculation.
03:01  17       THE WITNESS:  I would disagree with that
03:01  18   statement.
03:01  19       THE COURT:  Mr. Teather, you've sat through a lot
03:01  20   of this.  When your attorney objects, let me rule on the
03:01  21   objection.  In this case the objection is overruled, and the
03:01  22   witness's answer — did you get an answer, Mr. Mulcahy?
03:01  23       MR. MULCAHY:  I didn't hear the answer.
03:01  24       THE COURT:  Okay.
03:01  25           Then why don't you go ahead and answer the
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

```
03:01   1   question, Mr. Teather.  And if you need to restate the
03:01   2   question, Mr. Mulcahy —
03:01   3       THE WITNESS:  I disagree with the statement that
03:01   4   you just made.
03:01   5   BY MR. MULCAHY:
03:01   6   Q   Can you tell us where in the universe that piece of
03:01   7   paper is?
03:01   8   A   I think with Mr. Feasby we looked at several pieces of
03:01   9   paper where people were articulating things that were not
03:01  10   consistent with area rep duties such as running the ads that
03:01  11   didn't have inclusion or getting them off the technology.  I
03:01  12   think all of that paper indicates things that I wouldn't
03:01  13   feel are consistent with the area rep duties.
03:01  14   Q   None of those pieces of paper state to Bennion &
03:01  15   Deville that they are breaching their area representation
03:01  16   agreement, correct?
03:01  17   A   I'm quite certain through either Mr. Sunderland or
03:02  18   direct conversation with Mr. Deville that I made it clear we
03:02  19   did not think that they were properly fulfilling their
03:02  20   duties.
03:02  21   Q   But there is no piece of paper in the universe that
03:02  22   says they were breaching their agreement, correct?
03:02  23   A   I couldn't answer that question.
03:02  24   Q   Now, let's go back to the beginning.  We started your
03:02  25   testimony —
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

```
03:02   1   A   Can I put this book away now?
03:02   2   Q   Well, we might need to use it again, if you could hold
03:02   3   it by your side.
03:03   4           You came to Windermere in 2008, correct?
03:03   5   A   I don't remember whether it was late 2007 or sometime
03:03   6   in early 2008, but thereabouts, yes, sir.
03:03   7   Q   Your first visit to California occurred in 2010,
03:03   8   correct?
03:03   9   A   I couldn't tell you that.
03:03  10   Q   Take a look at page 25 of your deposition transcript
03:03  11   and read to yourself lines 7 through 10 of page 25 and tell
03:03  12   me if that helps you remember.
03:03  13   A   Could you remind me of the lines, please?
03:03  14   Q   Page 25, lines 7 through 10.
03:03  15   A   (Witness reading)  Yes, I read that.
03:04  16   Q   And does it refresh your memory?
03:04  17   A   Yeah.
03:04  18   Q   Excuse me.
03:04  19   A   Yes, it does.
03:04  20   Q   You came to California in the first instance in 2010,
03:04  21   correct?
03:04  22   A   Yes.
03:04  23   Q   Your initial contact during that trip was a franchisee
03:04  24   in California named Gretchen Peterson, correct?
03:04  25   A   No, sir.  It was Gretchen Pearson.
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

## Page 56 (bottom right)

```
03:04   1   Q   Pearson?
03:04   2   A   Yes, correct.
03:04   3   Q   Gretchen Pearson?
03:04   4   A   Yes.
03:04   5   Q   Do you remember her?
03:04   6   A   Oh, yes.  I remember Gretchen very well.
03:04   7   Q   She was in Northern California, correct?
03:04   8   A   That is correct.
03:04   9   Q   She was an area representative just like Bennion &
03:04  10   Deville but for Northern California at that time, correct?
03:04  11   A   That is correct.
03:04  12   Q   And you came out to see her because, to use your words,
03:04  13   you and Windermere had some difficulty in Northern
03:04  14   California in that she was wearing two different hats,
03:04  15   correct?
03:04  16   A   Yes.
03:05  17   Q   One hat she wore was that of a franchise owner,
03:05  18   correct?
03:05  19   A   That is correct.
03:05  20   Q   A franchisee, in other words —
03:05  21   A   Yeah.  I got it.
03:05  22   Q   — with offices?
03:05  23   A   Yeah.  I got it, yeah.
03:05  24   Q   Okay.  And the other hat she was wearing was the hat of
03:05  25   an area representative, correct?
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

57

```
03:05  1   A    That is correct.
03:05  2   Q    You came out there because your company felt that there
03:05  3   had been some difficulty and some turmoil among the owners
03:05  4   in Northern California as a consequence of Ms. Pearson's
03:05  5   status as an area representative, correct?
03:05  6   A    That is correct.
03:05  7   Q    And you came out to determine whether or not she had
03:06  8   the franchisees' interests at heart, correct?
03:06  9   A    I believe so, yes.
03:06 10   Q    You wanted to know whether she had their interests at
03:06 11   heart or whether she was interested more in her own real
03:06 12   estate operations, correct?
03:06 13   A    Yes.
03:06 14   Q    And so you viewed that relationship as a difficult
03:06 15   relationship for Windermere; did you not?
03:06 16   A    Yes.  The problem was difficult.
03:06 17   Q    Yes, and you and your company wanted to find out
03:06 18   whether or not the franchisees were of the belief that they
03:06 19   were joining something where the whole was greater than the
03:06 20   sum of the parts, to use your words, correct?
03:06 21   A    Yes, of course.
03:06 22   Q    And it is Windermere who put Ms. Pearson in that
03:06 23   position where she was both an area representative and a
03:07 24   franchisee, correct?
03:07 25   A    Yes, that is correct.
```

58

```
03:07  1   Q    And you viewed that as problematic, so you went out
03:07  2   there to investigate, correct?
03:07  3   A    No, sir.
03:07  4   Q    You had gone down to visit her to investigate whether
03:07  5   there was a problem there where people didn't feel like it
03:07  6   was fair, correct?
03:07  7   A    That is correct.
03:07  8   Q    And after you left Northern California, her area
03:07  9   representation agreement was terminated, correct?
03:07 10   A    Both myself and Mr. Wood made that trip, and we did
03:07 11   agree with Ms. Pearson to terminate her franchise area rep
03:07 12   rights, yes.
03:07 13   Q    Just like Mr. Bennion and Deville, correct?
03:07 14   A    Not at all like Mr. Bennion and Deville.
03:07 15   Q    Now, do you remember coming down to visit in the desert
03:08 16   with Mr. Deville and Mr. Sunderland on May 23rd, 2014?
03:08 17   A    I remember visits with them.  I'm assuming if you say
03:08 18   May 23rd, we had a visit on that date, yes.
03:08 19   Q    Was that your first trip to Southern California?
03:08 20   A    I don't know.
03:08 21   Q    I see.  But you do remember that Mr. Wood told you to
03:08 22   come down to visit Gooding, Johnson, and Schuster following
03:08 23   his dinner with them on April 4th, correct?
03:08 24   A    No, I do not recall that.
03:08 25   Q    Mr. Wood is the person who sent you down to visit with
```

59

```
03:08  1   those folks, correct?
03:10  2   A    Mr. Wood told me generally to figure out what we could
03:09  3   do to solve the problems that we had in Southern California.
03:09  4   It wasn't related to the dinner that Mr. Wood had in San
03:09  5   Diego.
03:09  6   Q    You came down then on July 22nd, 2014.  Do you recall
03:09  7   that?
03:09  8   A    I recall visits.  If you're telling me that it was on
03:09  9   July 22nd, I don't quibble with that.
03:09 10   Q    Look if you would at Exhibit 257.
03:09 11   A    Are we into the book that you have given me now?
03:09 12   Q    Yes, I believe we are.
03:09 13   A    Thank you.  (Witness retrieving document)  Yes.
03:09 14   Q    This is an e-mail that you received from Mr. Schuster
03:09 15   after your meeting with him and the others on July 22nd,
03:09 16   correct?
03:09 17   A    I believe that that is, yes.
03:09 18   Q    The people you met with then were whom?
03:09 19   A    I'm assuming it would be Mr. Gooding, Mr. Johnson, with
03:10 20   Mr. Schuster present as well.
03:10 21   Q    Okay.  Mr. Deville was not present; was he?
03:10 22   A    No, he was not present.
03:10 23   Q    And neither was anyone from his organization, correct?
03:10 24   A    No.  At that time I was meeting with them separately,
03:10 25   yes.
```

60

```
03:10  1   Q    And this e-mail from Mr. Schuster is an e-mail the very
03:10  2   following day to follow up on what you had discussed with
03:10  3   him and his partners, correct?
03:10  4   A    That is correct.
03:10  5   Q    Mr. Deville is not copied on the e-mail; is he?
03:10  6   A    He was aware of the visit, but he is not copied on the
03:10  7   e-mail.  You are correct.
03:10  8   Q    Now, did you forward this e-mail on to Mr. Deville so
03:10  9   he could understand what you were up to on July 22nd?
03:10 10   A    I believe at that time what I was to do was to report
03:10 11   back to Mr. Sunderland, not Mr. Deville.
03:10 12        MR. MULCAHY:  Your Honor, I'd move to strike as
03:10 13   being nonresponsive.
03:10 14        THE COURT:  Overruled.
03:11 15   BY MR. MULCAHY:
03:11 16   Q    Did you send this e-mail to anyone in the Bennion &
03:11 17   Deville camp?
03:11 18   A    I don't believe I did, no.
03:11 19   Q    Now, Mr. Schuster says:  "It was nice meeting you
03:11 20   yesterday.  We are looking forward to working with you as it
03:11 21   relates to the next steps in your process with Windermere
03:11 22   SoCal."  Do you see that?
03:11 23   A    Yes, I do.
03:11 24   Q    And you discussed with him what your plans were for
03:11 25   Windermere SoCal on July 22nd; did you not?
```

61

```
 1   A    I did not have specific plans myself, but I discussed
 2   the situation we were facing in Southern California, yes.
 3   Q    And that situation involved Windermere's next steps in
 4   its process with Windermere SoCal, meaning Mr. Bennion and
 5   Mr. Deville, correct?
 6   A    Yes.  That's correct.
 7   Q    All right.  He also then provided you with the
 8   financials on Bennion & Deville's operation, correct?
 9   A    Yes.  That is correct.
10   Q    So when you said that you didn't understand what the
11   financials were for Bennion & Deville, what you meant was
12   that they hadn't given them to us.  You were getting them
13   from Schuster, Gooding, and Johnson, correct?
14   A    No, sir.  That is not correct at all.
15   Q    Well, they're sending you financial information that
16   relates to sales by agent, et cetera, et cetera, correct?
17   A    What they are sending me are BrokerMetrics reports.
18   That's publicly available information.  They of course do
19   not have Mr. Deville and Mr. Bennion's financials.
20   Q    Okay.  So — well, it shows the top-line sales; doesn't
21   it?
22   A    Yes.
23   Q    Okay.  And they sent that to you because you asked them
24   to do that while you were on July 22nd, right?
25   A    I don't remember whether I asked them to or whether
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

62

```
 1   Mr. Schuster just chose to, but it would be logical that
 2   they would share those with me because — well, yes.
 3   Q    And then on the very same day they sent you another
 4   e-mail attaching the financials for the Bennion & Deville
 5   two offices in Orange County.  Do you remember that?
 6   A    Again I would quibble with your term financials.
 7   Q    Do you know who Mr. Riley is?
 8   A    Don Riley, yes, I do know Mr. Riley.
 9   Q    He was working for Windermere at that time as well;
10   wasn't he?
11   A    Mr. Riley, I believe, at this point was working for our
12   title entity and not working at the Windermere Services
13   Company.
14   Q    He had been working with Bennion & Deville before that,
15   correct?
16   A    Yes.  I think — I couldn't tell you the years.
17   Q    And do you know what kind of information they were
18   sharing with him on a regular basis?
19   A    No.  I would have no idea what they were sharing with
20   Mr. Riley.
21   Q    Financials.  Are you aware of that?
22   A    No.  I would not know that.
23   Q    Now, the very next day, July 24th, Mr. Schuster,
24   Mr. Johnson, and Mr. Gooding sent you the information on
25   which of Bennion & Deville's offices they wanted, correct?
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

63

```
 1   A    I requested information on — I asked them to look at
 2   Mr. Bennion and Deville's offices and rank them in the order
 3   of ones they might be interested in acquiring.  That is
 4   correct.  I'm not sure when they sent that to me.
 5   Q    Well, look at Exhibit 487 and tell us if that helps you
 6   remember.
 7   A    (Witness complies.)  Yes, that does help me remember.
 8   I remember this earlier with Mr. Feasby.
 9   Q    So after your meeting on July 22nd, during the
10   following two days Johnson, Schuster, and Gooding sent you
11   this information on the Bennion & Deville office performance
12   as well as their list of preferred offices to get from them,
13   correct?
14   A    Yes.  I asked for it.
15   Q    Yes.  And they also provided you with the information
16   relating to all of the aspects of their business operation,
17   correct?
18   A    I don't know if it was at this time, but then through
19   today Mr. Gooding and Mr. Johnson made their financials
20   available to me.
21   Q    So Exhibit 487 is the information that you requested,
22   correct?
23   A    Yes.  That is correct.
24   Q    And the first part of it is which offices they wanted
25   to take from Bennion & Deville, correct?
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

64

```
 1   A    No, I don't believe that is correct.
 2   Q    Well, it says: "I am listing the following offices and
 3   I'm ranking them in terms of which they would prefer first,
 4   second, third, fourth, fifth."  Do you see that?
 5   A    I'm not quibbling with that, but they had no intention
 6   of taking anything, and they certainly weren't interested in
 7   all of these offices.
 8   Q    So after your meeting on the 22nd, this was just an
 9   exploratory activity by you and the folks?
10   A    Precisely.
11   Q    Okay.  And you were supposed to get back to them to
12   provide them with a report on your activities relating to
13   the SoCal steps, the process, correct?
14   A    I don't know that that's correct, no.
15   Q    Well, look at Exhibit 489.  This is an e-mail that you
16   received from Mr. Schuster on July 29th, which would be one
17   week after your meeting, correct?
18   A    Yes.  That is correct.
19        MR. MILCAHY:  Your Honor, I offer this exhibit in
20   evidence.
21        THE COURT:  Are we still on 487?
22        MR. MILCAHY:  It might be in there.  It's 489.
23        THE COURT:  489, I'm sorry.
24        Any objection to 489 if it's not in?
25        MR. FEASBY:  I believe it's in, Your Honor.
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER


**66**

1   THE COURT: All right. 489 is received.

2   (Exhibit 489 received in evidence)

3 BY MR. MULCAHY:

4   Q Now, Mr. Schuster wrote you this because he was just

5 checking in with you one week after your meeting. Do you

6 see that?

7   A Yes, I do.

8   Q And he said that he wanted to make sure you had

9 received his e-mails. You understood that to be the e-mails

10 we just looked at with the financial information and the

11 ranking of the offices and all of that stuff, right?

12   A Yes — the BrokerMetrics reports and the offices.

13   Q Uh-huh, and also the report on how well they were doing

14 as of July 29th in their first month of business, correct?

15   A If you say so, yes.

16   Q Well, confirm it for me if I'm —

17   A I don't have any reason to quibble. I would ask for

18 that type of thing.

19   Q So had you reviewed that stuff a week afterwards when

20 they were coming to you to find out what's going on?

21   A I don't know whether I had or had not.

22   Q Do you remember when you provided them with the updates

23 that they were looking for following your conversation on

24 July 22nd with them?

25   A No, sir.

**66**

1   Q Now, you do recall, though, do you not, that you were

2 to report back to Mr. Gooding and Mr. Johnson to provide

3 them with the results of your next steps in this area

4 representation process, we'll call it?

5   A Yes, I was.

6   Q And you were to get back to them by August 1st, which

7 would be nine days later, correct?

8   A I don't know when I was supposed to get back to them.

9   Q Look at Exhibit 490 and tell us if that helps refresh

10 your memory.

11   A (Witness complies.) Mr. Schuster was under the

12 understanding that I was to get back to him by some date,

13 but I don't know if that was my understanding.

14   Q Well, he says to you: "Any update? Expected to hear

15 from you on Friday."

16     That would have been August 1st; wouldn't it?

17   A If you say so.

18   Q And do you have any idea why he would expect to hear

19 from you other than because you told him you would get back

20 to him?

21   A No. I just don't know when I was supposed to get back

22 to him.

23   Q I see. Well, Mr. Schuster was under the impression as

24 a result of talking with you at the meeting that you would

25 be getting back to him within nine days; wasn't he?

**67**

1   A I don't quibble with that.

2   Q Okay. And so did you have a report for him on the

3 steps to take back the area rep agreement?

4   A No. He was not looking for any type of report from me.

5   Q Well, Mr. Schuster then sent you another e-mail on

6 August 12th, just a few days later; didn't he?

7   A If you say so.

8   Q Look at Exhibit 272.

9   A (Witness complies.) Yes, sir.

10     MR. MULCAHY: Your Honor, I believe this is in

11 evidence.

12     MR. ADAMS: It is.

13 BY MR. MULCAHY:

14   Q Mr. Schuster says to you on August 12th, just a few

15 days later: "Can we push back our call to 3:00 p.m. today?

16 I will call you then if that's okay."

17     So is it fair to say that you scheduled a

18 telephone call for August 12th so that you could provide

19 Mr. Schuster with your report on these steps that were being

20 taken by your employer?

21   A It's fair to say we had scheduled a telephone call.

22   Q And do you remember that call?

23   A No, I don't know that I do.

24   Q You sent the e-mail just above that says in response:

25 No problem. We can push it back.

**68**

1   A Yeah.

2   Q Does that refresh your memory at all?

3   A I talked to Mr. Schuster many times, so I don't know

4 what call you're talking about.

5   Q I'm talking about the call that took place on

6 August 12th, 2014. Do you recall that?

7   A No, I don't recall that call specifically.

8   Q Do you remember that during the telephone call, you

9 told Mr. Schuster that the transfer of the Bennion & Deville

10 services area representation agreement back to Windermere

11 was, quote, "about done," end quote?

12   A I don't believe I would have told him that it was about

13 done. I told him that we were working on it. And at that

14 time I was talking to Mr. Sunderland as well, and I was

15 optimistic. But I don't think I ever used the phrase about

16 done.

17   Q Okay. We'll see as we go.

18     Now, after your meeting you then went to

19 Mr. Drayna and told Mr. Drayna to put together a draft

20 agreement or a series of agreements. Do you recall that?

21   A Are those agreements that we would be terminating the area

22 rep rights with the negotiations I was doing with them?

23   Q Yes.

24   A Yes. Yes, I did. I told Mr. Drayna that.

25   Q And so when you went to Mr. Drayna, if I heard you



69

```
03:22   1   correctly, you told him what the agreement should say; is
03:22   2   that right?
03:22   3   A    Yes, because I was the only one that would know those
03:22   4   terms that I had negotiated with Mr. Sunderland.
03:22   5   Q    So the terms of that draft agreement that Mr. Drayna
03:22   6   put together were your idea, Mr. Teather's idea about what
03:23   7   should happen, correct?
03:23   8   A    No.  Those terms were between myself and
03:23   9   Mr. Sunderland.
03:23  10   Q    And you told Mr. Drayna to put them together because
03:23  11   that is what you wanted to see happen, correct?
03:23  12   A    That's what I believe Mr. Sunderland and I agreed would
03:23  13   happen.
03:23  14   Q    Well, my point is this.  You dictated the terms of the
03:23  15   draft agreement to be provided to Mr. Sunderland, correct?
03:23  16   A    With Mr. Sunderland I spoke about the terms.  Once we
03:23  17   reached an agreement as to what those terms would be, I
03:23  18   tried to relay those to Mr. Drayna so he could provide me a
03:23  19   document that reflected those terms.
03:23  20   Q    And so it's fair to say, is it not, that the terms of
03:23  21   that draft agreement represent what you wanted to see happen
03:23  22   with Bennion & Deville?  Correct?
03:23  23   A    I agreed with Mr. Sunderland that it was a good way to
03:24  24   handle it, yes.
03:24  25   Q    Now, you have said that you could have sent a notice of
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

70

```
03:24   1   termination rather than this agreement, correct?
03:24   2   A    Yes, certainly.
03:24   3   Q    And you said that you always had the right to terminate
03:24   4   the area rep agreement without cause, correct?
03:24   5   A    No.  When they were delinquent — I'm sorry.  Without
03:24   6   cause, yes.  We could always terminate the area
03:24   7   representative agreement without cause at any time we chose.
03:24   8   Q    And you said rather than going down this road with this
03:24   9   draft agreement, the easiest way to accomplish taking the
03:24  10   rights back were to simply issue the 180 days termination
03:24  11   without cause.  That would have been the easiest way to go
03:24  12   about it, correct?
03:24  13   A    No, sir.
03:24  14   Q    Don't you remember saying that the easiest way to
03:24  15   accomplish taking the rights back, that you always had the
03:24  16   right to terminate the ARA on 180 days' notice?
03:25  17   A    Yes.  We did always have that right.
03:25  18   Q    And what you want everyone here to believe is that you
03:25  19   didn't issue the 180-day notice because you were, quote,
03:25  20   "trying to fix something," end quote, correct?
03:25  21   A    Yes, of course.
03:25  22   Q    And you wanted to fix something so that it would meet
03:25  23   the goals of your company and you, correct?
03:25  24   A    No, sir.  That is not correct.
03:25  25   Q    Well, clearly if you agreed this is what you wanted to
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

71

```
03:25   1   see happen going back to August of 2014, then that would be
03:26   2   consistent with the company's goals in dealing with Bennion
03:26   3   & Deville, correct?
03:25   4   A    If you are referring to Mr. Bennion and Mr. Deville's
03:25   5   services company, our services company, and the other
03:25   6   affiliates, yes.  My goal was to meet the objectives of each
03:26   7   company so we could resolve this in a way that we all felt
03:26   8   positive about.
03:26   9   Q    Okay.  Let's talk about the objective.
03:26  10   A    Yes.
03:26  11   Q    Your objective was to terminate the area representation
03:26  12   agreement, correct?
03:26  13   A    In a fair way where Mr. Deville and Mr. Bennion would
03:26  14   feel like that was the proper solution.
03:26  15   Q    Your goal was to terminate the area representation
03:26  16   agreement after you came back from meeting with Schuster,
03:26  17   Johnson, and Gooding, and put this agreement with
03:26  18   your lawyer, correct?
03:26  19   A    That wouldn't be accurate, no.
03:26  20   Q    Well, did you want to achieve something other than what
03:26  21   is in this agreement?
03:26  22   A    I feel like you're implying that we wanted to do it
03:26  23   unilaterally.  We wanted to do it with the consent of
03:26  24   Mr. Bennion and Mr. Deville.  If we couldn't achieve that
03:26  25   consent at that time, then that would not be our goal.
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

72

```
03:26   1       In other words, if they were sincerely interested
03:26   2   in actually performing the jobs of area representatives, I
03:27   3   wasn't adverse to that at that time either.  This was one of
03:27   4   the solutions we were proposing.
03:27   5   Q    When you have Mr. Drayna put this agreement together,
03:27   6   you wanted to give it to them, have them sign it, and then
03:27   7   you would have achieved what you consider to be your
03:27   8   company's goals on this issue, correct?
03:27   9   A    I thought that was the goal of ours and Mr. Bennion and
03:27  10   Mr. Deville's jointly.
03:27  11   Q    The joint goals as you call them involve a termination
03:27  12   of the area rep agreement, correct?
03:27  13   A    Yes, sir.
03:27  14   Q    And you recall — well, let me put it this way.  You
03:27  15   did not want to terminate the franchise agreements, correct?
03:27  16   A    No, sir.
03:27  17   Q    Well, the agreements that were put together provide for
03:27  18   the termination of the area representation agreement.  Do
03:27  19   you agree with me on that?
03:27  20   A    Yes.
03:27  21   Q    But they do not provide for the termination of the two
03:27  22   franchise agreements, one for Coachella Valley and the other
03:27  23   for San Diego, right?
03:27  24   A    No, sir.  The intent that I was working on with
03:28  25   Mr. Sunderland is that they could continue to operate their
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

73

```
03:28   1   franchises.
03:28   2   Q     So my point is you wanted to terminate the area
03:28   3   representative agreement but not the franchise agreements,
03:28   4   right?
03:28   5   A     Yes.  I agree with you.  We wanted them to remain as
03:28   6   franchisees but not be responsible for the services.
03:28   7   Q     Okay.  And you well knew that the area representative,
03:28   8   the Bennion & Deville area representatives, were also
03:28   9   parties to the two franchise agreements that Bennion &
03:28  10   Deville had for Coachella and San Diego, correct?
03:28  11   A     I don't know if I knew that, no.
03:28  12   Q     Well, you gave the terms to Mr. Drayna to put together.
03:28  13   Did you understand the situation when you gave him these
03:28  14   instructions?
03:28  15   A     Yes.  When I give instructions to Mr. Drayna, I give
03:28  16   him the objective of what I'm trying to accomplish.  He's
03:28  17   really responsible for how that works mechanically as a
03:29  18   lawyer.
03:29  19   Q     And you're a lawyer, too, right?
03:29  20   A     No.  I was a lawyer a long, long time ago.
03:29  21   Q     All right.  So let's do it this way, then, if we must.
03:29  22   Look at Exhibit 729.  This is —
03:29  23   A     Is that in the same booklet, sir?
03:29  24   Q     It's in the booklet that you were looking at with your
03:29  25   lawyer.
```

74

```
03:29   1   A     With Mr. Feasby?
03:29   2   Q     Yes.  Yes.
03:29   3   A     I have it in front of me, sir.
03:29   4   Q     All right.  So you received a copy of Mr. Drayna's
03:29   5   e-mail to Sunderland, right?
03:29   6   A     Yes, I did.
03:29   7   Q     I take it you reviewed the draft agreements that he
03:29   8   included with the e-mail before he actually sent them out?
03:29   9   A     I probably did not do that.  I generally trust
03:30  10   Mr. Drayna to prepare legal documents, and I actually do not
03:30  11   normally read them.
03:30  12   Q     Okay.  But you were very clear in your instructions to
03:30  13   Mr. Drayna about how these agreements should read and what
03:30  14   provisions would be in them, correct?
03:30  15   A     Yes.  That is correct.
03:30  16   Q     All right.  Look, then, at page 7.  Well, let's start
03:30  17   with page 6.
03:30  18   A     We're — you're talking about on the exhibit paging?
03:30  19   Q     Yes, I am.  Are you there?
03:30  20   A     Yes.  I have it.  Thank you.
03:30  21   Q     Okay.  Now, there are three draft agreements here,
03:30  22   right?  Mr. Drayna put together three draft agreements
03:30  23   pursuant to your instructions, correct?
03:30  24   A     Yes.  It appears he put together a flat fee reduction
03:30  25   addendum, a termination agreement, and he was intending to
```

75

```
03:31   1   amend a promissory note.  So, yes, three documents.
03:31   2   Q     All right.  Let's talk about them one at a time.
03:31   3   A     Sure.
03:31   4   Q     The promissory note was just a typical part of your
03:31   5   relationship with Bennion & Deville, your doing another
03:31   6   adjustment to a balloon payment, correct?
03:31   7   A     I don't know if I would describe it as typical.
03:31   8   Q     Well, it was consistent with the discussions that you
03:31   9   were having on an ongoing basis, correct?
03:31  10   A     Yes.  That agreement would have reflected the agreement
03:31  11   that we'd reached with Mr. Bennion and Mr. Deville as to how
03:31  12   they would get out of default and back on track regarding a
03:31  13   promissory note.
03:31  14   Q     All right.  The second agreement is a draft termination
03:31  15   agreement.  Do you recall?  Well, look at it and tell us if
03:31  16   you need to.
03:31  17   A     Yes.  The second agreement is a termination agreement.
03:31  18   Q     Now, this termination agreement has two separate
03:31  19   aspects to it; doesn't it?
03:32  20   A     I'm not certain.
03:32  21   Q     Well, look at it, and start with page 4 at the bottom.
03:32  22   A     I'm looking at page 4, yes.
03:32  23   Q     At the bottom.
03:32  24   A     Yes.
03:32  25   Q     It says —
```

76

```
03:31   1         MR. MULCAHY:  John, if we can get to the part on
03:32   2   the bottom, the last paragraph just above agreement.
03:32       BY MR. MULCAHY:
03:32   4   Q     It says legal mumbo jumbo.  The parties agree as
03:32   5   follows:  Number one, termination of the area representation
03:32   6   agreement.  So the first thing that this agreement was
03:32   7   intended to do was terminate the area representation
03:32   8   agreement, correct?
03:32   9   A     Yes.
03:32  10   Q     And then the second thing that this agreement was to
03:32  11   accomplish was to take the area representative off the
03:32  12   license agreement.  Do you recall that?
03:33  13   A     No, sir.  I didn't author these documents.
03:33  14   Q     Look at paragraph two on page 7.
03:33  15   A     I'm looking at — oh, wait.  That's 9.
03:33  16   Q     It's entitled amendment of the franchise agreements.
03:33  17   A     Yes, sir.
03:33  18   Q     Bennion & Deville and the area representative, which is
03:33  19   their company, shall cooperate with Windermere in notifying
03:33  20   all franchisees in the region of the termination of the area
03:33  21   representation agreement.
03:33  22         Let's stop right there.  The region is Southern
03:33  23   California in its entirety; is it not?
03:33  24   A     It would be the franchises currently operating in
03:33  25   Southern California, yes.
```

1    Q    And the franchises that were currently operating in
2    Southern California were first and foremost the franchise
3    that was owned and operated by Bennion & Deville in
4    Coachella Valley, correct?
5    A    Yes, that was one of the franchises.
6    Q    And the other franchise that was being operated by
7    Bennion & Deville was the franchise agreement for the
8    coastal area in San Diego, correct?
9    A    Yes.  That is correct.
10   Q    And each of those franchise agreements has the area
11   representative as a party with a legal interest in those
12   franchise agreements.  Do you recall?
13   A    No, sir.
14   Q    You don't remember that?
15   A    No, sir.
16   Q    Well, this would terminate the involvement of the area
17   representative in whatever franchise agreements the area
18   representative happens to also be a party to, correct?
19   A    I'm sorry.  Could you repeat that question?
20   Q    It says all franchise agreements in the region.  You
21   agree with me that that would include Bennion & Deville
22   Coachella Valley, Bennion & Deville San Diego, and all of
23   the other franchisees in San Diego and elsewhere, correct?
24   A    I think it would be Gooding and Johnson and the
25   Riverside franchisee also, yes.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

1    Q    All franchise agreements in the region shall be amended
2    to eliminate any reference to the area representative and
3    shall provide that effective with fees for September '14,
4    all franchise and other fees will be remitted directly to
5    Windermere and not the area representative.
6         Does that refresh your memory that the area
7    representative was not only a party to the area
8    representative agreement but also had an interest as a party
9    in all of the franchise agreements, including the Bennion &
10   Deville agreements.  Does that ring a bell now?
11   A    It seems logical to me that if Mr. Bennion and
12   Mr. Deville's company, Windermere Services Southern
13   California, was no longer going to be the area
14   representative, then they shouldn't represent themselves as
15   such on other agreements.
16        Beyond that the best I could do would be try to
17   tell you what I remembered Mr. Drayna explained to you about
18   this same issue.
19   Q    But the point is that the interest of the area
20   representative, the Bennion area representative in the
21   Coachella Valley and in the San Diego franchise agreements,
22   would no longer exist, correct?
23   A    I'm not sure.
24   Q    Now, the second document is an addendum to the
25   franchise license agreement that Bennion & Deville held in

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

1    Coachella Valley, correct?
2    A    I'm sorry.  Where does that one start?
3    Q    It starts on page 3.
4    A    I went the wrong way, 50/50 and I lost.
5         I got it.  Addendum to franchise license
6    agreement, yes.
7    Q    Okay.  So first and foremost, the termination agreement
8    terminates the area representation agreement, and it
9    terminates the Bennion & Deville area representative's
10   interest in the franchise agreements.
11        This is then an addendum to the Coachella
12   franchise agreement held by Bennion & Deville, correct?
13   A    Yes.  That is what it's titled.
14   Q    The first thing that happens is the area rep, their
15   area rep, is no longer a party to the agreement.  Fair
16   enough?
17   A    You would have to ask Mr. Drayna how it works.
18   Q    Well, isn't that the way it reads when you look at it,
19   Mr. Teather?
20   A    I know that the goal, if they took the deal, was to
21   have them --
22   Q    Excuse me.
23   A    Okay.
24   Q    That's how you interpret the language that we just
25   read; is it not?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

1    A    I feel like that's Mr. Drayna's department.
2    Q    This addendum to the Coachella Valley license agreement
3    is an addendum, meaning it amends the Coachella Valley
4    license agreement, but it's an amendment to that license
5    agreement alone, correct?
6    A    Yes.  It appears to be an addendum to the franchise
7    license agreement for Coachella Valley, yes.
8    Q    And this addendum is part of your proposed deal
9    provided that the Coachella Valley license agreement would
10   remain in place without the area representative, but it
11   would also get a discount on fees, correct?
12   A    Yes.  I think that our proposed -- I'm certain our
13   proposed deal allowed for a 50 percent discount in fees in
14   the Coachella Valley.  Yes, sir.
15   Q    And when the area representative -- well, because the
16   area representative was a party to the Coachella Valley
17   franchise, that resulted in a 50 percent reduction in the
18   cost of doing business because 50 percent of the royalties
19   are paid to the other entity.  So it results in a net effect
20   of only having to pay half the fees in Coachella Valley,
21   correct?
22   A    Yes.  If we discount their fees by 50 percent, they
23   would only pay the other 50 percent in fees.  I think that
24   was the agreement, yes.
25   Q    Now, there is no addendum that would amend the San

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER



81

```
03:39   1   Diego franchise agreement held by Bennion & Deville,
03:39   2   correct?
03:39   3   A    No.  I don't believe that we were offering — yes, in
03:39   4   the Coachella Valley they go to 50 percent.
03:39   5   Q    Yes.
03:39   6   A    In my deal on the coast they would pay the full $5,000
03:39   7   per office.
03:39   8   Q    So because there's no amendment to the San Diego
03:40   9   region, when the area representative comes out as a part of
03:40  10   this termination agreement, that automatically results in a
03:40  11   doubling of the fees that were being paid by Bennion &
03:40  12   Deville in San Diego, correct?
03:40  13   A    No.  I don't know that I would agree with that, no,
03:40  14   sir.
03:40  15   Q    Well, if the area rep comes out, then they're not
03:40  16   entitled to the 50 percent discount, right?
03:40  17   A    Yes.
03:40  18   Q    And if they're not entitled to the 50 percent discount,
03:40  19   then they pay the standard royalty rate, correct?
03:40  20   A    I'm sorry, but your question presumes that the 50
03:40  21   percent that they were able to keep under the area rep
03:40  22   agreement, you're suggesting Mr. Deville's position that
03:40  23   that was for his pocket.  That isn't my position.  My
03:40  24   position —
03:40  25   Q    Listen to my question.
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

82

```
03:40   1   A    Yes.
03:40   2   Q    Because there is no addendum to the San Diego
03:40   3   agreement, they no longer get the 50 percent discount that
03:41   4   they got in San Diego when they were the area rep, correct?
03:41   5   A    I don't believe they ever received a discount in San
03:41   6   Diego.  I believe that the money —
03:41   7   Q    The fees that they pay are 50 percent less than the
03:41   8   standard rate, correct?
03:41   9   A    No, that is not true.  They were supposed to pay all of
03:41  10   the $5,000 to their servicing company.  They were then
03:41  11   allowed to keep 50 percent inside of their services company
03:41  12   to then run that company.  So to call it a discount is not a
03:41  13   fair characterization of that money.
03:41  14   Q    Well, let's use a different word then because we are
03:41  15   both talking about the same thing.  If they signed this
03:41  16   deal, they would no longer receive the 50 percent as the
03:41  17   area rep, correct?
03:41  18   A    That is correct.  They would not have any duties as
03:41  19   area representative, so it wouldn't be fair.
03:41  20   Q    If the franchisee that they're operating in San Diego
03:41  21   is paying the full rate but the area rep gets 50 percent,
03:42  22   then Bennion & Deville end up with paying half the normal
03:42  23   rate, right?
03:42  24   A    I don't know that I agree with that, no, sir.  They're
03:42  25   paying the same rate.  They just don't get to put 50 percent
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

83

```
03:42   1   into their area rep company.
03:42   2   Q    If they signed this deal, the royalties that Bennion &
03:43   3   Deville through its entities for San Diego —
03:42   4   A    Yes, sir.
03:42   5   Q    — would double; wouldn't they?
03:42   6   A    No, they would not.
03:42   7   Q    Now, do you remember getting back to Mr. Schuster in
03:42   8   September of 2014?  In other words, he's waiting since July.
03:42   9   Do you remember that?
03:42  10   A    Yes.  I may have talked to him in September.  I'm
03:42  11   certain I did.
03:42  12   Q    And he was waiting for you to tell him that the area
03:43  13   representation agreement had been taken back from Bennion &
03:43  14   Deville by Windermere, correct?
03:43  15   A    Mr. Schuster would have wanted to know the status of
03:43  16   our negotiations with Bennion & Deville, yes.  That is
03:43  17   correct.
03:43  18   Q    And he was very frustrated; wasn't he?
03:43  19   A    I couldn't speak for Mr. Schuster.
03:43  20   Q    Now, do you remember that he went over your head and
03:43  21   went to Mr. Wood and CB Jacobi because you weren't getting
03:43  22   back to him fast enough?
03:43  23   A    I think I saw that when you were talking with
03:43  24   Mr. Schuster on the stand, yes, sir.
03:43  25   Q    Okay.  And as of September 25th, you sent an e-mail to
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

84

```
03:42   1   Mr. Schuster and you said:  "I have got an update."  Do you
03:43   2   remember that?
03:43   3   A    If you say so.
03:43   4   Q    But as of September 25th, you had not heard from Rob
03:43   5   Sunderland or anybody else in response to the deal that you
03:43   6   had Mr. Drayna put together which we have just discussed,
03:43   7   correct?
03:43   8   A    I know that I did not have agreement.  I couldn't say
03:44   9   that I'd never heard from them.  I talked to Mr. Sunderland
03:44  10   pretty regularly.
03:44  11   Q    Well, do you remember that he never responded to that
03:44  12   proposal, ever?
03:44  13   A    They never accepted that proposal.
03:44  14   Q    He never even responded to you until at the end of the
03:44  15   year, acknowledging that he had even received it, correct?
03:44  16   A    I doubt that that is true.
03:44  17   Q    Pardon me?
03:44  18   A    I don't think that is true.
03:44  19   Q    Okay.
03:44  20   A    As a matter of fact, I'm pretty certain would have
03:44  21   talked to him on the phone to make certain that he received
03:44  22   it.
03:44  23   Q    Now, when you talked to Johnson and Gooding and
03:44  24   Schuster in September, they expressed the concern about
03:44  25   competing with Bennion & Deville.  That was their concern,
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER



85

03:44  1    correct?
03:44  2    A    I think it's unfair to say that they were just
03:44  3    complaining about the competition.
03:44  4    Q    Look if you will at Exhibit 280.
03:44  5         MR. MULCAHY:  This is in evidence.
03:45  6         THE WITNESS:  I have that in front of me, yes,
03:45  7    sir.
03:45  8    BY MR. MULCAHY:
03:45  9    Q    All right.  This is an e-mail you sent to Mr. Deville
03:45 10    on September 26th, correct?
03:45 11    A    Yes.  I have an e-mail from myself to Mr. Deville dated
03:45 12    October 15th.
03:45 13    Q    A month after Mr. Drayna put this agreement together
03:45 14    for you, correct?
03:45 15    A    Yes, sir.
03:45 16    Q    And you had heard nothing from anybody during that
03:45 17    month-long period?
03:45 18    A    I can't tell you that.  I don't know.
03:45 19    Q    You say:  "We have a problem with San Diego owners.  I
03:45 20    spoke with Fred and Rich this AM and they expressed the
03:45 21    opinion with some emotion that you and your organization are
03:45 22    competitors that inhibit their growth rather than a
03:45 23    franchisor supporting it."
03:45 24         If they were complaining about support or services
03:45 25    in general, as you've referred to it here, wouldn't you have

86

03:45  1    included it in your e-mail to Mr. Deville?
03:45  2    A    I don't know that, sir.
03:45  3    Q    Well, you never sent Mr. Deville an e-mail at any time
03:46  4    telling them that you felt they were in violation of their
03:46  5    area representation agreement by not providing enough
03:46  6    support; did you?
03:46  7    A    At this time I would not have done that.  I was hoping
03:46  8    to find a way that they could be successful in that job as
03:46  9    area representatives.
03:46 10    Q    Well, judging from the draft agreement that you put
03:46 11    together, you were hoping that they would give you back
03:46 12    services and take the area rep off their franchise
03:46 13    agreements.  That's what you were trying to accomplish,
03:46 14    correct?
03:46 15    A    What I was trying to accomplish was an agreement.  If I
03:46 16    wanted to just take it away, I would have done so.
03:46 17    Q    Well, if you sent a notice of termination without cause
03:46 18    of the area rep agreement pursuant to the area
03:46 19    representation agreement, you would be terminating the area
03:46 20    rep agreement, right?
03:46 21    A    If I sent a notice without cause to terminate the area
03:46 22    rep agreement, yes, I would be terminating the area rep
03:46 23    agreement.
03:46 24    Q    But you would still have in place the franchise
03:46 25    agreements with Bennion & Deville where the area

87

03:47  1    representative still had an interest in those agreements,
03:47  2    the franchise agreements; isn't that correct?
03:48  3    A    I think as we were trying to resolve it, what you had
03:48  4    me read before, I think we contemplated that, and that would
03:47  5    have to be changed in some way because you wouldn't want to
03:47  6    represent to people that they were still doing a job that
03:47  7    they were no longer doing.
03:47  8    Q    That's right.  You would have to get them to agree to
03:47  9    something that you had no control over.  You would have to
03:47 10    get them to agree to take the area representatives'
03:47 11    interests out of the franchise agreements.
03:48 12         You can't send a notice of termination of the area
03:48 13    rep agreement and at the same time terminate the license
03:48 14    agreements; now, can you?
03:48 15    A    That's not what was represented to me by legal counsel,
03:48 16    no, sir.
03:48 17    Q    Well, if you wanted them to continue as franchisees —
03:48 18    A    Yes, sir.
03:48 19    Q    — you had no choice but to continue with the area rep
03:48 20    as a stakeholder in those agreements, correct?
03:48 21         MR. FEASEY:  Your Honor, that calls for a legal
03:48 22    conclusion.
03:48 23         THE WITNESS:  I'm not sure I know, sir.
03:48 24         MR. FEASEY:  I object.
03:48 25         THE COURT:  Overruled.  You have got your answer,

88

03:47  1    Mr. Mulcahy.  Let's move on.
03:47  2    BY MR. MULCAHY:
03:47  3    Q    Look at Exhibit 281, please.  Now, we have looked at
03:47  4    this.  This is an e-mail that Mr. Deville sent to you,
03:47  5    correct?
03:47  6    A    Excuse me.  I haven't found it yet.  I'm looking for
03:47  7    281?
03:47  8    Q    Yes, sir.  It's in my notebook.
03:47  9         MR. ADAMS:  Your Honor, may I approach the
03:47 10    witness?
03:47 11         THE COURT:  You may.
03:47 12         THE WITNESS:  Sorry about that.  I have 281 in
03:47 13    front of me.  I apologize.
03:48 14    BY MR. MULCAHY:
03:48 15    Q    All right.  Now, Mr. Deville sent this e-mail to you
03:48 16    that appears on the bottom on September 26th, 2014, correct?
03:48 17    A    Yes, sir.
03:48 18    Q    And he said that he heard that they were supposed to
03:48 19    give up the services agreement, and he learned it from
03:49 20    Mr. Schuster.
03:49 21         Did you talk with Mr. Deville after you received
03:49 22    this?
03:49 23    A    I would say most likely yes.
03:49 24    Q    Well, you said that you had a number of conversations
03:50 25    with Mr. Deville about transferring the services.  When you

90

```
 1   read this and you read that he was surprised to hear this
 2   not from you but from Schuster and then made clear, quote,
 3   Bob B and I have no intention of giving up services and we
 4   should meet soon, was there any inability on your part to
 5   read that statement in this e-mail that he sent to you?
 6   A   No, sir.  I read that then and I've seen this e-mail
 7   several times during the course of this —
 8   Q   And did you talk with him after you received it?
 9   A   I'm sure that I did.
10   Q   Well, it's pretty clear that, at least in your mind as
11   of September 26th, the only thing he had to say was we are
12   not going to give it up, correct?
13   A   I doubt that he was sincere when he said that.  This
14   e-mail also indicates that he, myself, and Rob Sunderland,
15   who was his lawyer, were all aware of these ongoing
16   negotiations.  We certainly were.
17   Q   Well, this statement is pretty unequivocal; is it not?
18   A   What I'm questioning isn't what it reads.  I'm
19   questioning the sincerity of the statement.
20   Q   Oh, you think he didn't mean what he said?  Is that
21   what you're saying?
22   A   No.  I think he knew full well that we were having a
23   negotiation that we were in fact having.
24   Q   He also made it very clear that the negotiations were
25   over.  He was not going to give up the area rep agreement,
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

91

```
 1   right?
 2   A   I don't know that that is true, no, sir.
 3   Q   How else do you read this?
 4   A   Because later on we continued to talk about them giving
 5   up the area rep agreement and even made further proposals to
 6   them that included additional terms which they both asked
 7   for and received.
 8   Q   Nobody ever agreed to anything; did they?
 9   A   No, sir.  Mr. Deville never agreed to any of the things
10   that we were talking about ultimately.
11   Q   So when you're telling this jury I'm just trying to be
12   fair, I'm trying to figure out what would be best for one
13   person as opposed to another person, really it's Windermere
14   who you're trying to break out what would be best for a
15   person, right?
16   A   Of course not.
17   Q   Well, you have to agree with me, do you not, that while
18   you might want to talk about what is fair, while you might
19   talk about what you wanted to see happen, the simple fact of
20   the matter is you had an obligation to honor your
21   contractual obligations without regard to whether it was
22   something you personally wanted to see happen, correct?
23   A   Yes, that would be correct.
24   Q   Now, when we get to the end of the year, you still had
25   not heard from Sunderland or anyone else in response to the
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

91

```
 1   proposal that you sent — that you had Drayna send, correct?
 2   A   I don't know whether that's true or not.
 3   Q   Well, do you recall ever hearing anything?
 4   A   I don't recall them ever agreeing.  I'm certain we were
 5   still discussing it because the terms had changed by the end
 6   of the year.
 7   Q   Well, you weren't discussing it with Mr. Deville; were
 8   you?
 9   A   I don't know.  I would assume I did talk to Mr. Deville
10   about to this at some point, but whether or not I was talking
11   directly to Mr. Deville or to his counsel, Mr. Sunderland, I
12   couldn't tell you certainly.
13   Q   Well, surely Mr. Sunderland told you that he's the
14   lawyer.  He doesn't make the business decisions.  He has to
15   go to his client for that, right?
16   A   Mr. Sunderland represented to me that when he spoke to
17   me, he was speaking for Mr. Deville as his attorney.
18   Q   Look if you will at Exhibit 292.
19          MR. ADAMS:  It's in.
20          THE WITNESS:  (Witness complies.)  Yes, sir.
21   BY MR. MULCAHY:
22   Q   You're still talking with Schuster and Johnson and
23   Gooding about ramping up in the San Diego area as of
24   October 7th, correct?
25   A   Yes.  Certainly Mr. Gooding and Johnson wanted to open
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

92

```
 1   additional offices.
 2   Q   And Mr. Deville is not a party to that conversation; is
 3   he?
 4   A   No, sir.
 5   Q   Now, had you gotten back to Schuster, Johnson, and
 6   Gooding to let them know what it is that you were doing in
 7   your effort to take back the Windermere area representation
 8   agreement?
 9   A   Sir, I was never trying to take back anything.  What I
10   was trying to do was find an agreement between Mr. Bernion
11   and Mr. Deville myself as to who would handle the area
12   servicing rights in Southern California.
13   Q   As of October, Schuster, Gooding, and Johnson were
14   still down there in San Diego waiting for you to tell them
15   mission accomplished, correct?
16   A   No, sir.
17   Q   Look at Exhibit 492, please.
18   A   (Witness complies.)  Yes, sir.
19   Q   This is an e-mail that you received from Mr. Schuster
20   on October 21st, correct?
21   A   Yes, sir.
22   Q   Almost exactly three months after you met with them on
23   July 22nd; is that right?
24   A   Yes, sir.  That would be correct.
25   Q   And it's 19 days after your October 2nd meeting with
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER



93

03:55  1   them; isn't it?
03:55  2   A    Yes.  That is correct.
03:55  3   Q    And he says:  Hi, Mike.  Any updates to discuss?
03:55  4   A    Yes.
03:55  5   Q    Did you get back to him to give him an update on your
03:55  6   steps dealing with SoCal?
03:56  7   A    We were dealing with many issues at that time.  I can't
03:56  8   tell you.  This e-mail simply reads:  Any updates to
03:56  9   discuss?  So I couldn't tell you what I was talking to him
03:56  10  on that date unless you have something else that helps me.
03:56  11  Q    And while you're talking about these criticisms of
03:56  12  services, as of this same period of time you're talking
03:56  13  about working with Bennion & Deville to achieve great
03:56  14  success.  Do you recall that?
03:56  15  A    At some point Mr. Bennion and Mr. Deville did make it
03:56  16  clear that they would not reach — we couldn't reach an
03:56  17  agreement.  So at that point I had told Mr. Gooding and
03:56  18  Mr. Johnson that they're the area reps and let's give it a
03:56  19  shot and let's see if they can do that.  And I did try to
03:56  20  motivate Mr. Bennion and Mr. Deville to do it with
03:57  21  sincerity, yes.
03:57  22  Q    But you were down there running the show; weren't you?
03:57  23  A    No, sir.  There's no show that I was running.
03:57  24  Q    Well, how many times a week did you meet with Gooding
03:57  25  and Johnson during this period August, September, October,

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

94

03:57  1   November?
03:57  2   A    I couldn't tell you that, sir.  I probably went down
03:57  3   there monthly.
03:57  4   Q    Now, look if you will at Exhibit 325.
03:57  5   A    Is that again in your booklet, sir?
03:57  6   Q    Yes, it is.
03:57  7        MR. MULCAHY:  It's in evidence as well.
03:57  8        THE WITNESS:  I apologize, by the way.  These
03:57  9   aren't in numerical order, so I have to look at — I'm
03:57  10  looking for 325?
03:57  11       MR. MULCAHY:  Yes, you are — the second notebook.
03:57  12       THE WITNESS:  Oh, I'm sorry.
03:57  13       If you could tell me ahead of time which notebook,
03:57  14  it would help.  Thank you.
03:57  15  BY MR. MULCAHY:
03:58  16  Q    Do you see Exhibit 325?
03:58  17  A    Yes, sir.
03:58  18  Q    Okay.  This is an e-mail from Fred Schuster to you and
03:58  19  copying his partners, right?
03:58  20  A    Yes, sir.
03:58  21  Q    Now, let's — Mr. Schuster writes the understanding at
03:58  22  the time was that the servicing rights were to be
03:58  23  transferred back to Seattle within a few weeks and that Bob
03:58  24  Deville had agreed to that.  Do you see that?
03:58  25  A    Yes, I do see that.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

95

03:58  1   Q    Mr. Deville never agreed at any time that the servicing
03:59  2   rights would be transferred back to Seattle within a few
03:59  3   weeks; did he?
03:59  4   A    I believe that he agreed to the deal but then did not
03:59  5   follow the paperwork, so that deal was never accomplished.
03:59  6   You are correct.
03:59  7        MR. MULCAHY:  Your Honor, I would like to read
03:59  8   from this witness's sworn testimony on page 147 of his
03:59  9   second deposition volume, beginning on line 5 and continuing
03:59  10  through line 8.
03:59  11       THE COURT:  Go ahead.
03:59  12       MR. MULCAHY:
03:59  13       "Q    Did Mr. Deville in fact agree that the
03:59  14  servicing rights would be transferred back to
03:59  15  Seattle within a few weeks?
03:59  16       "A    No."
03:59  17  BY MR. MULCAHY:
03:59  18  Q    Now, during this same time frame, November 2014, you
04:00  19  were simultaneously discussing with Mr. Bennion and
04:00  20  Mr. Deville that you saw them with services for many years
04:00  21  to come.  Do you remember that?
04:00  22  A    That must have been the time, yes, when they had made
04:00  23  it clear that they weren't going to go forward with the deal
04:00  24  we had talked about.  So I did in fact tell them:  If you
04:00  25  want to do services, you can do it.  And if you do it, you

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

96

04:00  1   have my blessing.
04:00  2        What I'm trying to do is say if we're going to do
04:00  3   this, let's really do it, yes.
04:00  4        MR. MULCAHY:  Your Honor, I'd like to read from
04:00  5   this witness's sworn testimony on page 148, line 14 through
04:00  6   line 25.
04:00  7        THE COURT:  Go ahead.
04:00  8        MR. MULCAHY:
04:01  9        "Q    Now, during this same time period,
04:01  10  this earlier November 2014 time period, you were
04:01  11  simultaneously discussing with Mr. Bennion and
04:01  12  Mr. Deville that you saw them with services for
04:01  13  many years to come; didn't you?
04:01  14       "A    Let's see.  I think I hoped they would
04:01  15  be with services, yes.
04:01  16       "Q    But you in fact relayed to Mr. Bennion
04:01  17  and Mr. Deville that you saw them providing
04:01  18  services for many years to come, right?
04:01  19       "A    Yes.  That was — I wish they were
04:01  20  with us today."
04:01  21  BY MR. MULCAHY:
04:01  22  Q    That's what you were telling them, not that they were
04:01  23  defaulting on their obligations at services under the
04:01  24  agreement, correct?
04:01  25  A    That is correct, yes.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

97



```
04:01  1    Q   Now, do you see the e-mail from Mr. Schuster,
04:01  2    Exhibit 325?
04:02  3    A   Is that the one we were just talking about?
04:02  4    Q   Yes.
04:02  5    A   Yes.  I have that.
04:02  6    Q   In the third sentence, he says:  "When we started our
04:02  7    conversation a couple of months ago concerning the apparent
04:02  8    conflict with the Bobs, you and Windermere Seattle,
04:02  9    including Paul Drayna, CB, Geoff, and Jill, were clear that
04:02 10    something had to be done."
04:02 11           That conversation that you started with them a
04:02 12    couple of months before was during your meeting on July 22,
04:02 13    2014, in their offices with them; is it not?
04:02 14    A   Yes, sir.
04:02 15    Q   And they went on to say:  "So we were all in agreement
04:02 16    that since there was a conflict of interest with Bob being
04:02 17    our service manager and competing with us in the San Diego
04:02 18    market, it made sense for Windermere to take back Bob's
04:02 19    servicing rights.  We also understand that Bob will be
04:03 20    divesting from San Diego and focusing his time and
04:03 21    attentions in the Coachella Valley."
04:03 22           Now, if you wanted to run them out of Coachella
04:03 23    Valley, tell me if this would be a good way to do it.
04:03 24    A   Are we running them out of Coachella Valley now?
04:03 25    Q   We're running them — let's put it this way.
```

98

```
04:03  1    A   I think you're talking about San Diego.
04:03  2    Q   Yeah.  If you wanted to run them out of the San Diego
04:03  3    area as franchisees, one way that you might do that is to
04:03  4    terminate the services agreement but try to keep the
04:03  5    franchise agreement in place so that they would have to pay
04:03  6    twice as much in fees in San Diego, and that would create a
04:03  7    financial issue for them; isn't that right?
04:03  8    A   No, sir.
04:03  9    Q   The fact of the matter is as of this date, you wanted
04:03 10    services back and you wanted them out of San Diego; isn't
04:03 11    that right?
04:03 12    A   That's absolutely untrue.
04:03 13    Q   Now, Mr. Teather, as of January 19, 2015, some —
04:03 14    A   Is this after they had been terminated, sir?
04:04 15    Q   Well, it's just before you sent the notice of
04:04 16    termination.
04:04 17    A   Okay.  Thank you.
04:04 18    Q   On January 19, 2015, you still hadn't heard from
04:04 19    anybody, Sunderland or anybody, in response to your proposal
04:04 20    that you had Mr. Drayna put together, correct?
04:04 21    A   No, that's not true.
04:04 22    Q   Look at Exhibit 758, please.
04:04 23    A   Is that in your first binder or your second?
04:04 24    Q   I believe that it is in the binder that you were given.
04:04 25    A   From Mr. Feasby?
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

99

```
04:05  1    Q   Yes.
04:05  2           MR. ADAMS:  758?
04:05  3           MR. MULCAHY:  758.
04:05  4           MR. ADAMS:  Your Honor, may I approach the
04:05  5    witness?
04:05  6           THE COURT:  Yes.
04:05  7           (Counsel handing the witness a document)
04:05  8           THE WITNESS:  Yes, sir.  I have that in front of
04:05  9    me.
04:05 10    BY MR. MULCAHY:
04:05 11    Q   All right.  This is an e-mail that you sent to
04:05 12    Mr. Sunderland, correct?
04:05 13    A   Yes, sir.
04:05 14           MR. MULCAHY:  Your Honor, I offer it in evidence.
04:05 15           THE COURT:  758.  Any objection?
04:05 16           MR. FEASBY:  No objection, Your Honor.
04:05 17           THE COURT:  758 will be received.
04:05 18           (Exhibit 758 received in evidence)
04:05 19    BY MR. MULCAHY:
04:05 20    Q   You say to Mr. Sunderland:  "Please advise if you have
04:05 21    received a response to our offer to ensure permanent
04:05 22    discounts in the Coachella Valley and the payment of
04:06 23    25 percent of the fees for four years in San Diego."
04:06 24           You hadn't heard from him, correct?
04:06 25    A   It appears that, no, I had not heard from
```

100

```
      1    Mr. Sunderland in response that offer.
04:06  2    Q   And he never responded to this either; did he?
04:06  3    A   I don't know for certain whether he did or didn't.  I
04:06  4    do know that ultimately they rejected all offers to mutually
04:06  5    agree on how they could terminate their servicing rights.
04:06  6    Q   And so on January 27th, your company issued a notice of
04:06  7    termination of the area rep agreement without cause.  Do you
04:06  8    recall?
04:06  9    A   The first termination — I couldn't tell you date —
04:06 10    was without cause.  That is correct.
04:06 11    Q   And you did not terminate the franchise agreements,
04:06 12    correct?
04:06 13    A   No, sir, we did not terminate the franchise agreements.
04:06 14    Q   So when you terminated the area representation
04:06 15    agreement, you breached the franchise agreements because the
04:06 16    area rep still had a financial interest in the economic
04:07 17    model that provided for the discounts, correct?
04:07 18           MR. FEASBY:  Objection.  Calls for a legal
04:07 19    conclusion.
04:07 20           THE COURT:  Overruled.
04:07 21           You may answer.
04:07 22           THE WITNESS:  You would have to ask that question
04:07 23    of Mr. Drayna.  I don't know the legal consequence of how
04:07 24    our termination without cause would work.
      25
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER



101

BY MR. MULCAHY:

Q   Do you remember we talked about the termination agreement that you had Mr. Drayna put together?  We said there's two prongs.  One is terminate the area representation agreement.  Do you remember that?

A   Yes, I do.

Q   And the other is terminate the area representative's interest in the franchise agreement.  Do you recall that?

A   I recall you talking about it, yes.

Q   Without terminating the franchise agreements themselves, correct?

A   Yes.  They could still maintain their franchises and operate under the Windermere name, but they would no longer be the area rep over those franchises.  That's what we were conceptually trying to do.

Q   But you and your folks were not able to negotiate with Bennion & Deville the termination of the area representative's rights under the franchise agreements, correct?

A   I'm sorry.  Say that again.

Q   When Mr. Drayna put this together for you, you were trying to negotiate a termination of the area representative's interest in the franchise agreements.  Do you recall that?

A   Where you're losing me is their interest in the

102

franchise agreement.  That's the part that I don't understand.  What we were trying to do is terminate them as the area representative.

Q   Let me try to explain it to you.

THE COURT:  You don't explain.  You ask questions, Mr. Mulcahy.

BY MR. MULCAHY:

Q   Let me try to ask a question.

A   Thank you.

THE COURT:  Thank you.

BY MR. MULCAHY:

Q   The area rep company was still a party to the franchise agreements in Coachella Valley and in San Diego at the time when you issued the notice of termination of the area representation agreement, correct?

MR. FEASEY:  Objection.  Calls for a legal conclusion.  Improper expert witness testimony.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  I only know that our goal was to terminate their area rep rights, and our goal was not to terminate their franchises.

BY MR. MULCAHY:

Q   And after terminating Bennion & Deville while they were still waiting to go through September, you offered Johnson,

103

Gooding, and Schuster a million dollars to expand in Coachella Valley.  Do you remember that?

A   Yes, sir, I do.

Q   And you didn't provide a new area representative for them, correct?

A   I'm sorry.  I think I misspoke.  When Mr. Bennion and Mr. Deville gave us notice that they were going to terminate their franchises, we knew that all of the people who worked for Windermere in the Coachella Valley, some of them may want to stay with us.

So we did speak with Mr. Gooding and Johnson regarding how we might accomplish that, but I don't think we did that until we knew that they had terminated their franchises.

Q   You offered them a million dollars, right?

A   Yes, sir.

Q   And after Bennion & Deville were gone as the area representative, did you appoint a new area representative for them because they needed this support?

A   No, sir.  We did that from Seattle.

Q   So after terminating the area rep agreement and getting rid of Bennion & Deville, they continued on to prosper without any area representative whatsoever, correct?

A   No, sir.  That is not true.

Q   Well, they never had an area representative; did they?

104

A   That's not true.  Myself and others, many, many people from the services company in Seattle engaged in an effort to be area representatives as you describe it but in my terminology to help and assist them with their growth.

Q   In point of fact, Gooding and Johnson became their own area representative; didn't they?

A   No, sir.

Q   Look at Exhibit 411.

A   Could you tell me which binder that's in, please?

Q   It's in my binder.

A   You have two.

Q   The second binder.

A   411?

Q   Yes.

A   Yes, sir.

Q   This is an e-mail that you sent to Brian Gooding on September 2nd, 2015, correct?

A   Yes, sir.

MR. MULCAHY:  Your Honor, I offer this in evidence.

THE COURT:  Any objection to 411?

MR. FEASEY:  No objection.

THE COURT:  411 will be received.

(Exhibit 411 received in evidence)

BY MR. MULCAHY:

105

Q   You say:  Thanks for taking the time to chat today.  I want to confirm that after we have made an agreement regarding funding for potential new offices in the Coachella Valley, it is also our intention to offer your company the opportunity to receive 20 percent of all fee revenue derived for additional affiliates that you and Rich bring into Windermere in the future.

A   Yes.  That's correct.

Q   So they're performing the function of an area representative who finds you franchise prospects on the one hand, correct?

A   No, sir.  We were not asking them to be an area representative.

Q   You were telling them that if they could find for you prospects, you would pay them 20 percent of the initial franchise fee, right?

A   Yes, sir.  That is correct.

Q   So you got yourself a better deal.  Instead of 50 percent to Bennion & Deville, you got Johnson, Schuster, and Gooding to solicit new franchisees for you at a 60 percent discount, correct?

A   No, sir.  That is not correct.

MR. MULCAHY:  I have no further questions.

THE COURT:  Redirect?

MR. FEASBY:  Yes, Your Honor.  Just one second

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

106

here.

(Brief pause in proceedings)

REDIRECT EXAMINATION

BY MR. FEASBY:

Q   Mr. Teather, I want to pick up where Mr. Mulcahy left off with this Exhibit 411.

A   I would appreciate that.  Thank you.

Q   If you look at the last sentence of that e-mail —

A   Yes, sir.

Q   — it says:  Under this agreement you will be responsible for consulting with new affiliates only.  All responsibility to build infrastructure, et cetera, in Southern California will be ours.

What did you mean by the et cetera there?

A   That is correct.  What happened was we knew that we were going to lose the Windermere presence in the Coachella Valley.  At first we said we would be willing to invest up to $1 million for four offices and make that money payable through franchise fees.

The idea is that people work for us.  And if they work for Windermere and they want to keep working for Windermere, we wanted to maintain some infrastructure so they could do so.

When we spoke with Mr. Gooding and Mr. Johnson, they quickly realized that operating multiple offices in the

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

107

Coachella Valley would be too taxing for them and would take away too many resources of what they were trying to do in San Diego.

We also wanted to have more than one — the term I always use — more than one flavor of ice cream.  It's good to have multiple owners.  We aren't down there, so I told them that this is something we do.  It is not an area representative agreement.

If a franchise owner helps us find other people who may want to work within our network, we share some portion of those fees, in this case 20 percent, with those franchise owners who helped us meet the new people.  And the idea is then they will enjoy working with those new people.  They'll bring in people who they know, appreciate, and that type of thing.

So it's really just a way to get other people to work where we were soon going to lose all of the officers we had had for some time.

Q   And it says here — this reference to responsibility to build infrastructure, et cetera, is that something that you would expect an area representative to do?

A   That's my point.  They're not required to.  We will take the burden of making sure that they are serviced.  So far as we figure, service functions, that's like setting up education programs, coordinating meetings amongst owners —

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

108

all of the things that — offering advice on how to be successful within the system, all of the things we would take responsibility to make sure whomever joined us would be properly served.

Q   And those are the types of things that Mr. Bennion and Mr. Deville were supposed to be doing as the area representative in Southern California?

A   That's correct.

Q   And in your view, given the time that you dedicated to Southern California beginning in April, May, June of 2014 through the termination of the area representation agreement, were these the kinds of things that Bennion & Deville were doing?

A   No.  Those were the kinds of things that an area representative should do.  They were not the types of things that Bennion & Deville were actually doing.

Q   And the fact that they weren't actually doing those, was that one of the reasons that Gooding and Johnson complained to you about the service they were receiving?

A   We've been through all of that, and, yes.

Q   And for Windermere Seattle to take on the responsibility to build infrastructure, et cetera, in Seattle, would there be a cost associated with that?

A   Of course.

Q   And can you estimate for me over the course of a year

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

109

```
04:17  1   what that cost might be?
04:17  2   A   I'm trying to think.  I sit in on those budget
04:17  3   meetings, and I'm not the great budget guy.
04:17  4   Q   Let me ask you this.  Do you think it's more than the
04:17  5   30 percent savings that Mr. Mulcahy alluded to here for the
04:17  6   fee revenue?
04:17  7   A   Yes.  I can assure you that Windermere has not been
04:17  8   successful from that standpoint in Southern California.  It
04:17  9   costs us more to service people.
04:18 10   Q   If you can grab the binder that we have, at least for
04:18 11   this one.
04:18 12   A   I got it.
04:18 13   Q   Sorry.  I already misled you.  It's going to probably
04:18 14   be in the second binder of Mr. Mulcahy's there.
04:18 15   A   I have two of two in front of me.
04:18 16   Q   758, is that in there?
04:18 17   A   I've got 759.
04:18 18       MR. FEASEY:  It has been admitted into evidence.
04:18 19   It's fairly short.  You can look on the screen there.
04:18 20   BY MR. FEASEY:
04:18 21   Q   Do you see it?
04:18 22   A   Yes, sir.
04:18 23   Q   Do you remember discussing this e-mail with
04:18 24   Mr. Mulcahy?
04:18 25   A   Yes, sir, I do.
```

110

```
04:18  1   Q   And in this e-mail you are discussing an offer that had
04:19  2   been made to Mr. Bennion and Mr. Deville through
04:19  3   Mr. Sunderland for them to turn over the area representation
04:19  4   rights and you would provide them with something in place of
04:19  5   that.  Is that fair?
04:19  6   A   Yes, that's correct.  Mr. Sunderland expressed to me
04:19  7   that they were looking for some incentive on the coast, and
04:19  8   this is what we came up with.
04:19  9   Q   And this also includes a 25 percent fee from current
04:19 10   franchisees for a negotiable number of years.  Do you see
04:19 11   that?
04:19 12   A   Yes.  I believe that ultimately turned out to be a
04:19 13   four-year time period.
04:19 14   Q   Was this 25 percent fee included in the offer that was
04:19 15   drafted — I shouldn't say offer — in the agreement that
04:19 16   was drafted up by Mr. Drayna in August of 2014?
04:19 17   A   No.  I think this was an additional term that we were
04:19 18   offering to them.
04:19 19   Q   So this was a different offer than what you guys were
04:19 20   discussing — by you guys, I mean you and Mr. Sunderland —
04:19 21   in August of 2014?
04:19 22   A   Yes.  Mr. Sunderland said that they wanted some
04:19 23   incentive for the coast, and so that's what we came up with.
04:20 24   Q   Now —
04:20 25   A   And by the way, we weren't asking them to work.  This
```

111

```
04:20  1   money was for their pocket.  They weren't required to
04:20  2   provide any area representative functions.
04:20  3   Q   That was just to sweeten the pot, so to speak?
04:20  4   A   So to speak, yes.
04:20  5   Q   Now, if you can grab that binder that we have there.
04:20  6   A   We've got a lot of binders.
04:20  7   Q   The one that I started with, the black one.
04:20  8   A   Yes, sir.
04:20  9   Q   Mr. Mulcahy said in his examination of you with regard
04:20 10   to the documents that were prepared by Mr. Drayna, he said
04:20 11   Mr. Sunderland never got back to you.  He said he never
04:21 12   responded.  I wrote it down, in quotes, he never responded.
04:21 13   A   I remember that question, yes.
04:21 14   Q   Take a look at Exhibit 731.
04:21 15       MR. FEASEY:  This has been admitted.
04:21 16       THE WITNESS:  Yes, sir.  I have that in front of
04:21 17   me.
04:21 18   BY MR. FEASEY:
04:21 19   Q   And you see at the bottom Mr. Drayna's August 27th
04:21 20   e-mail forwarding the documents?
04:21 21   A   Yes, sir.
04:21 22   Q   And this is the addendum to the promissory note as well
04:21 23   as the termination agreement and the addendum to the
04:21 24   franchise agreement, correct?
04:21 25   A   Yes, sir.
```

112

```
04:21  1   Q   And if you look at Mr. Sunderland's September 10th
04:21  2   e-mail, it says:  Hello, Paul.  I just wanted to touch base.
04:21  3   Mike and I have spoken some and plan to follow up this week
04:21  4   to move forward.  I just wanted to make sure you didn't
04:21  5   think I was sidetracked.
04:21  6       So you in fact did receive a response from
04:21  7   Mr. Sunderland; isn't that correct?
04:22  8   A   Yes.  It's hard for me to remember between telephone
04:22  9   calls and written response.  But, yes, apparently he
04:22 10   responded in writing.
04:22 11   Q   And you also discussed it with him, at least he said
04:22 12   here?
04:22 13   A   Yeah.  My normal — it's hard here when we sort of
04:22 14   pretend that all we did was send e-mails to each other.  We
04:22 15   talked to each other.  So it's hard to tell what was done
04:22 16   orally and what's in an e-mail.
04:22 17   Q   And you talked to each other because this was a
04:22 18   negotiation?
04:22 19   A   Of course.
04:22 20   Q   Do you know whether Mr. Drayna spoke with
04:22 21   Mr. Sunderland about the termination documents that he was
04:22 22   preparing prior to providing those to Mr. Sunderland?
04:22 23   A   Normally in Mr. Drayna's practice there are some issues
04:22 24   in constructing legal documents that require a conversation.
04:22 25   I couldn't testify that I am certain in this case that they
```

113

spoke to each other, but his ordinary course of practice would be to speak with the lawyer he's working with about particular documents before he thought they were finalized.

Q   Can you turn to Exhibit 729 that you have there?

A   Is this in my black book?

Q   It is.

A   I found it, yes.

Q   Can you look at the e-mail from Mr. Drayna: Robert, thank you for your time today to discuss the draft documents I prepared.

Does that refresh your recollection whether or not Mr. Drayna spoke with Mr. Sunderland about these documents?

A   Personally I don't have a recollection, but when I look at this, I can tell that they were — that's logical, yes. Of course they were talking about the documents they were working on together.

Q   Now, Mr. Mulcahy also talked to you about Exhibit 255, which is probably in that exhibit binder number one, the white one.

A   There's two white ones.  We're going to make a 50/50 bet again here and look for 255.  There it is.

Q   And do you recall we talked about it this morning, a meeting with Mr. Sunderland at his office on the morning of July 22nd, 2014, at 10 a.m.?

A   Yes.  I remember that meeting in particular because he

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

114

was just arriving back, I believe, from Europe, and it was important to me to talk to Mr. Sunderland before I went and talked to Mr. Gooding, Johnson, and apparently Mr. Schuster. So, yes, I do remember such a meeting.

Q   And after that meeting did you meet with Mr. Schuster, Mr. Gooding, and Mr. Johnson?

A   Yes.

Q   Was it that same day?

A   I believe so.

Q   And did you discuss with them the items that you had discussed with Mr. Sunderland in your morning meeting with him at his office?

A   That was the purpose of the morning meeting, to make sure we were in alignment on issues before I went and spoke with people who were not getting along well with the first people.

Q   And one of those issues that you discussed was the possible sale of some of the offices in San Diego that Mr. Bennion and Mr. Deville owned to the Homes and Estates people; is that correct?

A   Yes, of course.

Q   Another issue was the services company, that Mr. Bennion and Mr. Deville are turning over the servicing rights to Windermere in Seattle; is that right?

A   That is correct.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

115

Q   I want to talk briefly about Gretchen Pearson.

A   Yes, sir.

Q   Why did Ms. Pearson leave Windermere?

A   I believe that Gretchen had an offer from Coldwell Banker to take some type of an executive position and move her offices to Coldwell Banker.  And that — I don't think — I know that it was her desire to go do that.

Q   And did you agree to allow her to do that?

A   Of course.  By the way, I will say, though, that there was money, so we did reach a financial settlement.  When you leave Windermere, you have to give a six-month notice.  And Gretchen had agreed to pay what we would have anticipated in revenue during the time between when she wanted to leave because we accommodated her so she could leave earlier than six months.  But she graciously agreed to pay.

Q   Mr. Teather, I hate to do this to you.  Can you help me track down Exhibit 292.  I don't think it's in my binder, but I do want you to keep my binder handy if you have it.

A   You can look in this one.

Yes, I have 292 in front of me.

Q   And 292, this is the e-mail from Mr. Schuster to you and a copy to Mr. Gooding and Mr. Johnson —

A   That is correct.

Q   — on October 7, 2014?

A   That is correct.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

116

Q   So this was after the October 2nd meeting you had with these gentlemen and with Mr. Bennion and Mr. Deville; is that right?

A   Yes.

Q   And during that meeting with everyone present, you discussed the possible sale of the Carlsbad and Encinitas offices from Mr. Bennion and Mr. Deville to Mr. Gooding and Johnson?

A   Yes.  None of these things were secrets.  Everybody knew what we were talking about.

Q   And if you look in my binder at Exhibit 729, on the second page —

A   Just a moment.  Yes, sir.

Q   Under item 10 there in the middle, is Mr. Bennion saying:  I don't think we will ever agree on a price to sell Carlsbad and Encinitas to them?  Do you see that there?

A   Yes, I do.

Q   That was discussed, the potential sale of those two branches, to possibly Homes and Estates at that time?

A   The problem was not whether or not there was a discussion.  The problem was the revenue that Mr. Bennion and Mr. Deville wanted for those offices didn't match the price that Mr. Gooding and Johnson wanted to pay for those offices.

Q   So were you surprised on October 7th, 2014, when you

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER



**117**

04:30  1    received the e-mail from Mr. Schuster with the BrokerMetrics
04:30  2    reports relating to the Bennion & Deville offices?
04:30  3    A    No.  And I had told him, take a look at the offices if
04:30  4    you want to buy them.  Rank the ones you want to buy and
04:30  5    then come up with some idea of what you think they might be
04:30  6    worth.
04:30  7         So in order to do that, he would have to try to
04:30  8    find some information about the offices, and that is the
04:30  9    information that was available to him, the publicly
04:30 10    available BrokerMetrics data.
04:30 11    Q    Now, the area representation agreement terminated on
04:30 12    September 30th, 2015; is that right?
04:30 13    A    Yes, sir.
04:30 14    Q    Do you know whether after that date Windermere ever
04:30 15    amended any of the other franchise agreements for the
04:30 16    franchisees in Southern California to remove Windermere
04:31 17    Services SoCal, the servicing entity of Mr. Bennion and
04:31 18    Mr. Deville, from those contracts?
04:31 19    A    I'm sorry.  Mr. Drayna knows what we do so we can
04:31 20    perform our functions.  I don't.
04:31 21    Q    Did you ever receive a request from anyone affiliated
04:31 22    with Mr. Bennion and Mr. Deville to remove the services
04:31 23    entity from those contracts?
04:31 24    A    No, sir.
04:31 25         MR. FEASBY:  No further questions.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**118**

04:31  1         THE COURT:  Recross?
04:31  2         MR. MULCAHY:  No, Your Honor.
04:31  3         THE COURT:  Okay.
04:31  4         Mr. Teather, you may step down.
04:31  5         Ladies and gentlemen, let's let you go home for
04:31  6    the evening.  Promise me you won't talk about the case and
04:31  7    you won't form any opinions about the case.  You've heard a
04:31  8    lot of evidence, but you still have to keep an open mind and
04:31  9    you have to follow all the other instructions and
04:31 10    admonitions I have given you.
04:31 11         We will start tomorrow at 9:00 a.m.  I promised
04:31 12    you I think yesterday that we will be done tomorrow by
04:31 13    12:30.  There's even possibly a better than that, better
04:31 14    than 50/50 chance we will be done a little earlier than
04:31 15    that.
04:31 16         So we'll see you tomorrow at 9:00.
04:31 17         (Jury not present)
04:31 18         THE COURT:  All right.  I'm going to ask you to
04:31 19    stick around for just a couple minutes.  We've been working
04:31 20    on the verdict form, which may be helpful to our discussion
04:31 21    of the jury instructions.  So I will have that for you in a
04:31 22    couple minutes so that you can look at it tonight.
04:31 23         MR. FEASBY:  Thank you.
04:33 24         THE COURT:  I for whatever reason kind of believe
04:33 25    in working backwards from the verdict form through the

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**119**

04:33  1    instructions rather than vice versa, but I want to give you
04:33  2    guys that as a starting point.
04:33  3         And then if we do have time tomorrow, I think we
04:33  4    should probably, if we finish the evidence, sit and go
04:33  5    through the instructions.
04:33  6         All right.  Let's take care of some formal
04:33  7    housekeeping matters.
04:33  8         Mr. Adams, you don't intend to call Mr. Wrobel, so
04:33  9    at this point the plaintiffs' case-in-chief is over; is that
04:33 10    correct?
04:33 11         MR. ADAMS:  That's correct, Your Honor.
04:33 12         THE COURT:  Okay.
04:33 13         And Mr. Feasby wanted to make various motions at
04:33 14    the end of the plaintiff's case, so now would be the time I
04:33 15    think to ask the record to reflect those motions.
04:33 16         MR. FEASBY:  Yes, Your Honor.
04:33 17         The defense would move for judgment as a matter of
04:33 18    law on the following claims asserted by the plaintiff as
04:34 19    reflected in the second amended pretrial conference order.
04:34 20    This would be the affirmative defense of justification.
04:34 21         Justification is not an affirmative defense to a
04:34 22    contract claim, as reflected in our trial brief.  I'm happy
04:34 23    to go over the citations there and reference that it's
04:34 24    document number 182, page 3, lines 1 through 13, in our
04:34 25    trial brief.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**120**

04:34  1         THE COURT:  Okay.
04:34  2         MR. FEASBY:  Also move for judgment as a matter of
04:34  3    law on Claim 2, breach of the implied covenant of good faith
04:34  4    and fair dealing asserted by Bennion & Deville Fine Homes,
04:35  5    Inc.  The stated breaches of the covenant are reflected on
04:35  6    the second amended pretrial conference order, page 14, the
04:35  7    first being terminating Services SoCal as the area
04:35  8    representative for the Southern California region and
04:35  9    thereby negating plaintiff's 50 percent reduction in
04:35 10    franchise fees owed to WSC under the Coachella Valley
04:35 11    franchise agreement.
04:35 12         The testimony and evidence is undisputed that once
04:35 13    the franchise agreements were terminated, there were no
04:35 14    longer any franchise fees that were owed by those
04:35 15    franchisees.  The franchise agreements terminated on the
04:35 16    same date as the area representation agreement, so as a
04:35 17    matter of law there can be no damages for anything relating
04:35 18    to that claim.
04:35 19         The second claim asserted there, terminating
04:35 20    Services SoCal as the area representative for the Southern
04:35 21    California region as discussed below and not providing a
04:36 22    comparable replacement, the evidence is undisputed that both
04:36 23    Bennion & Deville franchise agreements were terminated by
04:36 24    the plaintiffs prior to the effective termination date of
04:36 25    the area representation agreement.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

121

```
04:36   1          So there could be no damages resulting from that.
04:36   2   So we move for judgment as a matter of law as to the second
04:36   3   cause of action in the First Amended Complaint.
04:36   4          With regard to the Claim 3, breach of the area
04:36   5   representation agreement, defendant moves for judgment as a
04:36   6   matter of law on plaintiffs' claimed breach of section four
04:36   7   of the area representation agreement for failure to pay
04:36   8   Services the termination fee.
04:37   9          There has not been any evidence presented what
04:37  10   that termination fee would be, and there is no basis for the
04:37  11   jury to calculate that termination fee.  The agreement is
04:37  12   clear that it was to be done by appraisers, and there is no
04:37  13   evidence or testimony that the plaintiffs ever requested
04:37  14   that that appraisal be done.
04:37  15          Also move for judgment as a matter of law on
04:37  16   Claim 4, breach of the implied covenant of good faith and
04:37  17   fair dealing as reflected in the final pretrial conference
04:37  18   order at page 16, taking action to interfere with and damage
04:37  19   many of the relationships between Services SoCal and
04:37  20   franchisee in the Southern California Region.
04:38  21          There has been no evidence or testimony presented
04:38  22   regarding damages sustained by the Services entity as a
04:38  23   result of the interference or alleged interference with
04:38  24   those relationships, and so we would move for judgment on
04:38  25   that ground.
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

122

```
04:38   1          As to Claim 6, this is the same or these are the
04:38   2   same claims for breach of implied covenant of good faith and
04:38   3   fair dealing as they're asserted on behalf of the Coachella
04:38   4   Valley entity.
04:38   5          This is asserted on behalf of Bennion & Deville
04:38   6   Fine Homes Southern California, and we would move for
04:38   7   judgment as a matter of law on both of these claims stated
04:38   8   in the final pretrial conference order on the same grounds
04:38   9   as I stated with regard to Claim 2.
04:38  10          That would be our motion, Your Honor.
04:38  11          THE COURT:  Okay.
04:38  12          Mr. Adams or Mr. Mulcahy, are there any of the
04:38  13   motions for judgment as a matter of law on which you do not
04:38  14   oppose a motion being granted?  In other words, are there
04:38  15   any of these claims that you wish to drop, I guess, or
04:38  16   affirmative defenses you wish to drop or don't wish to have
04:38  17   the jury instructed on?
04:38  18          MR. ADAMS:  Not at this time, Your Honor, no.
04:39  19          THE COURT:  Okay.
04:39  20          So I will take all of the other issues, all of
04:39  21   these judgment as a matter of law arguments under submission
04:39  22   pending the jury's verdict, and we can address them at a
04:39  23   post-verdict time.  But they are preserved.
04:39  24          MR. FEASEY:  Thank you, Your Honor.
04:39  25          THE COURT:  Okay.
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

123

```
04:39   1          All right.  So tomorrow morning we will have
04:39   2   Mr. Baur.  We will have some deposition testimony, and then
04:40   3   I presume it will be the defense's intent to rest?
04:40   4          MR. FEASEY:  That is correct, Your Honor.
04:40   5          THE COURT:  Okay.  And then we anticipate having a
04:40   6   rebuttal case?
04:40   7          MR. ADAMS:  Three witnesses, Your Honor.
04:40   8          THE COURT:  Okay.  And we will hopefully see that
04:40   9   through.  I don't know whether you guys can give me any
04:40  10   reasonable guess, but does it sound like we can conclude
04:40  11   that in the roughly three hours or so trial time available?
04:40  12          MR. ADAMS:  For the rebuttal, Your Honor, or are
04:40  13   you talking about for the full —
04:40  14          THE COURT:  Well, I don't know how much —
04:40  15   Mr. Baur sounds like he should be less than a hour.  I don't
04:40  16   know how long we plan to spend with depositions.
04:40  17          MR. FEASEY:  Fifteen minutes maybe.
04:40  18          THE COURT:  Okay.  Do you think you're going to
04:40  19   have more than about an hour and a half?  I don't know how
04:40  20   much time you have left.  You probably don't have that much
04:40  21   time left.
04:40  22          MR. ADAMS:  Right.  We plan to use whatever time
04:40  23   we have left, Your Honor.
04:40  24          THE COURT:  Okay.  Well, I think we'll probably be
04:40  25   done around noon, then.
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

124

```
04:40   1          Okay.  Very well.  Plan to grab your lunch and
04:41   2   come back and spend at least a little bit of time in the
04:41   3   afternoon with me going over jury instructions so we can try
04:41   4   to finish those.  I would like to get through those if
04:41   5   possible.
04:41   6          And then I would intend to have us argue the case
04:41   7   to the jury, unless something screwy happens tomorrow, on
04:41   8   Monday at — I'm going to have to check on the master
04:41   9   calendar at home — 9:00 or 9:30, depending on when we can
04:41  10   begin.
04:41  11          I have made arrangements to clear my calendar
04:41  12   Monday morning.  I had a short conflict that maybe would
04:41  13   have precipitated a longer recess than usual, and I've
04:41  14   gotten rid of that so we can argue without undue
04:41  15   interruption.
04:41  16          I do preinstruct, so I instruct before argument.
04:41  17   So if you have instructions and want to show them as part of
04:41  18   your presentation, you will be able to do so.  So that's
04:41  19   where we are.
04:42  20          I also — I think it's suggested to you we would
04:42  21   be potentially dark on Tuesday.  If we get the case to the
04:42  22   jury on Monday, we would tell the jurors that they could
04:42  23   deliberate on Tuesday.  I have not told them anything about
04:42  24   Tuesday yet.
04:42  25          So if we get the case to them on Monday, obviously
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER



125

```
04:42   1    they would have the remainder of the day on Monday to
04:42   2    deliberate, and then they could come back on Tuesday and
04:42   3    then would have that time as well.
04:42   4             So that's the schedule in chalk or pencil or
04:42   5    however you want to describe it, and we'll go from there.
04:42   6             Anything else this afternoon?
04:42   7        MR. FEASEY:  No, Your Honor.
04:42   8        MR. ADAMS:  No, Your Honor.
04:42   9        THE COURT:  All right.  Stick around for a little
04:42   10   bit and we'll get you that special verdict form.
04:42   11       MR. FEASEY:  Thank you.
04:42   12           (Proceedings adjourned at 4:42 p.m.)
04:42   13                       *    *    *
04:42   14
04:42   15
04:42   16
04:42   17
04:42   18
        19
        20
04:42   21
04:42   22
04:42   23
04:42   24
04:42   25
```

126

```
1
2
3
4
5                    CERTIFICATE
6
7             I hereby certify that pursuant to Section 753,
8    Title 28, United States Code, the foregoing is a true and
9    correct transcript of the stenographically reported
10   proceedings held in the above-entitled matter and that the
11   transcript page format is in conformance with the
12   regulations of the Judicial Conference of the United States.
13
14   Date:   July 20, 2018
15
16
17               /s/   Sharon A. Seffens  7/20/18
17               SHARON A. SEFFENS, U.S. COURT REPORTER
18
19
20
21
22
23
24
25
```

MR. ADAMS: [14]
49/8 50/8 51/2
67/11 88/8
91/18 99/1 99/3
119/10 122/17
123/6 123/11
123/21 125/7
MR. FEASBY:
[45]  5/3 5/10
12/2 15/22 16/3
16/10 26/6
26/17 28/5
28/11 30/22
31/5 33/1 37/17
39/19 39/24
40/3 47/24
48/17 48/20
48/24 49/17
49/19 49/23
50/2 53/15
64/24 87/20
87/23 99/15
100/17 102/15
104/21 105/24
109/17 111/14
117/24 118/22
119/15 120/1
122/23 123/3
123/16 125/6
125/10
MR. MULCAHY:
[26]  12/5
15/25 16/7
28/14 31/8
48/14 50/15

60/11 64/18
64/21 67/9
75/25 85/4 94/6
94/10 95/6
95/11 96/3 96/7
99/2 99/13
104/18 105/22
118/1
MR. ROWLETT:
[6]  26/14
26/16 33/3
39/16 39/18
43/25
THE COURT: [65]
5/2 12/4 12/6
15/24 16/1 16/5
16/8 26/15
28/13 28/15
31/7 31/9 39/17
40/2 44/1 48/1
48/10 48/15
48/18 48/22
49/1 49/10
49/18 49/22
49/24 50/3
50/11 50/13
51/3 52/24
53/18 53/23
60/13 64/20
64/22 64/25
87/24 88/10
95/10 96/6 99/5
99/14 99/16
100/19 102/4
102/9 102/17

104/20 104/22
105/23 117/25
118/2 118/17
118/23 119/11
119/25 122/10
122/18 122/24
123/4 123/7
123/13 123/17
123/23 125/8
THE WITNESS:
[17]  26/8
26/19 28/6 44/3
51/4 53/16 54/2
85/5 87/22
88/11 91/19
94/7 94/11 99/7
100/21 102/19
111/15

## $

$1 [1]  106/18
$1 million [1]
106/18
$1,151,060 [1]
44/24
$1,574,790.30
[2]  47/22
47/24
$1,588,545.39
[1]  47/2
$1.1 [1]  45/16
$1.1 million [1]
45/16
$1.588 [1]  47/1
$107,249.69 [1]
41/1
$13,755.09 [1]

**$**

$13,755.09... [1]   47/4
$257,915.77 [2]   43/5 43/8
$313,746.74 [1]   35/9
$471.38 [3]   46/5 46/10 46/14
$477,503.43 [2]   41/17 46/15
$493,306.26 [3]   40/19 40/24 46/21
$5,000 [2]   81/6 82/10
$863,560 [5]   41/19 45/16 46/3 46/10 46/18
$92,159.02 [1]   35/12

**'**

'14 [1]   78/3

**/**

/s [1]   126/16

**0**

087 [1]   44/14
0870 [1]   1/23

**1**

1,013 [2]   46/13 46/15

1/26 [1]   28/25
1/26/15 [1]   29/14
10 [5]   35/4 55/11 55/14 113/24 116/14
104 [1]   4/17
1053 [1]   1/22
106 [1]   4/11
10th [2]   6/13 112/1
11 [4]   35/4 44/11 44/13 45/10
11th [2]   11/21 12/18
12 [1]   4/14
1230 [3]   2/4 2/8 2/12
12:30 [1]   118/13
12th [4]   67/6 67/14 67/18 68/6
13 [1]   119/24
14 [2]   96/5 120/6
147 [1]   95/8
148 [1]   96/5
15 [2]   29/14 49/7
15th [2]   8/22 85/12
16 [3]   4/14 4/15 121/18

180 [3]   27/9 70/10 70/16
180-day [1]   70/19
182 [1]   119/24
19 [5]   1/19 5/1 92/25 98/13 98/18
1:34 [1]   5/1
1st [2]   66/6 66/16

**2**

20 [2]   49/7 126/14
20 percent [5]   36/11 36/12 105/5 105/15 107/11
2007 [1]   55/5
2008 [2]   55/4 55/6
2010 [2]   55/7 55/20
2012 [2]   40/15 46/9
2014 [29]   5/15 6/13 8/14 9/2 9/25 10/12 10/22 11/21 14/22 15/13 27/21 36/23 38/20 38/25 58/16 59/6 68/6 71/1 83/8 88/16 95/18 96/10

**2**

2014... [7]
 97/13 108/10
 110/16 110/21
 113/24 115/24
 116/25
2015 [9]   10/25
 27/13 31/14
 35/16 38/14
 98/13 98/18
 104/17 117/12
2018 [4]   1/19
 5/1 42/6 126/14
2100 [2]   2/18
 3/5
21st [2]   46/9
 92/20
22 [1]   97/12
22nd [11]   59/6
 59/9 59/15 60/9
 60/25 61/24
 63/9 64/8 65/24
 92/23 113/24
23rd [2]   58/16
 58/18
24th [2]   19/6
 62/23
25 [4]   55/10
 55/11 55/14
 96/6
25 percent [5]
 24/9 25/10
 99/23 110/9
 110/14
255 [2]   113/17
 113/21

25th [5]   8/23
 14/22 15/13
 83/25 84/4
26 [1]   28/25
26th [3]   85/10
 88/16 89/11
272 [1]   67/8
27th [2]   100/6
 111/19
28 [2]   4/15
 126/8
280 [1]   85/4
281 [3]   88/3
 88/7 88/12
28th [3]   17/10
 26/13 27/13
292 [4]   91/18
 115/17 115/20
 115/21
29th [2]   64/16
 65/14
2:36 [1]   48/8
2:50 [1]   48/7
2:52 [1]   48/9
2nd [4]   17/14
 92/25 104/17
 116/1

**3**

30 [1]   49/1
30 percent [1]
 109/5
30th [4]   10/25
 35/15 38/13
 117/12
31 [1]   4/16

 5/11
325 [4]   94/4
 94/10 94/16
 97/2
330 [2]   6/9
 11/9
333 [6]   4/14
 11/23 12/4 12/5
 12/7 12/8
341 [6]   4/15
 14/17 16/5 16/7
 16/9 16/10
3549 [1]   2/23
363 [1]   26/9
364 [1]   26/9
366 [1]   26/9
367 [2]   26/6
 26/12
370 [3]   32/25
 50/23 51/6
379 [2]   37/16
 37/17
3:00 p.m [1]
 67/15
3rd [6]   10/3
 31/14 38/24
 38/25 39/1 39/2

**4**

411 [8]   1/22
 4/17 104/8
 104/13 104/21
 104/23 104/24
 106/6
45 [1]   49/1
487 [3]   63/5

```
4

487... [2]
 63/21 64/21
489 [7]   4/16
 64/15 64/22
 64/23 64/24
 65/1 65/2
490 [1]   66/9
492 [1]   92/17
4:25 [1]   49/15
4:42 [1]   125/12
4th [2]   1/22
 58/23

5

50 [12]   4/11
 11/6 79/4 80/13
 81/4 81/18
 81/20 82/7
 82/11 105/18
 113/20 118/14
50 percent [11]
 11/8 80/17
 80/18 80/22
 80/23 81/16
 82/3 82/16
 82/21 82/25
 120/9
50/50 [3]   79/4
 113/20 118/14
543-0870 [1]
 1/23

6

60 percent [1]
 105/20
600 [4]   2/17
```

```
619-702-8044 [2]
 2/19 3/6
619-784-3549 [1]
 2/23
65 [1]   4/16
6th [1]   31/17

7

7/10/2018 [1]
 42/6
7/20/18 [1]
 126/16
714 [1]   1/23
729 [3]   73/22
 113/4 116/11
731 [1]   111/14
746 [1]   39/16
753 [1]   126/7
755 [6]   4/14
 15/18 15/24
 15/25 16/2 16/3
756 [1]   18/23
758 [8]   4/17
 98/22 99/2 99/3
 99/15 99/17
 99/18 109/16
759 [3]   18/21
 20/2 109/17
772 [5]   4/16
 30/21 31/7
 31/10 31/11
773 [7]   4/15
 28/3 28/7 28/13
 28/14 28/16
 28/17
7th [4]   5/15
```

```
116/25

8

80 [1]   8/10
80 percent [1]
 36/13
8044 [2]   2/19
 3/6
819 [1]   39/16
824 [3]   39/20
 39/20 46/1
863,540 [1]
 46/20
87 [3]   43/22
 43/24 44/14

9

92101 [3]   2/18
 2/22 3/5
92614 [3]   2/5
 2/9 2/13
92701 [1]   1/22
9377 [3]   2/5
 2/9 2/13
949-252-9377 [3]
 2/5 2/9 2/13
99 [1]   4/17
9:00 [3]   118/11
 118/16 124/9
9:08 [1]   49/14
9:30 [1]   124/9

A

a.m [2]   113/24
 118/11
ability [1]   7/3
```

able [8]   6/3
 17/21 19/13
 32/2 33/21
 81/21 101/16
 124/18
about [76]   7/17
 8/4 8/15 9/1
 9/23 10/25
 12/19 14/12
 16/13 16/14
 17/3 17/11 18/1
 18/24 20/20
 21/22 25/15
 29/10 30/1 33/8
 33/14 44/7
 45/23 48/5 48/6
 48/7 52/1 53/6
 68/4 68/5 68/11
 68/12 68/15
 69/6 69/16
 70/12 71/8 71/9
 74/13 74/18
 75/2 78/17
 82/15 84/24
 85/3 85/24
 88/12 88/25
 90/4 90/10
 90/18 90/19
 91/10 91/23
 93/11 93/13
 95/24 97/3 98/1
 101/2 101/9
 108/19 112/21
 113/2 113/12
 113/15 113/17

 116/10 117/8
 118/6 118/7
 123/13 123/19
 124/23
above [7]   13/8
 19/20 32/16
 43/2 67/24 76/2
 126/10
above-entitled
 [1]   126/10
absolutely [1]
 98/12
accept [1]   26/4
accepted [1]
 84/13
accommodated [1]
 115/14
accomplish [8]
 21/10 70/9
 70/15 73/16
 76/11 86/13
 86/15 103/12
accomplished [2]
 92/15 95/5
according [2]
 27/12 52/15
accounting [2]
 40/7 42/13
accrue [2]
 41/10 41/12
accrued [1]
 35/15
accurate [1]
 71/19
achieve [3]

 93/13
achieved [1]
 72/7
acknowledging
 [1]   84/15
acquiring [1]
 63/3
act [2]   36/20
 37/3
action [4]
 35/17 42/22
 121/3 121/18
actions [1]
 18/5
activities [1]
 64/12
activity [1]
 64/9
actually [12]
 10/2 18/1 18/3
 22/14 29/22
 37/5 50/4 72/2
 74/8 74/10
 108/16 108/17
Adams [4]   2/7
 39/25 119/8
 122/12
add [1]   46/20
added [1]   25/22
addendum [13]
 27/24 74/25
 78/24 79/5
 79/11 80/2 80/3
 80/6 80/8 80/25
 82/2 111/22

**addendum... [1]**
111/23

**addition [1]**
36/15

**additional [9]**
13/22 23/10
25/10 25/14
35/19 90/6 92/1
105/6 110/17

**address [1]**
122/22

**adequately [1]**
23/5

**adjourned [1]**
125/12

**adjustment [2]**
7/12 75/6

**admitted [12]**
11/24 12/4
14/18 15/20
15/24 28/13
30/23 31/7
37/18 40/1
109/18 111/15

**admonitions [1]**
118/10

**ads [1]  54/10**

**adverse [1]**
72/3

**advertisements**
**[1]  37/11**

**advertising [1]**
37/10

**advertorial [1]**
6/23

**advise [1]**
108/1

**advise [1]**
99/20

**affiliated [1]**
117/21

**affiliates [10]**
7/20 17/6 21/2
22/20 24/25
29/25 47/14
71/6 105/6
106/11

**affirmative [3]**
119/20 119/21
122/16

**after [34]  6/16**
11/21 12/22
20/24 29/4
38/20 38/24
38/25 39/1
41/20 41/21
48/19 52/24
58/8 59/15 63/9
64/8 64/17 65/5
68/18 71/16
85/13 88/21
89/8 92/22
92/25 98/14
102/24 103/17
103/21 105/2
114/5 116/1
117/14

**afternoon [3]**
48/3 124/3
125/6

**afterwards [2]**

**again [14]  17/1**
21/13 21/16
21/18 22/12
36/1 41/12
42/13 44/19
55/2 62/6 94/5
101/20 113/21

**against [1]**
47/8

**agent [1]  61/16**

**ago [2]  73/20**
97/7

**agree [16]**
21/19 44/22
58/11 72/19
73/5 76/4 77/21
81/13 82/24
87/8 87/10
90/17 95/13
100/5 115/8
116/15

**agreed [10]**
69/12 69/23
70/25 90/8 90/9
94/24 95/1 95/4
115/12 115/15

**agreeing [1]**
91/4

**agreement [130]**

**agreements [43]**
39/12 42/2 52/5
68/20 68/21
72/15 72/17
72/22 73/3 73/9
74/7 74/13

agreements...
 [31]  74/21
 74/22 76/16
 77/10 77/12
 77/17 77/20
 78/1 78/9 78/10
 78/15 78/21
 79/10 86/13
 86/25 87/1 87/2
 87/11 87/14
 87/20 100/11
 100/13 100/15
 101/10 101/18
 101/23 102/13
 117/15 120/13
 120/15 120/23
ahead [7]  6/9
 48/2 51/16
 53/25 94/13
 95/11 96/7
al [2]  1/11 2/2
Alan [1]  3/4
alignment [1]
 114/14
all [62]  7/9
 10/2 11/14
 13/20 13/24
 14/8 24/8 26/20
 37/13 38/9
 40/12 42/18
 49/2 49/3 49/8
 49/17 50/6 50/8
 53/11 54/12
 58/14 61/7
 61/14 63/16

68/2 71/7 73/21
74/4 74/16 75/2
75/14 76/20
77/20 77/22
78/1 78/4 78/9
82/9 85/9 88/15
89/15 97/15
99/11 100/4
103/8 105/5
106/11 107/17
108/1 108/2
108/20 112/14
118/9 118/18
119/6 122/20
122/20 123/1
125/9
alleged [1]
 121/23
allow [1]  115/8
allowed [2]
 80/13 82/11
alluded [1]
 109/5
almost [2]
 43/23 92/22
alone [2]  27/2
 80/5
along [1]
 114/15
already [1]
 109/13
also [26]  3/8
 18/24 23/8 24/9
 33/16 33/23
 36/7 61/7 63/15

77/18 77/25
78/8 80/11
89/14 89/24
97/19 105/4
107/4 110/9
112/11 113/17
120/2 121/15
124/20
although [1]
 23/8
always [10]  8/2
 14/16 21/9
 21/23 29/12
 70/3 70/6 70/15
 70/17 107/5
am [7]  10/23
 29/15 30/5 64/2
 74/19 85/20
 112/25
amend [2]  75/1
 80/25
amended [5]
 78/1 117/15
 119/19 120/6
 121/3
amendment [3]
 76/16 80/4 81/8
amends [1]  80/3
among [1]  57/3
amongst [1]
 107/25
amount [20]
 36/4 40/19
 40/22 41/15
 41/19 41/20

**amount... [14]**
41/24 41/25
42/14 42/14
42/15 43/5 43/6
43/15 44/24
45/2 45/24
46/19 47/6
47/16
**amounts [2]**
42/21 47/12
**Ana [3]** 1/18
1/22 5/1
**and the [1]**
64/9
**and/or [1]** 35/5
**another [9]**
8/12 14/25
31/18 34/4 62/3
67/5 75/5 90/13
114/22
**answer [9]** 8/2
53/22 53/22
53/23 53/25
54/23 87/25
100/21 102/19
**anticipate [1]**
123/5
**anticipated [1]**
115/12
**any [53]** 7/2
10/15 11/20
11/21 12/5
15/14 15/25
16/7 16/23
17/20 18/11

27/17 27/18
27/19 28/14
30/5 30/19 31/8
35/14 36/16
37/7 39/12 41/6
41/24 47/16
48/6 64/24
65/17 66/14
66/18 67/4 70/7
78/2 82/18 86/3
89/4 90/9 93/3
93/8 95/1 99/15
103/23 104/21
111/2 117/15
118/7 120/14
121/9 122/12
122/15 123/9
**anybody [5]**
37/14 84/5
85/16 98/19
98/19
**anyone [6]** 9/21
17/8 59/23
60/16 90/25
117/21
**anything [12]**
9/6 21/11 21/25
33/19 37/14
64/6 90/8 91/3
92/9 120/17
124/23 125/6
**anytime [1]** 9/1
**anywhere [1]**
39/9
**apologize [3]**

94/8
**apparent [1]**
97/7
**apparently [2]**
112/9 114/3
**APPEARANCES [1]**
2/1
**appears [6]** 6/2
20/5 74/24 80/6
88/16 99/25
**appoint [1]**
103/18
**appraisal [1]**
121/14
**appraisers [1]**
121/12
**appreciate [3]**
7/21 106/7
107/14
**appreciated [2]**
7/21 8/1
**approach [6]**
26/15 39/17
44/1 51/3 88/9
99/4
**April [2]** 58/23
108/10
**April 4th [1]**
58/23
**ARA [3]** 10/16
27/12 70/16
**are [72]** 5/18
6/20 7/21 8/18
8/19 8/19 8/20
8/21 15/9 19/10

**are... [62]**
19/21 20/7
20/21 21/1 21/2
21/18 21/19
22/3 25/2 25/18
29/17 31/21
34/21 35/14
35/16 35/18
38/5 38/6 42/16
43/4 44/14 45/2
47/7 47/8 47/23
47/23 52/4
52/15 54/13
54/15 59/11
59/12 60/7
60/20 61/17
61/17 62/21
64/21 68/21
71/4 74/19
74/21 80/19
82/7 82/14
85/21 89/11
94/11 95/6
97/24 107/23
108/5 110/1
112/23 114/23
120/5 122/1
122/12 122/14
122/23 123/12
124/19

**area [138]**

**aren't [5]** 17/6
22/14 51/24
94/9 107/6

**argue [2]** 124/6

**argument [1]**
124/16

**arguments [1]**
122/21

**around [7]** 8/20
18/11 43/21
43/23 118/19
123/25 125/9

**arrangements [1]**
124/11

**arriving [1]**
114/1

**article [1]**
6/18

**articulate [1]**
20/11

**articulating [1]**
54/9

**as [113]** 6/25
7/3 8/21 9/10
9/10 9/13 10/3
10/12 14/5 14/9
14/9 19/6 19/21
20/22 24/1 27/4
30/1 30/3 30/11
32/12 35/2 37/3
37/14 37/14
38/10 38/18
40/9 41/21 42/5
43/2 43/17 47/8
49/10 50/5
54/10 57/4 57/5
57/14 58/1
59/20 60/12
60/20 62/9

65/14 66/23
68/14 68/17
69/17 72/11
73/5 73/17 75/7
75/11 76/4
77/11 78/8
78/14 81/9
82/16 82/18
83/25 84/4
84/20 85/25
86/8 87/3 87/17
87/20 89/10
90/13 91/17
91/23 92/11
92/13 93/12
94/7 98/3 98/6
98/9 98/13
102/2 103/17
104/3 107/24
108/6 111/22
111/23 119/2
119/17 119/18
119/22 120/2
120/7 120/16
120/16 120/20
120/21 121/2
121/2 121/5
121/15 121/17
121/22 122/1
122/3 122/7
122/9 122/13
122/21 124/17
125/3

**aside [1]** 33/18

**ask [13]** 18/6

**A**

ask... [12]
 26/25 30/25
 32/3 48/5 65/17
 79/17 100/22
 102/5 102/8
 109/4 118/18
 119/15
asked [6]   27/2
 61/23 61/25
 63/1 63/14 90/6
asking [5]   13/4
 43/8 47/10
 105/12 110/25
aspects [2]
 63/16 75/19
asserted [5]
 119/18 120/4
 120/19 122/3
 122/5
assist [1]
 104/4
assisting [1]
 44/3
associated [1]
 108/23
assume [3]   8/15
 16/18 91/9
assuming [3]
 31/23 58/17
 59/19
assure [1]
 109/7
attaching [1]
 62/4
attempts [3]
 23/25
attend [1]
 32/20
attending [1]
 31/24
attention [1]
 32/21
attentions [1]
 97/21
attorney [3]
 37/21 53/20
 91/17
August [14]
 8/20 25/16
 27/21 66/6
 66/16 67/6
 67/14 67/18
 68/6 71/1 93/25
 110/16 110/21
 111/19
August 12th [4]
 67/6 67/14
 67/18 68/6
August 1st [2]
 66/6 66/16
August of [1]
 110/21
author [1]
 76/13
automatically
 [1]   81/10
available [7]
 32/6 32/24
 61/18 63/20
 117/9 117/10
avoid [1]   25/23
aware [3]   60/6
 62/21 89/15
away [4]   23/14
 55/1 86/16
 107/2

**B**

back [49]   5/8
 5/21 13/2 21/23
 24/2 28/4 31/4
 34/20 43/12
 44/12 46/1 47/9
 50/20 54/24
 60/11 64/11
 66/2 66/6 66/8
 66/12 66/19
 66/21 66/25
 67/3 67/15
 67/25 68/10
 70/10 70/15
 71/1 71/16
 75/12 83/7
 83/13 83/22
 86/11 92/5 92/7
 92/9 93/5 94/23
 95/2 95/14
 97/18 98/10
 111/11 114/1
 124/2 125/2
backwards [1]
 118/25
bad [4]   7/1
 14/13 29/24
 32/23
balance [3]

balance... [3]
15/12 40/18
41/12
balloon [1]
75/6
Banker [2]
115/5 115/6
bankruptcy [1]
47/17
base [1]  112/2
basis [3]  62/18
75/9 121/10
Baur [4]  48/21
48/24 123/2
123/15
be [126]  7/5
7/10 8/1 8/5
8/17 8/23 10/8
12/4 12/7 13/23
14/4 15/11
15/24 16/2
17/21 18/14
18/20 19/13
20/5 22/7 22/9
22/11 22/12
22/13 22/17
22/17 23/9
23/10 23/17
25/7 26/13
28/13 30/1 31/7
31/24 32/2 32/5
32/24 33/21
38/13 39/15
40/1 44/12
45/14 47/10

48/16 48/19
48/24 49/5
49/13 59/19
62/1 63/3 64/16
64/22 65/9 66/7
66/25 68/21
69/15 69/17
71/1 71/19
71/25 72/7 73/6
74/14 76/24
77/18 77/24
78/1 78/4 78/13
78/16 80/6
82/19 86/8
86/19 86/22
87/5 90/11
90/12 90/14
90/23 92/24
94/22 95/2
95/14 96/15
97/10 97/19
97/23 99/17
101/14 104/3
104/23 105/12
106/10 106/13
106/17 107/1
108/1 108/3
108/6 108/23
109/1 109/14
110/12 113/2
117/5 118/12
118/14 118/20
119/14 119/20
120/17 121/1
121/10 121/12
121/14 122/10

123/24 124/18
124/21
became [3]  18/9
42/2 104/5
because [31]
6/1 9/19 9/23
10/1 10/12 23/1
25/8 34/2 56/12
57/2 61/23 62/2
65/4 66/19 69/3
69/10 70/19
80/15 80/18
81/8 82/2 82/14
83/21 87/5 90/4
91/5 100/15
103/19 112/17
113/25 115/14
become [1]  39/2
been [38]  7/16
9/3 9/7 11/12
11/24 14/17
15/20 18/16
20/20 24/21
24/24 27/20
29/1 29/12
29/22 29/25
30/18 30/23
31/22 33/19
33/22 35/25
52/2 57/3 62/14
66/16 70/11
83/13 95/22
98/14 108/20
109/7 109/18
110/2 111/15

been... [3]
118/19 121/9
121/21
before [16]
6/17 17/10
17/25 33/17
35/24 48/3
48/11 62/14
74/8 87/4 97/12
98/15 113/3
114/2 114/14
124/16
beforehand [1]
18/24
begin [2]   48/3
124/10
beginning [4]
50/20 54/24
95/9 108/10
begins [1]
23/20
behalf [3]   9/15
122/3 122/5
behavior [1]
7/24
behind [2]
26/21 39/15
being [15]   6/3
16/17 20/21
23/25 25/19
36/21 43/21
45/16 60/13
67/19 77/6
81/11 97/16
120/7 122/14

behaved [1]   6/6
22/18 22/23
23/3 23/15
38/22 57/18
believe [41]
6/12 6/24 8/11
12/12 15/20
16/6 17/11 18/8
24/2 26/7 29/4
34/14 36/13
36/18 38/19
42/5 47/7 47/18
51/17 57/9
59/12 59/17
60/10 60/18
62/11 64/1
64/25 67/10
68/12 69/12
70/18 81/3 82/5
82/6 95/4 98/24
110/12 114/1
114/9 115/4
118/24
believed [2]
10/12 22/25
bell [1]   78/10
below [1]
120/21
benefit [2]
36/8 37/13
BENNION [120]
1/10 2/2 6/13
6/20 7/25 8/8
8/9 9/5 9/16
9/17 9/21 10/19
11/10 13/4

15/21 15/24
17/6 17/8 17/21
18/12 19/12
20/6 20/16
23/11 24/4 26/2
28/19 30/3
30/12 30/15
31/15 31/18
31/23 32/13
32/17 32/19
34/11 36/16
36/24 37/9
38/20 41/20
43/18 51/9
51/13 53/4
53/13 54/14
56/9 58/13
58/14 60/16
61/4 61/8 61/11
62/4 62/14
62/25 63/2
63/11 63/25
68/9 69/22 71/2
71/4 71/13
71/24 72/9 73/8
73/9 75/5 75/11
76/18 77/3 77/7
77/21 77/22
78/9 78/11
78/20 78/25
79/9 79/12 81/1
81/11 82/22
83/2 83/13
83/16 84/25
86/25 92/10
93/13 93/15

BENNION... [26]
 93/20 95/19
 96/11 96/16
 101/17 102/24
 103/6 103/17
 103/22 105/19
 108/5 108/12
 108/16 110/2
 114/19 114/23
 116/2 116/7
 116/14 116/21
 117/2 117/17
 117/22 120/4
 120/23 122/5
Bennion's [3]
 10/10 20/23
 61/19
besides [1]
 21/10
best [4]   37/12
 78/16 90/12
 90/14
bet [1]   113/21
better [4]   37/8
 105/18 118/13
 118/13
between [14]
 25/14 27/3
 29/16 29/24
 30/2 30/3 34/15
 36/2 46/8 69/8
 92/10 112/8
 115/13 121/19
beyond [2]
 20/22 78/16

bridge [1]
 42/24
bill [1]   22/9
binder [14]
 28/4 39/14
 98/23 98/24
 104/9 104/10
 104/12 109/10
 109/14 111/5
 113/18 115/17
 115/18 116/11
binders [2]
 50/10 111/6
bit [4]   26/11
 49/4 124/2
 125/10
black [2]   111/7
 113/5
blank [1]   49/13
blessing [1]
 96/1
block [1]   42/24
blow [1]   28/2
Bob [10]   11/15
 19/2 19/3 29/14
 31/19 32/19
 89/3 94/23
 97/16 97/19
Bob's [1]   97/18
Bobs [1]   97/8
Boehme [1]   50/8
book [4]   51/2
 55/1 59/11
 113/5
booklet [3]
 73/23 73/24

both [13]   3/9
 8/7 30/6 32/10
 43/16 45/2 45/2
 57/23 58/10
 82/15 90/6
 120/22 122/7
bottom [15]
 6/12 19/2 24/12
 31/17 44/6
 44/14 44/19
 45/13 46/23
 52/10 75/21
 75/23 76/2
 88/16 111/19
bottom or [1]
 45/13
bow [2]   20/16
 20/22
branch [1]
 13/22
branches [1]
 116/19
brand [2]   6/25
 22/3
breach [9]
 10/13 10/17
 39/12 40/20
 120/3 121/4
 121/6 121/16
 122/2
breached [2]
 35/3 100/15
breaches [1]
 120/5
breaching [2]

breaching... [2]
  54/15 54/22
break [2]   48/3
  90/14
breakdown [1]
  45/5
Brent [3]   16/14
  16/15 17/11
Brian [1]
  104/16
brief [3]   106/2
  119/22 119/25
briefly [3]
  18/24 34/14
  115/1
bring [2]   105/6
  107/14
broke [1]   41/11
brokerage [2]
  22/8 22/21
BrokerMetrics
  [4]   61/17
  65/12 117/1
  117/10
Browne [1]
  47/17
budget [2]
  109/2 109/3
build [4]   14/7
  106/12 107/20
  108/22
bunch [1]   38/8
burden [1]
  107/23
business [10]

22/8 22/21
23/16 24/6 24/6
50/2 63/16
65/14 80/18
91/14
busy [2]   6/8
  19/22
buy [3]   9/9
  117/4 117/4
buying [1]   9/10

## C

CA [1]   1/22
calculate [1]
  121/11
calculation [1]
  43/1
calendar [3]
  8/20 124/9
  124/11
CALIFORNIA [52]
  1/5 1/18 2/5
  2/9 2/13 2/18
  2/22 3/5 5/1
  7/4 9/18 9/24
  10/9 10/20
  10/21 16/16
  16/25 17/19
  17/22 18/13
  21/2 30/13
  30/17 32/14
  34/12 37/4 52/8
  55/7 55/20
  55/24 56/7
  56/10 56/14
  57/4 58/8 58/19
  59/3 61/2 76/23

76/25 77/2
78/13 92/12
106/13 108/7
108/10 109/8
117/16 120/8
120/21 121/20
122/6
call [15]   5/22
  6/3 66/4 67/15
  67/16 67/18
  67/21 67/22
  68/4 68/5 68/7
  68/8 72/11
  82/12 119/8
called [1]
  34/20
calls [5]   53/16
  87/21 100/18
  102/16 112/9
came [12]   7/9
  33/16 47/14
  55/4 55/20
  56/12 57/2 57/7
  59/6 71/16
  110/8 110/23
camp [1]   60/17
can [48]   11/13
  14/6 14/17
  15/18 18/21
  21/19 21/24
  22/25 25/20
  28/3 29/10
  30/21 32/25
  36/2 37/16 45/8
  45/9 45/11
  46/23 51/5 53/7

can... [27]
54/6 55/1 67/15
67/25 76/1
87/14 93/19
95/25 108/25
109/7 109/10
109/19 111/5
113/4 113/8
113/14 115/16
115/19 117/19
118/22 120/17
122/22 123/9
123/10 124/3
124/9 124/14
can tell [1]
113/14
can't [4]  52/19
85/18 87/12
93/7
canceled [4]
5/25 10/11
32/17 32/19
capacity [4]
23/3 23/7 23/17
36/21
care [2]  50/2
119/6
Carlsbad [2]
116/6 116/16
Carrillo [1]
2/11
case [15]  33/9
48/6 48/6 52/21
53/21 107/11
112/25 118/6

119/14 123/6
124/6 124/21
124/25
case-in-chief
[1]  119/9
cash [2]  22/5
23/10
catch [6]  8/10
11/14 19/7
19/10 19/13
19/18
catch-up [5]
8/10 19/7 19/10
19/13 19/18
cause [18]
24/20 27/6
27/10 27/16
27/19 27/20
33/12 34/21
70/4 70/6 70/7
70/11 86/17
86/21 100/7
100/10 100/24
121/3
cautious [1]
13/23
CENTRAL [1]  1/5
certain [18]
10/1 10/23 17/1
17/2 18/8 20/18
36/4 44/23
51/19 54/17
75/20 80/12
83/11 84/20
84/21 91/4

certainly [6]
6/25 64/6 70/2
89/16 91/12
91/25
CERTIFICATE [1]
126/5
certify [1]
126/7
cetera [6]
61/16 61/16
106/12 106/14
107/20 108/22
chalk [1]  125/4
challenges [2]
22/2 22/8
chance [3]
13/24 43/24
118/14
changed [3]
20/18 87/5 91/5
characterization
[1]  82/13
Charles [2]
34/8 37/23
chat [1]  105/1
check [2]  9/1
124/8
check's [1]
21/23
checking [1]
65/5
chief [1]  119/9
choice [1]
87/19
chose [2]  62/1

chose... [1]
70/7
Christopher [1]
2/20
chronological
[1] 26/14
circle [1]
50/20
citations [1]
119/23
claim [8]
119/22 120/3
120/18 120/19
121/4 121/16
122/1 122/9
Claim 4 [1]
121/16
CLAIMANT [2]
2/15 3/1
claimed [1]
121/6
claims [4]
119/18 122/2
122/7 122/15
Clause [1]
45/20
clear [11]
20/25 54/18
74/12 89/2
89/10 89/24
93/16 95/23
97/9 121/12
124/11
clearly [1]
70/25

client [2]
14/10 91/15
close [2] 34/2
51/25
closing [1] 6/1
Coachella [36]
23/4 23/18 24/8
24/23 25/4
27/24 35/8
42/20 43/2
72/22 73/10
77/4 77/22
78/21 79/1
79/11 80/2 80/3
80/7 80/9 80/14
80/16 80/20
81/4 97/21
97/22 97/24
99/22 102/13
103/2 103/9
105/3 106/16
107/1 120/10
122/3
coast [8] 23/4
23/13 24/10
25/7 43/8 81/6
110/7 110/23
coastal [1]
77/8
Code [1] 126/8
coincide [1]
38/17
Coldwell [2]
115/4 115/6
collaborate [1]
13/24

colleagues [3]
18/17 18/19
25/17
collect [9]
10/20 10/23
11/3 35/4 36/15
52/8 52/13
52/17 52/19
collected [1]
52/2
collector [1]
22/10
column [2]
45/12 45/13
combat [2]
38/23 39/11
combining [1]
17/4
come [11] 33/14
46/15 47/13
49/6 58/22
95/21 96/13
96/18 117/5
124/2 125/2
comes [2] 81/9
81/15
coming [5]
13/21 47/3 49/8
58/15 65/20
commercially [2]
38/23 39/11
commit [1]
21/19
commitment [1]
36/6
communicate [1]

communicate...
 [1]   51/12
companies [4]
 29/17 38/7 38/8
 38/9
company [32]
 1/14 2/15 3/2
 7/18 15/8 15/12
 18/10 23/5
 29/24 29/25
 34/11 38/8 40/7
 43/19 57/2
 57/17 62/13
 70/23 71/5 71/5
 71/7 76/19
 78/12 82/10
 82/11 82/12
 83/1 100/6
 102/12 104/2
 105/4 114/22
company's [2]
 71/2 72/8
comparable [1]
 120/22
competing [2]
 84/25 97/17
competition [1]
 85/3
competitors [1]
 85/22
complained [1]
 108/19
complaining [2]
 85/3 85/24
Complaint [1]

complaints [1]
 25/3
complies [5]
 63/7 66/11 67/9
 91/20 92/18
component [9]
 35/19 35/23
 41/1 41/7 42/8
 42/11 42/25
 43/7 43/10
composed [1]
 15/11
compute [1]
 42/13
conceptually [1]
 101/15
concern [5]
 14/16 21/14
 21/16 84/24
 84/25
concerned [2]
 9/23 14/14
concerning [1]
 97/7
concerns [2]
 7/2 36/25
conclude [1]
 123/10
conclusion [3]
 87/22 100/19
 102/17
conference [6]
 5/21 119/19
 120/6 121/17
 122/8 126/12

conferencing [1]
 5/10
confirm [4]
 33/2 49/25
 65/16 105/2
conflict [3]
 97/8 97/16
 124/12
conformance [1]
 126/11
confrontational
 [1]   25/24
confusing [1]
 8/23
consent [2]
 71/23 71/25
consequence [3]
 40/9 57/4
 100/23
consider [2]
 29/7 72/7
considered [1]
 10/11
consistent [5]
 11/16 54/10
 54/13 71/2 75/8
consistently [1]
 37/13
conspiracy [1]
 30/12
constructing [1]
 112/24
consultation [2]
 18/16 27/4
consulting [1]
 106/11

contact [1]
 55/23
contemplated [3]
  17/5 17/14
 87/4
contends [1]
 39/5
content [1]
 53/13
continue [5]
 10/20 11/3
 72/25 87/17
 87/19
continued [6]
 3/2 4/11 5/6
 10/23 90/4
 103/22
continuing [1]
 95/9
contract [2]
 23/12 119/22
contracts [4]
 39/6 42/16
 117/18 117/23
contractual [1]
 90/21
contrary [2]
 22/18 30/18
control [1]
 87/9
convenience [1]
 32/6
convenient [1]
 30/6
conversation [7]
  25/17 54/18

65/23 92/6 97/1
97/11 112/24
conversations
 [1]  88/24
convinced [1]
 18/9
cooler [1]  9/10
cooperate [2]
 37/6 76/19
cooperating [2]
 37/10 37/12
cooperatively
 [1]  21/1
coordinating [1]
  107/25
copied [3]
 28/22 60/5 60/6
copy [3]  31/18
 74/4 115/22
copying [3]
 13/3 26/18
 94/19
cordial [1]
 20/25
correct [181]
corrected [1]
 43/9
correctly [3]
 41/14 43/12
 69/1
corresponding
 [1]  43/3
cost [3]  80/18
 108/23 109/1
costs [1]  109/9
could [40]  5/8

6/9 12/22 18/2
18/24 23/5
23/10 24/15
25/23 27/17
27/18 27/20
27/21 30/18
37/14 40/4
49/15 55/2
55/13 59/2 60/9
67/18 69/18
69/25 70/6 71/7
72/25 77/19
78/16 86/8
94/13 100/5
101/12 104/9
105/14 106/23
115/14 121/1
124/22 125/2
couldn't [14]
 20/22 44/25
 54/23 55/9
 62/16 71/24
 83/19 84/8
 91/12 93/9
 93/16 94/2
 100/9 112/25
counsel [9]  2/1
 5/10 33/25
 33/25 34/8 44/3
 87/15 91/11
 99/7
COUNTER [3]  2/2
 2/15 3/1
County [1]  62/5
couple [9]  49/9
 50/6 50/9 50/19

couple... [5]
50/22 97/7
97/12 118/19
118/22
course [19]    9/4
16/21 22/24
30/10 32/15
34/4 53/8 57/21
61/18 70/21
89/7 90/16
108/24 108/25
112/19 113/1
113/15 114/21
115/9
COURT [2]    1/4
126/17
Courthouse [1]
1/21
covenant [4]
120/3 120/5
121/16 122/2
cream [1]    107/5
create [1]    98/6
creating [1]
33/22
credit [2]    8/10
47/9
criticisms [1]
93/11
cross [6]    4/4
4/9 48/4 48/13
50/14 50/17
cross-examinatio
n [3]    48/4
50/14 50/17

cross-examine
[1]    48/13
crossed [1]
11/14
cure [1]    51/19
current [1]
110/9
currently [3]
35/6 76/24 77/1
cyclical [1]
11/17

D

damage [1]
121/18
damages [13]
35/19 35/23
41/4 42/8 42/12
42/25 43/7
45/20 47/21
47/23 120/17
121/1 121/22
dark [1]    124/21
dash [2]    44/15
44/16
data [1]    117/10
date [16]    26/12
36/12 38/13
38/18 41/12
41/13 42/2
58/18 66/12
93/10 98/9
100/9 117/14
120/16 120/24
126/14
dated [3]    6/13
14/22 85/11

dates [1]    9/1
Davey [2]    37/22
51/10
Davey's [1]
39/4
day [14]    1/14
6/16 18/1 42/6
45/23 46/6
46/11 49/23
60/2 62/3 62/23
70/19 114/8
125/1
days [10]    40/22
46/8 46/12
63/10 66/7
66/25 67/6
67/15 70/10
92/25
days' [2]    27/9
70/16
deal [12]    14/3
79/20 80/8
80/13 81/6
82/16 83/2 84/5
95/4 95/5 95/23
105/18
dealing [6]
71/2 93/6 93/7
120/4 121/17
122/3
December [4]
11/13 19/7
19/14 46/8
decide [1]    6/4
decided [1]
36/1

decision [3]
 18/11 18/15
 27/3
decisions [1]
 91/14
dedicate [1]
 22/20
dedicated [1]
 108/9
deduct [1]
 41/20
default [1]
 75/12
defaulting [1]
 96/23
defendant [4]
 1/14 2/15 3/1
 121/5
DEFENDANT'S [1]
 5/5
DEFENDANT/COUNTER
R [2]  2/15 3/1
DEFENDANTS [1]
 2/2
defense [5]  4/9
 4/12 119/17
 119/20 119/21
defense's [1]
 123/3
defenses [1]
 122/16
deliberate [2]
 124/23 125/2
delinquent [2]
 42/18 70/5

delivering [1]
 6/5
department [2]
 42/13 80/1
depending [1]
 124/9
deposition [4]
 48/21 55/10
 95/9 123/2
depositions [1]
 123/16
derived [1]
 105/5
describe [3]
 75/7 104/3
 125/5
describes [1]
 40/21
desert [2]
 11/18 58/15
desire [2]
 18/10 115/7
despite [2]
 20/25 22/4
detail [1]  13/5
details [1]
 13/4
determine [1]
 57/7
DEVILLE [147]
Deville's [12]
 31/4 32/22
 34/11 43/19
 51/9 61/8 62/25
 63/2 71/4 72/10
 78/12 81/22

dictated [1]
 69/14
did [99]  6/24
 7/2 7/16 7/21
 8/13 9/6 9/11
 9/13 9/16 9/21
 10/15 10/19
 11/3 11/5 11/20
 11/22 16/4 16/6
 17/8 17/18
 17/19 17/23
 18/11 18/18
 19/18 19/19
 23/14 24/18
 24/22 24/22
 25/25 26/4
 26/25 28/24
 30/11 30/14
 32/12 33/14
 34/9 34/13
 36/23 37/2 37/7
 37/14 38/20
 38/24 39/21
 41/21 51/1
 53/22 54/19
 57/15 58/10
 60/8 60/16
 60/18 60/25
 61/1 67/2 68/24
 70/17 71/20
 72/15 74/6 74/9
 83/11 84/8 86/6
 88/21 89/8 89/9
 90/8 91/9 93/5
 93/15 93/19

did... [23]
93/24 95/3 95/4
95/13 95/24
100/2 100/3
100/11 100/13
103/11 103/13
103/18 103/20
103/25 106/14
112/6 112/14
114/5 114/10
115/3 115/8
115/10 117/21
didn't [26] 6/6
10/6 13/17 14/2
18/5 18/20
21/25 23/9 32/3
43/10 49/13
53/23 54/11
58/5 61/10 67/6
70/19 73/13
76/13 89/20
96/13 100/3
103/4 104/6
112/4 116/22
Diego [34] 2/18
2/22 3/5 22/2
35/11 43/2 59/5
72/23 73/10
77/8 77/22
77/23 78/21
81/1 81/8 81/12
82/2 82/4 82/6
82/20 83/3
85/19 91/23
92/14 97/17

97/20 98/1 98/2
98/6 98/10
99/23 102/13
107/3 114/18
different [4]
23/2 56/14
82/14 110/19
difficult [3]
22/10 57/14
57/16
difficulty [3]
12/13 56/13
57/3
dinner [2]
58/23 59/4
direct [4] 4/4
4/9 5/6 54/18
directly [2]
78/4 91/11
disagree [2]
53/17 54/3
discount [9]
80/11 80/13
80/22 81/16
81/18 82/3 82/5
82/12 105/21
discounted [3]
22/5 25/5 25/6
discounts [2]
99/22 100/17
discuss [6]
13/24 31/15
93/3 93/9 113/9
114/10
discussed [13]
17/15 19/1

25/11 60/2
60/24 61/1 84/6
112/11 114/11
114/17 116/6
116/18 120/21
discussing [9]
12/22 17/1 91/5
91/7 95/19
96/11 109/23
110/1 110/20
discussion [3]
10/6 116/21
118/20
discussions [11]
8/7 9/5 14/2
16/23 17/3
20/19 20/20
21/18 36/23
37/2 75/8
display [1]
40/4
DISTRICT [2]
1/4 1/5
divergent [1]
29/17
divesting [1]
97/20
DIVISION [1]
1/6
do [183]
document [22]
14/24 15/21
15/22 20/4
26/23 26/25
28/9 28/11 33/6
33/8 37/20

document... [11]
  37/25 39/23
  40/6 41/9 46/23
  53/9 59/13
  69/19 78/24
  99/7 119/24
documents [13]
  27/23 34/15
  74/10 75/1
  76/13 111/10
  111/20 112/21
  112/24 113/3
  113/9 113/12
  113/15
does [15]   39/9
  39/13 40/6
  44/14 47/16
  47/18 55/16
  55/19 63/7 68/2
  78/6 78/10 79/2
  113/11 123/10
doesn't [4]
  41/10 61/20
  75/19 91/14
doing [15]   7/13
  14/9 23/23
  23/24 65/13
  68/22 75/5
  80/18 87/6 87/7
  92/6 108/6
  108/13 108/16
  108/17
dollars [4]
  8/11 43/21
  103/1 103/15

don't [73]   6/8
  7/11 7/23 8/25
  13/16 15/16
  15/20 16/4 16/6
  18/7 21/11 25/3
  26/1 28/6 42/16
  47/18 47/20
  49/3 49/5 50/19
  53/25 55/5
  58/20 59/9
  60/18 61/25
  63/18 64/1
  64/14 65/17
  65/21 66/8
  66/13 66/21
  67/1 67/23 68/3
  68/7 68/12
  68/15 70/14
  73/11 75/7
  77/14 81/3
  81/13 82/5
  82/24 82/25
  84/18 85/18
  86/2 90/2 91/2
  91/4 91/9 100/3
  100/23 102/1
  102/5 103/12
  113/13 115/6
  115/17 116/15
  117/20 119/8
  122/16 123/9
  123/14 123/15
  123/19 123/20
done [20]   13/9
  13/19 27/17

49/8 49/14
  68/11 68/13
  68/16 86/7
  86/16 97/10
  112/15 118/12
  118/14 121/12
  121/14 123/25
double [1]   83/5
doubling [1]
  81/11
doubt [2]   84/16
  89/13
DOUGLAS [1]   1/8
down [25]   5/13
  6/6 12/17 21/12
  23/19 23/19
  26/11 31/14
  38/4 42/24
  45/24 46/5 58/4
  58/15 58/22
  58/25 59/6 70/8
  92/14 93/22
  94/2 107/6
  111/12 115/17
  118/4
draft [11]
  68/19 69/5
  69/15 69/21
  70/9 74/7 74/21
  74/22 75/14
  86/10 113/9
drafted [2]
  110/15 110/16
dramatic [1]
  18/9

**Drayna [38]**
14/5 26/25 27/2
27/4 27/22 29/5
34/4 37/22
38/11 68/19
68/19 68/24
68/25 69/5
69/10 69/18
72/5 73/12
73/15 74/10
74/13 74/22
78/17 79/17
84/6 85/13 91/1
97/9 98/20
100/23 101/3
101/21 110/16
111/10 112/20
113/8 113/12
117/19
**Drayna's [6]**
27/12 41/3 74/4
80/1 111/19
112/23
**driving [1]**
38/1
**drop [2]** 122/15
122/16
**due [9]** 8/17
8/18 8/19 8/19
8/20 8/22 9/1
36/12 47/1
**during [15]**
9/24 10/15
13/20 37/2
55/23 63/9 68/8

85/16 89/7
93/25 95/18
96/9 97/12
115/13 116/5
**duties [4]**
54/10 54/13
54/20 82/18
**duty [1]** 52/7

**E**

**e-mail [81]**
5/13 5/19 5/21
5/25 6/2 6/11
6/12 6/16 6/21
7/19 11/9 11/25
12/1 12/11
12/19 13/3
14/20 14/21
14/25 14/25
16/13 17/12
19/1 19/2 19/16
20/5 20/7 20/9
20/13 28/19
28/24 28/25
29/2 29/14
30/11 30/25
31/2 31/3 31/17
31/18 31/21
32/12 32/22
59/14 60/1 60/1
60/5 60/7 60/8
60/16 62/4
64/15 67/5
67/24 74/5 74/8
83/25 85/9
85/11 86/1 86/3
88/4 88/15 89/5

89/6 89/14
92/19 93/8
94/18 97/1
99/11 104/16
106/8 109/23
110/1 111/20
112/2 112/16
113/8 115/21
117/1
**e-mails [6]** 7/9
7/14 29/5 65/9
65/9 112/14
**each [10]** 21/20
22/13 45/23
46/11 71/6
77/10 112/14
112/15 112/17
113/1
**earlier [7]** 7/6
24/15 25/16
63/8 96/10
115/14 118/14
**early [3]** 25/3
41/4 55/6
**easiest [3]**
70/9 70/11
70/14
**easy [2]** 8/18
29/12
**economic [1]**
100/16
**EDCV [1]** 1/13
**EDCV-15-01921-DF
M [1]** 1/13
**education [1]**
107/25

**effect [5]**
 10/10 10/14
 17/20 17/24
 80/19
**effective [4]**
 38/13 42/3 78/3
 120/24
**effort [2]   92/7**
 104/2
**efforts [6]**
 7/22 8/11 17/16
 22/3 38/23
 39/11
**either [10]**
 9/14 9/16 15/14
 15/17 17/9
 33/20 34/5
 54/17 72/3
 100/2
**eliminate [1]**
 78/2
**else [7]   17/8**
 51/14 84/5 90/3
 90/25 93/10
 125/6
**elsewhere [1]**
 77/23
**emotion [1]**
 85/21
**employer [1]**
 67/20
**Encinitas [2]**
 116/6 116/16
**encouraged [1]**
 7/11

**end [12]   19/5**
 23/20 30/5
 38/12 49/23
 68/11 70/20
 82/22 84/14
 90/24 91/5
 119/14
**engaged [2]**
 38/22 104/2
**enjoy [1]**
 107/13
**enjoyed [1]**
 21/8
**enough [3]**
 79/16 83/22
 86/5
**ensure [1]**
 99/21
**enter [1]   40/11**
**entering [1]**
 19/22
**entire [1]**
 53/12
**entirety [1]**
 76/23
**entities [8]**
 17/9 23/11
 23/13 24/10
 43/16 43/18
 45/2 83/3
**entitled [5]**
 45/20 76/16
 81/16 81/18
 126/10
**entity [8]   23/9**
 42/20 62/12

 117/23 121/22
 122/4
**estate [6]   1/13**
 2/15 3/1 38/8
 38/9 57/12
**Estates [3]**
 14/15 114/19
 116/19
**estimate [1]**
 108/25
**estimates [1]**
 49/1
**et [8]   1/11 2/2**
 61/16 61/16
 106/12 106/14
 107/20 108/22
**Europe [1]**
 114/1
**even [4]   84/14**
 84/15 90/5
 118/13
**evening [1]**
 118/6
**event [2]   17/18**
 31/22
**ever [19]   8/12**
 9/22 10/15
 19/18 19/24
 25/25 30/15
 31/13 38/21
 68/15 82/5
 84/12 90/8 91/3
 91/4 116/15
 117/14 117/21
 121/13

every [1]    21/9
Everybody [1]
 116/9
everyone [2]
 70/18 116/5
evidence [38]
 5/11 6/11 7/16
 12/4 12/8 14/18
 15/24 16/3
 16/10 18/23
 18/25 26/7
 26/12 28/6
 28/13 28/17
 31/7 31/11
 37/18 39/20
 40/1 64/20 65/2
 67/11 85/5 94/7
 99/14 99/18
 104/20 104/24
 109/18 118/8
 119/4 120/12
 120/22 121/9
 121/13 121/21
exact [1]    43/1
exactly [3]
 7/23 21/7 92/22
examination [6]
 5/6 48/4 50/14
 50/17 106/3
 111/9
examine [1]
 48/13
example [2]
 21/8 36/10
examples [1]

except [1]
 21/25
exchange [2]
 24/5 40/15
excluded [1]
 37/11
Excuse [4]
 52/23 55/18
 79/22 88/6
execution [1]
 41/21
executive [1]
 115/5
exhibit [70]
 4/14 4/14 4/15
 4/15 4/16 4/16
 4/17 4/17 5/8
 5/11 6/9 11/9
 11/23 12/4 12/8
 12/18 14/17
 15/18 15/23
 16/3 16/5 16/10
 18/21 20/2 26/6
 28/3 28/13
 28/17 30/21
 31/7 31/11
 32/25 37/16
 43/22 44/11
 44/14 45/6 45/8
 45/11 46/1
 50/23 51/2
 59/10 63/5
 63/21 64/15
 64/19 65/2 66/9
 67/8 73/22

91/18 92/17
94/4 94/16 97/2
98/22 99/18
104/8 104/24
106/6 111/14
113/4 113/17
113/18 115/17
116/11
Exhibit 255 [1]
 113/17
Exhibit 257 [1]
 59/10
Exhibit 272 [1]
 67/8
Exhibit 280 [1]
 85/4
Exhibit 281 [1]
 88/3
Exhibit 292 [1]
 115/17
Exhibit 321 [2]
 5/8 5/11
Exhibit 325 [3]
 94/4 94/16 97/2
Exhibit 330 [1]
 11/9
Exhibit 333 [1]
 12/4
Exhibit 367 [1]
 26/6
Exhibit 411 [2]
 104/8 106/6
Exhibit 487 [2]
 63/5 63/21
Exhibit 489 [1]

Exhibit 489...
 [1]   64/15
Exhibit 490 [1]
 66/9
Exhibit 492 [1]
 92/17
Exhibit 729 [2]
 73/22 113/4
Exhibit 731 [1]
 111/14
Exhibit 758 [1]
 98/22
Exhibit 759 [1]
 20/2
Exhibit 772 [2]
 30/21 31/7
Exhibit 773 [2]
 28/3 28/13
Exhibit 824 [1]
 46/1
Exhibit A [1]
 45/6
Exhibit No [4]
 15/18 16/5
 32/25 44/11
exhibits [5]
 4/7 4/13 39/16
 50/20 50/22
exist [1]   78/22
expand [1]
 103/1
expect [2]
 66/18 107/21
expectations [3]
 34/17 34/18

Expected [1]
 66/14
expert [1]
 102/17
explain [4]
 13/5 22/25
 102/4 102/5
explained [2]
 43/10 78/17
explanation [1]
 9/12
exploratory [1]
 64/9
express [2]
 10/15 38/21
expressed [4]
 7/6 84/24 85/20
 110/6
expressing [2]
 5/18 6/2
extended [1]
 38/17

**F**

face [1]   22/1
faces [1]   22/8
facing [1]   61/2
fact [17]   17/5
 21/16 23/15
 24/11 49/3
 51/18 52/1
 84/20 89/23
 90/19 95/13
 95/24 96/16
 98/9 104/5
 108/17 112/6

 36/20 53/4
 53/13
failing [1]
 35/4
failure [3]
 36/15 39/10
 121/7
fair [20]   7/5
 25/1 25/4 25/5
 25/7 25/9 58/6
 67/17 67/21
 69/20 71/13
 79/15 82/13
 82/19 90/12
 90/18 110/5
 120/4 121/17
 122/3
fairly [1]
 109/19
fairness [1]
 15/16
faith [4]   36/20
 120/3 121/16
 122/2
fall [4]   9/25
 10/12 10/21
 36/23
Fallbrook [4]
 6/4 12/12 12/13
 13/13
familiar [1]
 20/7
far [3]   7/16
 37/14 107/24
fast [1]   83/22

fcarrillo [1]
 2/14
feasby [13]
 2/17 2/21 3/4
 3/4 3/6 5/3
 48/20 50/24
 54/8 63/8 74/1
 98/25 119/13
February [2]
 31/14 31/17
fee [9]   74/24
 105/5 105/16
 109/6 110/9
 110/14 121/8
 121/10 121/11
feel [7]   7/10
 22/10 54/13
 58/5 71/14
 71/22 80/1
feelings [1]
 29/24
fees [83]   8/1
 8/4 8/13 8/16
 8/18 8/19 8/20
 8/23 9/19 9/23
 10/7 10/20 11/3
 11/7 11/8 11/20
 19/11 19/12
 21/13 21/17
 21/20 21/22
 22/5 22/5 24/7
 24/9 25/5 25/6
 25/11 33/23
 35/5 35/14
 35/15 35/16

 35/25 36/4 36/8
 36/15 40/9
 40/15 42/14
 42/15 42/15
 42/17 42/18
 42/18 42/19
 43/3 43/3 43/4
 44/8 44/20
 44/23 45/14
 46/25 47/1 47/8
 51/14 52/1 52/4
 52/9 52/11
 52/14 52/14
 52/15 52/17
 52/17 52/19
 78/3 78/4 80/11
 80/13 80/20
 80/22 80/23
 81/11 82/7 98/6
 99/23 106/19
 107/11 120/10
 120/14
felt [8]   10/16
 20/11 21/6 21/7
 29/12 57/2 71/7
 86/4
few [6]   26/12
 67/6 67/14
 94/23 95/2
 95/15
Fifteen [1]
 123/17
fifth [1]   64/4
figure [4]   6/5
 59/2 90/12
 107/24

 40/8
Filemon [1]
 2/11
fill [1]   49/13
final [2]
 121/17 122/8
finalized [1]
 113/3
financial [6]
 15/14 61/15
 65/10 98/7
 100/16 115/10
financials [13]
 15/3 15/4 15/6
 15/7 15/8 15/9
 61/8 61/11
 61/19 62/4 62/6
 62/21 63/19
find [11]   25/20
 29/23 33/20
 37/12 57/17
 65/20 86/8
 92/10 105/14
 107/9 117/8
finding [2]
 24/24 43/24
finds [1]
 105/10
fine [5]   1/10
 2/2 49/12 120/4
 122/6
Fingers [1]
 11/14
finish [4]   49/3
 49/6 119/4

finish... [1]
 124/4
finished [1]
 49/16
first [24]   13/2
 17/11 20/15
 40/14 42/6
 43/10 45/12
 52/11 55/7
 55/20 58/19
 63/24 64/3
 65/14 76/6 77/2
 79/7 79/14
 98/23 100/9
 106/17 114/15
 120/7 121/3
five [7]   36/4
 36/6 36/7 36/10
 40/10 40/15
 43/24
five-year [1]
 40/15
fix [4]   28/1
 30/19 70/20
 70/22
flag [1]   24/22
flat [1]   74/24
flavor [1]
 107/5
floor [1]   39/15
flow [1]   22/6
focusing [2]
 24/5 97/20
folks [3]   59/1
 64/9 101/16

13/14 13/15
 60/2 95/5 112/3
 118/9
followed [2]
 12/15 34/24
following [7]
 13/12 58/22
 60/2 63/10 64/2
 65/23 119/18
follows [1]
 76/5
force [3]   30/12
 30/15 32/13
foregoing [1]
 126/8
foremost [2]
 77/2 79/7
forgave [1]
 43/17
forgive [2]
 36/4 40/15
forgiven [7]
 22/5 36/8 36/12
 41/15 43/15
 45/3 46/19
form [5]   48/6
 118/7 118/20
 118/25 125/10
formal [1]
 119/6
format [1]
 126/11
former [1]
 47/14
Forsberg [1]

forth [1]   42/9
forward [4]
 60/8 60/20
 95/23 112/4
forwarded [1]
 6/17
forwarding [2]
 16/18 111/20
found [2]   88/6
 113/7
four [5]   25/12
 99/23 106/18
 110/13 121/6
four-year [1]
 110/13
fourth [1]   64/4
frame [1]   95/18
franchise [69]
 8/17 8/23 11/7
 11/20 14/15
 24/6 25/11 35/8
 35/11 39/6 42/2
 42/18 44/7
 44/19 46/25
 51/14 52/5
 56/17 58/11
 72/15 72/22
 73/3 73/9 76/16
 77/2 77/6 77/7
 77/10 77/12
 77/17 77/20
 78/1 78/4 78/9
 78/21 78/25
 79/5 79/10
 79/12 80/6

franchise...
 [29]  80/17
 81/1 86/12
 86/24 87/2
 87/11 98/5
 100/11 100/13
 100/15 101/8
 101/10 101/18
 101/23 102/1
 102/12 105/10
 105/16 106/19
 107/9 107/12
 111/24 117/15
 120/10 120/11
 120/13 120/14
 120/15 120/23
franchisee [10]
 52/14 52/15
 52/20 52/22
 55/23 56/20
 57/24 77/25
 82/20 121/20
franchisees [16]
  10/21 10/24
 11/4 41/21 52/4
 52/10 57/18
 73/6 76/20
 77/23 87/17
 98/3 105/20
 110/10 117/16
 120/15
franchisees' [1]
  57/8
franchises [12]
 8/24 9/18 38/10

77/5 101/12
101/14 102/22
103/8 103/14
franchisor [7]
 8/24 8/25 14/5
 38/7 52/7 52/13
 85/23
frankly [1]
 34/20
Fred [2]  85/20
 94/18
freeing [1]
 22/19
Friday [1]
 66/15
front [11]
 11/23 28/7 50/7
 50/10 74/3 85/6
 88/13 99/8
 109/15 111/16
 115/20
frustrated [4]
 13/20 13/23
 14/1 83/18
frustration [2]
 6/3 14/8
fulfilled [1]
 35/2
fulfilling [1]
 54/19
full [5]  49/12
 81/6 82/21
 89/22 123/13
fully [1]  43/10
function [1]

functions [3]
 107/24 111/2
 117/20
funding [1]
 105/3
further [8]
 26/11 31/15
 44/12 47/25
 53/11 90/5
 105/23 117/25
future [1]
 105/7

G

gave [5]  34/15
 34/23 73/12
 73/13 103/7
general [2]
 23/3 85/25
generally [2]
 59/2 74/9
gentlemen [3]
 48/2 116/2
 118/5
Geoff [4]  28/22
 31/19 32/5 97/9
Gerry [1]  51/10
Gerry Davey [1]
 51/10
get [26]  18/2
 46/20 48/11
 50/4 53/22
 63/12 64/11
 66/6 66/8 66/12
 66/19 66/21
 75/12 76/1

get... [12]
 80/11 82/3
 82/25 87/8
 87/10 90/24
 93/5 107/16
 124/4 124/21
 124/25 125/10
gets [2]  9/10
 82/21
getting [10]
 8/5 14/12 37/8
 54/11 61/12
 66/25 83/7
 83/21 103/21
 114/15
give [16]  20/10
 23/17 27/9 45/9
 72/6 73/15
 73/15 86/11
 88/19 89/12
 89/25 93/5
 93/18 115/11
 119/1 123/9
given [6]  16/16
 59/11 61/12
 98/24 108/9
 118/10
gives [1]  51/18
giving [6]  10/5
 24/6 38/5 51/13
 89/3 90/4
glad [1]  32/5
go [31]  12/17
 13/2 15/5 17/4
 23/14 23/19

43/12 46/1
46/23 48/2 50/4
51/16 52/10
53/25 54/24
68/17 70/11
81/4 91/15
95/11 95/23
96/7 102/25
115/7 118/5
119/4 119/23
125/5
go-between [1]
 30/3
goal [8]  30/15
 71/6 71/15
 71/25 72/9
 79/20 102/20
 102/21
goals [4]  70/23
 71/2 72/8 72/11
goes [6]  22/1
 26/9 44/23 45/5
 45/24 46/5
going [37]  10/8
 12/10 13/17
 17/10 18/2
 18/14 25/18
 26/11 27/9
 31/23 33/20
 34/20 37/3 38/6
 38/9 39/15
 39/16 48/13
 49/20 50/1
 65/20 70/8 71/1
 78/13 89/12

96/2 103/7
106/16 107/17
109/13 113/20
118/18 123/18
124/3 124/8
gone [2]  58/4
 103/17
good [11]  14/2
 14/12 18/4
 31/25 36/20
 69/23 97/23
 107/5 120/3
 121/16 122/2
Gooding [34]
 5/23 7/1 12/25
 13/11 13/21
 25/2 58/22
 59/19 61/13
 62/24 63/10
 63/19 66/2
 71/17 77/24
 84/23 91/23
 91/25 92/6
 92/13 93/17
 93/24 103/1
 103/11 104/5
 104/16 105/20
 106/24 108/18
 114/3 114/6
 115/22 116/7
 116/23
got [20]  5/14
 6/10 23/14
 23/16 29/5
 37/10 49/24

got... [13]
50/6 56/21
56/23 79/5 82/4
84/1 87/25
105/18 105/19
109/12 109/17
111/6 111/11
gotten [2]   92/5
124/14
grab [4]   51/5
109/10 111/5
124/1
graciously [1]
115/15
granted [1]
122/14
great [6]   6/25
21/9 22/9 29/22
93/13 109/3
greater [1]
57/19
Gretchen [7]
55/24 55/25
56/3 56/6 115/1
115/4 115/12
gross [1]   47/2
ground [1]
121/25
grounds [1]
122/8
grow [1]   23/6
growing [5]
6/23 14/15 22/2
23/8 25/8
grown [1]   24/23

growth [2]
85/22 104/4
guess [5]   37/22
40/12 49/2
122/15 123/10
guessing [1]
49/1
guy [1]   109/3
guys [5]   34/21
110/19 110/20
119/2 123/9

## H

had [112]   5/22
7/6 7/16 8/7
9/3 9/3 13/24
15/9 15/13
15/16 15/17
16/15 16/23
16/23 17/2
17/13 17/24
17/25 18/4
19/12 20/18
20/19 21/11
21/17 23/2 23/2
23/15 24/9
24/23 24/24
25/3 25/8 27/22
29/6 29/12
29/25 33/8
33/16 33/16
33/22 34/7
34/14 34/16
35/25 36/18
36/20 37/5
37/23 38/6
38/22 39/2

51/8 56/13 57/3
57/7 57/10 58/4
58/18 59/3 59/4
60/2 62/14 64/5
65/8 65/19
65/21 65/21
67/21 69/4 70/3
70/15 73/10
78/8 83/13 84/4
84/6 84/15
85/16 87/1 87/3
87/9 87/19
88/24 89/11
90/20 90/24
91/1 91/5 92/5
93/17 94/24
95/22 95/24
97/10 98/14
98/20 99/25
100/16 101/3
103/13 103/25
107/18 107/18
110/1 114/10
115/4 115/12
116/1 117/3
124/12
hadn't [7]   9/7
29/6 29/22
33/19 61/12
98/18 99/24
half [5]   24/7
25/5 80/20
82/22 123/19
hand [1]   105/11
handing [1]

handing... [1]
99/7
handle [2]
69/24 92/11
handy [1]
115/18
Hang [1]   44/10
happen [9]
17/10 18/5 69/7
69/11 69/13
69/21 71/1
90/19 90/22
happened [3]
33/18 34/15
106/15
happening [1]
22/14
happens [6]
14/13 18/4
46/16 77/18
79/14 124/7
happy [3]   7/7
30/5 119/22
hard [4]   7/5
112/8 112/13
112/15
has [17]   11/23
13/8 14/17
15/20 30/23
35/3 43/9 46/8
53/13 75/18
77/10 91/14
109/7 109/18
111/15 121/9
121/21

hand [3]   56/17
56/24 56/24
hate [1]   115/16
hats [1]   56/14
have [151]
haven't [2]
16/14 88/6
having [11]
10/7 14/11 17/4
23/13 29/14
35/2 75/9 80/20
89/22 89/23
123/5
he [88]   7/8 9/6
10/11 10/12
10/15 10/16
11/12 14/4 15/3
16/15 16/16
16/24 19/12
27/23 32/16
34/8 39/5 39/5
39/9 39/13
59/21 59/22
60/5 60/6 60/6
60/9 61/7 62/9
62/10 62/14
65/4 65/8 65/8
66/14 66/18
66/25 67/4 67/6
69/18 74/7 74/8
74/24 74/25
83/12 83/18
83/18 83/20
84/11 84/14
84/15 84/21
88/18 88/18

89/11 89/13
89/13 89/14
89/20 89/20
89/22 89/24
89/25 91/14
91/14 91/16
91/17 92/3 93/3
95/3 95/4 97/6
100/2 100/2
100/3 111/10
111/11 111/11
111/12 112/9
112/11 112/21
113/3 113/25
117/7 123/15
he'd [2]   6/5
19/13
he's [5]   50/1
73/16 83/8
91/13 113/2
head [2]   7/15
83/20
hear [9]   9/8
9/11 9/13 21/23
34/4 53/23
66/14 66/18
89/1
heard [15]   9/14
10/14 17/12
18/4 26/2 68/25
84/4 84/9 85/16
88/18 90/25
98/18 99/24
99/25 118/7
hearing [1]

hearing... [1]
  91/3
heart [2]  57/8
  57/11
held [4]  78/25
  79/12 81/1
  126/10
Hello [1]  112/2
help [6]  18/3
  18/10 63/7
  94/14 104/4
  115/16
helped [1]
  107/12
helpful [1]
  118/20
helps [6]  26/13
  55/12 63/5 66/9
  93/10 107/9
her [10]  56/5
  56/12 57/11
  58/4 58/8 58/11
  115/6 115/7
  115/8 115/14
here [20]  6/21
  7/19 14/9 20/13
  23/22 28/11
  29/9 33/17 39/9
  40/25 43/23
  70/18 74/21
  85/25 106/1
  107/19 109/5
  112/12 112/13
  113/21
hereby [2]

hey [3]  8/4
  21/18 21/22
Hi [1]  93/3
him [29]  21/9
  59/15 60/3
  60/24 62/18
  66/12 66/19
  66/20 66/22
  66/25 67/2
  68/12 68/13
  69/1 73/13
  73/16 83/10
  83/12 83/22
  84/21 89/8 93/5
  93/5 93/9 99/24
  112/11 114/12
  117/3 117/9
hired [1]  37/23
his [21]  9/15
  10/14 16/24
  34/5 34/8 58/23
  59/23 60/3 65/9
  81/23 89/15
  91/11 91/15
  91/17 94/19
  95/8 97/20
  111/9 113/1
  113/23 114/12
history [1]
  34/19
hold [2]  5/14
  55/2
holding [3]
  47/7 47/8 47/12
home [2]  118/5

HOMES [7]  1/10
  2/2 14/15
  114/19 116/19
  120/4 122/6
honor [50]  5/4
  12/3 12/6 15/23
  16/1 16/4 16/8
  16/11 26/15
  28/12 28/15
  31/6 31/9 39/17
  40/2 44/1 48/1
  48/15 49/10
  49/18 50/9
  50/16 51/3
  52/23 60/12
  64/19 64/25
  67/10 87/21
  88/9 90/20 95/7
  96/4 99/4 99/14
  99/16 104/19
  105/25 118/2
  119/11 119/16
  122/10 122/18
  122/24 123/4
  123/7 123/12
  123/23 125/7
  125/8
HONORABLE [1]
  1/8
hope [1]  25/23
hoped [1]  96/14
hopeful [3]
  18/1 18/2 32/1
hopefully [1]
  123/8

hoping [2]   86/7
 86/11
horrible [1]
 48/25
hostile [1]
 22/17
hostility [1]
 20/19
hot [1]   9/9
hour [2]   123/15
 123/19
hours [1]
 123/11
housekeeping [1]
 119/7
houses [2]   9/10
 9/11
how [24]   6/5
 14/6 33/14
 36/13 38/11
 40/12 43/16
 46/5 48/23
 65/13 73/17
 74/13 75/11
 79/17 79/24
 90/3 93/24
 100/5 100/23
 103/12 108/1
 123/14 123/16
 123/19
however [1]
 125/5
huh [1]   65/13

I'd [8]   9/1
 15/23 17/2
 28/12 52/23
 60/12 84/9 96/4
I'll [3]   30/25
 49/25 50/4
I'm [79]   5/8
 6/2 6/22 7/14
 8/3 8/22 10/1
 14/6 17/1 17/2
 18/8 18/23
 20/11 23/24
 23/24 24/1
 25/17 28/12
 29/9 30/22
 31/24 33/2
 33/15 33/15
 37/17 38/1
 39/21 43/22
 43/23 44/10
 45/19 45/23
 46/13 48/25
 49/1 49/19
 50/22 51/2
 51/17 54/17
 58/17 59/19
 63/4 64/3 64/5
 64/23 65/16
 68/5 70/5 73/16
 75/20 75/22
 76/15 77/19
 78/23 79/2
 80/12 81/20
 83/10 84/20
 87/23 88/6 89/9

 89/14 89/19
 90/11 90/12
 91/4 94/9 94/12
 96/2 101/20
 103/6 109/2
 109/3 117/19
 118/18 119/22
 124/8
I've [4]   5/14
 89/6 109/17
 124/13
I-N-D-E-X [1]
 4/2
ice [1]   107/5
idea [13]   7/7
 14/12 14/13
 23/13 34/3
 53/13 62/19
 66/18 69/6 69/6
 106/20 107/13
 117/5
ideas [1]   23/2
identified [1]
 35/1
idiots [1]
 34/21
II [1]   1/14
illustrative [2]
 22/7 22/13
implied [3]
 120/3 121/16
 122/2
implying [1]
 71/22
important [1]
 114/2

impression [1]
 66/23
Improper [1]
 102/17
inability [1]
 89/4
INC [6]   1/11
 2/2 2/17 2/21
 3/4 120/5
incentive [2]
 110/7 110/23
include [3]   8/6
 47/16 77/21
included [5]
 47/19 74/8 86/1
 90/6 110/14
includes [2]
 25/10 110/9
including [2]
 78/9 97/9
inclusion [1]
 54/11
incur [1]   42/17
incurred [1]
 35/15
independent [1]
 41/6
indicate [1]
 39/9
indicated [1]
 19/12
indicates [4]
 32/16 44/8
 54/12 89/14
industry [1]

information [11]
 61/15 61/18
 62/17 62/24
 63/1 63/11
 63/15 63/21
 65/10 117/8
 117/9
infrastructure
 [4]   106/12
 106/22 107/20
 108/22
inhibit [1]
 85/22
initial [2]
 55/23 105/15
inside [1]
 82/11
instance [2]
 52/12 55/20
Instead [3]
 37/10 37/12
 105/18
instruct [1]
 124/16
instructed [2]
 34/24 122/17
instructions
 [10]   73/14
 73/15 74/12
 74/23 118/9
 118/21 119/1
 119/5 124/3
 124/17
intend [3]   32/3
 119/8 124/6

intended [3]
 18/12 22/17
 76/7
intending [1]
 74/25
intent [4]
 13/14 28/1
 72/24 123/3
intention [3]
 64/5 89/3 105/4
interest [22]
 41/1 41/4 41/10
 41/11 41/13
 41/24 41/25
 42/1 42/17
 42/19 43/4
 46/20 77/11
 78/8 78/19
 79/10 87/1
 97/16 100/16
 101/8 101/23
 101/25
interested [4]
 57/11 63/3 64/6
 72/1
interests [3]
 57/8 57/10
 87/11
interfere [1]
 121/18
interference [2]
 121/23 121/23
interpret [1]
 79/24
interpretation
 [1]   34/5

interpreted [2]
20/21 24/1
interruption [1]
124/15
intimately [1]
14/4
invest [1]
106/17
investigate [2]
58/2 58/4
involve [2]
10/6 72/11
involved [2]
14/4 61/3
involvement [1]
77/16
Irvine [3]   2/5
2/9 2/13
is [268]
isn't [15]
19/24 24/14
49/20 52/18
52/20 53/12
53/15 79/18
81/23 87/2
89/18 93/1 98/7
98/10 112/7
issue [8]   10/2
10/4 15/5 70/10
70/19 72/8
78/18 98/7
issued [2]
100/6 102/14
issues [8]   9/23
22/6 31/15 93/7

114/17 122/20
it [225]
it's [44]   9/9
13/14 22/7 22/9
22/10 22/12
24/2 24/2 25/4
26/7 26/11
28/22 39/14
39/16 40/12
64/22 64/24
64/25 67/21
69/20 73/24
76/16 79/13
80/4 85/2 88/8
89/10 90/13
91/19 92/25
94/7 98/15
104/10 107/5
107/16 109/4
109/13 109/19
112/8 112/13
112/15 115/17
119/23 124/20
item [2]   40/14
116/14
items [1]
114/10
its [5]   51/9
53/13 61/4
76/23 83/3

J

Jacobi [1]
83/21
James [1]   2/3
January [4]

98/18 100/6
January 19 [2]
98/13 98/18
January 27th [1]
100/6
January 28th [1]
26/13
Jeffrey [1]   3/4
Jill [2]   28/22
97/9
jmulcahy [1]
2/6
job [6]   18/15
29/23 30/19
40/8 86/8 87/6
jobs [1]   72/2
John [4]   2/16
3/9 40/4 76/1
Johnson [33]
5/23 7/1 12/25
13/12 13/22
25/2 58/22
59/19 61/13
62/24 63/10
63/19 66/2
71/17 77/24
84/23 91/22
91/25 92/5
92/13 93/18
93/25 102/25
103/11 104/5
105/19 106/24
108/18 114/3
114/6 115/22
116/8 116/23

**J**

joined [1]
 108/3
joining [1]
 57/19
joint [1]   72/11
jointly [1]
 72/10
JUDGE [1]   1/8
judging [1]
 86/10
judgment [10]
 50/5 119/17
 120/2 121/2
 121/5 121/15
 121/24 122/7
 122/13 122/21
Judicial [1]
 126/12
July [22]   1/19
 5/1 8/19 8/19
 25/16 27/13
 59/6 59/9 59/15
 60/9 60/25
 61/24 62/23
 63/9 64/16
 65/14 65/24
 83/8 92/23
 97/12 113/24
 126/14
July 22 [1]
 97/12
July 22nd [10]
 59/6 59/9 59/15
 60/9 60/25
 61/24 63/9

 113/24
July 24th [1]
 62/23
July 28th [1]
 27/13
July 29th [2]
 64/16 65/14
jumbo [1]   76/4
jump [1]   43/23
June [10]   8/14
 8/16 8/19 10/3
 38/20 38/24
 38/25 39/1 39/2
 108/10
June 3rd [5]
 10/3 38/24
 38/25 39/1 39/2
June of [1]
 108/10
jurors [1]
 124/22
jury [15]   5/2
 22/25 47/10
 48/10 48/11
 49/6 50/13
 90/11 118/17
 118/21 121/11
 122/17 124/3
 124/7 124/22
jury's [1]
 122/22
just [44]   10/7
 13/15 14/3 14/6
 14/11 18/24
 22/9 22/10

 49/12 49/21
 51/5 53/6 54/4
 56/9 58/13 62/1
 64/8 65/4 65/10
 66/21 67/6
 67/14 67/24
 75/4 76/2 79/24
 82/25 84/6 85/2
 86/16 90/11
 97/3 98/15
 105/25 107/16
 111/3 112/2
 112/4 114/1
 116/13 118/19
justification
 [2]   119/20
 119/21

**K**

kadams [1]   2/10
keep [9]   18/12
 26/11 50/6
 81/21 82/11
 98/4 106/21
 115/18 118/8
Kevin [1]   2/7
kick [1]   17/5
kind [3]   42/24
 62/17 118/24
kinds [3]   14/2
 108/12 108/14
King [1]   47/15
Kirksey [1]
 47/15
knew [8]   17/11
 73/7 73/11

## K

knew... [5]
  89/22 103/8
  103/13 106/15
  116/10
knocked [1]
  49/15
know [59]   7/11
  8/25 9/9 11/6
  13/16 13/17
  15/16 21/23
  22/1 26/1 29/5
  30/6 32/23 38/1
  47/19 49/7
  49/15 50/5
  57/10 58/20
  62/7 62/8 62/17
  62/22 63/18
  64/14 65/21
  66/8 66/13
  66/21 67/23
  68/3 69/3 73/11
  75/7 79/20
  81/13 82/24
  83/15 84/8
  85/18 86/2
  87/23 90/2 91/2
  91/9 92/6 100/3
  100/4 100/23
  102/20 107/14
  112/20 115/7
  117/14 123/9
  123/14 123/16
  123/19
knowledge [1]
  41/6

knows [1]
  117/19

## L

Ladies [2]   48/2
  118/5
laid [1]   37/6
language [1]
  79/24
Las [1]   31/23
last [12]   5/25
  7/25 8/13 8/16
  15/17 19/6
  19/21 42/24
  50/19 50/22
  76/2 106/8
late [7]   8/21
  8/22 42/15
  42/17 42/19
  43/4 55/5
later [5]   7/19
  66/7 67/6 67/15
  90/4
law [10]   50/5
  119/18 120/3
  120/17 121/2
  121/6 121/15
  122/7 122/13
  122/21
laws [1]   39/7
lawyer [13]
  26/3 33/16 34/4
  51/9 51/10
  71/18 73/18
  73/19 73/20
  73/25 89/15
  91/14 113/2

lawyers [1]
  37/22
leadership [1]
  23/3
learned [1]
  88/19
least [5]   25/2
  89/10 109/10
  112/11 124/2
leave [5]   38/9
  115/3 115/11
  115/13 115/14
led [1]   43/11
Lee [2]   16/14
  16/15
Lee's [1]   17/12
left [9]   41/11
  41/19 46/13
  47/14 58/8
  106/5 123/20
  123/21 123/23
legal [9]   74/10
  76/4 77/11
  87/15 87/21
  100/18 100/23
  102/16 112/24
less [2]   82/7
  123/15
let [13]   5/21
  25/5 26/7 30/6
  32/23 33/2
  53/20 72/14
  92/6 102/4
  102/8 109/4
  118/5
let's [22]

let's... [22]
 29/11 43/12
 48/2 48/11
 49/17 49/23
 54/24 71/9
 73/21 74/16
 75/2 76/22
 82/14 88/1
 93/18 93/19
 94/21 96/3
 96/14 97/25
 118/5 119/6
letter [17]
 27/12 27/22
 33/11 33/14
 33/16 34/25
 35/2 37/21 38/5
 39/4 51/8 51/12
 51/18 52/1
 52/18 53/3 53/7
level [1] 20/18
license [14]
 35/5 42/14
 42/18 43/3 52/5
 76/12 78/25
 79/5 80/2 80/4
 80/4 80/7 80/9
 87/13
licensees [1]
 35/5
life [1] 29/23
like [29] 7/10
 7/17 9/9 11/13
 13/8 14/10
 14/10 20/11

23/11 23/24
 27/22 49/7
 49/11 49/13
 56/9 58/5 58/13
 58/14 71/14
 71/22 80/1 95/7
 96/4 107/24
 123/10 123/15
 124/4
likely [1]
 88/23
line [5] 61/20
 95/9 95/10 96/5
 96/6
lines [4] 55/11
 55/13 55/14
 119/24
Liquidated [1]
 45/20
list [2] 26/9
 63/12
listed [1]
 40/14
Listen [1]
 81/25
listing [1]
 64/2
lists [1] 39/5
little [5]
 26/11 53/11
 118/14 124/2
 125/9
live [1] 23/10
lived [1] 34/22
Living [2] 6/1

LLP [3] 2/3 2/7
 2/11
loans [1] 22/4
location [1]
 13/13
locations [1]
 37/12
logical [3]
 62/1 78/11
 113/14
long [5] 48/23
 73/20 73/20
 85/17 123/16
longer [11]
 20/5 51/2 78/13
 78/22 79/15
 82/3 82/16 87/7
 101/13 120/14
 124/13
look [54] 5/13
 6/22 7/17 19/2
 19/20 20/2
 21/12 24/11
 24/11 26/6
 32/16 38/2
 38/12 39/4
 40/14 42/8
 43/22 44/6
 45/12 45/19
 48/7 49/13
 55/10 59/10
 63/1 63/5 64/15
 66/9 67/8 73/22
 74/16 75/15
 75/21 76/14

look... [20]   79/18 85/4 88/3
91/18 92/17
94/4 94/9 98/22
104/8 106/8
109/19 111/14
112/1 113/8
113/13 113/21
115/19 116/11
117/3 118/22
looked [5]   6/11
19/16 54/8
65/10 88/3
looking [13]
44/10 44/13
45/19 51/6
60/20 65/23
67/4 73/24
75/22 76/15
88/6 94/10
110/7
looks [3]   11/13
13/8 26/20
Loscher [1]
47/17
lose [3]   36/8
106/16 107/17
losing [1]
101/25
loss [1]   15/11
lost [1]   79/4
lot [4]   17/12
53/19 111/6
118/8
love [1]   6/8

lunch [2]   6/17
124/1

**M**

made [17]   6/22
8/9 9/7 19/24
27/3 54/4 54/18
58/10 63/19
89/2 89/24 90/5
95/22 97/18
105/2 110/2
124/11
MAGISTRATE [1]
1/8
mail [82]   5/13
5/19 5/21 5/25
6/2 6/11 6/12
6/16 6/21 7/19
11/9 11/25 12/1
12/11 12/19
13/3 14/20
14/21 14/25
14/25 16/13
17/12 19/1 19/2
19/16 20/5 20/7
20/9 20/13
21/24 28/19
28/24 28/25
29/2 29/14
30/11 30/25
31/2 31/3 31/17
31/18 31/21
32/12 32/22
59/14 60/1 60/1
60/5 60/7 60/8
60/16 62/4

67/24 74/5 74/8
83/25 85/9
85/11 86/1 86/3
88/4 88/15 89/5
89/6 89/14
92/19 93/8
94/18 97/1
99/11 104/16
106/8 109/23
110/1 111/20
112/2 112/16
113/8 115/21
117/1
mails [6]   7/9
7/14 29/5 65/9
65/9 112/14
maintain [2]
101/12 106/22
maintains [1]
25/20
make [24]   7/10
7/16 11/20
12/14 13/18
13/24 18/11
19/13 24/18
26/8 32/5 36/2
41/14 49/21
65/8 84/21
91/14 93/15
106/18 108/3
112/4 113/20
114/13 119/13
makes [1]   23/1
making [7]
13/15 20/12

making... [5]
 21/3 23/22
 43/23 48/25
 107/23
manage [3]
 22/19 24/25
 24/25
manager [1]
 97/17
many [12]   22/1
 22/5 68/3 93/7
 93/24 95/20
 96/13 96/18
 104/1 104/1
 107/2 121/19
MARKED [2]   4/7
 4/13
market [2]
 11/17 97/18
marketing [1]
 17/15
master [1]
 124/8
match [2]   18/5
 116/22
math [2]   8/18
 35/13
matter [17]
 39/1 39/2 42/6
 50/5 84/20
 90/20 98/9
 119/17 120/2
 120/17 121/2
 121/6 121/15
 122/7 122/13

matters [3]
 32/20 34/7
 119/7
may [23]   5/3
 26/15 39/17
 39/18 44/1
 48/16 48/16
 49/11 51/3 51/4
 58/16 58/18
 83/10 88/9
 88/11 99/4
 100/21 102/19
 103/9 107/10
 108/10 118/4
 118/20
May 23rd [2]
 58/16 58/18
maybe [4]   25/4
 25/7 123/17
 124/12
MCCORMICK [1]
 1/8
me [73]   5/21
 7/8 7/16 9/20
 14/5 14/19
 16/13 16/19
 17/12 18/7
 24/15 25/9 26/8
 28/7 30/6 32/23
 33/2 34/14 39/2
 43/9 43/24 45/9
 52/23 53/20
 55/12 55/13
 55/18 59/2 59/8
 59/11 61/17

63/20 65/16
 67/4 69/18
 72/14 72/19
 74/3 77/21
 78/11 79/22
 84/17 85/6 87/4
 87/15 88/6
 88/13 90/17
 91/16 91/17
 93/10 94/13
 97/23 99/9
 101/25 102/4
 102/8 104/9
 108/25 109/4
 109/15 110/6
 111/17 112/8
 114/2 115/16
 115/20 118/6
 123/9 124/3
mean [6]   14/16
 43/18 51/22
 89/20 106/14
 110/20
meaning [3]
 29/10 61/4 80/3
means [1]   36/11
meant [2]   22/17
 61/11
meantime [1]
 48/5
mechanically [1]
 73/17
mechanism [1]
 34/6
meet [6]   70/22

**M**

meet... [5]
  71/6 89/4 93/24
  107/12 114/5
meeting [26]
  17/15 29/11
  30/2 31/25 32/3
  37/5 59/15
  59/24 60/19
  63/9 64/8 64/17
  65/5 66/24
  68/18 71/16
  92/25 97/12
  113/23 113/25
  114/4 114/5
  114/11 114/13
  116/1 116/5
meetings [2]
  107/25 109/3
memory [4]
  55/16 66/10
  68/2 78/6
mention [1]
  22/6
merging [1]
  17/15
met [3]   34/13
  59/18 92/22
MICHAEL [2]
  4/10 5/5
mid [1]   11/13
middle [1]
  116/14
midway [1]
  45/13
might [14]   8/23

43/11 43/11
55/2 63/3 64/22
90/18 90/18
98/3 103/12
109/1 117/5
Mike [4]   8/4
  11/12 93/3
  112/3
million [6]
  43/21 45/16
  47/1 103/1
  103/15 106/18
mind [4]   36/16
  50/7 89/10
  118/8
minute [1]   6/1
minutes [7]
  43/24 49/1 49/7
  49/16 118/19
  118/22 123/17
misled [1]
  109/13
mission [1]
  92/15
misspoke [1]
  103/6
mistake [1]
  24/21
model [1]
  100/17
modification [9]
  35/20 35/24
  35/25 36/3 36/7
  40/10 41/22
  43/15 43/17

116/13
Monday [6]   32/6
  124/8 124/12
  124/22 124/25
  125/1
money [13]   22/6
  27/20 35/7
  40/12 42/16
  42/19 47/7
  47/23 82/6
  82/13 106/18
  111/1 115/10
month [8]   7/20
  8/13 8/19 15/17
  65/14 85/13
  85/17 115/11
month-long [1]
  85/17
monthly [1]
  94/3
months [5]   9/3
  92/22 97/7
  97/12 115/15
more [10]   14/1
  22/20 25/23
  39/10 57/11
  107/4 107/5
  109/4 109/9
  123/19
morning [9]
  49/4 49/12
  49/12 113/22
  113/23 114/11
  114/13 123/1
  124/12

most [1]   88/23
motion [3]
 49/21 122/10
 122/14
motions [3]
 119/13 119/15
 122/13
motivate [2]
 7/24 93/20
motive [1]
 20/23
move [14]   16/5
 18/8 31/6 52/23
 60/12 88/1
 112/4 115/5
 119/17 120/2
 121/2 121/15
 121/24 122/6
moves [1]   121/5
Mr [95]   5/23
 8/9 8/9 9/21
 9/21 15/10
 15/10 15/14
 15/15 17/21
 19/1 19/20 20/6
 23/2 24/4 24/5
 26/2 26/23 27/3
 27/4 28/19 30/3
 30/12 30/12
 30/15 31/3
 31/15 31/18
 32/12 32/13
 32/13 34/11
 36/16 38/20
 43/18 43/19

 50/14 51/9 53/4
 53/4 53/22 54/1
 54/2 58/13
 58/14 58/16
 60/8 61/5 68/25
 71/4 71/13
 71/13 71/24
 72/9 72/10
 75/11 75/11
 78/11 88/1
 92/11 93/15
 93/15 93/20
 93/20 95/19
 96/11 96/17
 102/6 103/7
 106/5 108/5
 108/6 109/5
 109/14 110/2
 110/2 110/20
 111/9 113/8
 113/17 114/19
 114/23 116/2
 116/2 116/7
 116/7 116/21
 116/22 117/1
 117/17 117/22
 117/22 122/12
Mr. [288]
Mr. Adams [3]
 39/25 119/8
 122/12
Mr. Baur [3]
 48/24 123/2
 123/15
Mr. Bennion [33]
  6/13 6/20 7/25

 11/10 13/4
 17/21 19/12
 20/6 20/16
 23/11 26/2 30/3
 31/15 31/18
 31/23 32/17
 34/11 36/24
 51/9 61/4 63/2
 71/4 71/24
 92/10 96/16
 103/6 114/19
 114/23 116/7
 116/14
Mr. Bennion's
 [3]   10/10
 20/23 61/19
Mr. Davey [1]
 37/22
Mr. Davey's [1]
 39/4
Mr. Deville [54]
  5/16 6/13 6/20
 7/7 7/12 8/8
 9/13 9/14 9/16
 12/19 12/21
 13/3 14/3 16/17
 16/23 17/2 17/8
 27/1 28/20
 28/25 29/3 30/2
 30/16 31/5
 31/24 32/16
 36/17 36/24
 38/21 54/18
 58/16 59/21
 60/5 60/11

Mr. Deville...
 [20]   61/19
 85/9 85/11 86/1
 86/3 88/4 88/15
 88/21 88/25
 90/9 91/7 91/9
 91/11 91/17
 92/2 95/1 95/13
 95/20 96/12
 117/18
Mr. Deville's
 [4]   31/4 32/22
 78/12 81/22
Mr. Drayna [33]
 14/5 26/25 27/2
 27/22 29/5 34/4
 37/22 38/11
 68/19 68/19
 68/24 69/5
 69/10 69/18
 72/5 73/12
 73/15 74/10
 74/13 74/22
 78/17 79/17
 84/6 85/13
 98/20 100/23
 101/3 101/21
 110/16 111/10
 112/20 113/12
 117/19
Mr. Drayna's [6]
 27/12 41/3
 74/4 80/1
 111/19 112/23
Mr. Feasby [7]

63/8 74/1 98/25
119/13
Mr. Forsberg [1]
 17/3
Mr. Gooding [16]
 5/23 12/25
 13/11 13/21
 59/19 62/24
 63/19 66/2
 91/25 93/17
 103/11 106/24
 114/3 114/6
 115/22 116/23
Mr. Johnson [11]
 12/25 13/12
 13/22 59/19
 62/24 63/19
 66/2 93/18
 106/24 114/6
 115/22
Mr. Mulcahy [2]
 40/1 109/24
Mr. Riley [4]
 62/7 62/8 62/11
 62/20
Mr. Rowlett [1]
 43/9
Mr. Schuster
 [31]   5/25 6/17
 14/21 15/1
 59/14 59/20
 60/1 60/19 62/1
 62/23 64/16
 65/4 66/11
 66/23 67/5

68/3 68/9 83/7
83/15 83/19
83/24 84/1
88/20 92/19
94/21 97/1
114/3 114/5
115/21
Mr. Sirianni [1]
 34/7
Mr. Sunderland
 [37]   9/15 9/17
 9/22 17/2 21/8
 25/15 29/12
 36/24 38/21
 54/17 60/11
 68/14 69/4 69/9
 69/12 69/15
 69/16 69/23
 72/25 84/9
 91/11 91/13
 91/16 99/12
 99/20 100/1
 110/3 110/6
 110/22 111/11
 112/7 112/21
 112/22 113/12
 113/23 114/2
 114/11
Mr. Sunderland's
 [1]   112/1
Mr. Teather [23]
 5/8 11/25
 14/19 15/21
 16/13 30/11
 31/13 33/6

**M**

Mr. Teather...
[15]  37/16
37/20 38/20
39/14 39/23
40/6 48/13
50/15 50/19
53/19 79/19
98/13 106/5
115/16 118/4
Mr. Teather's
[2]  48/3 69/6
Mr. Wood [8]
32/10 34/3
58/10 58/21
58/25 59/2 59/4
83/21
Mr. Wrobel [2]
49/20 119/8
Ms [7]  13/3
13/8 50/8 57/4
57/22 58/11
115/3
much [11]  7/21
8/1 16/14 23/7
40/12 43/16
46/5 98/6
123/14 123/20
123/20
Mulcahy [17]
2/3 2/3 2/7
2/11 40/1 48/13
50/14 53/22
54/2 88/1 102/6
106/5 109/5
109/24 111/9

Mulcahy's [1]
109/14
mulcahyllp.com
[3]  2/6 2/10
2/14
multiple [2]
106/25 107/6
multiply [1]
46/14
mumbo [1]  76/4
must [3]  31/22
73/21 95/22
mutually [1]
100/4
my [46]  7/6
7/15 14/8 15/17
17/25 18/16
22/15 22/18
23/12 23/24
23/25 25/17
25/17 26/9
26/18 27/18
29/1 29/23
29/23 30/19
31/4 36/20
43/20 49/2
49/21 50/5 51/2
66/13 69/14
71/6 73/2 81/6
81/23 81/23
81/25 88/8 96/1
104/3 104/10
107/22 112/13
113/5 115/17
115/18 116/11

myself [12]
12/1 20/5 27/3
31/3 32/10
58/10 61/1 69/8
85/11 89/14
92/11 104/1

**N**

name [1]  101/13
named [1]  55/24
need [6]  32/21
39/19 50/4 54/1
55/2 75/16
needed [1]
103/19
negating [1]
120/9
negotiable [1]
110/10
negotiate [4]
22/16 23/25
101/16 101/22
negotiated [2]
25/20 69/4
negotiation [2]
89/23 112/18
negotiations [4]
68/22 83/16
89/16 89/24
neither [1]
59/23
net [1]  80/19
network [3]
23/6 24/23
107/10
never [18]  9/20

**N**

never... [17]
 17/1 17/5 23/14
 84/9 84/11
 84/13 84/14
 86/3 90/9 92/9
 95/1 95/5 100/2
 103/25 111/11
 111/11 111/12

new [9]   7/7
 14/10 103/4
 103/18 105/3
 105/20 106/11
 107/12 107/13

next [13]   8/19
 14/13 22/15
 26/9 35/11
 43/24 47/10
 48/19 53/1
 60/21 61/3
 62/23 66/3

nice [1]   60/19

night [1]   7/9

nine [2]   66/7
 66/25

no [121]   5/20
 9/20 10/1 10/18
 11/22 12/6
 14/17 15/16
 15/18 15/24
 16/1 16/5 16/8
 17/17 19/19
 19/24 26/5 26/5
 28/15 30/14
 31/9 31/16
 32/15 32/25

39/21 39/13
41/25 41/25
44/11 47/20
47/25 51/2
51/15 54/21
55/25 58/3
58/24 59/22
59/24 60/18
61/14 62/19
62/19 62/22
64/1 64/5 64/14
65/25 66/21
67/4 67/23
67/25 68/7 69/8
70/5 70/13
70/24 71/19
72/16 72/24
73/11 73/20
76/13 77/13
77/15 78/13
78/22 79/15
80/25 81/3 81/8
81/13 81/13
82/2 82/3 82/9
82/16 82/24
83/6 87/7 87/9
87/16 87/19
89/3 89/6 89/22
90/2 90/9 92/4
92/16 93/23
93/23 95/16
98/8 98/21
99/16 99/25
100/13 101/13
103/20 103/24
104/7 104/22

105/23 108/14
110/17 117/3
117/24 117/25
118/2 120/13
120/17 121/1
121/10 121/12
121/21 122/18
125/7 125/8

No. [4]   6/9
 18/21 37/16
 43/22

No. 330 [1]   6/9

No. 379 [1]
 37/16

No. 759 [1]
 18/21

No. 87 [1]
 43/22

nobody [2]   39/2
 90/8

nods [1]   24/13

None [4]   4/5
 4/8 54/14 116/9

nonresponsive
 [1]   60/13

noon [1]   123/25

normal [2]
 82/22 112/13

normally [4]
 52/21 52/24
 74/11 112/23

Northern [5]
 56/7 56/10
 56/13 57/4 58/8

not [148]

# N

not reach [1]
  93/16
note [5]  21/21
  75/1 75/4 75/13
  111/22
notebook [3]
  88/8 94/11
  94/13
nothing [2]
  53/3 85/16
notice [14]
  27/9 29/4 38/5
  69/25 70/16
  70/19 86/17
  86/21 87/12
  98/15 100/6
  102/14 103/7
  115/11
notification [1]
  16/16
notifying [1]
  76/19
November [12]
  5/15 5/22 6/13
  9/2 11/21 12/18
  14/22 15/13
  17/10 94/1
  95/18 96/10
November 10th
  [1]  6/13
November 11th
  [1]  11/21
November 2014
  [2]  95/18
  96/10

November 25th
  [2]  14/22
  15/13
November 28th
  [1]  17/10
November 7th [2]
  5/15 5/22
now [52]  19/21
  20/2 20/18
  20/19 20/21
  22/5 23/22
  27/16 40/25
  41/14 43/9
  49/22 52/1 53/3
  53/11 54/24
  55/1 58/15
  59/11 60/8
  60/19 62/23
  65/4 66/1 68/18
  69/25 74/21
  75/18 78/10
  78/24 80/25
  83/7 83/20
  84/23 87/14
  88/3 88/15
  90/24 92/5 94/4
  94/21 95/18
  96/9 97/1 97/22
  97/24 98/13
  110/24 111/5
  113/17 117/11
  119/14
number [22]
  39/5 41/13
  44/13 44/13
  44/15 44/25

  45/2 45/9 46/3 46/8
  46/11 46/14
  46/18 47/2 47/3
  47/10 47/10
  47/21 76/5
  88/24 110/10
  113/18 119/24
numerical [1]
  94/9

# O

OB [3]  28/22
  83/21 97/9
object [1]
  87/24
objection [15]
  12/5 15/25 16/7
  28/14 31/8
  53/16 53/21
  53/21 64/24
  99/15 99/16
  100/18 102/16
  104/21 104/22
objective [3]
  71/9 71/11
  73/16
objectives [1]
  71/6
objects [1]
  53/20
obligation [3]
  22/19 35/1
  90/20
obligations [4]
  34/22 53/5
  90/21 96/23
observe [1]

observe... [1]
  23/8
obviously [3]
  8/24 17/12
  124/25
occasionally [1]
  9/8
occurred [2]
  17/13 55/7
October [10]
  17/14 85/12
  91/24 92/13
  92/20 92/25
  93/25 115/24
  116/1 116/25
October 15th [1]
  85/12
October 21st [1]
  92/20
October 2nd [3]
  17/14 92/25
  116/1
October 7 [1]
  115/24
October 7th [2]
  91/24 116/25
off [11]  16/17
  16/22 16/24
  17/6 17/19 41/9
  49/15 54/11
  76/11 86/12
  106/6
offer [15]
  23/22 24/18
  25/10 29/7

99/21 100/1
104/19 105/4
110/1 110/14
110/15 110/19
115/4
offered [3]
  24/9 102/25
  103/15
offering [5]
  24/4 24/7 81/3
  108/1 110/18
offers [1]
  100/4
office [13]  6/4
  12/12 12/13
  12/14 12/16
  13/19 13/25
  14/11 16/15
  63/11 81/7
  113/23 114/12
officers [1]
  107/17
offices [32]
  6/1 7/7 13/22
  23/4 23/6 23/6
  23/13 37/13
  43/2 56/22 62/5
  62/25 63/2
  63/12 63/24
  64/2 64/7 65/11
  65/12 92/1
  97/13 105/3
  106/18 106/25
  114/18 115/6
  116/7 116/22

117/3 117/8
offset [1]  47/8
oh [8]  26/5
  38/5 39/20
  51/17 56/6
  76/15 89/20
  94/12
okay [47]  5/14
  20/3 40/3 43/14
  44/4 44/18
  48/16 48/19
  48/23 49/2
  49/11 49/25
  50/12 50/21
  51/6 51/22
  52/15 53/24
  56/24 59/21
  61/20 61/23
  64/11 67/2
  67/16 68/17
  71/9 73/7 74/12
  74/21 79/7
  79/23 83/25
  84/19 94/18
  98/17 118/3
  119/12 120/1
  122/11 122/19
  122/25 123/5
  123/8 123/18
  123/24 124/1
onboarding [1]
  13/18
once [3]  41/11
  69/16 120/12
one [41]  6/16

one... [40]   7/9
 8/9 14/3 17/3
 21/20 21/25
 23/12 23/20
 36/10 39/19
 42/21 44/10
 50/24 51/5
 56/17 64/16
 65/5 69/3 72/3
 72/22 75/2 76/5
 77/5 79/2 90/12
 97/3 98/3 101/4
 105/10 105/25
 107/4 107/5
 108/18 109/11
 111/7 111/7
 113/18 113/19
 114/17 115/19
ones [5]   37/23
 50/24 63/3
 113/20 117/4
ongoing [6]   8/7
 21/13 21/18
 22/8 75/9 89/15
only [10]   9/8
 10/2 50/5 69/3
 78/7 80/20
 80/23 89/11
 102/20 106/11
open [8]   12/14
 12/15 12/22
 13/22 14/11
 37/14 91/25
 118/8
openings [1]

operate [3]   7/3
 72/25 101/13
operated [2]
 77/3 77/6
operating [4]
 76/24 77/1
 82/20 106/25
operation [2]
 61/8 63/16
operations [2]
 22/2 57/12
opinion [3]
 41/8 41/10
 85/21
opinions [2]
 48/6 118/7
opportunity [3]
 51/13 51/19
 105/5
oppose [1]
 122/14
opposed [1]
 90/13
optimistic [1]
 68/15
orally [1]
 112/16
Orange [1]   62/5
order [8]   26/14
 63/2 94/9 117/7
 119/19 120/6
 121/18 122/8
ordinary [1]
 113/1
organization [3]
 23/4 59/23

original [1]
 28/4
originally [1]
 24/22
other [52]   7/8
 7/13 10/16
 10/20 10/24
 11/3 14/4 17/3
 17/18 17/22
 18/3 21/20
 22/14 22/19
 23/6 23/11 24/9
 24/25 25/1
 25/11 36/13
 36/16 37/11
 39/6 44/24
 46/25 53/5
 56/20 56/24
 66/19 71/5
 71/20 72/1
 72/22 77/6
 77/23 78/4
 78/15 80/19
 80/23 83/8
 101/7 107/9
 107/16 112/14
 112/15 112/17
 113/1 117/15
 118/9 122/14
 122/20
others [6]   7/13
 18/10 22/4
 36/22 59/15
 104/1
our [48]   6/6

our... [47]
7/20 11/14 17/4
19/22 20/25
21/2 22/3 22/16
24/22 24/23
25/21 28/1
29/15 29/16
29/24 29/25
32/20 32/21
34/16 34/17
34/19 37/9
37/22 41/8
41/10 42/15
48/3 62/11
67/15 71/5
71/25 80/12
80/12 83/16
97/6 97/17
99/21 100/24
102/20 102/21
105/4 107/10
117/20 118/20
119/22 119/24
122/10
our proposed [1]
80/12
ours [2]   72/9
106/13
ourself [1]
14/6
ourselves [2]
29/16 32/6
out [29]   6/5
7/20 23/16
30/12 30/16

47/3 47/17
56/12 57/2 57/7
57/17 58/1 59/2
65/20 74/8
75/12 81/9
81/15 87/11
90/12 90/14
97/22 97/24
98/2 98/10
110/12
outlined [1]
20/13
outlook [1]
17/20
outside [3]
33/24 33/25
51/9
outstanding [3]
21/13 35/14
40/8
over [15]   7/20
20/16 20/22
26/12 41/19
83/20 87/9
89/25 101/14
108/25 110/3
114/23 119/9
119/23 124/3
overruled [5]
53/21 60/14
87/25 100/20
102/18
owe [4]   22/6
36/13 40/13
45/24

owed [1]   22/6
35/7 35/8 35/12
36/9 40/8 40/9
40/23 42/14
42/15 47/9 52/4
120/10 120/14
own [3]   7/15
57/11 104/5
owned [3]   23/11
77/3 114/19
owner [2]   56/17
107/9
owners [9]
17/19 17/22
18/13 25/11
57/3 85/19
107/6 107/12
107/25
owns [1]   38/8

P

P-a-i-g-e [1]
12/1
p.m [5]   5/1
48/8 48/9 67/15
125/12
page [34]   12/18
12/18 13/2
14/12 14/24
35/11 38/2 44/6
44/6 44/7 44/13
44/13 44/24
45/9 45/10
45/13 45/19
51/23 55/10
55/11 55/14
74/16 74/17

page... [11]
 75/21 75/22
 76/14 79/3 95/8
 96/5 116/12
 119/24 120/6
 121/18 126/11
paging [1]
 74/18
paid [5]  21/17
 47/7 52/16
 80/19 81/11
Paige [3]  12/1
 13/5 13/18
paper [6]  53/12
 54/7 54/9 54/12
 54/14 54/21
paperwork [1]
 95/5
paragraph [11]
 7/25 20/15
 21/12 22/15
 24/12 38/4
 38/12 39/5
 45/20 76/2
 76/14
paragraphs [2]
 23/19 35/3
Pardon [1]
 84/17
Park [3]  2/4
 2/8 2/12
part [12]  30/11
 32/12 43/17
 45/23 63/24
 75/4 76/1 80/8

124/17
participated [1]
 25/8
particular [3]
 23/18 113/3
 113/25
particularly [1]
 49/14
parties [3]
 37/13 73/9 76/4
parties' [1]
 39/6
partners [2]
 60/3 94/19
parts [1]  57/20
party [9]  34/3
 77/11 77/18
 78/7 78/8 79/15
 80/16 92/2
 102/12
passionate [1]
 7/17
past [2]  7/20
 34/8
patience [1]
 6/7
Paul [2]  97/9
 112/2
pause [1]  106/2
pay [21]  8/5
 8/24 10/7 21/25
 25/5 33/23
 42/16 51/14
 52/11 80/20
 80/23 81/6

98/5 105/15
 115/12 115/15
 116/23 121/7
payable [1]
 106/18
paying [7]  9/11
 11/13 35/25
 41/9 82/21
 82/22 82/25
payment [15]
 8/10 8/12 8/15
 8/16 9/3 19/7
 19/10 19/13
 19/18 19/21
 19/24 21/25
 34/18 75/6
 99/22
payments [2]
 9/6 11/20
pays [3]  8/25
 52/14 52/20
Pearson [7]
 55/25 56/1 56/3
 57/22 58/11
 115/1 115/3
Pearson's [1]
 57/4
pencil [1]
 125/4
pending [1]
 122/22
people [25]  8/3
 9/9 17/13 18/3
 34/6 37/8 37/9
 37/11 40/7 54/9

**people... [15]**
 58/5 59/18 87/6
 103/8 104/1
 106/20 107/9
 107/12 107/13
 107/14 107/16
 109/9 114/15
 114/16 114/20
**per [2]   46/5**
 81/7
**percent [32]**
 11/6 11/8 24/9
 25/10 36/11
 36/12 36/13
 80/13 80/17
 80/18 80/22
 80/23 81/4
 81/16 81/18
 81/21 82/3 82/7
 82/11 82/16
 82/21 82/25
 99/23 105/5
 105/15 105/19
 105/20 107/11
 109/5 110/9
 110/14 120/9
**PEREZ [3]   2/17**
 2/21 3/4
**perform [3]**
 53/4 53/14
 117/20
**performance [1]**
 63/11
**performing [2]**
 72/2 105/9

**Perhaps [1]**
 14/16
**period [8]**
 25/11 51/19
 85/17 93/12
 93/25 96/9
 96/10 110/13
**permanent [1]**
 99/21
**person [5]**
 29/13 58/25
 90/13 90/13
 90/15
**personal [1]**
 29/22
**personally [3]**
 18/14 90/22
 113/13
**Peterson [1]**
 55/24
**Phil [1]   2/11**
**phone [1]   84/21**
**phrase [1]**
 68/15
**pick [1]   106/5**
**piece [3]   53/12**
 54/6 54/21
**pieces [2]   54/8**
 54/14
**place [6]   30/6**
 68/5 80/10
 86/24 98/5
 110/4
**placed [1]**
 50/10
**plaintiff [1]**

**plaintiff's [2]**
 119/14 120/9
**plaintiffs [6]**
 1/12 2/2 49/21
 50/1 120/24
 121/13
**plaintiffs' [4]**
 4/4 4/6 119/9
 121/6
**PLAINTIFFS/COUNT
ER [1]   2/2**
**plan [6]   19/21**
 32/13 112/3
 123/16 123/22
 124/1
**plans [4]   32/17**
 32/20 60/24
 61/1
**plant [1]   24/22**
**platform [1]**
 17/19
**Plaza [3]   2/4**
 2/8 2/12
**please [11]**
 13/5 28/5 32/23
 45/9 53/1 55/13
 88/3 92/17
 98/22 99/20
 104/9
**pocket [2]**
 81/23 111/1
**point [29]   7/22**
 9/6 9/12 11/21
 15/13 18/3 18/6
 21/17 23/25

**point...** [20]
  24/8 24/18
  25/18 26/3 32/1
  34/10 35/14
  36/1 49/25
  62/11 69/14
  73/2 78/19
  91/10 93/15
  93/17 104/5
  107/22 119/2
  119/9
**portion** [4]
  5/18 40/25 41/4
  107/11
**position** [7]
  22/11 49/6
  57/23 81/22
  81/23 81/24
  115/5
**positive** [3]
  7/14 7/15 71/8
**possible** [3]
  114/18 116/6
  124/5
**possibly** [2]
  116/19 118/13
**post** [1]   122/23
**post-verdict** [1]
   122/23
**pot** [1]   111/3
**potential** [2]
  105/3 116/18
**potentially** [1]
  124/21
**power** [1]   23/15

**practice** [2]
  112/23 113/1
**precipitated** [1]
  124/13
**precisely** [3]
  39/10 44/25
  64/10
**prefer** [1]   64/3
**preferred** [1]
  63/12
**preinstruct** [1]
  124/16
**prepare** [2]
  26/25 74/10
**prepared** [3]
  27/23 111/10
  113/10
**preparing** [1]
  112/22
**presence** [1]
  106/16
**present** [10]
  3/8 5/2 29/12
  48/10 50/13
  59/20 59/21
  59/22 116/5
  118/17
**presentation** [1]
  124/18
**presented** [3]
  7/16 121/9
  121/21
**preserve** [1]
  22/3
**preserved** [1]
  122/23

**PRESIDING** [1]
  1/9
**pressing** [1]
  32/20
**presumably** [1]
  46/15
**presume** [1]
  123/3
**presumes** [1]
  81/20
**pretend** [1]
  112/14
**pretrial** [4]
  119/19 120/6
  121/17 122/8
**pretty** [9]
  16/15 25/17
  26/21 33/2
  43/25 84/10
  84/20 89/10
  89/17
**previously** [2]
  5/5 20/19
**price** [2]
  116/15 116/23
**prior** [6]   14/25
  16/23 19/16
  25/16 112/22
  120/24
**probably** [13]
  6/6 18/1 23/1
  39/14 49/3 50/4
  74/9 94/2
  109/13 113/18
  119/4 123/20
  123/24

problem [7]
 30/20 57/16
 58/5 67/25
 85/19 116/20
 116/21
problematic [1]
 58/1
problems [2]
 36/5 59/3
proceedings [5]
 1/17 48/9 106/2
 125/12 126/10
process [7]
 12/15 13/12
 40/21 60/21
 61/4 64/13 66/4
profit [1]
 15/11
programs [1]
 107/25
progress [1]
 21/3
Promise [1]
 118/6
promised [2]
 19/7 118/11
promissory [4]
 75/1 75/4 75/13
 111/22
prongs [1]
 101/4
proper [3]
 12/15 13/19
 71/14
properly [2]

proportionally
 [1]   45/25
proposal [9]
 24/14 25/25
 26/4 27/23
 31/14 84/12
 84/13 91/1
 98/19
proposals [1]
 90/5
proposed [4]
 30/2 80/8 80/12
 80/13
proposing [2]
 31/21 72/4
propriety [1]
 41/7
prospects [2]
 105/10 105/15
prosper [1]
 103/22
provide [13]
 21/1 34/9 36/17
 64/12 66/2
 67/18 69/18
 72/17 72/21
 78/3 103/4
 110/4 111/2
provided [10]
 10/9 15/3 15/6
 36/18 61/7
 63/15 65/22
 69/15 80/9
 100/17
providing [4]

 112/22 120/21
provisions [1]
 74/14
publicly [2]
 61/18 117/9
purportedly [2]
 52/5 52/11
purports [3]
 51/12 51/17
 51/22
purpose [2]
 20/9 114/13
pursuant [6]
 27/8 40/10 52/5
 74/23 86/18
 126/7
push [2]   67/15
 67/25
put [21]   40/11
 55/1 57/22
 68/19 69/6
 69/10 71/17
 72/5 72/14
 72/17 73/12
 74/22 74/24
 82/25 84/6
 85/13 86/10
 97/25 98/20
 101/3 101/21
pvflaw.com [3]
 2/19 2/23 3/6

Q

question [12]
 13/14 18/7 53/1
 54/1 54/2 54/23

question... [6]
 77/19 81/20
 81/25 100/22
 102/8 111/13
questioning [2]
 89/18 89/19
questions [4]
 47/25 102/5
 105/23 117/25
quibble [4]
 59/9 62/6 65/17
 67/1
quibbling [1]
 64/5
quick [2]  29/6
 49/18
quickly [3]
 12/14 48/11
 106/25
quite [6]  18/8
 26/12 30/18
 34/20 49/4
 54/17
quote [6]  20/16
 68/11 68/11
 70/19 70/20
 89/2
quotes [2]
 20/15 111/12

R

ramping [1]
 91/23
ran [2]  6/23
 37/11

rank [2]  63/12
 117/4
ranking [2]
 64/3 65/11
rash [1]  29/6
rate [6]  14/14
 81/19 82/8
 82/21 82/23
 82/25
rather [9]
 20/25 20/25
 22/7 24/19
 27/22 70/1 70/8
 85/22 119/1
ratio [1]  45/22
reach [4]  7/20
 93/16 93/16
 115/10
reached [3]
 46/12 69/17
 75/11
reaction [1]
 16/20
read [14]  53/7
 55/11 55/15
 74/11 74/13
 79/25 87/4 89/1
 89/1 89/5 89/6
 90/3 95/7 96/4
reading [2]
 53/9 55/15
reads [3]  79/18
 89/18 93/8
real [10]  1/13
 2/15 3/1 6/1
 6/8 24/21 38/8

38/9 49/18
 57/11
realized [2]
 33/18 106/25
really [8]  18/7
 29/10 29/11
 33/18 73/17
 90/13 96/3
 107/16
reason [4]
 24/21 25/2
 65/17 118/24
reasonable [3]
 38/23 39/11
 123/10
reasons [1]
 108/18
rebuttal [3]
 49/9 123/6
 123/12
recall [28]
 6/18 7/23 9/2
 13/11 15/4 16/4
 30/25 31/13
 37/5 58/24 59/6
 59/8 66/1 68/6
 68/7 68/20
 72/14 75/15
 76/12 77/12
 91/3 91/4 93/14
 100/8 101/8
 101/9 101/24
 113/22
receive [7]
 8/13 19/18
 25/25 82/16

receive... [3]
 105/5 112/6
 117/21
received [39]
 4/7 4/13 8/12
 9/3 12/7 12/8
 15/14 16/2 16/3
 16/9 16/10 26/1
 28/16 28/17
 29/2 29/4 31/10
 31/11 33/16
 47/17 59/14
 64/16 65/1 65/2
 65/9 74/4 82/5
 84/15 84/21
 88/21 89/8 90/7
 92/19 99/17
 99/18 99/21
 104/23 104/24
 117/1
receiving [2]
 31/13 108/19
recess [2]   48/8
 124/13
recognize [12]
 11/25 14/19
 15/6 15/21
 15/22 20/4
 26/23 26/24
 28/9 33/6 37/20
 39/23
recognized [1]
 6/7
recollection [4]
  11/16 43/20

recommend [1]
 33/25
recommendation
 [4]   18/18 34/9
 34/23 34/24
record [2]
 49/22 119/15
recover [2]
 35/16 43/6
RECROSS [3]   4/4
 4/9 118/1
redirect [5]
 4/4 4/9 48/17
 105/24 106/3
reduced [1]
 46/10
reduction [3]
 74/24 80/17
 120/9
reference [5]
 15/3 19/5 78/2
 107/19 119/23
referencing [1]
 21/13
referred [1]
 85/25
referring [4]
 19/10 20/17
 45/22 71/4
refers [2]
 12/12 52/18
reflect [2]
 40/6 119/15
reflected [9]
 12/17 40/18

 75/10 119/19
 119/22 120/5
 121/17
reflects [2]
 40/25 41/13
refresh [6]
 43/20 55/16
 66/9 68/2 78/6
 113/11
regard [8]
 13/12 21/16
 34/10 36/25
 90/21 111/9
 121/4 122/9
regarding [15]
 7/2 8/1 9/6
 11/17 13/20
 17/20 18/11
 29/16 36/24
 41/3 41/6 75/12
 103/12 105/3
 121/22
region [11]
 22/2 22/4 35/6
 76/20 76/22
 77/20 78/1 81/9
 120/8 120/21
 121/20
regular [1]
 62/18
regularly [1]
 84/10
regulations [1]
 126/12
rejected [1]

rejected... [1]
  100/4
related [2]
  35/20 59/4
relates [3]
  5/21 60/21
  61/16
relating [5]
  9/23 63/16
  64/12 117/2
  120/17
relations [1]
  21/1
relationship [9]
  25/21 29/16
  33/23 34/19
  36/2 51/18
  57/14 57/15
  75/5
relationships
  [2]  121/19
  121/24
relatively [1]
  14/10
relay [1]  69/18
relayed [1]
  96/16
remain [5]  7/14
  22/6 41/21 73/5
  80/10
remainder [1]
  125/1
remained [2]
  18/1 46/11
remained hopeful
  [1]  18/1

remaining [2]
  7/15 40/23
remember [39]
  9/8 10/10 12/10
  23/1 41/3 43/16
  43/20 44/25
  55/5 55/12 56/5
  56/6 58/15
  58/17 58/21
  61/25 62/5 63/6
  63/7 63/8 65/22
  67/22 68/8
  70/14 77/14
  83/7 83/9 83/20
  84/2 84/11
  95/21 101/2
  101/5 103/2
  109/23 111/13
  112/8 113/25
  114/4
remembered [1]
  78/17
remind [1]
  55/13
remit [2]  35/5
  52/9
remitted [1]
  78/4
remove [2]
  117/16 117/22
removed [2]
  30/18 37/10
renewed [1]
  15/17
rep [37]  10/11
  20/21 33/20

33/21 52/16
  52/17 52/19
  54/10 54/13
  58/11 67/3
  68/22 70/4
  72/12 79/14
  79/15 81/15
  81/21 82/4
  82/17 82/21
  83/1 86/12
  86/18 86/20
  86/22 86/22
  87/13 87/19
  89/25 90/5
  100/7 100/16
  101/14 102/12
  102/21 103/21
repair [1]
  29/24
repeat [1]
  77/19
replacement [1]
  120/22
reply [2]  29/1
  29/2
report [8]  8/1
  60/10 64/12
  65/13 66/2 67/2
  67/4 67/19
reported [1]
  126/9
REPORTER [1]
  126/17
REPORTER'S [1]
  1/17
reports [3]

reports... [3]
 61/17 65/12
 117/2
represent [3]
 69/21 78/14
 87/6
representation
 [32]   11/1
 24/19 27/5 27/8
 27/13 36/17
 38/17 54/15
 58/9 66/4 68/10
 71/11 71/15
 72/18 76/5 76/7
 76/21 79/8
 83/13 86/5
 86/19 92/7
 100/14 101/5
 102/15 108/11
 110/3 117/11
 120/16 120/25
 121/5 121/7
representative
 [54]   10/19
 25/19 29/8
 30/13 30/16
 32/14 33/12
 35/6 36/21 37/4
 44/22 52/2
 52/13 56/9
 56/25 57/5
 57/23 70/7 73/3
 73/7 76/11
 76/18 77/11
 77/17 77/18

78/2 78/5 78/7
78/8 78/14
78/20 78/20
80/10 80/15
80/16 81/9
82/19 87/1
102/3 103/4
103/18 103/18
103/23 103/25
104/6 105/10
105/13 107/8
107/21 108/7
108/15 111/2
120/8 120/20
representative's
 [4]   79/9 101/7
 101/18 101/23
representatives
 [5]   34/17 72/2
 73/8 86/9 104/3
representatives'
 [1]   87/10
represented [3]
 34/7 87/15
 91/16
reps [1]   93/18
request [6]
 12/3 15/17
 15/23 16/5
 28/12 117/21
requested [4]
 15/10 63/1
 63/21 121/13
requesting [2]
 16/24 35/20
requests [1]

require [1]
 112/24
required [4]
 27/9 52/11
 107/22 111/1
required to [1]
 107/22
reread [1]
 29/14
resolve [2]
 71/7 87/3
resolved [2]
 10/2 10/3
resources [2]
 22/20 107/2
responded [8]
 12/21 19/20
 84/11 84/14
 100/2 111/12
 111/12 112/10
response [15]
 5/20 25/25 26/1
 31/4 31/4 31/13
 32/22 67/24
 84/5 90/25
 98/19 99/21
 100/1 112/6
 112/9
responsibilities
 [2]   10/8 53/14
responsibility
 [4]   106/12
 107/19 108/3
 108/22
responsible [3]

responsible...
  [3]   73/6 73/17
  106/11
rest [3]   18/16
  18/18 123/3
restate [1]
  54/1
rested [2]
  49/21 50/2
result [2]
  66/24 121/23
resulted [1]
  80/17
resulting [1]
  121/1
results [3]
  66/3 80/19
  81/10
resume [1]   5/3
resumed [1]
  48/9
retained [2]
  11/6 11/8
retrieving [1]
  59/13
return [1]
  22/16
revenue [4]
  105/5 109/6
  115/13 116/21
reviewed [2]
  65/19 74/7
reviewing [1]
  6/17
Rich [2]   85/20

rid [2]   103/22
  124/14
right [58]   14/5
  19/25 22/10
  26/20 27/14
  27/17 33/9 38/7
  46/19 49/2
  49/17 50/8
  52/20 53/11
  61/7 61/24 65/1
  65/11 69/2 70/3
  70/16 70/17
  72/23 73/4
  73/19 73/21
  74/4 74/5 74/16
  74/22 75/2
  75/14 76/22
  81/16 82/23
  85/9 86/20 87/8
  88/15 90/1
  90/15 91/15
  92/23 94/19
  96/18 98/7
  98/11 99/11
  103/15 105/16
  114/24 116/3
  117/12 118/18
  119/6 123/1
  123/22 125/9
rightly [1]
  43/9
rights [21]
  9/24 10/5 20/21
  22/16 29/8
  33/21 33/21

  70/10 70/15
  92/12 94/22
  95/2 95/14
  97/19 100/5
  101/18 102/21
  110/4 114/24
Riley [5]   62/7
  62/8 62/8 62/11
  62/20
ring [1]   78/10
Riverside [2]
  16/16 77/25
road [1]   70/8
Rob [2]   84/4
  89/14
Robert [1]
  113/8
role [4]   30/13
  30/16 30/19
  32/14
roughly [1]
  123/11
row [1]   46/25
rowlett [3]
  2/20 2/23 43/9
royalties [3]
  53/6 80/18 83/2
royalty [1]
  81/19
RPR [1]   1/21
rule [1]   53/20
run [5]   23/4
  23/5 82/12
  97/22 98/2
running [6]

**R**

running... [6]
 7/17 54/10
 93/22 93/23
 97/24 97/25

**S**

sad [1]   30/1
saddened [2]
 29/15 29/19
said [26]   9/20
 14/3 23/11
 34/20 36/3 36/7
 38/11 39/2 51/8
 61/10 65/8
 69/25 70/3 70/8
 84/1 88/18
 88/24 89/13
 89/20 101/3
 106/17 110/22
 111/9 111/10
 111/11 112/11
sale [3]   114/18
 116/6 116/18
sales [2]   61/16
 61/20
same [21]   8/15
 14/12 15/5
 19/12 22/14
 43/1 51/23 62/3
 73/23 78/18
 82/15 82/25
 87/13 93/12
 95/18 96/9
 114/8 120/16
 122/1 122/2

San [34]   2/18
 2/22 3/5 22/2
 35/11 43/2 59/4
 72/23 73/10
 77/8 77/22
 77/23 78/21
 80/25 81/8
 81/12 82/2 82/4
 82/5 82/20 83/3
 85/19 91/23
 92/14 97/17
 97/20 98/1 98/2
 98/6 98/10
 99/23 102/13
 107/3 114/18
Santa [3]   1/18
 1/22 5/1
sat [1]   53/19
savings [1]
 109/5
saw [6]   7/6
 18/8 83/23
 95/20 96/12
 96/17
say [40]   7/19
 13/23 14/6 22/1
 22/15 25/18
 29/14 30/5
 38/24 39/16
 42/16 44/14
 44/23 45/5 49/8
 51/17 51/22
 51/22 51/23
 58/17 65/15
 66/17 67/7

69/1 69/20 84/3
 84/8 85/2 85/19
 88/23 89/11
 96/2 97/15
 99/20 101/20
 105/1 110/15
 115/9
saying [10]
 6/20 6/22 8/4
 21/21 22/13
 29/5 29/9 70/14
 89/21 116/15
says [25]   11/12
 13/5 19/6 19/21
 32/5 40/14 41/9
 42/5 42/5 51/20
 51/23 54/22
 60/19 64/2
 66/14 67/14
 67/24 75/25
 76/4 77/20 93/3
 97/6 106/10
 107/19 112/2
scale [1]   23/9
schedule [1]
 125/4
scheduled [3]
 5/22 67/17
 67/21
schedules [1]
 30/7
scheduling [1]
 48/12
Schuster [44]
 5/25 6/17 14/21

**Schuster... [41]**
15/1 58/22
59/14 59/20
60/1 60/19
61/13 62/1
62/23 63/10
64/16 65/4
66/11 66/23
67/5 67/14
67/19 68/3 68/9
71/16 83/7
83/15 83/19
83/24 84/1
84/24 88/20
89/2 91/22 92/5
92/13 92/19
94/18 94/21
97/1 103/1
105/19 114/3
114/5 115/21
117/1
**screen [1]**
109/19
**screwy [1]**
124/7
**season [2]**
11/14 19/22
**seasonal [1]**
9/9
**Seattle [18]**
8/3 33/11 38/22
42/21 43/18
44/9 45/17
47/16 47/21
94/23 95/2

103/20 104/2
108/21 108/23
114/24
**Seattle's [1]**
39/10
**second [24]**
5/13 12/17
14/24 19/5
21/12 38/4 42/8
44/10 64/4
75/14 75/17
76/10 78/24
94/11 95/9
98/23 104/12
105/25 109/14
116/12 119/19
120/6 120/19
121/2
**secrets [1]**
116/9
**section [2]**
121/6 126/7
**see [55]** 5/15
6/14 11/10 12/1
12/18 12/22
14/21 15/1 19/3
19/7 19/8 19/22
20/15 20/24
21/3 22/21
24/12 24/16
31/19 31/24
32/17 33/25
39/7 41/1 41/2
41/17 45/6
45/14 45/21

58/21 60/22
64/4 65/6 66/23
68/17 69/11
69/21 71/1
90/19 90/22
93/19 94/16
94/24 94/25
96/14 97/1
109/21 110/10
111/19 116/16
118/16 123/8
**seeking [6]**
35/16 40/19
42/22 43/6
47/22 47/23
**seem [2]** 14/10
23/9
**seemed [1]** 25/9
**seems [2]** 23/24
78/11
**seen [1]** 89/6
**SEFFENS [3]**
1/21 126/16
126/17
**self [1]** 23/9
**self-sustaining**
**[1]** 23/9
**sell [2]** 23/13
116/15
**send [12]** 21/21
26/25 27/22
27/22 28/24
30/11 32/12
51/9 60/16
87/12 91/1

send... [1]
 112/14
sending [3]
 20/9 61/15
 61/17
sense [2]   23/1
 97/18
sent [26]   12/11
 12/19 28/25
 31/17 58/25
 61/23 62/3
 62/24 63/4
 63/10 67/5
 67/24 69/25
 74/8 83/25 85/9
 86/3 86/17
 86/21 88/4
 88/15 89/5 91/1
 98/15 99/11
 104/16
sentence [5]
 7/25 19/6 19/21
 97/6 106/8
SEO [1]   8/11
separate [1]
 75/18
separately [1]
 59/24
September [18]
 10/25 25/16
 35/15 38/13
 78/3 83/8 83/10
 83/25 84/4
 84/24 85/10
 88/16 89/11

104/17 112/1
 117/12
September '14
 [1]   78/3
September 10th
 [1]   112/1
September 25th
 [1]   84/4
September 26th
 [2]   85/10
 88/16
September 2nd
 [1]   104/17
September 30th
 [3]   10/25
 35/15 117/12
series [2]   7/9
 68/20
served [1]
 108/4
service [9]
 10/5 17/22 23/6
 36/21 53/14
 97/17 107/24
 108/19 109/9
serviced [1]
 107/23
servicer [1]
 7/3
services [41]
 1/14 2/15 3/2
 6/6 10/8 21/2
 23/5 36/16
 43/19 52/8 53/5
 62/12 68/10

78/12 82/11
 85/24 86/12
 88/19 88/25
 89/3 93/12
 95/20 95/25
 96/12 96/15
 96/18 96/23
 98/4 98/10
 104/2 114/22
 117/17 117/22
 120/7 120/20
 121/8 121/19
 121/22
servicing [17]
 7/17 9/24 18/10
 18/13 22/16
 23/16 24/6
 34/11 82/10
 92/12 94/22
 95/1 95/14
 97/19 100/5
 114/23 117/17
set [3]   21/10
 32/2 42/9
setting [1]
 107/24
settled [1]
 39/1
settlement [1]
 115/10
several [3]
 29/15 54/8 89/7
shall [3]   76/19
 78/1 78/3
share [4]   25/7

share... [3]
 33/20 62/2
 107/10
sharing [2]
 62/18 62/19
SHARON [3]  1/21
 126/16 126/17
she [12]  56/7
 56/9 56/14
 56/17 56/24
 57/7 57/10
 57/11 57/23
 115/13 115/14
 115/15
sheet [2]  40/25
 42/9
sheets [1]
 15/12
short [2]
 109/19 124/12
shorter [1]
 34/14
shortly [1]
 40/12
shot [3]  20/16
 20/22 93/19
should [17]  6/7
 6/7 20/11 26/13
 33/24 33/24
 34/10 34/21
 44/12 52/16
 69/1 69/7 74/13
 89/4 108/15
 119/4 123/15
shouldn't [2]

show [4]  6/6
 93/22 93/23
 124/17
showed [3]  7/8
 34/15 34/19
shows [1]  61/20
side [2]  48/20
 55/3
sides [1]  3/9
sidetracked [1]
 112/5
sign [1]  72/6
signed [2]
 82/15 83/2
significance [1]
 37/24
similar [1]
 15/9
simple [2]  14/9
 90/19
simply [3]
 32/23 70/10
 93/8
simultaneously
 [2]  95/19
 96/11
since [4]  9/3
 46/12 83/8
 97/16
sincere [3]
 18/9 22/18
 89/13
sincerely [1]
 72/1
sincerity [2]

single [2]  21/9
 53/12
sir [74]  51/11
 51/15 55/6
 55/25 58/3
 61/14 65/25
 67/9 70/13
 70/24 72/13
 72/16 72/24
 73/23 74/3
 76/13 76/17
 77/13 77/15
 80/14 81/14
 82/24 83/4
 83/24 85/7
 85/15 86/2
 87/16 87/18
 87/23 88/8
 88/17 89/6 90/2
 90/9 91/20 92/4
 92/9 92/16
 92/18 92/21
 92/24 93/23
 94/2 94/5 94/17
 94/20 97/14
 98/8 98/14 99/8
 99/13 100/13
 103/3 103/16
 103/20 103/24
 104/7 104/15
 104/18 105/12
 105/17 105/22
 106/9 109/22
 109/25 111/8
 111/16 111/21

sir... [5]
111/25 115/2
116/13 117/13
117/24

Sirianni [2]
34/7 37/23

sit [3]  31/14
109/2 119/4

situated [1]
37/8

situation [4]
34/2 61/2 61/3
73/13

six [2]  115/11
115/15

six-month [1]
115/11

skip [2]  6/9
23/19

skipped [1]
26/11

slow [1]  11/17

small [1]  16/15

sneak [1]  8/2

so [144]

SoCal [12]
16/18 35/3 43/1
60/22 60/25
61/4 64/13 93/6
117/17 120/7
120/20 121/19

SoCal's [1]
35/6

solicit [1]
105/20

solution [3]
23/12 25/20
71/14

solutions [1]
72/4

solve [1]  59/3

some [44]  6/5
9/3 9/12 18/3
18/6 23/10 25/2
25/8 26/3 28/25
31/22 32/12
32/20 33/8
33/17 36/1
42/17 42/17
44/15 47/7
48/17 56/13
57/3 57/3 66/12
85/21 87/5
91/10 93/15
98/13 103/9
106/22 107/10
107/18 110/7
110/22 112/3
112/23 114/18
115/5 117/5
117/8 119/6
123/2

someone [2]
16/18 18/7

someone's [1]
13/14

something [22]
14/9 18/3 18/7
25/23 27/16
28/2 29/10
29/11 30/1 32/2

sound [3]
70/22 71/20
87/9 90/22
93/10 97/10
107/7 107/20
110/4 124/7

sometime [1]
55/5

somewhat [1]
49/5

somewhat worried
[1]  49/5

somewhere [1]
41/8

son [1]  34/8

soon [5]  9/10
19/21 21/24
89/4 107/17

sorry [20]  5/9
18/23 28/12
39/21 43/22
49/19 50/22
51/2 51/17
64/23 70/5
77/19 79/2
81/20 88/12
94/12 101/20
103/6 109/13
117/19

sort [5]  20/10
25/18 34/15
37/5 112/13

sought [1]  34/8

sound [1]
123/10

sounds [2]

sounds... [2]
49/11 123/15
SOUTHERN [35]
1/6 7/4 9/18
9/24 10/9 10/20
10/21 16/24
17/18 17/22
18/13 21/2
30/13 30/16
32/14 34/11
37/4 52/8 58/19
59/3 61/2 76/22
76/25 77/2
78/12 92/12
106/13 108/7
108/10 109/8
117/16 120/8
120/20 121/20
122/6
speak [6]   20/22
83/19 103/11
111/3 111/4
113/2
speaking [1]
91/17
special [1]
125/10
specific [1]
61/1
specifically [2]
35/3 68/7
speculation [1]
53/16
spend [2]
123/16 124/2

spirit [1]
spiteful [2]
22/7 22/12
spoke [9]   9/15
69/16 85/20
91/16 106/24
112/20 113/1
113/12 114/14
spoken [1]
112/3
stack [1]   26/20
stakeholder [1]
87/20
stand [1]   83/24
standard [2]
81/19 82/8
standpoint [1]
109/8
start [9]   9/10
9/11 11/13
41/12 50/19
74/16 75/21
79/2 118/11
started [5]   6/5
54/24 97/6
97/11 111/7
starters [1]
50/23
starting [2]
20/24 119/2
starts [2]   31/3
79/3
state [2]   20/10
54/14
stated [3]
120/5 122/7

statement [5]
53/18 54/3 89/5
89/17 89/19
statements [1]
15/14
STATES [4]   1/4
1/21 126/8
126/12
status [3]   8/1
57/5 83/15
stay [6]   36/4
36/6 36/7 45/24
46/6 103/10
stayed [4]
36/10 36/11
40/22 49/15
staying [1]
40/10
stenographically
[1]   126/9
step [1]   118/4
steps [8]   13/15
60/21 61/3
64/13 66/3 67/3
67/19 93/6
stick [2]
118/19 125/9
still [20]   7/14
14/6 23/14
25/20 32/1 36/9
64/21 86/24
87/1 87/6 90/24
91/5 91/22
92/14 98/18
100/16 101/12

still... [3]
 102/12 102/25
 118/8
stipulated [1]
 39/25
stipulation [1]
 39/21
stop [1]   76/22
Street [4]   1/22
 2/17 2/21 3/5
strike [2]
 52/24 60/12
studying [1]
 11/12
stuff [3]   50/5
 65/11 65/19
subject [1]
 42/16
submission [1]
 122/21
subsequently [1]
  38/16
subtracted [2]
 40/22 46/18
success [4]
 21/11 29/22
 37/7 93/14
successful [10]
 18/15 18/20
 23/17 24/24
 30/1 33/19
 33/22 86/8
 108/2 109/8
successfully [1]
  17/21

such [14]   12/15
 54/10 78/15
 114/4
sudden [1]   29/6
suggest [1]
 53/3
suggested [1]
 124/20
suggesting [1]
 81/22
Suite [7]   1/22
 2/4 2/8 2/12
 2/18 2/22 3/5
sum [2]   14/8
 57/20
summarizes [1]
 35/7
Sunderland [47]
 9/15 9/17 9/22
 17/2 21/8 23/2
 25/15 29/12
 30/3 31/19
 36/24 38/21
 54/17 58/16
 60/11 68/14
 69/4 69/9 69/12
 69/15 69/16
 69/23 72/25
 74/5 84/5 84/9
 89/14 90/25
 91/11 91/13
 91/16 98/19
 99/12 99/20
 100/1 110/3
 110/6 110/20
 110/22 111/11

112/7 112/21
 112/22 113/12
 113/23 114/2
 114/11
Sunderland's [1]
  112/1
support [5]
 34/5 34/5 85/24
 86/6 103/19
supporting [1]
 85/23
supposed [7]
 8/5 64/11 66/8
 66/21 82/9
 88/18 108/6
sure [23]   8/22
 12/15 13/15
 13/18 13/24
 23/24 25/17
 26/8 33/3 33/15
 38/1 41/14
 49/13 63/4 65/8
 75/3 78/23
 87/23 89/9
 107/23 108/3
 112/4 114/14
surely [1]
 91/13
surprised [3]
 16/21 89/1
 116/25
sustained [2]
 52/25 121/22
sustaining [1]
 23/9
sweeten [1]

sweeten... [1]
 111/3
sworn [3]   5/5
 95/8 96/5
system [5]
 16/18 16/22
 16/25 17/7
 108/2
systems [1]
 17/4

**T**

T-y-l-e-y [1]
 12/2
table [1]   40/12
tabulated [1]
 43/4
take [31]   9/1
 16/21 16/24
 20/2 26/6 42/8
 46/14 46/19
 48/3 50/2 53/11
 55/10 63/25
 67/3 74/7 76/11
 86/12 86/16
 87/10 92/7 92/9
 97/18 107/1
 107/23 108/3
 108/21 111/14
 115/5 117/3
 119/6 122/20
taken [5]   13/16
 16/17 48/8
 67/20 83/13
taking [6]

70/15 105/1
121/18
talk [18]   18/4
 18/5 18/23
 29/10 29/13
 33/24 48/5 71/9
 75/2 88/21 89/8
 90/4 90/18
 90/19 91/9
 114/2 115/1
 118/6
talked [14]
 16/14 53/6 68/3
 83/10 84/9
 84/21 84/23
 95/24 101/2
 112/15 112/17
 113/17 113/22
 114/3
talking [25]
 8/3 8/15 21/7
 21/8 25/15
 45/23 66/24
 68/4 68/5 68/14
 74/18 82/15
 83/23 90/10
 91/10 91/22
 93/9 93/11
 93/12 97/3 98/1
 101/9 113/15
 116/10 123/13
talks [2]   44/7
 52/1
task [1]   21/10
tasked [2]   40/7

taxing [1]
 107/1
TEATHER [28]
 4/10 5/5 5/8
 11/25 14/19
 15/21 16/13
 26/23 30/11
 31/13 32/12
 33/6 37/16
 37/20 38/20
 39/14 39/23
 40/6 48/13
 50/15 50/19
 53/19 54/1
 79/19 98/13
 106/5 115/16
 118/4
Teather's [2]
 48/3 69/6
tech [2]   42/15
 43/3
technician [1]
 3/9
technology [9]
 16/18 17/7
 17/15 17/19
 35/5 37/9 44/8
 44/20 54/11
telephone [4]
 67/18 67/21
 68/8 112/8
tell [32]   9/6
 9/17 9/22 14/19
 16/13 17/9 37/2
 37/15 51/16

tell... [23]
54/6 55/9 55/11
62/16 63/5 66/9
75/15 78/17
83/12 85/18
91/12 92/14
93/8 93/9 94/2
94/13 95/24
97/23 100/9
104/9 112/15
113/14 124/22

telling [6]
18/7 59/8 86/4
90/11 96/22
105/14

tells [1]    14/5

temper [1]
33/24

ten [1]    49/16

term [6]    25/14
25/22 40/16
62/6 107/4
110/17

terminate [29]
20/20 24/19
27/10 27/13
34/6 34/21 38/6
58/11 70/3 70/6
70/16 71/11
71/15 72/15
73/2 76/7 77/16
86/21 87/13
98/4 100/5
100/11 100/13
101/4 101/7

102/22 103/7

terminated [13]
10/12 10/16
11/1 27/19
27/20 58/9
98/14 100/14
103/13 117/11
120/13 120/15
120/23

terminates [3]
51/18 79/8 79/9

terminating [10]
33/12 38/10
68/21 86/19
86/22 101/10
102/24 103/21
120/7 120/19

termination [39]
27/5 27/16
27/24 29/4
33/11 38/13
38/16 41/4 42/2
70/1 70/10
72/11 72/18
72/21 74/25
75/14 75/17
75/18 76/5
76/20 79/7
81/10 86/17
87/12 98/16
100/7 100/9
100/24 101/2
101/17 101/22
102/14 108/11
111/23 112/21

121/10 121/11

terminology [1]
104/4

terms [16]    10/5
25/19 37/8 53/6
64/3 69/4 69/5
69/8 69/14
69/16 69/17
69/19 69/20
73/12 90/6 91/5

territory [1]
10/6

testified [2]
23/2 33/17

testify [3]
49/20 50/1
112/25

testimony [14]
7/6 10/10 10/14
33/8 41/3 48/22
54/25 95/8 96/5
102/17 120/12
121/13 121/21
123/2

than [23]    24/19
27/22 34/14
53/5 57/19
66/19 70/1 70/8
71/20 82/7
85/22 107/4
107/5 109/4
110/19 115/14
118/13 118/14
118/14 119/1
123/15 123/19

**than... [1]**
  124/13
**thank [20]   5/4**
  11/12 16/11
  26/17 46/22
  50/3 50/12
  50/16 53/9
  59/13 74/20
  94/14 98/17
  102/9 102/10
  106/7 113/9
  118/23 122/24
  125/11
**thankful [1]**
  22/3
**Thanks [3]**
  11/15 49/8
  105/1
**that [813]**
**that's [67]**
  7/23 8/18 10/2
  12/17 14/16
  14/22 21/7
  21/13 22/9
  23/15 24/14
  25/14 26/18
  26/20 31/25
  32/23 36/13
  37/21 38/11
  41/19 42/1 42/6
  42/21 43/1 43/5
  45/2 45/18
  45/20 45/23
  46/5 46/19
  46/19 47/2

48/18 51/20
51/22 52/21
52/24 61/6
61/18 64/14
67/16 69/12
76/15 79/24
80/1 86/13 87/8
87/15 91/2
96/22 98/12
98/21 101/14
102/1 104/1
104/9 105/8
107/22 107/24
108/8 110/6
110/23 113/14
119/11 124/18
125/4
**their [57]   7/2**
 7/21 9/18 9/24
 10/5 10/7 11/6
 11/8 15/8 16/22
 17/19 18/10
 20/21 23/6 24/5
 29/24 30/19
 32/13 32/17
 33/23 34/22
 37/21 38/6
 38/21 53/4
 53/14 54/15
 54/19 54/22
 57/10 63/12
 63/16 63/19
 65/14 72/25
 76/19 79/14
 80/22 82/10
 82/11 83/1

84/25 85/22
86/4 86/12
96/23 97/13
100/5 101/12
101/25 102/21
102/22 103/8
103/13 104/4
104/5 111/1
**them [115]   8/3**
 8/5 8/12 10/5
 10/7 11/14
 12/21 13/17
 14/3 14/7 15/16
 16/21 16/24
 18/16 23/17
 23/22 24/5 24/7
 24/14 24/18
 25/5 25/19
 27/19 33/21
 34/13 34/14
 34/15 34/16
 34/19 34/21
 34/24 35/2 37/2
 40/9 47/9 47/9
 51/18 52/20
 54/11 58/17
 58/23 59/24
 61/12 61/12
 61/23 61/25
 63/1 63/2 63/12
 64/3 64/11
 64/12 65/22
 65/24 66/3 66/6
 66/8 68/22
 69/10 72/6 72/6
 72/11 73/5 74/8

them... [51]
74/11 74/14
75/2 79/21 84/9
86/4 87/8 87/10
87/17 90/4 90/6
91/4 92/6 92/14
92/22 93/1
95/20 95/24
96/12 96/17
96/22 97/11
97/13 97/22
97/24 97/25
98/2 98/7 98/10
102/2 103/5
103/9 103/15
103/19 104/4
105/12 105/14
105/15 107/1
107/7 110/3
110/4 110/18
110/25 114/10
116/16 117/4
122/22 124/17
124/23 124/25
themselves [3]
29/25 78/14
101/11
then [73]   6/9
7/19 8/16 8/25
13/2 13/8 14/3
18/6 20/24
23/19 25/5
25/10 25/18
31/4 32/22 35/7
38/7 38/16

40/11 42/2 42/8
42/24 44/8
44/23 45/5
45/19 46/5 46/8
46/15 46/18
47/3 47/9 47/21
48/21 49/8
49/21 50/2
50/20 53/25
59/6 59/18 61/7
62/3 63/18 67/5
67/16 68/18
71/1 71/25 72/6
73/21 74/16
76/10 78/14
79/11 81/15
81/19 82/10
82/12 82/14
82/22 89/2 89/6
95/4 107/13
117/5 119/3
123/2 123/5
123/25 124/6
125/2 125/3
there [89]   6/6
11/9 11/23 13/2
14/24 19/5
19/24 20/18
23/7 24/12
24/16 28/25
29/10 30/22
31/22 32/18
35/19 35/22
35/22 36/2
36/16 39/14
40/14 40/19

41/24 41/25
42/5 42/9 42/24
43/5 43/13 44/8
44/12 44/17
45/13 46/3
46/13 46/16
46/25 47/3
48/16 50/10
53/3 53/11
54/21 57/2 57/2
58/2 58/5 58/5
64/22 74/19
74/21 76/22
80/25 82/2 89/4
92/14 93/22
94/3 97/16
106/14 107/6
108/23 109/14
109/16 109/19
111/5 112/23
113/4 113/21
115/9 116/14
116/16 116/20
119/23 120/13
120/17 120/19
121/1 121/9
121/10 121/12
121/21 122/12
122/14 125/5
there's [7]
46/25 50/9 81/8
93/23 101/4
113/20 118/13
thereabouts [1]
55/6

**thereby [1]**
 120/9
**these [25]   7/14**
 15/9 25/3 31/15
 36/5 50/19 52/4
 52/11 52/15
 64/7 67/19
 73/13 74/13
 76/13 89/15
 93/11 94/8
 108/12 113/12
 116/2 116/9
 122/1 122/7
 122/15 122/21
**they [186]**
**they'll [2]**
 9/10 107/14
**they're [15]**
 8/4 8/22 15/8
 18/2 38/7 41/9
 61/15 81/15
 81/18 82/20
 82/24 93/18
 105/9 107/22
 122/3
**thin [1]   26/21**
**thing [13]   6/8**
 9/8 22/14 24/3
 25/9 65/18 76/6
 76/10 79/14
 82/15 89/11
 107/15 114/22
**things [22]**
 7/13 10/3 14/9
 20/18 21/19

34/16 37/6 37/7
 39/5 54/9 54/12
 90/9 108/1
 108/2 108/5
 108/12 108/14
 108/15 116/9
**think [59]   7/5**
 7/13 8/9 8/22
 10/2 12/13 14/1
 14/8 15/5 18/20
 21/11 21/24
 22/7 24/1 24/7
 24/8 25/3 25/22
 27/3 28/6 29/9
 32/10 34/3
 43/11 48/18
 48/23 54/8
 54/12 54/19
 62/16 68/15
 77/24 80/12
 80/23 83/23
 84/18 85/2 87/3
 87/4 89/20
 89/22 96/14
 98/1 103/6
 103/12 109/2
 109/4 110/17
 112/5 115/7
 115/17 116/15
 117/5 118/12
 119/3 119/15
 123/18 123/24
 124/20
**thinking [4]**
 7/11 17/25

**third [5]   24/11**
 34/3 39/4 64/4
 97/6
**this [219]**
**those [57]   8/7**
 9/6 11/7 11/8
 11/20 14/2 14/9
 15/4 15/7 21/20
 25/5 25/8 35/14
 35/16 35/19
 36/8 37/2 37/7
 38/9 39/12
 43/17 45/5
 47/12 48/25
 54/14 59/1 62/2
 68/21 69/3 69/8
 69/17 69/18
 69/19 77/10
 77/11 87/1
 87/20 101/14
 107/11 107/11
 107/13 108/5
 108/14 108/17
 109/2 112/22
 114/17 116/18
 116/22 116/23
 117/18 117/23
 119/15 120/14
 121/24 124/4
 124/4
**though [2]   66/1**
 115/9
**thought [8]**
 18/14 19/13
 25/4 26/2 33/15

thought... [3]
 33/24 72/9
 113/3
thousand [1]
 8/11
three [7]   35/4
 74/21 74/22
 75/1 92/22
 123/7 123/11
through [28]
 7/8 10/25 11/4
 11/14 11/18
 18/10 35/15
 39/16 43/12
 45/13 53/19
 54/17 55/11
 55/14 63/18
 83/3 95/10 96/5
 102/25 106/19
 108/11 108/20
 110/2 118/25
 119/5 119/24
 123/9 124/4
throughout [3]
 10/21 11/7
 36/23
throw [1]   25/18
THURSDAY [1]
 5/1
time [88]   7/2
 7/6 10/15 10/16
 11/4 11/7 12/10
 13/11 13/20
 14/3 14/14
 15/13 16/15

16/24 17/10
17/25 18/11
18/19 20/10
21/6 21/9 21/17
21/21 21/21
22/23 24/4 24/7
27/17 27/18
27/19 29/6
30/19 31/25
32/1 33/17
34/10 35/7 35/8
36/1 36/11
36/19 41/20
46/12 47/25
50/1 51/19
56/10 59/24
60/10 62/9
63/18 68/14
70/7 71/25 72/3
73/20 75/2 86/3
86/7 87/13 93/7
93/12 94/13
94/22 95/1
95/18 95/22
96/9 96/10
97/20 102/13
105/1 107/18
108/9 110/13
113/9 115/13
116/19 119/3
119/14 122/18
122/23 123/11
123/20 123/21
123/22 124/2
125/3
time that [1]

timeline [2]
 33/15 34/16
times [7]   11/17
 14/4 29/15 50/6
 68/3 89/7 93/24
Tisa [1]   3/9
title [2]   62/12
 126/8
titled [1]
 79/13
today [9]   19/6
 49/3 49/6 49/15
 63/19 67/15
 96/20 105/1
 113/9
together [20]
 13/25 17/4 21/3
 24/25 68/19
 69/6 69/10
 71/17 72/5
 72/17 73/12
 74/22 74/24
 84/6 85/13
 86/11 98/20
 101/3 101/21
 113/16
told [20]   12/21
 12/25 24/15
 34/13 42/13
 58/21 59/2
 66/19 68/9
 68/12 68/13
 68/19 68/24
 69/1 69/10
 91/13 93/17

told... [3]
 107/6 117/3
 124/23
tomorrow [9]
 49/7 49/12
 49/14 118/11
 118/12 118/16
 119/3 123/1
 124/7
tonight [1]
 118/22
too [7]   8/3 9/9
 29/6 32/23
 73/19 107/1
 107/2
took [4]   8/10
 40/21 68/5
 79/20
top [4]   11/9
 42/5 43/12
 61/20
top-line [1]
 61/20
total [14]
 40/22 40/23
 41/15 42/18
 43/5 43/15 45/2
 45/14 45/24
 46/10 46/11
 46/25 47/21
 47/23
totaled [1]
 43/4
touch [2]   48/12
 112/2

towards [1]
 21/3
towel [1]   25/19
track [2]   75/12
 115/17
traction [1]
 23/14
transcript [4]
 1/17 55/10
 126/9 126/11
transfer [2]
 29/7 68/9
transferred [3]
 94/23 95/2
 95/14
transferring [1]
 88/25
transitioned [1]
 17/25
travel [1]   30/5
trial [5]   39/16
 42/6 119/22
 119/25 123/11
Tribune [1]
 6/18
tried [3]   34/16
 40/11 69/18
trip [3]   55/23
 58/10 58/19
trouble [1]
 14/12
true [9]   82/9
 84/16 84/18
 90/2 91/2 98/21
 103/24 104/1
 126/8

trust [2]
 74/9
truth [2]   21/24
 24/22
try [13]   8/2
 8/5 14/7 21/10
 29/23 30/19
 78/16 93/19
 98/4 102/4
 102/8 117/7
 124/3
trying [32]   6/4
 6/5 7/5 7/14
 7/24 12/14
 13/18 14/6
 22/12 22/13
 24/1 24/16 28/1
 29/9 31/24 37/6
 70/20 73/16
 86/13 86/15
 87/3 90/11
 90/12 90/14
 92/9 92/10 96/2
 101/15 101/22
 102/2 107/2
 109/2
Tuesday [5]
 32/6 124/21
 124/23 124/24
 125/2
turmoil [1]
 57/3
turn [15]   5/8
 11/23 14/17
 14/24 15/18
 18/21 28/3

**turn...** [8]
  30/21 32/25
  35/11 37/16
  44/24 45/8
  110/3 113/4
**turned** [1]
  110/12
**turning** [1]
  114/23
**twice** [1]   98/6
**two** [18]   23/19
  38/6 43/16
  43/18 47/14
  56/14 62/5
  63/10 72/21
  73/9 75/18
  76/14 101/4
  104/11 109/15
  109/15 113/20
  116/18
**Tyley** [3]   12/1
  13/3 13/8
**type** [8]   6/6
  7/24 23/10
  31/22 65/18
  67/4 107/15
  115/5
**types** [2]   108/5
  108/15
**typical** [2]
  75/4 75/7

**U**

**U.S** [1]   126/17
**Uh** [1]   65/13

**Uh-huh** [1]
  65/13
**ultimately** [3]
  90/10 100/4
  110/12
**ultimatum** [3]
  22/17 24/1 24/2
**under** [17]   8/17
  36/17 44/8
  45/12 45/19
  53/5 53/14
  66/11 66/23
  81/21 96/23
  101/13 101/18
  106/10 116/14
  120/10 122/21
**understand** [7]
  41/14 43/10
  60/9 61/10
  73/13 97/19
  102/2
**understanding**
  [8]   27/10
  27/18 37/24
  40/18 42/11
  66/12 66/13
  94/21
**understood** [1]
  65/9
**undisputed** [2]
  120/12 120/22
**undue** [1]
  124/14
**unequivocal** [1]
  89/17
**unfair** [1]   85/2

**Unfortunately**
  [1]   32/19
**unilaterally** [1]
  71/23
**Union** [1]   6/18
**UNITED** [4]   1/4
  1/21 126/8
  126/12
**universe** [3]
  53/12 54/6
  54/21
**unless** [3]
  52/19 93/10
  124/7
**unpaid** [2]   44/7
  44/19
**unsettled** [1]
  39/3
**until** [3]   36/18
  84/14 103/13
**untrue** [1]
  98/12
**up** [36]   5/21
  8/10 9/5 10/5
  11/14 13/8 19/7
  19/10 19/13
  19/18 19/20
  24/6 28/2 32/2
  34/22 36/18
  43/12 46/15
  49/16 60/2 60/9
  82/22 88/19
  89/3 89/12
  89/25 90/5
  91/23 106/5
  106/17 107/24

**up...** [5]   110/8
 110/16 110/23
 112/3 117/5
**update** [3]
 66/14 84/1 93/5
**updates** [3]
 65/22 93/3 93/8
**us** [35]   8/25
 14/10 14/11
 23/11 24/25
 25/2 34/7 34/15
 34/20 34/23
 36/2 36/5 38/5
 40/8 40/9 40/13
 40/22 41/10
 46/11 47/8
 51/16 54/6 63/5
 66/9 75/15
 96/20 97/17
 103/7 103/10
 106/20 107/9
 107/12 108/3
 109/9 124/6
**use** [8]   34/6
 39/10 55/2
 56/12 57/20
 82/14 107/5
 123/22
**used** [3]   7/12
 50/24 68/15
**usual** [1]
 124/13

**V**

**valley** [35]

 23/25 25/1 24/8
 24/23 25/4
 27/25 32/24
 35/8 42/20 43/3
 72/22 77/4
 77/22 78/21
 79/1 80/2 80/3
 80/7 80/9 80/14
 80/16 80/20
 81/4 97/21
 97/23 97/24
 99/22 102/13
 103/2 103/9
 105/4 106/17
 107/1 120/10
 122/4
**various** [1]
 119/13
**vaughn** [5]   2/16
 2/17 2/19 2/21
 3/4
**Vegas** [1]   31/23
**venue** [1]   14/2
**verdict** [5]
 118/20 118/25
 122/22 122/23
 125/10
**versa** [1]   119/1
**very** [12]   7/5
 7/21 16/14 34/2
 56/6 60/1 62/3
 62/23 74/12
 83/18 89/24
 124/1
**vibrant** [1]
 6/22

**vices** [1]   10/9
**view** [4]   23/12
 36/20 45/11
 108/9
**viewed** [3]   30/1
 57/14 58/1
**views** [1]   29/15
**violated** [1]
 39/6
**violation** [1]
 86/4
**virtue** [1]
 10/17
**vis** [2]   10/8
 10/8
**vis-a-vis** [1]
 10/8
**visit** [7]   55/7
 58/4 58/15
 58/18 58/22
 58/25 60/6
**visits** [2]
 58/17 59/8
**volume** [2]   1/14
 95/9
**voluntarily** [1]
 20/21

**W**

**wait** [1]   76/15
**waiting** [4]
 83/8 83/12
 92/14 102/25
**waive** [1]   44/22
**waived** [2]
 45/14 45/16
**waiver** [2]   44/7

waiver... [1]
 44/19
walk [1]   24/1
want [23]   14/11
 18/23 37/14
 41/14 49/5
 70/18 71/20
 72/15 87/5
 90/18 95/25
 103/10 105/2
 106/5 106/21
 107/10 115/1
 115/18 117/4
 117/4 119/1
 124/17 125/5
wanted [39]
 13/23 23/16
 27/21 34/3 34/4
 49/12 57/10
 57/17 62/25
 63/24 65/8
 69/11 69/21
 70/22 70/25
 71/22 71/23
 72/6 73/2 73/5
 83/15 86/16
 87/17 90/19
 90/22 91/25
 97/22 98/2 98/9
 98/10 106/22
 107/4 110/22
 112/2 112/4
 115/13 116/22
 116/23 119/13
wanting [1]

wants [1]   14/4
was [217]
wasn't [12]   7/7
 18/14 22/12
 23/7 25/14 28/1
 47/19 59/4
 62/10 66/25
 72/3 83/18
Watch [8]   9/19
 10/1 10/4 21/10
 33/19 38/23
 39/9 39/11
way [26]   13/19
 22/18 24/24
 26/21 29/23
 33/20 36/2
 69/23 70/9
 70/11 70/14
 71/7 71/13
 72/14 73/21
 79/4 79/18 86/8
 87/5 94/8 97/23
 97/25 98/3
 107/16 110/25
 115/9
Wayne [1]   2/20
we [230]
we'd [3]   10/3
 12/3 75/11
we'll [9]   9/11
 50/2 50/20 66/4
 68/17 118/16
 123/24 125/5
 125/10
we're [15]   8/15

20/12 20/12
 22/13 43/8 47/8
 49/8 51/23
 51/25 74/18
 96/2 97/25
 113/20
we've [4]   33/8
 108/20 111/6
 118/19
wearing [2]
 56/14 56/24
Wednesday [1]
 32/7
week [5]   64/17
 65/5 65/19
 93/24 112/3
weeks [3]   94/23
 95/3 95/15
welcomed [1]
 34/3
well [69]   9/13
 21/18 23/1 27/4
 29/20 29/22
 38/10 38/18
 49/2 49/10
 50/23 51/20
 52/19 55/2 56/6
 59/20 61/15
 61/20 62/2 62/9
 63/5 63/12 64/2
 64/15 65/13
 65/16 66/14
 66/23 67/5
 68/14 69/14
 70/25 71/20

**W**

well... [36]
 72/14 72/17
 73/7 73/12
 74/16 75/8
 75/15 75/21
 77/16 79/18
 80/15 81/15
 82/14 84/11
 86/3 86/10
 86/17 87/17
 88/24 89/10
 89/17 89/22
 90/17 91/3 91/7
 91/13 93/24
 94/7 98/15
 103/25 111/22
 114/15 123/14
 123/24 124/1
 125/3
went [12]   7/8
 11/17 58/1
 68/18 68/25
 79/4 83/20
 83/21 94/2
 97/15 114/2
 114/14
were [167]
weren't [10]
 13/16 37/9 64/6
 83/21 91/7
 93/22 95/23
 108/17 110/25
 111/1
West [1]   1/22
what [124]   5/18

7/23 8/4 10/7
10/25 12/10
12/25 13/17
14/13 15/4 15/7
16/20 17/14
17/24 18/15
20/9 20/11
20/16 20/19
21/6 21/7 21/16
21/19 21/22
22/13 23/22
24/2 24/4 25/1
25/1 25/3 28/11
29/2 29/9 29/24
30/6 31/2 31/21
32/22 33/18
33/25 34/9
34/13 34/14
34/16 34/17
35/1 35/23 36/3
36/12 37/2
37/24 38/1 40/6
40/8 40/9 40/23
42/24 46/16
47/6 48/19
51/20 51/22
53/5 59/2 60/2
60/9 60/10
60/24 61/10
61/11 61/17
62/17 62/19
68/4 69/1 69/6
69/11 69/12
69/17 69/21
70/18 70/25

71/5 72/7
73/16 74/13
78/17 79/13
86/13 86/15
87/3 87/15
89/18 89/18
89/20 89/21
90/12 90/14
90/18 90/19
92/6 92/9 93/9
96/2 96/22
101/14 102/2
106/14 106/15
107/2 109/1
110/8 110/19
110/23 112/15
115/12 116/10
117/5 117/19
121/9
what's [5]
 22/14 40/23
 42/11 65/20
 112/16
whatever [7]
 8/10 34/5 36/5
 36/9 77/17
 118/24 123/22
whatsoever [1]
 103/23
when [47]   8/17
 8/21 10/25
 17/15 18/8 23/1
 25/15 32/23
 34/13 36/1
 49/14 53/20
 61/10 63/4

W

**when... [33]**
65/19 65/22
66/8 66/21
68/25 70/5 72/5
73/13 73/15
79/18 80/15
81/9 82/4 83/23
84/23 88/25
89/13 90/11
90/24 91/16
95/22 97/6
100/14 101/21
102/14 103/6
106/24 112/13
113/13 115/10
115/13 116/25
124/9
**whenever [1]**
8/3
**where [26]** 8/10
13/5 14/9 20/10
20/11 20/12
21/19 22/4
23/15 33/23
38/5 43/3 47/12
49/6 54/6 54/9
57/19 57/23
58/5 71/13 79/2
86/25 101/25
106/5 107/17
124/19
**whether [28]**
9/2 11/6 13/11
13/16 13/17
17/1 17/20

26/1 55/5 57/7
57/10 57/11
57/18 58/4
61/25 61/25
65/21 90/21
91/2 91/10
100/3 112/20
113/11 116/20
117/14 123/9
**which [22]** 8/13
14/14 15/5
19/10 39/19
40/21 44/9
49/12 50/22
62/25 63/24
64/3 64/16 66/6
76/18 84/6 90/6
94/13 104/9
113/18 118/20
122/13
**while [6]** 41/9
61/24 90/17
90/18 93/11
102/24
**white [2]**
113/19 113/20
**who [17]** 9/15
14/10 29/12
33/16 52/10
57/22 58/25
62/7 89/15
90/14 92/11
103/8 105/10
107/10 107/12
107/14 114/15

**whose [1]** 57/19
**whom [1]** 59/18
**whomever [1]**
108/3
**why [10]** 9/6
22/25 24/18
28/24 29/21
47/19 50/19
53/25 66/18
115/3
**will [38]** 12/7
16/2 21/20
22/20 27/13
32/24 36/3 36/4
40/1 48/5 48/6
48/24 49/9
49/21 67/16
78/4 85/4 91/18
94/4 97/19
99/17 104/23
106/10 106/13
107/13 107/22
115/9 116/15
118/11 118/12
118/14 118/21
122/20 123/1
123/2 123/3
123/8 124/18
**willing [4]**
30/9 32/9 32/10
106/17
**WINDERMERE [64]**
1/13 2/15 3/1
6/22 6/25 7/3
9/19 10/1 10/4
10/13 16/17

**W**

WINDERMERE...
[53]   21/10
33/11 33/19
35/3 35/6 38/22
38/23 39/9
39/10 39/11
40/19 42/21
43/6 43/18 44/9
45/17 47/16
47/21 51/8
51/13 52/8
52/16 55/4
56/13 57/15
57/22 60/21
60/25 61/4 62/9
62/12 68/10
76/19 78/5
78/12 83/14
90/13 92/7 97/8
97/18 101/13
103/9 105/7
106/16 106/21
106/22 108/21
109/7 114/24
115/3 115/11
117/14 117/16
Windermere's [2]
10/17 61/3
wish [4]   96/19
122/15 122/16
122/16
withholding [2]
9/18 9/22
within [7]
51/19 66/25

94/23 95/2
95/15 107/10
108/2
without [20]
23/10 24/20
27/6 27/10
27/16 27/19
70/4 70/5 70/7
70/11 80/10
86/17 86/21
90/21 100/7
100/10 100/24
101/10 103/23
124/14
witness [16]
5/5 24/13 44/3
50/11 53/9
55/15 59/13
63/7 66/11 67/9
88/10 91/20
92/18 99/5 99/7
102/17
witness's [3]
53/22 95/8 96/5
witnesses [4]
4/4 4/9 49/10
123/7
won't [2]   118/6
118/7
Wood [10]   27/3
31/19 32/10
34/3 58/10
58/21 58/25
59/2 59/4 83/21
word [2]   20/24
82/14

words [16]   56/12
56/20 57/20
72/1 83/8
122/14
wore [1]   56/17
work [12]   13/18
14/7 18/2 24/25
36/2 36/5
100/24 106/20
106/21 107/10
107/17 110/25
worked [2]
36/14 103/8
working [18]
7/12 10/3 21/1
21/3 60/20 62/9
62/11 62/12
62/14 68/13
72/24 93/13
106/21 107/13
113/2 113/16
118/19 118/25
works [3]   30/7
73/17 79/17
worried [2]
8/25 49/5
worth [1]   117/6
would [142]
wouldn't [11]
7/10 13/23 27/2
32/3 54/12
66/16 71/19
82/19 83/5
85/25 87/5
write [1]   34/24
writes [1]

## W

writes... [1]
 94/21
writing [2]
 24/14 112/10
written [2]
 27/23 112/9
Wrobel [2]
 49/20 119/8
wrong [2]   43/11
 79/4
wrote [4]   14/21
 37/22 65/4
 111/12
WSC [4]   44/9
 44/22 45/12
 120/10

## Y

yeah [11]   9/11
 15/5 37/21
 45/23 55/17
 56/21 56/23
 56/23 68/1 98/2
 112/13
year [8]   25/16
 40/15 50/6
 84/15 90/24
 91/6 108/25
 110/13
years [13]   22/5
 25/12 36/4 36/6
 36/8 36/10
 40/10 62/16
 95/20 96/13
 96/18 99/23

yes [282]
yesterday [4]
 6/11 10/11
 60/20 118/12
yet [4]   15/20
 19/7 88/6
 124/24
York [1]   48/21
you [649]
you'd [1]   26/6
you're [27]   8/4
 21/12 23/22
 23/23 35/16
 35/20 38/1
 44/13 44/17
 45/22 47/12
 51/6 59/8 68/4
 71/22 73/19
 74/18 81/22
 89/21 90/11
 90/14 91/22
 93/11 93/12
 98/1 101/25
 123/18
you've [4]   50/6
 53/19 85/25
 118/7
your [150]
yours [1]   21/14
yourself [3]
 18/6 55/11
 105/18

EXHIBIT C

1

```
 1                   UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

 3         HONORABLE DOUGLAS F. McCORMICK, U.S. MAGISTRATE JUDGE

 4  BENNION AND DEVILLE FINE HOMES,  )
    et al.,                         )
 5                                  )
                                    )   Certified Transcript
 6     Plaintiffs/Counter Defendants,)
                                    )   Case No.
 7           vs.                    )   5:15-CV-01921-DFM
                                    )
 8  WINDERMERE REAL ESTATE SERVICES )
    COMPANY,                        )
 9                                  )   Day 9, Volume I
        Defendant/Counter Claimant. )
10  _____ )

11

12

13

14                 REPORTER'S TRANSCRIPT OF
                        JURY TRIAL
15               FRIDAY, JULY 20, 2018
                      8:52 A.M.
16               SANTA ANA, CALIFORNIA

17

18

19

20

21

22  _____

23       DEBBIE HINO-SPAAN, CSR 7953, CRR
            FEDERAL OFFICIAL COURT REPORTER
24          411 WEST FOURTH STREET, ROOM 1-191
             SANTA ANA, CALIFORNIA 92701-4516
25                 dhinospaan@yahoo.com


              UNITED STATES DISTRICT COURT
```

2

```
 1              APPEARANCES OF COUNSEL:

 2

 3  FOR THE PLAINTIFFS AND COUNTER DEFENDANTS BENNION AND DEVILLE
    FINE HOMES, INC., ET AL.:
 4
        MULCAHY LLP
 5      BY:  JAMES M. MULCAHY, ESQ.
             KEVIN A. ADAMS, ESQ.
 6           FILEMON "PHIL" CARRILLO, ESQ.
        4 Park Plaza
 7      Suite 1230
        Irvine, California 92614
 8      949-252-9377

 9  FOR THE DEFENDANT AND COUNTERCLAIMANT WINDERMERE REAL ESTATE
    SERVICES COMPANY:
10
        PEREZ VAUGHN & FEASBY, INC.
11      BY:  CHRISTOPHER WAYNE ROWLETT, ESQ.
             JEFFREY ALAN FEASBY, ESQ.
12           JOHN D. VAUGHN, ESQ.
        600 B Street
13      Suite 600
        San Diego, California 92101
14      619-784-3549

15  ALSO PRESENT:

16      Michael Teather, representative
        John Tisa, technician for both sides
17

18
19
20
21
22
23
24
25
              UNITED STATES DISTRICT COURT
```

3

```
 1                    I N D E X

 2

 3  WITNESSES                              PAGE

 4  YORK BAUER, CALLED BY THE DEFENDANT

 5      Direct Examination by Mr. Rowlett        6
        Cross-Examination by Mr. Adams          35
        Redirect Examination by Mr. Rowlett     44
 6

 7  (Testimony of Patrick Robinson was read by Messrs. Feasby and
    Rowlett at Page 47)

 8  KIRK GREGOR, CALLED BY THE PLAINTIFFS

 9      Direct Examination by Mr. Adams         69
        Cross-Examination by Mr. Feasby         79

10

11

12

13

14                    EXHIBITS

15                                         IN     WITHDRAWN
                                        EVIDENCE    OR
                                                  REJECTED
    EXHIBIT
16
17  820    04/30/2013 Email from Greg      20
           Sundberg to York Baur re:
18         Draft Proposal - Confidential
           (WSC017449)

19  821    05/01/2013 Email from Greg      21
           Sundberg to York Baur re:
20         Draft Proposal - Confidential
           (WSC017451)
21
22  704    10/8/2013 Email from York Baur  26
           re Windermere Watch
23         (WSC019492)

24

25

              UNITED STATES DISTRICT COURT
```

4

```
 1          SANTA ANA, CALIFORNIA; FRIDAY, JULY 20, 2018

 2                       8:52 A.M.

 3                        - - -

 4            (Out of the presence of the jury.)

08:52AM  5       THE COURT:  Counsel had something to raise?

 6            MR. FEASBY:  Yes, Your Honor.  With regard to the

 7  rebuttal witnesses, Mr. Gregor and Ms. Tyley, both those

 8  witnesses appear on the plaintiff's witness list.

 9            THE COURT:  Okay.

08:52AM 10            MR. FEASBY:  I anticipate that they'll testify

11  regarding the services that were provided by the area rep.

12  During their case in chief, the plaintiffs elected to have

13  Mr. Deville testify regarding those issues.  I think that any

14  testimony from them on rebuttal regarding those issues would be

08:52AM 15  cumulative of that.

16            To the extent it's not, though, I think one of those

17  witnesses certainly could testify regarding that.  Two of the

18  witnesses testifying regarding those issues would also be

19  cumulative.  So I just wanted to put --

08:52AM 20            THE COURT:  Well, the reality is, I think, somebody

21  asked me yesterday -- the other day where we were.  I think

22  that plaintiffs have less than an hour of time left.  And I'm

23  not going to -- given how our progress has been, I'm not going

24  to cut them off mid sentence or anything.  But unless you take

08:53AM 25  dramatically more time than you've indicated, I do think we

              UNITED STATES DISTRICT COURT
```

**7**

```
1   should finish the evidence today.  And I will hold them to the
2   time limits necessary to do that.  So in terms of the
3   cumulative nature of any of that testimony, I don't -- I'm not
4   terribly concerned about that unduly consuming too much of the
5   Court's or the jury's time.
6            MR. FEASBY:  Okay.  Thank you, Your Honor.
7            THE COURT:  But, you know, objection noted and
8   overruled.
9       Anything else?
10           MR. FEASBY:  No.
11           THE COURT:  No.  Okay.  We're starting with
12  Mr. Baur?
13           MR. ROWLETT:  Yes, Your Honor.  He's ready to go.
14           THE COURT:  Okay.  We'll start in a few minutes.
15           (Recess from 8:53 a.m. to 9:06 a.m.)
16           (In the presence of the jury.)
17           THE COURT:  Mr. Rowlett, your next witness.
18           MR. ROWLETT:  Yes, Your Honor.  Windermere Real
19  Estate Services Company calls York Baur.
20           THE COURT:  All right.  Mr. Baur.
21           YORK BAUR, DEFENSE WITNESS, WAS SWORN
22           THE COURTROOM DEPUTY:  Will you please state your
23  name for the record, spelling your last name.
24           THE WITNESS:  Sure.  York Baur, B-a-u-r.
25  ///
```

**7**

```
1   InfoSpace.  We're the fourth largest search engine after
2   Microsoft, Yahoo, and Google at that time.  I went on then
3   to -- I took a job at a company called the Taz Group which
4   dealt with software for helping salespeople sell their services
5   more readily.  CRM, you may have heard that term, it was
6   CRM-related, customer relation management-related.
7        I took a brief detour at the Space Needle, ran sales and
8   marketing for them.  They thought they might want to build an
9   intellectual property business.  And if you've ever been to
10  Seattle, for people like me from Seattle, it's an icon.  So I
11  spent some time there before I came to hold the job I have now,
12  which I have had for the last six years, which is CEO of
13  Windermere Solutions.
14  Q    Did you also work for Microsoft for a time?
15  A    I did.  Yeah, before my time in the Internet through the
16  '80s and '90s, I worked for a number of enterprise software
17  companies, and the one I would point out there is Microsoft.  I
18  worked for Microsoft for several years in the early '90s.
19  Q    Did you also work for a company called Zango?
20  A    I did.  I worked for Zango in the mid 2000s.  Zango was an
21  Internet search company that would position targeted ads based
22  on search terms on the Internet.
23  Q    So if you could please explain what that experience
24  relates to Internet search.
25  A    Sure.  Really, with the exception of the Taz Group and the
```

UNITED STATES DISTRICT COURT

**6**

```
1                    DIRECT EXAMINATION
2   BY MR. ROWLETT:
3   Q    Good morning, Mr. Baur.
4   A    Good morning.
5   Q    How are you?
6   A    Doing well, thank you.  How are you?
7   Q    All right.  Thank you.
8        Please tell the jury a little bit about your educational
9   background.
10  A    Sure.  I hold a computer science degree from the
11  University of Southern California here with honors.  I
12  graduated in 1986.
13  Q    Please tell the jury a little bit about your work
14  experience.
15  A    I spent my entire career in technology.  I have over 30
16  years since I graduated working for now Windermere Solutions
17  being the 13th company I've worked for, almost always in the
18  Northwest in the Seattle market.
19  Q    Prior to Windermere Solutions, where did you work?
20  A    I held a variety of jobs, mostly in the last decade
21  dealing with Internet advertising and search.  I worked for a
22  company -- I had my own startup actually in 2000 in the dot-com
23  boom called Safari Dog, which was a metasearch add-in to your
24  web browser.
25       I then ran the search business at a company called
```

UNITED STATES DISTRICT COURT

**8**

```
1   Space Needle experience I have, all that -- all that I've done
2   since '99 is -- has been an exec in companies dealing with some
3   form of Internet search.
4   Q    What is Windermere Solutions?
5   A    Windermere Solutions is an independent company that was
6   spun out of the real estate company, Windermere, in late 2011.
7   And we produce what we hope and believe are the technologies
8   that agents need to do their business.  Our customer, though,
9   is the brokerage.  So we sell the technology to the brokerage,
10  and the brokerage then supplies it to their agents.
11       We currently have 120,000 agents that are in 65 brokerage
12  clients of ours across the United States.  And those customers
13  do about 10 percent of the transactions, the residential real
14  estate transactions in the United States every year.
15  Q    What do you mean by the term "brokerage" in that context?
16  A    Sorry.  I guess at the consumer level, think of it as the
17  companies, the brands that you see.  So when you drive down the
18  street and you see a real estate sign and it has a logo on
19  there, that's the brokerage.  It's the entity or the company
20  that the agents work for and that also holds the liability.
21  They're responsible to make sure these transactions work
22  correctly.
23  Q    So does Windermere Solutions provide -- it sounds like
24  they provide them for more than just Windermere; is that fair?
25  A    Oh, yeah.  Yeah.  Windermere today is a very small part
```

UNITED STATES DISTRICT COURT

9

1   of -- of the 120,000 agents that we work with.  Windermere
2   represents about 6,500 of those agents.  So at one time
3   Windermere was a large part of our business.  It's now a
4   relatively small part.
09:11AM 5   Q   We've heard reference to MoxiWorks.  How are MoxiWorks
6   and Windermere Solutions --
7   A   Sure.  We -- about four years ago as a company, we decided
8   we wanted a little bit more of a -- I guess you call it a hip
9   name, and so we renamed the company using a structure called
09:12AM 10   d/b/a.  So we're -- we're actually -- our official name is
11   Windermere Solutions, LLC, d/b/a or doing business as
12   MoxiWorks.  So if you go to MoxiWorks.com, for example, that's
13   how you would get to us.  So we operate today in the market
14   under the name MoxiWorks.  But it's the same company, just with
09:12AM 15   a different name.
16   Q   When did you join Windermere Solutions as the CEO?
17   A   I joined in September of 2012.
18   Q   Can you give the jury a picture of how Solutions has
19   grown from September 2012 when you joined to the present day.
09:12AM 20   A   Sure.  When I -- when I joined, it was a little more than
21   a year after the company had been, you know, taken out of
22   Windermere and turned into a separate company.  So at that time
23   our only customer was Windermere.  And today, as I mentioned,
24   we've grown it to 65, so 64 other clients.
09:13AM 25   The only thing I would tell you is that we have

UNITED STATES DISTRICT COURT

10

1   approximately quadrupled our revenue from that time.  So, you
2   know, we like to think that we've created some pretty good
3   success on the foundations that we built there six years ago.
4   Q   There's been a lot of talk about Windermere Watch in this
5   case.  When did you first hear about Windermere Watch?
09:13AM 6   A   Windermere Watch was first brought to my attention by
7   Mr. Paul Drayna who's the attorney for Windermere.  And that
8   would have been in -- my recollection is late in the first
9   quarter, very early second quarter of 2013.
09:13AM 10   Q   So February, March, that time frame?
11   A   Yeah.  Might have been March or early April, but yeah,
12   somewhere in that range.
13   Q   And what is your recollection of what Mr. Drayna told you
14   about that or what did he ask you to do?
09:13AM 15   A   He made it clear that it was -- it had historically been a
16   problem for Windermere.  I'm sure it's been discussed.  But
17   it's a hater site that got put up by
18   someone that had -- somebody who had a bad experience with
19   Windermere.  And so when you're worried about your brand,
09:14AM 20   obviously those kinds of things are important.
21   So he recounted some of the history to me of why this was
22   historically a problem at Windermere.  But he specifically was
23   calling me to tell me about the challenges that he felt it was
24   causing for the franchisee in Southern California.
09:14AM 25   Q   And the franchisee in Southern California you're

UNITED STATES DISTRICT COURT

11

1   referring to, is that Mr. Bennion and Mr. Deville's entity?
2   A   Correct.
3   Q   Did he ask you to do anything?
4   A   Yes.  Yeah.
09:14AM 5   Q   What did he ask you to do?
6   A   So as I recall, he had said there were some discussions
7   with Mr. Bennion and Deville and that there was a request made
8   for help from my company to provide them some guidance on how
9   they could better deal with this problem.  And so I took it as
09:14AM 10   a request to produce a formal report, a formal set of
11   recommendations, not just some phone call or something, but an
12   actual deeply researched set of recommendations to help them
13   out with.
14   Q   And we've heard the term "search engine optimization."
09:15AM 15   When did this first come up in the context of helping
16   Mr. Bennion and Mr. Deville with their Windermere Watch
17   problem?
18   A   Well, search engine optimization, unfortunately, is a kind
19   of a thick topic and a lot of -- there's a -- there's a lot of
09:15AM 20   nuance to it.  But let me -- let me give you maybe a brief
21   history to understand how it works, and then I'll relate it
22   back to what we're doing here.
23   So in the early days of the Internet, basically the way
24   search engine worked is that the provider of the website -- so
09:15AM 25   let's say you guys -- that we were running a website.  You

UNITED STATES DISTRICT COURT

12

1   could basically say what your pages were about.  You could say,
2   "My pages is about cars" or "about movies," and the search
3   engine would just take your word for it.
4   Unfortunately, that led a lot of people to game the
09:16AM 5   system.  You know, they would say their pages were about things
6   they weren't, et cetera.  And so the search engines got smart,
7   and what they did is they said, "Okay, first I'm going to
8   read -- programatically I'm going to read the contents of the
9   page.  I'm also going to look at what else is on the page and
09:16AM 10   se what this page is really about.  And I, the search engine,
11   will decide what your page is about.  You don't get to tell
12   me."
13   Q   Mr. Baur --
14   A   Yes, sir.
09:16AM 15   Q   -- would you slow down a little bit.  The court reporter
16   is trying to take down what you say --
17   A   Oh, I apologize.
18   Q   -- and I think your cadence might be a little bit fast.
19   A   Sure.  Sorry.
09:16AM 20   THE COURT:  About 20 percent slower.
21   THE WITNESS:  Thank you.
22   So the first thing search engines did was to read the page
23   and decide themselves what the page was about.  But the second
24   thing they did, which I think is by far the more critical, is
09:16AM 25   they looked at who else, what other websites were pointing back

UNITED STATES DISTRICT COURT

15

1   to your site for a given topic.

2       So let's put this in a frame context.  We all have buddies

3   and we all -- when we want to do something we don't know how to

4   do, we typically will know a friend that might know about that

09:17AM 5   topic.  But what we also factor in is how much have we heard

6   our other friends say that this person is the person to talk

7   to.

8       Like in a movie review, for example, everyone has an

9   opinion about a movie.  But your friends think, "Oh, I'll just

09:17AM 10   talk to John because John really understands how movies go" or

11   whatever it is.  So that's the element that search engines

12   added.  It's called authority.  It's understanding what another

13   site that is credible thinks of your site.

14       So let me give you an example.  If you have a page about

09:17AM 15   this area here where the courthouse is and what are great

16   restaurants or things to do, and the "L.A. Times" in an article

17   writes about things to do in Santa Ana and points to your page

18   as a place to go to learn more, that's a really good thing for

19   your website, because Google knows that the "L.A. Times" is a

09:18AM 20   credible website.

21       So their authority, their -- the term is SCO juice,

22   believe it or not, but their authority then accrues to or makes

23   your site more valuable in Google's eyes.  So that's the whole

24   thing with SCO.  You have to produce really valuable content.

09:18AM 25   You have to change the content frequently, but most important,

15

1   little dimmer and thinks of us first so that the eye of the

2   consumer first goes to our billboard versus someone else's.

3   It's a simple -- it's like -- it's just advertising.

4       So in a search engine context, what you're trying to do is

09:20AM 5   to -- for any given search term, you're trying to get your

6   result, your website to show up as high on that list as you

7   possibly can.  That's the objective.

8   Q    By "high on the list," do you mean first page?

9   A    Yes.  I mean, ideally, on the first page.  Almost -- and

09:20AM 10   you guys probably know this from your own experience, very,

11   very few people go beyond the first page of search results to

12   look and click on something.  So the vast majority of the

13   clicks go on the first page.

14   Q    When you joined Windermere Solutions in 2012, was it

09:20AM 15   making any of its own SCO efforts?

16   A    Oh, sure.  We -- one thing I didn't mention earlier is at

17   the time we operated probably I'd guess around 8,000, we now

18   operate over 16,000 websites on behalf of our customers.  Some

19   of them are brokerage websites for the companies, some are

09:21AM 20   agent websites for the individual agents.

21       And so we're constantly in the process of doing really two

22   things:  One is making sure that our technical capabilities are

23   up to date.  You have to make sure that the search engines can

24   come to your site easily, technically, and see the content

09:21AM 25   that's there.  That's our job.

14

1   you have to make sure that other sites that Google sees as

2   important are pointing back to your site for that same content.

3   Q    So content generation is an aspect of search engine

4   optimization, but it's not the only aspect; is that fair?

09:18AM 5   A    That's right.  And it's really worth pointing out

6   that -- we're going to talk a lot about search engine

7   optimization.  But why do you put content on a website in the

8   first place?  It's so that human beings can read it and go,

9   "Wow, that's cool" or "I've learned something.  Now I'm going

09:19AM 10   to like this site or this brand more."

11       So really you're not doing it just for the search engine.

12   You're doing it actually for the consumer.  And then the

13   benefit on the side is the search engines will like it too.

14   Q    Now what is the objective in search engine optimization

09:19AM 15   and why is it important?  I guess what I'm getting at here is

16   if you search Windermere, you can get 21 million results.  Why

17   does it matter where they come up?  How does that affect it?

18   A    Think of it this way:  If you're driving down the

19   interstate and you come to a section where there are a bunch of

09:19AM 20   billboards, you know, if we were a company and we were putting

21   up one of those billboards, we don't have the ability to

22   control anyone else's billboard.  We only can control our own.

23       So what we really want to do, though, is to try and make

24   it so that the sign company turns the light on for our

09:20AM 25   billboard when it's off for everybody else's or theirs are a

16

1       And then the second thing we do is advise our customers on

2   the stuff I just explained to you, on how do you generate good

3   content, how do you make sure you get it placed on other sites

4   to point back to you.  Because that's not something we can do

09:21AM 5   ourselves for the customer.  The customer has to do that

6   themselves.  So all we can do is provide recommendations.  And

7   we do that, frankly, all day every day.  It's just a core part

8   of our business and always has been.

9           THE COURT:  Mr. Baur, you're speeding up again.

09:22AM 10           THE WITNESS:  Sorry.

11           THE COURT:  You were doing good for a few minutes.

12           THE WITNESS:  Okay.  Thank you.

13   Q    BY MR. ROWLETT:  The -- we're going to get to in a moment

14   the report that Greg Sundberg prepared for Mr. Bennion and

09:22AM 15   Mr. Deville's entities.  Did you have Mr. Sundberg prepare a

16   report for Windermere about its search engine optimization?

17   A    Yes.  Yes, I did.  And would it be helpful to explain to

18   you who Mr. Sundberg is?

19   Q    Please.

09:22AM 20   A    Okay.  So Greg Sundberg is a gentleman that worked for me

21   when I ran the search business at InfoSpace.  And I just know

22   him to be one of the foremost experts in how SCO works.  And

23   it's important to understand, too, that it's a moving target.

24   And you -- I don't know how much you guys pay attention to this

09:22AM 25   stuff, but Google will change how they do this constantly.  So

17

1  you can't just know it from a few years ago and then still be
2  the expert. It's something you have to stay up with. And so I
3  knew Greg Sundberg to be that person.
4       And so when I came to Windermere Solutions in September of
09:23AM 5  2012, I brought him in to help do an analysis of Windermere.com
6  because Windermere was our only customer. And I wanted to make
7  sure that, while we've done a lot as a company already in this
8  area, I wanted to make absolutely sure that we were on the top
9  of our game.
09:23AM 10      So I hired him as -- at that time as a consultant to come
11  in and write a report that detailed, you know, how we were
12  doing and where we could continue to improve on Windermere.com.
13  Q     Was that report in any way related to Windermere Watch or
14  was it -- did you ask him to do it because of Windermere Watch?
09:23AM 15  A     No. In fact, if I recall, I wouldn't have known about
16  Windermere Watch personally at that time. I'm sure my company
17  did. But, you know, I'm the new guy and no one had brought it
18  to my attention yet. So this was a broad -- it was a broad
19  study of how do we make Windermere.com as visible as possible
09:24AM 20  and how do we help Windermere. Because, again, we can't do the
21  content part. So how do we help Windermere be on their game
22  for the content part of it?
23  Q     There was some testimony from Mr. Forsberg that the
24  search Bennion & Deville around this time frame, in the 2013
09:24AM 25  time frame when you were involved, returned results where

UNITED STATES DISTRICT COURT

18

1  Windermere Watch was pretty high on the list, maybe first page.
2  Was that a Bennion & Deville problem or was that a Windermere
3  problem?
4  A     So think of your own search efforts. You type some words
09:24AM 5  in, and you hit the search button. Those words are called key
6  words. And that's what Google or any search engine uses as the
7  basis for how they then look through the millions of websites
8  to figure out what they think you should look at.
9       And the -- it turns out -- and think about this -- I don't
09:25AM 10  know if you've bought or sold a home, but -- or even if you're
11  trying to find a doctor, you know, you don't search the
12  company, you search the person. And so -- and this is true
13  across all our customers. This isn't unique to Windermere.
14  People search the name of their agent because that's who they
09:25AM 15  want to learn about.
16      So the search engines will use in this case Bennion &
17  Deville or some combination of those words, and they'll serve
18  up what's the most relevant. So it really has at that point
19  less to do with the name Windermere and everything to do where
09:25AM 20  Google thinks Bennion & Deville are.
21      And that's why Windermere Watch was a problem. Bennion &
22  Deville, their names were all over that site, particularly on
23  the homepage. And so Google -- because there hadn't been
24  enough done to make those names visible in some other way on
09:25AM 25  some other site, the Windermere Watch one was the one that came

UNITED STATES DISTRICT COURT

19

1  up, you know, more often on the home page as a result.
2  Q     So when Mr. Drayna tasked you with looking into
3  Mr. Bennion and Mr. Deville's Windermere Watch problem, what
4  did you do?
09:26AM 5  A     I immediately -- well, I did two things. First I --
6  because I hadn't heard about Windermere Watch before and I
7  figured some people in my company had, the first thing I did is
8  talk to my staff and figure out what we knew, which confirmed
9  that we, in fact, did know Windermere Watch is a problem. And
09:26AM 10  I learned a little more about the history of what we had done
11  at -- for Windermere in that way because it had been done
12  before I had come to the company.
13      The second thing I did was to engage Greg Sundberg again,
14  because he's my go-to resource, at this time again as a
09:26AM 15  consultant, to do a similar exercise that he's done a million
16  times before around Windermere Watch as it related, though,
17  specifically to Bennion & Deville, both in Southern California
18  and in the Seattle market. And he then later produced that
19  report, which we delivered.
09:27AM 20  Q     Let's take a look -- you've got a binder in front of you.
21  A     Yeah.
22  Q     Turn with me, if you would, to Exhibit 820.
23  A     Okay.
24      MR. ROWLETT: This has not been admitted.
09:27AM 25  Q     What is Exhibit 820?

UNITED STATES DISTRICT COURT

20

1  A     It's an e-mail from Greg Sundberg to me on April 30th of
2  2013 with his -- looks like his initial proposal. It says
3  "Draft Proposal" for my review.
4      MR. ROWLETT: Your Honor, I move Exhibit 820 into
09:27AM 5  evidence, please.
6      THE COURT: Any objection to 820?
7      MR. ADAMS: No, Your Honor.
8      THE COURT: 820 is received.
9      (Exhibit No. 820 received.)
09:27AM 10  Q     BY MR. ROWLETT: Turn then, please, to Exhibit 821.
11  A     Okay.
12      MR. ROWLETT: John, just before we go, will you put
13  that 820 back up and highlight the date just so that we can be
14  clear on the date.
09:28AM 15  Q     Mr. Baur, you see the screen in front of you has what's
16  been highlighted to your right there?
17  A     Yeah. Thank you.
18  Q     And this is right around that same time frame that you
19  mentioned Mr. Drayna reached out to you, right, in the late Q1,
09:28AM 20  early Q2, 2013?
21  A     Right. This would have been the result of my actions
22  taken on the basis of Mr. Drayna's call.
23  Q     And then flip to 821, please.
24  A     Okay.
09:28AM 25  Q     What is 821?

UNITED STATES DISTRICT COURT

21

1  A    So 821 is the back-and-forth exchange from the first
2  e-mail where I say:
3         "Good stuff.  Thanks for cranking this out.
4       Did you deliberately not propose a Phase 1 and its
09:28AM 5       estimated cost or are you still planning to add
6       that?  Let's discuss on the morrow."
7         If I recall, he was coming in to talk about this.  And I
8  had -- in a prior conversation, I had proposed several phases.
9  You don't -- it's not an all-or-nothing thing.  You can start
09:29AM 10  doing things that have an impact and then do more later.  And I
11  was concerned about cost.  You know, nothing is free.  So I
12  wanted to have a proposal for how you might in stages go about
13  that.  And that's what this is about.
14         MR. ROWLETT:  Your Honor, I move Exhibit 821 into
09:29AM 15  evidence.
16         THE COURT:  Any objection to 821?
17         MR. ADAMS:  No, Your Honor.
18         THE COURT:  821 is received.
19         (Exhibit No. 821 received.)
09:29AM 20         MR. ROWLETT:  John, let's blow that up and make sure
21  we see the last date, May 1, 2013, at the top there.
22  Q    So it looks like Mr. Sundberg sent you a draft proposal
23  on April 30th.  You respond later that night with some
24  questions.  And he gets back with a revised draft the next day.
09:29AM 25  Do you see that?

UNITED STATES DISTRICT COURT

23

1  time.  And so it meant he couldn't dedicate 100 percent of his
2  time to our project.  And, again, I thought that was a good
3  tradeoff because I knew the quality of work he could generate.
4  So I was willing to let it take a bit longer.
09:31AM 5  Q    In September of 2013, did you attend a meeting in
6  Southern California with Mr. Bennion and Mr. Deville and
7  others?
8  A    I did.
9  Q    And was Windermere Watch discussed at that meeting?
09:32AM 10  A    It was.
11  Q    And at that time did you update Mr. Bennion and Deville,
12  and I believe Mr. Gooding and Mr. Johnson were at that meeting,
13  but did you update them on your efforts revolving around search
14  engine optimization?
09:32AM 15  A    Yes.  Yes, I did.
16  Q    Subsequent to that meeting, did you speak with Eric
17  Forsberg?
18  A    I did.
19  Q    What were your conversations with Mr. Forsberg about on
09:32AM 20  this issue?
21  A    We -- so after the meeting that we just mentioned in
22  Southern California, I had sent a note to Mr. Deville, because
23  it was the first time I met him, saying, "Hey, it was great to
24  meet you and" -- essentially a follow-up e-mail and that -- and
09:32AM 25  suggesting that we put our resources together, whoever he has

UNITED STATES DISTRICT COURT

22

1  A    I do.
2  Q    At the time in April or May of 2013 when you tasked
3  Mr. Sundberg with creating this report and some
4  recommendations, did you have a sense in your mind about how
09:30AM 5  long that might take?
6  A    Yeah, a couple factors.  You can -- if you want it done
7  well, you have to pick the right resource.  And I felt strongly
8  that this was an important enough exercise that I needed the
9  best person, and that was, in my opinion, Mr. Sundberg.  And so
09:30AM 10  that's the first comment.  So I was willing to have some
11  schedule flexibility because I knew the quality of the output
12  would be better.
13         The second thing is -- and this isn't apparent in just
14  these e-mail exchanges or even in the summary that you either
09:30AM 15  have seen or probably will see, but there is a tremendous
16  amount of research that goes into this.  I mean, it's countless
17  hours of figuring out where all these sites are pointing to,
18  where content is, where people's profiles are updated or not.
19  There's a lot of research that goes into this.
09:31AM 20         And so I was willing to both have the right resource and
21  let enough time lapse to make sure that work got done
22  correctly.  So I expected it to be a multi-month process to do
23  it -- to do it right.
24         It's also important to understand that Mr. Sundberg was --
09:31AM 25  had other commitments.  He was working on other projects at the

UNITED STATES DISTRICT COURT

24

1  working on this issue and my resource, which is Mr. Sundberg.
2         And that, then, led to a call with Mr. Forsberg on this
3  topic.  And so what we talked about was what were they doing to
4  date, what have they been doing.  I was a little surprised to
09:33AM 5  learn that they had had some resources engaged on this topic
6  that we were unaware of, which was good news, though, because
7  it meant they were making some progress on things.
8         And then we reviewed the recommendations in the report
9  that Mr. Sundberg generated.  Mr. Sundberg was on that call
09:33AM 10  also.  And we went through that series of recommendations on
11  what we felt they could do beyond what they were already doing
12  to help mitigate the Windermere Watch problem.
13  Q    There's been some reference to pushing down Windermere
14  Watch.  When you think about search and search engine
09:33AM 15  optimization, is pushing down the way you think about it?
16  A    It's not the way I think about it.  It's -- I kind of
17  mentioned this earlier with my billboard analogy.  You can't --
18  you can't actually do anything to anyone else's pages or how
19  Google sees them.  All you can do is improve your own
09:34AM 20  visibility.  So back to my billboard thing.  All I can do is
21  make my billboard prettier.  I can't change the other
22  billboards.
23         So it's not technically accurate to say I'm pushing the
24  other results down.  It's more accurate to say I'm boosting the
09:34AM 25  visibility of my results.  But the vast majority of people will

UNITED STATES DISTRICT COURT

25

**1** say the words "push the other results down." It's how people

**2** refer to it even though it's not technically accurate.

**3** Q    Yeah.  So sometimes it's used to refer -- sometimes it's

**4** referred to, but it's not -- you know, it's not how you think

09:34AM **5** about it?

**6** A    **Not how I personally think about it, no.**

**7** Q    Let's turn, if you would, to Exhibit 705.

**8**      This has been admitted, John.  It can go up.

**9** A    **Okay.**

09:34AM **10** Q    Actually, let's back up.  Sorry.  Let's look at 704 in

**11** your binder.

**12**      This has not been admitted, John.

**13**      What's Exhibit 704?

**14** A    **704 is an e-mail from me to Eric Forsberg copying Greg**

09:35AM **15** **Sundberg on Tuesday, October 8.  And it's an exchange where**

**16** **Eric had sent me an e-mail asking for some time to discuss**

**17** **Windermere Watch.  And it says, "Bob Deville asked that I reach**

**18** **out to you in order to discuss these efforts."  That would have**

**19** **been in response to my exchange with Mr. Deville.**

09:35AM **20**      **And then I reply and say:**

**21**      "Yep, thanks, and let's aim for this time on

**22** Friday and I'm going to include my new head of

**23** marketing, Greg Sundberg."

**24**      By this point, I had hired Greg Sundberg, Mr. Sundberg, as

09:35AM **25** our VP of marketing.

UNITED STATES DISTRICT COURT

26

**1** Q    Got it.  So -- and then --

**2**      I'm sorry, Your Honor.  I move 704 into evidence.

**3**      THE COURT:  Any objection to 704?

**4**      MR. ADAMS:  No, Your Honor.

09:35AM **5**      THE COURT:  704 will be received.

**6**      **(Exhibit No. 704 received.)**

**7**      MR. ROWLETT:  Thank you.

**8**      And now John, just put that up so the jury knows what

**9** we're talking about.

09:36AM **10** Q    And this is the e-mail exchange.  You're planning a call

**11** for later in the week.  That would be the week of -- looks like

**12** it started October 7?

**13** A    **Correct.**

**14** Q    And it looks like -- then turn to Page 705, Exhibit 705.

09:36AM **15**      This has been admitted, John.  We can put this up.

**16**      It looks like the following week -- and, again, as you

**17** testified, you had a call.  You and Mr. Sundberg and

**18** Mr. Forsberg talked about the efforts.  And looks like the

**19** following week the proposal was sent down to him.  Do you see

09:36AM **20** that?

**21** A    **I do.**

**22** Q    And this is the proposal that Mr. Sundberg started

**23** working on in April of 2013; correct?

**24** A    **Correct.**

09:36AM **25** Q    Okay.  Let's flip through a couple of things in this

UNITED STATES DISTRICT COURT

27

**1** proposal.

**2** A    **Okay.**

**3** Q    Turn to Page 2 of the exhibit.  It will be the first page

**4** of the --

09:36AM **5** A    **Okay.**

**6** Q    Let's look at the problem statement.

**7** A    **Okay.**

**8** Q    And it says:

**9**      "Bob Bennion and Bob Deville are being

09:37AM **10**      impacted in search engine results with disparaging

**11**      results being shown from WindermereWatch.com.

**12**      Bennion & Deville have employed a strategy of

**13**      productive positive image content online that can

**14**      out-rate content from WindermereWatch.com.  This

09:37AM **15**      effectively pushes the offending search results to

**16**      Page 2-plus where they are rarely seen."

**17**      Do you see that?

**18** A    I do.

**19** Q    And that's the difference we're talking about in pushing

09:37AM **20** down versus increasing content --

**21** A    **Right.**

**22** Q    -- right?

**23** A    **Yep.**

**24** Q    Even this report is acknowledging that, you know, the

09:37AM **25** real goal is to outrank, but it does have the side effect of --

UNITED STATES DISTRICT COURT

28

**1** A    **Yep.**

**2** Q    -- hopefully pushing down people's results.

**3** A    **That's right.  And if I recall correctly, those are also**

**4** **the words that Mr. Forsberg used, so yeah.**

09:37AM **5** Q    Common parlance?

**6** A    **Yep.**

**7** Q    And let's move on to the second page, "Ranking Pages in

**8** Link Schema."  This is very challenging to read --

**9** A    **Yeah.**

09:37AM **10** Q    -- and maybe more confusing.  Can you summarize what it

**11** says in these.

**12** A    **And I apologize to you guys for, you know, geeking out**

**13** **here on a Friday, but what this shows is in the center are --**

**14** **and it's a little hard to read here, but in the center are the**

09:38AM **15** **websites for Windermere and the Southern California websites**

**16** **that Bennion & Deville operated.  And around the outside are**

**17** **all of the things I talked about, the other types of sites that**

**18** **you could look at and point back to the Windermere sites in**

**19** **order to raise their visibility.**

09:38AM **20** Q    Let's pause for a moment.  Let me ask you this:  Was

**21** there something unique about how Mr. Bennion and Mr. Deville

**22** ran their technology program versus the technology used by

**23** other Windermere agents?

**24** A    **Yeah.  So our relationship with Windermere as a customer**

09:38AM **25** **is that part of the ongoing relationship is that these**

UNITED STATES DISTRICT COURT

29

1  franchisees, of which Bennion & Deville are one, they pay
2  for -- as part of their relationship with Windermere, they pay
3  for technology, but they're not obligated to use that
4  technology.  The vast majority do use it because they're paying
09:39AM  5  for it.
6      For whatever set of reasons, it's not clear to me
7  personally, Bennion & Deville decided they wanted their own
8  technology.  And so they went out and bought and did not use
9  the technologies that we are providing.  They bought other
09:39AM 10  stuff.
11      That makes it more challenging for us to provide advice
12  because we don't operate their website; they do.  And we --
13  it's on a totally different technology than what we provide.
14  So I would say that that made it more challenging only because
09:39AM 15  we couldn't really provide them any sort of technology
16  recommendations because it wasn't our technology.  So we
17  focused only really on content recommendations.
18  Q   And let's again look at the page "Ranking Pages in Link
19  Schema."
09:40AM 20      And, John, if you can just blow up the diagram.  I just
21  want the diagram blown up, please.  See if we can't figure out
22  a way to get the jury to be able to read this.
23      In the center of that mess, I see two -- four things,
24  sorry: a Windermere SoCal, Windermere.com, Seattle Fine
09:40AM 25  Properties, and Bennion & Deville.  Do you see that?

UNITED STATES DISTRICT COURT

31

1  recommendations.
2  A   Yeah.
3  Q   And let's look at the top of the page, John, the first
4  paragraph, please.  Thank you.
5      And it says:
6      "In order to push WindermereWatch.com further
7      down the search results, more profile and content
8      pages need to be created and hosted on quality
9      domains."
09:42AM 10  This is what you're talking about?
11  A   Correct.
12  Q   And, again, it's the reference to creating content,
13  putting it in the right places, and that will have the side
14  effect of pushing down Windermere Watch so it never gets seen;
09:42AM 15  right?
16  A   Correct.
17  Q   Let's turn, then, to the next page.  You might have to
18  flip your book a little bit.
19  A   Yep.
09:42AM 20  Q   What is this next page, Page 5?
21  A   So we sent two documents down.  One is the Word document
22  that you just saw, and this is a spreadsheet that we sent
23  along with it.  And when I talked earlier about the research
24  and the time it takes -- and it's a little hard to see.  Can we
09:42AM 25  possibly blow up like the top left box only, just the left half

UNITED STATES DISTRICT COURT

30

1  A   I do.
2  Q   What are those?
3  A   Those are websites.  And that's my point.  Three of the
4  four -- in other words, everything other than Windermere.com
09:40AM  5  was not our technology.  It was their technology they bought.
6  Q   I see Windermere.com.  Mr. Forsberg called that a
7  top-level domain.  Is Windermere.com a top-level domain or TLD?
8  A   No.  It's a common mistake that gets made.  A top-level
9  domain is the actual dot-com or dot-edu or dot-org.  That's a
09:40AM 10  top-level domain.  What Windermere.com is is a URL to the
11  dot-com top-level domain.  A little technical, but it's --
12  Windermere.com is not a top-level domain, just the dot-com part
13  is.
14  Q   And Windermere SoCal is also not a top-level domain;
09:41AM 15  correct?
16  A   Correct.
17  Q   And this link schema or this diagram we're looking at,
18  there's a lot of arrows pointing all over the place.
19  A   Uh-huh.
09:41AM 20  Q   And what are you trying to show here?
21  A   The main concept was to get across the point that you
22  can't just put content on your own sites and expect it to solve
23  the problem.  You have to get other sites to point back to that
24  content.  That's the purpose of the diagram.
09:41AM 25  Q   All right.  Now let's flip over to Page 4, the

UNITED STATES DISTRICT COURT

32

1  of that?  Yeah, right there.
2      So you can see -- if you look at the websites that are
3  listed there -- Facebook, LinkedIn, Zillow, Trulio,
4  Realtor.com -- these have nothing to do with the sites that
09:42AM  5  Bennion & Deville operated.  It's all about how do you get
6  something on to Facebook so it points to your page and,
7  therefore, Google would think you're more important.
8      So the research that goes behind this is extensive because
9  it's not -- it sounds simple, but if you look at the second one
09:43AM 10  there, Bob-Deville/11/740/355, that's a very specific thing
11  that Greg had to go figure out at LinkedIn in order to figure
12  out exactly where you can go onto LinkedIn to put your profile
13  on there.  So this isn't some nefarious thing.  It's just
14  making sure you get the right things in exactly the form that
09:43AM 15  LinkedIn wants them so they'll put it up and Google will see
16  it.  Google will see it points to you --
17  Q   Slow down.  Slow down.  Back it up.
18  A   Apologies.  Sorry.  Sorry.  I get excited about this
19  technology stuff.
09:43AM 20      The point is there's a lot of research that goes into
21  these specific recommendations.  And this spreadsheet, several
22  pages of it, is -- each line is a specific recommendation for
23  where to go put content to help solve this problem.
24  Q   In October of 2013, based on the report that Mr. Sundberg
09:44AM 25  completed and your conversations with Mr. Forsberg, what was

UNITED STATES DISTRICT COURT

---

**33**

1  Mr. Forsberg -- I'm sorry -- what was included in the Sundberg
2  report that Mr. Forsberg and Bennion & Deville were not doing?
3  A   Essentially this section I just described about getting
4  the content elsewhere, they seemed very focused on producing
5  content for their website, which is good. It's helpful, and
6  they should be doing it anyway for marketing purpose.
7       What they didn't seem to be doing was getting content
8  placed on other people's sites. It's a lot more work. For
9  example, it also -- and that's one of the recommendations we
10  made is getting news articles from other newspapers, et cetera,
11  placed to point back. That takes a lot of work because you
12  can't put an article on their site. You have to talk to them
13  and convince them to do that.
14       So we wanted to make sure they understood that you can't
15  get it done by just putting content on your own site. You also
16  have to do this extra work of getting content placed elsewhere.
17  Q   I think you touched on this, but I want to clarify it.
18  The -- Mr. Bennion and Mr. Deville in this case, sir, are
19  asking for some reimbursement for some search engine
20  optimization expenses. And part of the expenses they're
21  looking for are this content generation expenses. In your
22  eyes, is that a proper SCO expense that they should be
23  reimbursed for?
24  A   Not as a category, no. I mean, you have to spend money to
25  create content for a website. You can't have a website without

UNITED STATES DISTRICT COURT

---

**34**

1  good content on it. So to me, that's kind of table stakes to
2  have good content that -- so that when a consumer comes, they
3  see it. The side benefit is it also will help your search
4  engine visibility.
5  Q   They're also asking for reimbursement for some web
6  development expenses. In your view, is that appropriate search
7  engine optimization expenses that specifically Mr. Bennion and
8  Deville are entitled to?
9  A   Well, I would say two things: One is if they had used the
10  technology that was provided to them for free, in other words,
11  that they were already paying for from us through Windermere,
12  they wouldn't have had to spend that money because we do a good
13  job of this.
14       And, secondly, if they chose a provider that didn't have
15  their act together in this area and had to pay for them to get
16  their act together, I don't see how that would be on
17  Windermere.
18  Q   Does Windermere Solutions have outside counsel, attorneys
19  they work with?
20  A   In recent years, last probably two years we do, yeah.
21  Q   Are those attorneys -- withdrawn.
22       Why didn't Windermere just fix this problem for
23  Mr. Bennion and Mr. Deville? Why did you have to send a
24  report? Why couldn't you just fix it?
25  A   It -- as we've talked about, it relies on content that, at

UNITED STATES DISTRICT COURT

---

**35**

1  least in my opinion, could only be generated under the control
2  of Bennion & Deville. You can't do this for someone. It's --
3  the analogy I would use is when you go to the doctor, they're
4  an expert, but they're going to tell you here's a prescription,
5  do these exercises, go see this specialist. They can't do it
6  for you. You have to do it.
7       Search engine optimization is similar. Because the
8  content has to be credible. And the only way for that to
9  happen is for the entity that knows that content to generate
10  it.
11  Q   And also can you control -- I mean, there's a number of
12  websites here. Can you control where that content is placed on
13  those websites to link back?
14  A   No. All you can do is encourage LinkedIn or Facebook or
15  the "L.A. Times" to put something somewhere on their site. But
16  obviously it's their choice. They control where content goes
17  on their site.
18       MR. ROWLETT: Your Honor, I have no further
19  questions for this witness.
20       THE COURT: Cross-examination?
21       MR. ADAMS: Yes. Thank you, Your Honor.
22            CROSS-EXAMINATION
23  BY MR. ADAMS:
24  Q   Good morning, Mr. Baur.
25  A   Good morning.

UNITED STATES DISTRICT COURT

---

**36**

1  Q   I just want to take a couple minutes here and clear up a
2  couple things. Now you were aware that in early September
3  2013, Mr. Deville had been contacting Windermere anxious to
4  find out what had finally been done about Windermere Watch; is
5  that correct?
6  A   I became aware that Mr. Deville -- first time I met him
7  was in the meeting you're talking about. So that's when I
8  became aware of him.
9       MR. ADAMS: Your Honor, I'd like to play the
10  witness's deposition testimony video, Page 197, Line 9, through
11  Line 19.
12       THE COURT: Do I have a copy of that?
13       MR. ADAMS: You should, Your Honor. It's on the
14  corner.
15       THE COURT: Thank you. 197?
16       MR. ADAMS: Page 197, Lines 9 through 19.
17       THE COURT: Go ahead.
18       (Videotape was played, not reported.)
19  Q   BY MR. ADAMS: Mr. Baur, before that September 3rd date,
20  you had not reached out to anyone at Bennion & Deville about
21  any work you were doing in connection with Windermere Watch;
22  correct?
23  A   I don't recall doing so.
24  Q   Okay. Let's take a look at this Exhibit 821 that you
25  just went over with Windermere's attorney.

UNITED STATES DISTRICT COURT

37

1    A    Yes, I have it.

2    Q    Okay.  This is dated May 1st, 2013, at the top.  Do you

3    see that?

4    A    I do.

09:51AM 5    Q    And at the bottom, the first e-mail is dated April 30 of

6    2013; correct?

7    A    Correct.

8    Q    Okay.  And you testified along the lines of this is the

9    work that you were doing in connection with Windermere Watch

09:51AM 10    for Mr. Bennion and Mr. Deville; correct?

11    A    **Well, no, not correct, actually.  We were doing it at the**

12    **request of Windermere.**

13    Q    And nowhere in this e-mail is there a reference to

14    Windermere Watch; correct?

09:51AM 15    A    **Actually, in the attachments I believe there is, yes.**

16    Q    Where are the attachments?

17    A    **I don't know.**

18    Q    Okay.  Are they attachments with the documents you have?

19    A    **No.**

09:51AM 20    Q    The document that your attorney presented to you, does

21    that contain any attachments?

22    A    **No.**

23    Q    Okay.  So nowhere in this e-mail is Windermere Watch

24    referenced; correct?

09:52AM 25    A    **I know the contents of the attachment myself personally**

UNITED STATES DISTRICT COURT

---

39

1    Now that's not Phase No. 1 of the attachment to your

2    May 1st e-mail, is it?

3    A    **I'm not quite sure what point you're making there.  It's**

4    **just -- any document like this would start with a problem**

5    **statement.**

09:53AM 6    Q    Okay.  The document that Mr. Sundberg sent over to you

7    had three categories.  And none of those categories are

8    identified in this document that you say you started on

9    April 30th of 2013; correct?

09:53AM 10    A    **Yes.  And that's why there's some intervening months.**

11    **Work went into it, and the result was 705.  And, by the way,**

12    **maybe you're missing this point, the --**

13    MR. ADAMS:  Your Honor, I'd like to strike the

14    witness's answer.  Please have him answer my questions.

09:54AM 15    THE COURT:  That's fine.

16    Mr. Baur, you need to answer the question put to you by

17    the attorney.

18    THE WITNESS:  Okay.

19    Q    BY MR. ADAMS:  Mr. Baur, please take a look --

09:54AM 20    THE COURT:  Just a second.

21    MR. ADAMS:  I'm sorry, Your Honor.

22    THE COURT:  If your attorney has follow-up

23    questions, he will have a chance to ask you.

24    THE WITNESS:  Thank you, Your Honor.

09:54AM 25    Q    BY MR. ADAMS:  Mr. Baur, if you go to the first page of

UNITED STATES DISTRICT COURT

---

38

1    though.

2    Q    And the attachment isn't even here.  Do you think that's

3    a bit convenient?

4    A    **I'm not sure what you're implying.  I'm just telling you**

09:52AM 5    **that I personally know what this e-mail is about and what the**

6    **attachments were.  I'm the guy that contracted Mr. Sundberg to**

7    **do only this thing in this time frame.  So --**

8    Q    Let's take a look at Exhibit 705, please.

9    A    **Okay.**

09:52AM 10    Q    Let's go to Page 2.

11    And, John, could you do me a favor and see if I can use

12    technology here.  We'll do split screen, 821 on one side and

13    Page 2 of 705 on the other side.

14    And then, Mr. Baur, there is a screen in front of you.

09:52AM 15    I'm not sure how clear it is.

16    A    **Yeah, it's not very clear, but I can follow you, I think.**

17    Q    Okay.  Now looking at -- if you have both of those in

18    mind, 821, the e-mail at the top from Mr. Sundberg to you

19    identifies three phases; correct?

09:53AM 20    A    **It does.**

21    Q    Okay.  The first phase is research, build plan, create

22    content, promote; correct?

23    A    **Correct.**

24    Q    But if we look over here at Exhibit 705, we see the

09:53AM 25    heading "Problem Statement."

UNITED STATES DISTRICT COURT

---

40

1    Exhibit 705.

2    And John, you can keep the split screen.  Let's go to the

3    first page.

4    The documents attached to this e-mail at 705 that's dated

09:54AM 5    October 17, 2013, aren't even titled the same as the document

6    that you claim to be the same back in April of 2013, are they?

7    A    **They're not.  I can explain if you'd like.**

8    Q    Your attorney will have an opportunity to question you,

9    sir.

09:54AM 10    Now the item that you attached to Exhibit 821 in April

11    and May of 2013, that was just the general work you were doing

12    for Windermere, wasn't it?

13    A    **No.**

14    Q    Okay.  Now you testified about the September 17, 2013

09:55AM 15    meeting you had with members of Bennion & Deville; correct?

16    A    **Yes.**

17    Q    Now who else was at that meeting?

18    A    **It was Bennion and Deville, Gooding and Johnson, their**

19    **other partner whose name escapes me.  They brought in some of**

09:55AM 20    **their staff who I didn't know and couldn't recall the names of**

21    **it.  And then I believe it was also OB Jacobi and Geoff Wood of**

22    **Windermere.  It's been a while, so I'm not 100 percent on that.**

23    **That's what I recall.**

24    Q    Now going into that meeting, you understood that the

09:55AM 25    primary purpose of that meeting was to discuss Windermere's new

UNITED STATES DISTRICT COURT

**41**

```
 1   technology, not Windermere Watch; is that correct?
 2   A    That's right.
 3   Q    But the attendees of the meeting insisted on a discussion
 4   regarding Windermere Watch; right?
09:56AM 5   A    Define "insisted."
 6   Q    They wanted you to talk about it.
 7   A    Yes.  And I was planning to talk about it.  It just wasn't
 8   the primary purpose.
 9   Q    They wanted you to tell them what the plan was to deal
09:56AM 10  with Windermere Watch?
11   A    Correct.
12   Q    Did you give them a plan?
13   A    It would have been pointless to give them a plan that
14   we -- that's what we agreed, was to have a call with
09:56AM 15  Mr. Forsberg, which is what then happened.
16   Q    Okay.  You had that phone call with Mr. Forsberg.  And
17   after speaking with him, you concluded that he was already
18   doing everything he should be doing with respect to Mr. Bennion
19   and Mr. Deville's websites; correct?
09:56AM 20  A    No, not correct.  As I've testified --
21        MR. ADAMS:  Your Honor, I'd like to play the
22   witness's deposition testimony, Page 203, Line 20, through
23   Page 204, Line 5.
24        THE COURT:  203:20, 204:5?
09:57AM 25       MR. ADAMS:  Yes, sir.
```

UNITED STATES DISTRICT COURT

**42**

```
 1        THE COURT:  Just a moment.  Go ahead.
 2        (Videotape was played, not reported.)
 3   Q    BY MR. ADAMS:  Mr. Baur, you knew that Mr. Forsberg had
 4   no control over the Windermere.com website; correct?
09:58AM 5   A    Yes.
 6   Q    That's the website that you were controlling; correct?
 7   A    No.  It's the one that Windermere controls.
 8   Q    Okay.  And Mr. Forsberg had no control over what you
 9   referred to as this top-level domain used by Windermere;
09:58AM 10  correct?
11   A    I didn't refer to it as a top-level domain.
12   Q    You didn't testify about a top-level domain earlier?  You
13   don't recall that?
14   A    I do.  And I suggested that it was -- dot-com is a
09:58AM 15  top-level domain.  So Windermere.com is not a top-level domain.
16   That was my testimony.
17   Q    And Mr. Forsberg and the Bennion & Deville team had no
18   control over Windermere.com; correct?
19   A    Correct.
09:58AM 20  Q    Now you are aware, are you not, that Mr. Teather did not
21   feel your SCO efforts were sufficient; correct?
22   A    During my deposition, I think you showed me some comments
23   he had made.
24   Q    Now you testified that you do a good job, but as of April
09:59AM 25  2014, Mr. Teather disagreed with you, didn't he?
```

UNITED STATES DISTRICT COURT

**43**

```
 1   A    Per the e-mail I believe you showed me, yes.
 2   Q    And Mr. Teather felt he needed to get involved to
 3   personally increase this work that you were doing?
 4   A    I don't recall.  I wasn't a party to those e-mails.
09:59AM 5   Q    Now do you know if Mr. Teather is even capable of
 6   personally increasing the SCO?
 7   A    I'm not quite sure I follow your question there.
 8   Q    Let me ask it this way:  It's your position that it was
 9   impossible for you, your team, to do anything to push
09:59AM 10  Windermere Watch down in the search results.  Now isn't that
11   correct?
12   A    I'm sorry.  Could you repeat that, please.
13   Q    Sure.  Is your position that it was impossible for
14   you and your team to do anything to push Windermere Watch down in
10:00AM 15  the search results, Pages 5, 6, et cetera?
16   A    Well, I think it -- you'd have to be more specific about
17   the exact context of pushing down.  There isn't a generic
18   pushing down.  It's always specific to a given set of key words
19   and also where the searcher is located.
10:00AM 20       MR. ADAMS:  Your Honor, I'd like to play the
21   witness's video deposition testimony, Pages 52, Line 21,
22   through 53, Line 24.
23        THE COURT:  52:21 to 53:24.
24        MR. ADAMS:  Correct.
10:00AM 25       THE COURT:  Okay.
```

UNITED STATES DISTRICT COURT

**44**

```
 1        (Videotape was played, not reported.)
 2        MR. ADAMS:  No further questions, Your Honor.
 3        THE COURT:  Redirect?
 4        MR. ROWLETT:  Just a few, Your Honor.
10:02AM 5        REDIRECT EXAMINATION
 6   BY MR. ROWLETT:
 7   Q    Mr. Baur --
 8   John, let's do that fancy split screen again real fast.
 9   Let's put up 821 and 705, just the e-mail pages.
10:02AM 10  Mr. Baur, let's start with 821.  Do you recall receiving
11   the draft document attached to Mr. Sundberg's May 1st e-mail?
12   A    I do.
13   Q    Did it relate specifically to the Windermere Watch
14   problem?
10:03AM 15  A    Yes.
16   Q    Do you recall receiving -- and we've seen the report
17   attached to October 17, 2013; correct?
18   A    Yes.
19   Q    And that one directly relates to Windermere Watch;
10:03AM 20  correct?
21   A    Correct.
22   Q    Were both these reports generated in the same effort
23   after you were tasked by Mr. Drayna to look into this issue for
24   Mr. Bennion and Mr. Deville?
10:03AM 25  A    They were.
```

UNITED STATES DISTRICT COURT

45

```
 1   Q    Okay.  Did the May report focus on Mr. Bennion and
 2   Mr. Deville?
 3   A    Yes.
 4   Q    And is there an explanation for why the title's changed
 5   on the documents?
 6   A    Yes.
 7   Q    What's that explanation?
 8   A    When you commission something like this, at least my own
 9   way I do this, is I want to make sure that it's on the right
10   track so we don't get six months down the road and you realize
11   that the work wasn't what you expected.  So I asked for a draft
12   proposal.  Mr. Sundberg outlined what he was going to do.
13   That's the phases and so forth that were going to be part of
14   the recommendation.
15        And then he did the work and started with a new document
16   to -- you know, for the actual work and, of course, they have a
17   different name.  It's the same work.
18   Q    You saw some video of yourself in deposition testimony.
19   Do you feel like any of the testimony you gave today differed
20   in any material respect from the testimony that you watched on
21   the video?
22   A    No.
23             MR. ROWLETT:  No further questions, Your Honor.
24             THE COURT:  All right.  Recross, Mr. Adams?
25             MR. ADAMS:  None, Your Honor.
```

UNITED STATES DISTRICT COURT

47

```
 1             When someone's unavailable to testify at trial, the
 2   deposition of that person can be used at the trial.  The
 3   deposition of Patrick Robinson was taken on July 29, 2016.  I
 4   have that right, Mr. Feasby?
 5             MR. FEASBY:  That's what I have, Your Honor.
 6             THE COURT:  Insofar as possible, you should consider
 7   deposition testimony that's presented to you in court in lieu
 8   of live testimony in the same way as if the witness had been
 9   present to testify.  Do not place any significance on the
10   behavior or the tone of voice of any person reading the
11   questions or the answers.  And I've instructed the lawyers who
12   are reading these questions and answers to be basically as
13   bland and monotone as they can humanly be.
14             MR. ROWLETT:  Won't be a problem, Your Honor.
15             THE COURT:  Okay.  Mr. Feasby, go ahead.
16             MR. FEASBY:  Okay.  Beginning at Page 7 -- I'm going
17   to guide Mr. Rowlett through this just so we make sure we're on
18   the same page.  I tried to flag everything for him.  So if
19   you'll bear with us.  Page 7, beginning at Line 13.
20             (Testimony of Patrick Robinson was read by
21             Messrs. Feasby and Rowlett:)
22        "Q  Can you please state your name for the
23   record.
24        "A  Patrick Robinson.
25        "Q  And what is your date of birth?
```

UNITED STATES DISTRICT COURT

46

```
 1             THE COURT:  Okay.  Mr. Baur, thank you very much.
 2        Mr. Feasby, what's next?
 3             MR. FEASBY:  I have some deposition testimony, Your
 4   Honor, for the jury.
 5             THE COURT:  Okay.
 6             MR. FEASBY:  Give me one second.
 7             MR. ROWLETT:  Your Honor, would you like Mr. Feasby
 8   just to read it into the record, or would you like a call and
 9   response from the witness stand?
10             THE COURT:  I'd like someone to come up here and
11   pretend to be the witness.  Who's going to be the witness?  And
12   then I need to give the jury --
13             MR. ROWLETT:  I can do that, Your Honor.
14             THE COURT:  Okay.  So Mr. Robinson?
15             MR. FEASBY:  Are we going to do question and answer?
16   Sorry, I didn't hear.
17             THE COURT:  Yes, we are.
18             Ladies and gentlemen, Mr. Feasby and Mr. Rowlett are
19   going to present to you deposition testimony.  A deposition I
20   think we've heard a little bit about before, but let me tell
21   you explicitly is the sworn testimony of a witness that's taken
22   before the trial.  The witness is placed under oath to tell the
23   truth, and lawyers for each party can ask questions.  And so
24   that's what you've been seeing on these video screens.  The
25   questions and answers are recorded.
```

UNITED STATES DISTRICT COURT

48

```
 1        "A  5/13/64.
 2        "Q  Where were you born?
 3        "A  Sheridan, Wyoming.
 4        "Q  And did you go to high school in
 5   Wyoming?
 6        "A  Yes, I did.
 7        "Q  What high school did you attend?
 8        "A  Sheridan High School.
 9        "Q  When did you graduate?
10        "A  1982.
11        "Q  Did you go to college after that?
12        "A  I did.
13        "Q  Where did you go to college?
14        "A  Sheridan Community College and graduated
15   from the University of Wyoming in Laramie.
16        "Q  When did you graduate from the
17   University of Wyoming?
18        "A  1986.
19        "Q  What was your degree?
20        "A  Business administration.
21        "Q  Did you go to graduate school after
22   that?
23        "A  I did not.
24        "Q  Did you go to work after that?
25        "A  I did.
```

UNITED STATES DISTRICT COURT

49

```
 1        "Q   Do you have any -- currently hold any
 2   professional licenses or certifications?
 3        "A   No.
 4        "Q   When did you move out to California?
 5        "A   2003.
 6        "Q   And why did you move out here?
 7        "A   I moved --
 8        "Q   Let me ask it this way:  Did you move
 9   out for work?
10        "A   I did not.
11        "Q   Where did you begin working when you
12   first moved to California?
13        "A   I was working for Metro Cities Mortgage
14   in California.
15        "Q   Where is that located?
16        "A   I believe they're based out of Sherman
17   Oaks.
18        "Q   And where was the office you were
19   working?
20        "A   in Palm Springs.
21        "Q   At the time you moved in 2003, did you
22   have any background in real estate?
23        "A   I did not.
24        "Q   Did you have any background in
25   mortgages?
```

UNITED STATES DISTRICT COURT

50

```
 1        "A   I did not.
 2        "Q   And after you worked with Metro Cities
 3   Mortgage, where did you go to work next?
 4        "A   I worked for Windermere in Palm Springs.
 5        "Q   And were you working for Mr. Deville?
 6        "A   Yes.
 7        "Q   Do you know who your employer was at
 8   that time?
 9        "A   it was Bennion & Deville Fine Homes and
10   Windermere Services Southern California.
11        "Q   When did you go to work for Mr. Deville
12   in Palm Springs?
13        "A   it was 2007, April.
14        "Q   When did you begin working there" --
15   start again.
16        "When you began working there, what was your
17   job?
18        "A   I was -- my title was director of
19   services.  I worked in the accounting department.
20        "Q   What were your job duties as director of
21   services?
22        "A   As director of services, I would collect
23   the monthly statistical reports from the franchise
24   owners in Southern California and compile them into
25   a fees-collected spreadsheet for Seattle.  And I
```

UNITED STATES DISTRICT COURT

51

```
 1   would also collect franchise fees.  I would also do
 2   bookkeeping for some of our entities including some
 3   payroll.  And I would figure out commission
 4   breakdowns on sales.
 5        "Q   Anything else generally?
 6        "A   Bookkeeping.
 7        "Q   And you mentioned commission breakdown
 8   on sales.  Are you talking about the breakdown in
 9   terms of the percentage that would go to the agent
10   versus to the broker?
11        "A   Correct.
12        "Q   And in terms of your job duties, let me
13   ask you this:  When you began working with
14   Mr. Deville, the paycheck, did you receive one or
15   more paychecks at that time?
16        "A   I received two when I first started.
17        "Q   And one was from Bennion & Deville Fine
18   Homes?
19        "A   Correct.
20        "Q   And the other was from Windermere
21   Services SoCal?
22        "A   Correct.
23        "Q   And do you know how it was determined
24   which portion of your salary would be paid by one
25   entity versus the other?
```

UNITED STATES DISTRICT COURT

52

```
 1        "A   I don't recall.
 2        "Q   With regard to the job duties that you
 3   mentioned, were some of those performed
 4   specifically for one entity versus another?
 5        "A   Yes.
 6        "Q   So the collecting of monthly reports in
 7   Southern California, are those the franchise fee
 8   reports?
 9        "A   Correct.
10        "Q   And those would be submitted to you by
11   the other owners in the area?
12        "A   Yes.
13        "Q   And your job in that regard, were you
14   working for Bennion & Deville Fine Homes or
15   Windermere Services SoCal?
16        "A   For Windermere Services SoCal.
17        "Q   And in the compiling of spreadsheets
18   related to the information that was provided to
19   you, was that also for Windermere Services SoCal?
20        "A   Yes, it was.
21        "Q   And in collecting the fees from the
22   franchisees in Southern California, was that also
23   for Windermere Services SoCal?
24        "A   Yes.
25        "Q   The bookkeeping and payroll work that
```

UNITED STATES DISTRICT COURT

53

1  you did, was that for Bennion & Deville Fine Homes?

2       "A  No."

3       MR. FEASBY:  Skip ahead to Page 13, beginning at

4  Line 24.  (Reading:)

10:11AM 5       "Q  Fair enough.  When the monthly

6  reports -- how were the monthly reports submitted

7  to you from the franchises in Southern California?

8       "A  How were they submitted to me?

9       "Q  Yes.

10:11AM 10      "A  They would -- monthly, they would fill

11  in their monthly statistical report based on their

12  sales, and they would e-mail that to me.

13      "Q  The monthly statistical report, was that

14  a form that had been created -- or that you

10:11AM 15  created?

16      "A  No, it was -- Windermere Services

17  created it for me to use with our franchise owners.

18      "Q  When you say 'Windermere Services,' are

19  you referring to Windermere in Seattle?

10:11AM 20      "A  Yes.

21      "Q  And you -- would you do anything to

22  confirm the amounts that were set forth on those

23  reports provided by the franchises?

24      "A  I would collect backup reports from the

10:11AM 25  owners, whether they use an Excel spreadsheet or

**UNITED STATES DISTRICT COURT**

54

1  software.

2       "Q  And then you would cross-reference those

3  backup reports with the reports that they provided

4  to you?

10:12AM 5       "A  I would spot check them, yes.

6       "Q  Would you do that on a monthly basis?

7       "A  Yes.

8       "Q  For all owners?

9       "A  Yes.

10:12AM 10      "Q  Did you also receive reports in 2007

11  from Bennion & Deville Fine Homes?

12      "A  Yes.

13      "Q  And those were submitted to you in your

14  role as an employee of Windermere Services Southern

10:12AM 15  California?

16      "A  I would run those reports.

17      "Q  So you would run the Bennion & Deville

18  Fine Homes reports based on the information that

19  you had related to your work for Bennion & Deville

10:12AM 20  Fine Homes?

21      "A  I would run the production reports and fill

22  in the MSR.

23      "Q  And then subsequently another

24  franchisee, Bennion & Deville-related franchise,

10:12AM 25  was opened, and that was Bennion & Deville Fine

**UNITED STATES DISTRICT COURT**

55

1  Homes SoCal; correct?

2       "A  Yes.

3       "Q  Do you recall when it was that the

4  franchise opened?

10:12AM 5       "A  It was in 2011, I believe.

6       "Q  And you would also compile the reports

7  for that entity?

8       "A  That one, I would not.  We had another

9  accounting person responsible for that entity, so

10:13AM 10  they did it.

11      "Q  Who was that person?

12      "A  It was -- at the time I don't remember.  We've

13  had some staff changes.  Now it's Tom Lange, Thomas

14  Lange."

10:13AM 15      MR. FEASBY:  Go to Page 19.

16      MR. ROWLETT:  I'm there.

17      MR. FEASBY:  Line 6.  (Reading:)

18      "Q  After you collected the monthly reports

19  from the franchises in Southern California and

10:13AM 20  prepared your spreadsheet, what would you do with

21  that spreadsheet?

22      "A  I would reconcile with the fees that I

23  collected.  And then I would cut a check and submit

24  the report at the same time monthly.

10:13AM 25      "Q  When you received the reports from the

**UNITED STATES DISTRICT COURT**

56

1  franchisees, would they include a check with those

2  for the fees for that amount?

3       "A  Typically, yes, or they would send me an

4  e-mail" -- I'm sorry.

10:13AM 5       "Typically, yes, or they would send me the

6  e-mail of the MSR and then the fees would follow.

7       "Q  And so when you say that you would cut a

8  check, how did you determine the amount of the

9  check that would be cut?

10:13AM 10      "A  Oh, it would be calculated through the

11  fees collected spreadsheet that Seattle gave me.

12      "Q  So you just then, in terms of the

13  spreadsheet, you would compile all of the

14  information that you received from the other

10:14AM 15  franchises into one spreadsheet and then you would

16  submit that report to Seattle?

17      "A  Correct.

18      "Q  And then what would happen in terms of

19  the process?  What happened next in the process in

10:14AM 20  terms of collecting those fees?  Let me ask:  Do

21  you know what Windermere in Seattle would do with

22  those spreadsheets when they received them?

23      "A  I don't.

24      "Q  Would the spreadsheets that you

10:14AM 25  prepared, would you provide those also to the

**UNITED STATES DISTRICT COURT**

57

franchisees in the area?

"A  Not the fees-collected spreadsheet. That was for Seattle."

MR. FEASBY:  Move ahead to Page 32, Line 23.

MR. ROWLETT:  I'm there.

MR. FEASBY:  (Reading:)

"Q  And this statement here has got a date at the top, Wednesday, September 30th, 2015.  And the first -- on the first page underneath it says, 'Windermere Real Estate SoCal.'  Do you see that?

"A  Yes.

"Q  And is that Bennion & Deville Fine Homes SoCal?  Is that the franchise?

"A  Yes.

"Q  And if you look at the statement, it's got office name there on the left.  Do you see that?

"A  I do.

"Q  And the offices listed here if you go down, are Carlsbad, La Mesa Village, and Laguna Niguel.  Do you see that?

"A  Yes.

"Q  And for each of these, if you look like" -- start over.

"For each of these, it looks like the balance

UNITED STATES DISTRICT COURT

58

started accruing in July of 2014.  Do you see that?

"A  Yes.

"Q  And it continues on a monthly basis through August 1st of 2015.  Do you see that?

"A  Yes.

"Q  Is it your recollection that Bennion & Deville Fine Homes SoCal had not been paying its franchise fees throughout this period of time?

"A  Yes.

"Q  And if you look, then, on Page -- that's Bates-Stamped 57045, this looks like a statement that's got listed here Windermere Real Estate" -- Sorry.  Let me start over.

"And if you look then on page that is Bates-stamped 57045, this looks like a statement that's got listed there Windermere Real Estate Coachella Valley, Inc.  Is that Bennion & Deville Fine Homes?

"A  Yes.

"Q  That's the franchise?

"A  Yes.

"Q  And it lists here a number of offices: Cathedral City, Indian Wells, Main; correct?

"A  Yes.

"Q  Indio, La Quinta, Palm Springs, Portola,

UNITED STATES DISTRICT COURT

59

and it goes on from there.

"Do you recognize this as the offices that were opened by Bennion & Deville Fine Homes at that time?

"A  Yes.

"Q  And the statement also reflects or appears to reflect the balance beginning to accrue as of July 14 -- July 2014.  Do you see that?

"A  Yes.

"Q  And at least Cathedral City runs through June 2015.  Do you see that there?

"A  Yes.

"Q  Do you know whether that office closed after June of 2015?

"A  Yes, it did.

"Q  And then in Indian Wells, the next one, it also starts on July of 2014.  Do you see that?

"A  Yes.

"Q  And it runs through August of 2015 --

"A  Yes.

"Q  -- on the next page there.

"Do you recall during this time Bennion & Deville Fine Homes being delinquent on its franchise fees and technology fees?

"A  Yes.

UNITED STATES DISTRICT COURT

60

"Q  And do you know whether or not they were current up until July of 2014?

"A  I don't recall.

"Q  If they weren't current or there was an amount owing, would you expect that it would be reflected on this statement?

"A  Yes."

MR. FEASBY:  And then going over to Page 36.

MR. ROWLETT:  I'm there.

MR. FEASBY:  Line 3.  (Reading:)

"Q  In terms of your duties for Windermere Services SoCal, was one of your duties also to collect outstanding franchise and tech fees that were owed?

"A  Yes.

"Q  And what would you do in order to carry out those duties?

"A  I would check in with the owners or office managers who would send me the MSR reports.

"Q  And how would you check in with them, via e-mail?

"A  Either by e-mail or a phone call.

"Q  And before you did that, would you discuss the outstanding amounts with anyone in Seattle?

UNITED STATES DISTRICT COURT

61

```
 1      "A  No.
 2      "Q  So they wouldn't prompt you to follow up
 3   on those?
 4      "A  No.
 5      "Q  It was just something that you did?
 6      "A  Yeah.  Everything was time-based on what
 7   I had to do.
 8      "Q  And when was it, then, that you would
 9   follow up with an owner if there was a payment
10   outstanding?
11      "A  I needed to overnight this spreadsheet,
12   this fees collected spreadsheet, to make sure they
13   would get it by the 25th of each month with
14   payment.  I e-mailed it out before then and before
15   I FedEx'd the payment on the 24th.  I would reach
16   out to folks if I didn't have payment.
17      "Q  And that was your practice on a monthly
18   basis?
19      "A  Yes.
20      "Q  And who would you reach out to about
21   amounts that were outstanding by Bennion & Deville
22   Fine Homes?
23      "A  Our controller.
24      "Q  Who -- you say 'our controller.'  Is
25   that the controller for Bennion & Deville Fine
```

UNITED STATES DISTRICT COURT

62

```
 1   Homes?
 2      "A  Yeah.  That's Marie Wooten.
 3      "Q  And how would you reach out to her?
 4      "A  I would walk over to her office.
 5      "Q  Right next door to you?
 6      "A  Yeah.  And Thomas Lange was for SoCal.
 7      "Q  And how would you reach out to him?
 8      "A  Same way.
 9      "Q  And would you do that every month there
10   was a balance owing?
11      "A  I sent them -- I filled in the reports
12   for Coachella Valley, and I, in turn, sent
13   Marie a spreadsheet so that she could put in her
14   QuickBooks as a payable.  So that's how she was
15   aware.  Tom did his own, and he input his own in
16   his QuickBooks.
17      "Q  So when you were reaching out to them,
18   was that just to provide them with the numbers or
19   was it to request payment?
20      "A  They knew when payment -- they knew my
21   timeline.  So not every month did I check in with
22   them.
23      "Q  And your check-in with them, was that
24   different than the check-in that you would have
25   with the other owners in Southern California?
```

UNITED STATES DISTRICT COURT

63

```
 1      "A  Yeah, I guess it was, because they were
 2   in the next office.  So before I sent out my FedEx,
 3   I would ask.
 4      "Q  What would you ask them?
 5      "A  I would ask if they were going to be
 6   paying that month.
 7      "Q  And if the answer was 'no,' would you do
 8   anything further to follow up with them on that
 9   payment?
10      "A  I would check in at times.  It varied.
11      "Q  What would prompt you to check in with
12   them at other times?
13      "A  Seattle would reach out to me or I'd get
14   these and forward them.
15      "Q  As the representative of Windermere
16   Services SoCal, were you concerned about the
17   balance in terms of fees, franchise fees and tech
18   fees, that were owing by Bennion & Deville Homes
19   beginning in July 2014 and going through August of
20   2015?
21      "A  I'm sorry.  Ask that again.
22      "Q  As the representative of Windermere
23   Services SoCal, did you ever become concerned with
24   the balance that was accruing in outstanding
25   fees -- excuse me -- outstanding franchise and tech
```

UNITED STATES DISTRICT COURT

64

```
 1   fees by the Bennion & Deville franchises beginning
 2   in July of 2014 and running through August of 2015?
 3      "A  I received these monthlies, and I guess,
 4   yes.
 5      "MR. ADAMS:  For the record, the witness is
 6   referring to Exhibit 66.
 7      "THE WITNESS:  This statement.
 8      "Q  And so you would refer -- you would
 9   receive these statements on a monthly basis, and
10   every month during this period that we're talking
11   about, you were not receiving payments from either
12   of the Bennion & Deville franchises; correct?
13      "A  I was concerned about all owners that
14   weren't getting their fees in.  It was one of my
15   roles.
16      "Q  And during this time you weren't
17   receiving any fees from either of the Bennion &
18   Deville franchises; correct?
19      "A  During the time stated on here?
20      "Q  Yes.
21      "A  Yes.
22      "Q  And did you ever address the concerns
23   that you had about these outstanding amounts to
24   Mr. Deville?
25      "A  I believe a few times I did, yes.
```

UNITED STATES DISTRICT COURT

65

```
 1        "Q   Do you recall doing that?
 2        "A   I do recall.
 3        "Q   Did you do that via e-mail?
 4        "A   No.
10:21AM 5        "Q   Conversation you had over the phone or
 6   in person?
 7        "A   In person.
 8        "Q   Do you remember how many of those
 9   conversations that you had with him?
10:21AM 10       "A   No, I don't recall.
11       "Q   Can you estimate for me?
12       "A   No, I can't.
13       "Q   What was the concern that you had
14   expressed to Mr. Deville?
10:21AM 15       "A   I would just communicate this statement,
16   and I would check in with him at times.
17       "Q   And did he indicate for you whether or
18   not you could expect any payment of those amounts
19   that were outstanding?
10:22AM 20       "A   At times, yes.
21       "Q   During this time, was there any
22   indication that those amounts were going to be
23   paid?
24       "A   During this time, I don't recall.
10:22AM 25       "Q   Did you do any sort of budgeting or
```

UNITED STATES DISTRICT COURT

66

```
 1   projections for either Bennion & Deville Fine Homes
 2   or Bennion & Deville Fine Homes SoCal?
 3        "A   No.
 4        "Q   Do you know who it was at Bennion &
10:22AM 5   Deville Fine Homes was responsible for that?
 6        "A   I don't know.  Our CPA worked with us on
 7   a lot of our financials."
 8        MR. FEASBY:  Page 42 --
 9        MR. ROWLETT:  I'm there.
10:22AM 10       MR. FEASBY:  -- Line 5.  (Reading:)
11       "Q   Did you have any discussion with either
12   Mr. Bennion or Mr. Deville regarding what might be
13   a -- strike that.
14       "After the relationship between Bennion &
10:22AM 15   Deville and Windermere was terminated, did you
16   continue to receive these Windermere statements for
17   the Bennion & Deville franchises.
18       "A   I don't believe I did.
19       "Q   Did you receive any demand for payment
10:22AM 20   of those amounts from anyone in Seattle?
21       "A   I did not."
22       MR. FEASBY:  Page 62.
23       MR. ROWLETT:  I'm there.
24       (Reading:)
10:23AM 25       "Q   Were you responsible for keeping track
```

UNITED STATES DISTRICT COURT

67

```
 1   of the time of any other Bennion & Deville Fine
 2   Homes employees who were also providing services
 3   for Windermere Services Southern California?
 4        "A   No.  Other than doing our payroll, no.
10:23AM 5        "Q   So you did the payroll for Windermere
 6   Services Corner California?
 7        "A   Yes.
 8        "Q   And who is it that was on payroll
 9   that -- let me ask it this way:  Were there any
10:23AM 10   other full-time -- were there any full-time
11   employees of Windermere Services Southern
12   California?
13       "A   Full time, I don't believe so.
14       "Q   Were there other employees like you who
10:23AM 15   would do some work for Windermere Services Southern
16   California and work for one of the other Bennion &
17   Deville entities?
18       "A   Yes.
19       "Q   Who were those people?
10:23AM 20       "A   During which time frame are we --
21       "Q   Within the past four years.  So going
22   back to, let's say, 2012.  Let's go back to 2011.
23       "A   On payroll?
24       "Q   Yes.
10:23AM 25       "A   It was Bob Bennion, Bob Deville, myself,
```

UNITED STATES DISTRICT COURT

68

```
 1   Paige Tyley, and I believe Kirk Gregor.  And there
 2   was another person we had in education, I believe,
 3   that was also on payroll at that time.
 4        "Q   Do you remember that person's name?
10:24AM 5        "A   Curt Hempel.
 6        "Q   And how would you do payroll on a
 7   monthly basis" --
 8        "How would you do payroll, on a monthly
 9   basis?
10:24AM 10       "A   Semi-monthly.
11       "Q   Was Mr. Forsberg ever on the payroll for
12   Windermere Services Southern California?
13       "A   I don't believe so."
14       MR. FEASBY:  I'll conclude this testimony.
10:24AM 15       THE COURT:  Okay.  Hold on a second.
16   Mr. Adams, did you have a counterdesignation?
17       MR. ADAMS:  They were included, Your Honor.
18       THE COURT:  Okay.  It was all included.  Thank you.
19   You can step down, Mr. Robinson/Rowlett.
10:24AM 20   Mr. Feasby?
21       MR. FEASBY:  Defense rests, Your Honor.
22       THE COURT:  Okay.  Ladies and gentlemen, as a
23   housekeeping matter, you may recall a few days ago I said we
24   were starting the defense case in the middle of the plaintiff's
10:24AM 25   case.  I neglected to mention, I think probably at an earlier
```

UNITED STATES DISTRICT COURT

69

1  break, that the plaintiff had determined that they were not
2  calling a witness who was going to be the final witness.  And
3  so they rested and I neglected to tell you that.  So plaintiff
4  rested some time ago; now the defense has rested.
10:25AM  5  We now turn to plaintiff for an opportunity for what's
6  called a rebuttal case.
7  Mr. Adams.
8  MR. ADAMS:  Yes.  Thank you, Your Honor.  Plaintiffs
9  call Kirk Gregor.
10:25AM  10  THE COURT:  Mr. Gregor.
11  MR. ADAMS:  May I approach, Your Honor?
12  THE COURT:  Yes.
13  MR. ADAMS:  This is actually going to be for the
14  next witness.
10:25AM  15  **KIRK GREGOR, PLAINTIFF'S WITNESS, WAS SWORN**
16  THE COURTROOM DEPUTY:  Will you please state your
17  name for the record, spelling your last name.
18  THE WITNESS:  Kirk Gregor.  Last name's G-r-e-g-o-r.
19  **DIRECT EXAMINATION**
10:26AM  20  BY MR. ADAMS:
21  Q  Good morning, Mr. Gregor.  How are you?
22  A  **I'm good.  Thank you.**
23  Q  Mr. Gregor, I understand that you are currently employed
24  by Mr. Bennion and Mr. Deville; is that correct?
10:26AM  25  A  **That's correct.**

UNITED STATES DISTRICT COURT

70

1  Q  Okay.  Now were you with Mr. Bennion and Mr. Deville from
2  the time period 2013 through September of 2015?
3  A  **Yes, I was.**
4  Q  And what was your role at that time?
10:26AM  5  A  **I believe my title was director of office development.**
6  Q  And generally can you tell us what your job duties were
7  as director of office development.
8  A  **Sure.  I participated in working with the services**
9  **division that they owned.**
10:27AM  10  Q  Okay.  And did you provide any type of support in
11  connection with those services?
12  A  **Yes, I did.**
13  Q  And can you generally tell us what that support consisted
14  of.
10:27AM  15  A  **Yeah.  I believe I actually had a communication log that**
16  **spoke to some of this as well.  But I primarily was the liaison**
17  **to -- between the owners and the services division in regards**
18  **to requests.  And those requests could range from requests to**
19  **open offices.  It could be requests to address problems that**
10:27AM  20  **might be coming up.  It could be just standard support to**
21  **making sure marketing was compliant.  You name it, we pretty**
22  **much handled any type of request that came in.  We also did a**
23  **pretty good job with following up on a monthly basis to check**
24  **in with owners.**
10:27AM  25  Q  Okay.  Now Mr. Gregor, you just referenced a

UNITED STATES DISTRICT COURT

71

1  communication log.
2  A  **Yes.**
3  Q  Would that communication log help refresh your memory as
4  to the type of support you were providing during this specific
10:28AM  5  period of time, the '13 through 2014 period?
6  A  **It could help me be a little more specific, yes.**
7  MR. ADAMS:  Your Honor, may I provide the witness
8  with the item that will refresh his memory?
9  THE COURT:  Yes.  What -- is it an exhibit?
10:28AM  10  MR. ADAMS:  It is not, Your Honor.  I'm sharing it
11  with counsel.
12  THE COURT:  You can show it to him.
13  THE WITNESS:  Thank you.
14  BY MR. ADAMS:  Mr. Gregor, can you explain for us what
10:28AM  15  that item in your hand is so everybody understands.
16  A  **Sure.  It's basically a communication log of tracking**
17  **e-mails and possibly phone conversations with service -- us as**
18  **a service provider and owners and requests.**
19  Q  Okay.  Now you are here today because the jury has heard
10:28AM  20  some testimony that Mr. Bennion and Mr. Deville's services
21  company only had one person in it providing services as an area
22  representative.
23  A  **Okay.**
24  Q  Now do you believe that statement is true?
10:29AM  25  A  **It is not true.**

UNITED STATES DISTRICT COURT

72

1  Q  Okay.  Can you name the people that would provide support
2  and services on behalf of Mr. Bennion and Mr. Deville's
3  services company?
4  A  **Absolutely.  We had a team that included a gal by the name**
10:29AM  5  **of Paige Tyley.  We had a gentleman by the name of Eric**
6  **Forsberg who handled our IT.  We had an attorney by the name of**
7  **Robert Sunderland that gave us guidance as well.  Patrick**
8  **Robinson assisted with accounting needs.  I believe Martin**
9  **Duggan was introduced towards the end for social media needs.**
10:29AM  10  **And I may have left somebody out.  Of course, myself, as well**
11  **as Bob Deville and Bob Bennion were always available as well**
12  **from an owner's perspective.**
13  Q  Some of the names that you identified the jury is already
14  familiar with.  But can you tell us who Paige Tyley is?
10:29AM  15  A  **Yeah.  Paige -- Paige and I have known each other for a**
16  **long time.  But Paige basically handled, I believe, marketing**
17  **and advertising requests from the services perspective.**
18  Q  And then I think you said Martin Duggan?
19  A  **Correct.**
10:30AM  20  Q  What is Martin Duggan's role?
21  A  **Martin Duggan's role at the time was social media**
22  **consultant as well as -- I think it was social media primarily.**
23  Q  And it is your testimony that all of these people
24  provided services during this 2013 through 2015 time period?
10:30AM  25  A  **That's correct.**

UNITED STATES DISTRICT COURT

75

1   Q   Now are you familiar with the franchisee Homes & Estates?

2   A   Yes.

3   Q   And you're familiar with Mr. Gooding?

4   A   Yes.

10:30AM 5   Q   Mr. Johnson?

6   A   Yes.

7   Q   And Mr. Schuster?

8   A   Yes.  Yes, I've known them for quite some time.

9   Q   And how do you know them?

10:30AM 10   A   They were actually affiliated with Windermere prior to

11   them becoming owners.

12   Q   And when you say "prior to them becoming owners," do you

13   understand their history with Windermere?

14   A   Yeah.  I believe Brian Gooding was a manager back in the

10:30AM 15   first relationship with Windermere for a different owner.  And

16   Rich Johnson, I think his title was technology director or

17   technology manager.

18   Q   Okay.  And were you one of the people tasked with

19   providing services to Windermere Homes & Estates?

10:31AM 20   A   Correct.  Yes.

21   Q   And I want to focus on this period of time, this 2013

22   through September 2015 period.

23   A   Yes.

24   Q   Can you identify for us some of the services that you

10:31AM 25   personally were involved with providing them?

UNITED STATES DISTRICT COURT

---

74

1   A   I can.  So as I mentioned, you know, part of my job was to

2   be kind of the liaison between owners and requests, also to

3   check in with them on a regular basis.  So as needs arose, some

4   of the examples of those needs might be ideas about

10:31AM 5   collaborating between owners, ideas about collaborating in

6   regards to advertising.

7       I know there was one example where we were talking about

8   having agents from Mr. Bennion and Mr. Deville's office meet

9   with agents of their offices to attend a joint brokers caravan

10:31AM 10   pitch to show unity between the two companies.  I know there

11   were ideas shared about advertising and things like that.

12   Q   And at any time during our dialogue here, if you feel the

13   need to look at your log --

14   A   Sure.

10:32AM 15   Q   -- feel free to do so.

16   A   Sure.

17   Q   Okay.  Can you tell us during this time period what type

18   of marketing support was provided to franchisees in the region?

19   A   I believe Paige can probably speak better to this.  But to

10:32AM 20   my understanding, there were opportunities that were provided

21   to owners to collaborate on certain things if they chose to do

22   so.  But it was always at the discretion of whether the owner

23   of that office found value in it.

24   Q   Okay.

10:32AM 25       THE COURT:  Mr. Gregor, will you just slow down a

UNITED STATES DISTRICT COURT

---

1   little for me.

2       THE WITNESS:  Oh, sure.  Sorry about that.  Yes.

3   Q   BY MR. ADAMS:  Mr. Gregor, can you tell us, were there

4   any instances involving the Windermere Homes & Estates owners,

10:32AM 5   the San Diego gentlemen, where they wanted to collaborate on

6   ads that you can recall?

7   A   Yes.  I believe there was one situation where they wanted

8   to run an ad in a magazine called "Dream Homes."  And the

9   request came in, it was forwarded to Mr. Deville as an owner if

10:33AM 10   he chose to want to collaborate with them and run an additional

11   page.  And that response came back that he was not interested

12   at that time.  And that was sent back to Mr. Johnson and

13   Mr. Gooding.

14   Q   And as a services provider, did you have any problem with

10:33AM 15   one franchisee owner not wanting to share an advertisement with

16   another franchisee owner?

17   A   Not typically.  I mean, it was again at the owner's

18   discretion of where or not they found value in running an ad

19   for their office or their listings in that publication.

10:33AM 20   Q   Are you aware of any advertisements that the Homes &

21   Estates folks did that did not include Mr. Bennion and

22   Mr. Deville's locations?

23   A   Yes.  Yeah.

24   Q   And did you have a problem with that?

10:33AM 25   A   No.  Not personally, no.

UNITED STATES DISTRICT COURT

---

76

1   Q   Okay.  Mr. Gregor, are you familiar with Mike Teather?

2   A   Yes.

3   Q   Okay.  Tell us how you know him.

4   A   I've actually had, I believe, three interactions with

10:33AM 5   Mr. Teather.

6   Q   Slow down just a little bit.

7   A   Okay.  I've had three interactions with Mr. Teather.  Two

8   of them involved the same day of picking him up at the airport

9   and dropping him off at the airport.  And then one of them

10:34AM 10   basically was witnessing a phone call that was a little

11   disturbing, but -- I mean unprofessional.  But those are my

12   interactions with Mr. Teather.

13   Q   Okay.  Well, tell us about this phone call that you were

14   referencing.

10:34AM 15   A   Sure.  So I was in my vehicle driving Mr. Deville, I

16   believe, back to the airport, and he received a call.  It was

17   on speakerphone.  And it was a little disturbing because it had

18   a lot of profanity which I felt was a little unprofessional.

19   I'm certainly not a prude, but, you know, it was very

10:34AM 20   uncomfortable listening to this verbiage and this language to

21   the point where I would have gotten out of the car if I wasn't

22   on the freeway.

23       That being said, I know that there was discussion in

24   regards to an office opening.  And in the beginning of that

10:34AM 25   conversation it was totally off -- it was not going to happen.

UNITED STATES DISTRICT COURT

79

1   Q    At the end of that conversation, it was, "Do what you want.  Go

2   ahead and open it."  So it just seemed a little odd that it

3   went from one spectrum to the other over a period of about 20

4   minutes where it was --

10:35AM 5   Q    Was there a point in time where Mr. Teather, to your

6   knowledge, became your contact with Seattle?

7   A    I was never notified when Mr. Teather came on board.  I

8   was not clear as to -- as far as what my relationship was with

9   him as a service provider for the area or working for

10:35AM 10   Mr. Deville's service -- Mr. Deville and Mr. Bennion's service

11   division.  There was never any formal announcement if I was

12   supposed to be working with him.  And I never had any

13   interactions with him other than those three times.

14   Q    Slow down.

10:35AM 15   A    Sorry.

16   Q    Okay.  Before Mr. Teather came on board, was there

17   someone at Seattle that you would regularly communicate with?

18   A    Yes.  I had a longstanding relationship with a gentleman

19   by the name of Lance Teale (phonetic).

10:35AM 20   Q    And what was Lance Teale's role, to your understanding,

21   with Windermere in Seattle?

22   A    He was my main contact as far as any of the services needs

23   that we had in regards to directing me to the proper

24   departments if somebody, you know, had an issue with

10:36AM 25   technology.  If owners had questions about opening offices,

UNITED STATES DISTRICT COURT

---

79

1   Q    Now after Mr. Teather came on board, did your

2   relationship with these folks change, in your opinion?

3   A    It seemed sometime in October to me that there was a

4   change going on, because the communication back and forth

10:37AM 5   seemed to get a little colder and less frequent.

6   Q    Okay.  Now did anyone at Windermere in Seattle tell you

7   that you were not properly servicing the Homes & Estates folks?

8   A    I never received a complaint about that, no.

9   Q    Did any of the Homes & Estates folks tell you or suggest

10:37AM 10   to you that you were not giving them the service that they

11   needed?

12   A    I never received a complaint from them either.

13        MR. FEASBY:  No further questions, Your Honor.

14        THE COURT:  Cross-examination?

10:38AM 15              CROSS-EXAMINATION

16   BY MR. FEASBY:

17   Q    Good morning, Mr. Gregor.

18   A    Good morning.

19   Q    During this time you were also working as the office

10:38AM 20   manager for one or more of Mr. Bennion and Mr. Deville's

21   franchises in San Diego; isn't that right?

22   A    I had actually filled in as a broker manager from time to

23   time, and it would certainly be a service I would offer owners

24   if they requested it as well.

10:38AM 25   Q    But you weren't a full-time employee of Services Southern

UNITED STATES DISTRICT COURT

---

78

1   whether they were new owners or existing owners that wanted to

2   grow additional offices, he was part of the process of how we

3   turned in paperwork to seek approval.

4   Q    And how frequently would you communicate with Mr. Teale

10:36AM 5   up in Seattle before Mr. Teather was in the picture?

6   A    You know, it would depend on needs.  But, you know, I

7   would say we at least spoke once a month, sometimes once a week

8   depending on if there were issues that were being handled.

9   Q    And did your relationship with Seattle change when

10:36AM 10   Mr. Teather came on board?

11   A    Well, it was a little confusing because I didn't know -- I

12   called for Lance one day and was told that he was no longer in

13   that department, so I wasn't really sure who I should contact

14   at that point.  And, again, I had not been introduced to

10:36AM 15   Mr. Teather at that point.

16   Q    Okay.  Now before Mr. Teather showed up in Southern

17   California, what was your relationship like with Mr. Gooding

18   and Mr. Johnson and Mr. Schuster?

19   A    I felt it was good.  I didn't sense that there was any

10:37AM 20   issues going on.  Some of the e-mails that were going back and

21   forth were complimentary, you know, thank you for the services

22   and assistance that we provided.  I never received any

23   complaint from any of them.

24   Q    Okay.  And were you servicing them at that time?

10:37AM 25   A    I was.

UNITED STATES DISTRICT COURT

---

80

1   California, were you?

2   A    I -- you know, I was paid with one paycheck.  So my

3   responsibilities were to work with Services as well as part of

4   the Services was to provide assistance to Mr. Deville and

10:38AM 5   Mr. Bennion's office.

6   Q    In terms of payroll for Mr. Bennion and Mr. Deville's

7   companies, though, Mr. Robinson would know better about that

8   than you would, wouldn't he?

9   A    Correct, yes.

10:38AM 10   Q    And of the people that you identified as helping in

11   Southern California, Mr. Forsberg was not on the Services

12   company's payroll either, was he?

13   A    That, I don't have an answer for.  I couldn't tell you.

14   Q    And neither was Mark Dreyer (phonetic)?

10:39AM 15   A    I don't know who -- I couldn't answer that.

16   Q    Now this log that you had here, this wasn't produced in

17   discovery.  Do you know why that was?

18   A    I don't know.

19   Q    And it wasn't referenced during your deposition at all,

10:39AM 20   was it?

21   A    It wasn't brought up, no.

22   Q    You didn't produce it at your deposition?

23   A    No, I did not.

24   Q    This log, this is something that you created for this

10:39AM 25   trial, wasn't it?

UNITED STATES DISTRICT COURT

---

81

1   A   No, that's not correct.

2   Q   Were you providing support to the Homes & Estates

3   franchise when Mr. Deville decided to kick them off of his

4   technology program in November of 2018?

10:39AM 5   A   I was providing support to them, yes.

6           MR. FEASBY:  No further questions.

7           THE COURT:  Recross?

8           MR. ADAMS:  No, Your Honor.

9           THE COURT:  All right.  Mr. Gregor, you can step

10:39AM 10  down.

11          Ladies and gentlemen, let go ahead and take our morning

12  recess.  Don't form any opinions about the case.  Don't talk

13  about the case.  And follow all of my other admonitions.  Let's

14  come back at five minutes to 11:00, so 10:55.  See you then.

10:40AM 15          THE COURTROOM DEPUTY:  All rise.

16          THE COURT:  All right.  See you all in 15 minutes.

17          **(Further proceedings reported by**

18          **Sharon Seffens in Volume II.)**

19                      -oOo-

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

---

82

1               *CERTIFICATE OF OFFICIAL REPORTER*

2

3   COUNTY OF LOS ANGELES )

                          )

4   STATE OF CALIFORNIA   )

5           I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

6   COURT REPORTER, in and for the United States District Court for

7   the Central District of California, do hereby certify that

8   pursuant to Section 753, Title 28, United States Code that the

9   foregoing is a true and correct transcript of the

10  stenographically reported proceedings held in the

11  above-entitled matter and that the transcript page format is in

12  conformance with the regulations of the Judicial Conference of

13  the United States.

14

15  *Date:  July 20, 2018*

16

17

18

19          */S/ DEBBIE HINO-SPAAN*

20          *Debbie Hino-Spaan, CSR No. 7953*

            *Federal Official Court Reporter*

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

'

**'13** [1] - 71:5
**'80s** [1] - 7:16
**'90s** [2] - 7:16, 7:18
**'99** [1] - 8:2
**'no** [1] - 63:7
**'our** [1] - 61:24
**'Windermere** [2] - 53:18, 57:10

/

**/S** [1] - 82:19

0

**04/30/2013** [1] - 3:16
**05/01/2013** [1] - 3:19

1

**1** [3] - 21:4, 21:21, 39:1
**1-191** [1] - 1:24
**10** [1] - 8:13
**10/8/2013** [1] - 3:21
**100** [2] - 23:1, 40:22
**10:55** [1] - 81:14
**11:00** [1] - 81:14
**120,000** [2] - 8:11, 9:1
**1230** [1] - 2:7
**13** [2] - 47:19, 53:3
**13th** [1] - 6:17
**14** [1] - 59:8
**15** [1] - 81:16
**16,000** [1] - 15:18
**17** [3] - 40:5, 40:14, 44:17
**19** [3] - 36:11, 36:16, 55:15
**197** [3] - 36:10, 36:15, 36:16
**1982** [1] - 48:10
**1986** [2] - 6:12, 48:18
**1st** [4] - 37:2, 39:2, 44:11, 58:4

2

**2** [3] - 27:3,

**38:10, 38:13**
**2-plus** [1] - 27:16
**20** [7] - 1:14, 3:16, 4:1, 12:20, 41:22, 77:3, 82:15
**2000** [1] - 6:22
**2000s** [1] - 7:20
**2003** [2] - 49:5, 49:21
**2007** [2] - 50:13, 54:10
**2011** [3] - 8:6, 55:5, 67:22
**2012** [5] - 9:17, 9:19, 15:14, 17:5, 67:22
**2013** [21] - 10:9, 17:24, 20:2, 20:20, 21:21, 22:2, 23:5, 26:23, 32:24, 36:3, 37:2, 37:6, 39:9, 40:5, 40:6, 40:11, 40:14, 44:17, 70:2, 72:24, 73:21
**2014** [8] - 42:25, 58:1, 59:8, 59:17, 60:2, 63:19, 64:2, 71:5
**2015** [10] - 57:8, 58:4, 59:11, 59:14, 59:19, 63:20, 64:2, 70:2, 72:24, 73:22
**2016** [1] - 47:3
**2018** [4] - 1:14, 4:1, 81:4, 82:15
**203** [1] - 41:22
**203:20** [1] - 41:24
**204** [1] - 41:23
**204:5** [1] - 41:24
**21** [3] - 3:19, 14:16, 43:21
**23** [1] - 57:4
**24** [2] - 43:22, 53:4
**24th** [1] - 61:15
**25th** [1] - 61:13
**26** [1] - 3:21
**28** [1] - 82:8
**29** [1] - 47:3

3

**3** [1] - 60:10
**30** [2] - 6:15,

37:5
**30th** [4] - 20:1, 21:23, 39:9, 57:8
**32** [1] - 57:4
**35** [1] - 3:5
**36** [1] - 60:8
**3rd** [1] - 36:19

4

**4** [2] - 2:6, 30:25
**411** [1] - 1:24
**42** [1] - 66:8
**44** [1] - 3:5
**47** [1] - 3:7

5

**5** [4] - 31:20, 41:23, 43:15, 66:10
**5/13/64** [1] - 48:1
**52** [1] - 43:21
**52:21** [1] - 43:23
**53** [1] - 43:22
**53:24** [1] - 43:23
**57045** [2] - 58:11, 58:15
**5:15-CV-01921-DFM** [1] - 1:7

6

**6** [3] - 3:4, 43:15, 55:17
**6,500** [1] - 9:2
**600** [2] - 2:12, 2:13
**619-784-3549** [1] - 2:14
**62** [1] - 66:22
**64** [1] - 9:24
**65** [2] - 8:11, 9:24
**66** [1] - 64:6
**69** [1] - 3:8

7

**7** [3] - 26:12, 47:16, 47:19
**704** [3] - 3:21, 25:10, 25:13, 25:14, 26:2, 26:3, 26:5, 26:6
**705** [10] - 25:7, 26:14, 38:8, 38:13, 38:24, 39:11, 40:1, 40:4, 44:9

**753** [1] - 82:8
**79** [1] - 3:9
**7953** [2] - 1:23, 82:20

8

**8** [1] - 25:15
**8,000** [1] - 15:17
**820** [8] - 3:16, 19:22, 19:25, 20:4, 20:6, 20:8, 20:9, 20:13
**821** [5] - 3:19, 20:10, 20:23, 20:25, 21:1, 21:14, 21:16, 21:18, 21:19, 36:24, 38:12, 38:18, 40:10, 44:9, 44:10
**8:52** [2] - 1:15, 4:2
**8:53** [1] - 5:15

9

**9** [3] - 1:9, 36:10, 36:16
**92101** [1] - 2:13
**92614** [1] - 2:7
**92701-4516** [1] - 1:24
**949-252-9377** [1] - 2:8
**9:06** [1] - 5:15

A

**A.M** [2] - 1:15, 4:2
**a.m** [2] - 5:15
**ability** [1] - 14:21
**able** [1] - 29:22
**above-entitled** [1] - 82:11
**absolutely** [2] - 17:8, 72:4
**accounting** [3] - 50:19, 55:9, 72:8
**accrue** [1] - 59:7
**accrues** [1] - 13:22
**accruing** [2] - 58:1, 63:24
**accurate** [3] - 24:23, 24:24, 25:2
**acknowledging**

[1] - 27:24
**act** [2] - 34:15, 34:16
**actions** [1] - 20:21
**actual** [3] - 11:12, 30:9, 45:16
**ad** [2] - 75:8, 75:18
**ADAMS** [32] - 2:5, 20:7, 21:17, 26:4, 35:21, 35:23, 36:9, 36:13, 36:16, 36:19, 39:13, 39:19, 39:21, 39:25, 41:21, 41:25, 42:3, 43:20, 43:24, 44:2, 45:25, 64:5, 68:17, 69:8, 69:11, 69:13, 69:20, 71:7, 71:10, 71:14, 75:3, 81:8
**Adams** [5] - 3:5, 3:8, 45:24, 68:16, 69:7
**add** [2] - 6:23, 21:5
**add-in** [1] - 6:23
**added** [1] - 13:12
**additional** [2] - 75:10, 78:2
**address** [2] - 64:22, 70:19
**administration** [1] - 48:20
**admitted** [4] - 19:24, 25:8, 25:12, 26:15
**admonitions** [1] - 81:13
**ads** [2] - 7:21, 75:6
**advertisement** [1] - 75:15
**advertisements** [1] - 75:20
**advertising** [5] - 6:21, 15:3, 72:17, 74:6, 74:11
**advice** [1] - 29:11
**advise** [1] - 16:1
**affect** [1] - 14:17
**affiliated** [1] - 73:10

**agent** [3] - 15:20, 18:14, 51:9
**agents** [10] - 8:8, 8:10, 8:11, 8:20, 9:1, 9:2, 15:20, 28:23, 74:8, 74:9
**ago** [5] - 9:7, 10:3, 17:1, 68:23, 69:4
**agreed** [1] - 41:14
**ahead** [7] - 36:17, 42:1, 47:15, 53:3, 57:4, 77:2, 81:11
**aim** [1] - 25:21
**airport** [3] - 76:8, 76:9, 76:16
**AL** [1] - 2:3
**al** [1] - 1:5
**ALAN** [1] - 2:11
**all-or-nothing** [1] - 21:9
**almost** [2] - 6:17, 15:9
**ALSO** [1] - 2:15
**amount** [4] - 22:16, 56:2, 56:8, 60:5
**amounts** [7] - 53:22, 60:24, 61:21, 64:23, 65:18, 65:22, 66:20
**Ana** [1] - 13:17
**ANA** [3] - 1:15, 1:24, 4:1
**analogy** [2] - 24:17, 35:3
**analysis** [1] - 17:5
**AND** [4] - 1:4, 2:3, 2:9
**ANGELES** [1] - 82:3
**announcement** [1] - 77:11
**answer** [7] - 39:14, 39:16, 46:15, 63:7, 80:13, 80:15
**answers** [3] - 46:25, 47:11, 47:12
**anticipate** [1] - 4:10
**anxious** [1] - 36:3
**anyway** [1] -

33:6
**apologies** [1] - 32:18
**apologize** [2] - 12:17, 28:12
**apparent** [1] - 22:13
**appear** [1] - 4:8
**APPEARANCES** - 2:1
**approach** [1] - 69:11
**appropriate** [1] - 34:6
**approval** [1] - 78:3
**April** [11] - 10:11, 20:1, 21:23, 22:2, 26:23, 37:5, 39:9, 40:6, 40:10, 42:24, 50:13
**area** [8] - 4:11, 13:15, 17:8, 34:15, 52:11, 57:1, 71:21, 77:9
**arose** [1] - 74:3
**arrows** [1] - 30:18
**article** [2] - 13:16, 33:12
**articles** [1] - 33:10
**aspect** [2] - 14:3, 14:4
**assistance** [1] - 78:22, 80:4
**assisted** [1] - 72:8
**attached** [4] - 40:4, 40:10, 44:11, 44:17
**attachment** [3] - 37:25, 38:2, 39:1
**attachments** [5] - 37:15, 37:16, 37:18, 37:21, 38:6
**attend** [3] - 23:5, 48:7, 74:9
**attendees** [1] - 41:3
**attention** [3] - 10:6, 16:24, 17:18
**attorney** [7] - 10:7, 36:25, 37:20, 39:17, 39:22, 40:8, 72:6
**attorneys** [2] -

34:18, 34:21
**August** [4] - 58:4, 59:19, 63:19, 64:2
**authority** [3] - 13:12, 13:21, 13:22
**available** [1] - 72:11
**aware** [6] - 36:2, 36:6, 36:8, 42:20, 62:15, 75:20

**B**

**B-a-u-r** [1] - 5:24
**back-and-forth** [1] - 21:1
**background** [3] - 6:9, 49:22, 49:24
**backup** [2] - 53:24, 54:3
**bad** [1] - 10:18
**balance** [5] - 57:25, 59:7, 62:10, 63:17, 63:24
**based** [6] - 7:21, 32:24, 49:16, 53:11, 54:18, 61:6
**basis** [10] - 18:7, 20:22, 54:6, 58:3, 61:18, 64:9, 68:7, 68:9, 70:23, 74:3
**Bates** [2] - 58:11, 58:15
**Bates-stamped** [2] - 58:11, 58:15
**BAUER** [1] - 3:4
**Baur** [20] - 3:17, 3:19, 3:21, 5:12, 5:19, 5:24, 6:3, 12:13, 16:9, 20:15, 35:24, 36:19, 38:14, 36:19, 39:19, 39:25, 42:3, 44:7, 44:10, 46:1
**baur** [1] - 5:20
**BAUR** [1] - 5:21
**bear** [1] - 47:19
**became** [3] - 36:6, 36:8, 77:6
**become** [1] - 63:23
**becoming** [2] - 73:11, 73:12
**began** [2] -

50:16, 51:13
**begin** [2] - 49:11, 50:14
**beginning** [7] - 47:16, 47:19, 53:3, 59:7, 63:19, 64:1, 76:24
**behalf** [2] - 15:18, 72:2
**behavior** [1] - 47:10
**behind** [1] - 32:8
**beings** [1] - 14:8
**benefit** [2] - 14:13, 34:3
**Bennion** [72] - 11:1, 11:7, 11:16, 16:14, 17:24, 18:2, 18:16, 18:20, 18:21, 19:3, 19:17, 23:6, 23:11, 27:9, 27:12, 28:16, 28:21, 29:1, 29:7, 29:25, 32:5, 33:2, 33:18, 34:7, 34:23, 35:2, 36:20, 37:10, 40:15, 40:18, 41:18, 42:17, 44:24, 45:1, 50:9, 51:17, 52:14, 53:1, 54:11, 54:17, 54:19, 54:24, 54:25, 57:12, 58:6, 58:17, 59:3, 59:22, 61:21, 61:25, 63:18, 64:1, 64:12, 64:17, 66:1, 66:2, 66:4, 66:12, 66:14, 66:17, 67:1, 67:16, 67:25, 69:24, 70:1, 71:20, 72:2, 72:11, 74:8, 75:21, 79:20, 80:6
**BENNION** [2] - 1:4, 2:3
**Bennion's** [2] - 77:10, 80:5
**best** [1] - 22:9
**better** [4] - 11:9, 22:12, 74:19, 80:7
**between** [5] - 66:14, 70:17, 74:2, 74:5, 74:10

**beyond** [2] - 15:11, 24:11
**billboard** [6] - 14:22, 14:25, 15:2, 24:17, 24:20, 24:21
**billboards** [3] - 14:20, 14:21, 24:22
**binder** [2] - 19:20, 25:11
**birth** [1] - 47:25
**bit** [10] - 6:8, 6:13, 9:8, 12:15, 12:18, 23:4, 31:18, 38:3, 46:20, 76:6
**bland** [1] - 47:13
**blow** [3] - 21:20, 29:20, 31:25
**blown** [1] - 29:21
**board** [4] - 77:7, 77:16, 78:10, 79:1
**Bob** [8] - 25:17, 27:9, 32:10, 67:25, 72:11
**Bob-Deville/11/740/355** [1] - 32:10
**book** [1] - 31:18
**Bookkeeping** [1] - 51:6
**bookkeeping** [2] - 51:2, 52:25
**boom** [1] - 6:23
**boosting** [1] - 24:24
**born** [1] - 48:2
**bottom** [1] - 37:5
**bought** [4] - 18:10, 29:8, 29:9, 30:5
**box** [1] - 31:25
**brand** [2] - 10:19, 14:10
**brands** [1] - 8:17
**break** [1] - 69:1
**breakdown** [2] - 51:7, 51:8
**breakdowns** [1] - 51:4
**Brian** [1] - 73:14
**brief** [2] - 7:7, 11:20
**broad** [2] - 17:18
**broker** [2] - 51:10, 79:22
**brokerage** [7] -

8:9, 8:10, 8:11, 8:15, 8:19, 15:19
**brokers** [1] - 74:9
**brought** [5] - 10:6, 17:5, 17:17, 40:19, 80:21
**browser** [1] - 6:24
**buddies** [1] - 13:2
**budgeting** [1] - 65:25
**build** [2] - 7:8, 38:21
**built** [1] - 10:3
**bunch** [1] - 14:19
**Business** [1] - 48:20
**business** [7] - 6:25, 7:9, 8:8, 9:3, 9:11, 16:8, 16:21
**button** [1] - 18:5
**BY** [17] - 2:5, 2:11, 3:4, 3:8, 6:2, 16:13, 20:10, 35:23, 36:19, 39:19, 39:25, 42:3, 44:6, 69:20, 71:14, 75:3, 79:16

**C**

**cadence** [1] - 12:18
**calculated** [1] - 56:10
**CALIFORNIA** [5] - 1:2, 1:15, 1:24, 4:1, 82:4
**California** [29] - 2:7, 2:13, 6:11, 10:24, 10:25, 19:17, 23:6, 23:22, 28:15, 49:4, 49:12, 49:14, 50:10, 50:24, 52:7, 52:22, 53:7, 54:15, 55:19, 62:25, 67:3, 67:6, 67:12, 67:16, 68:12, 78:17, 80:1, 80:11, 82:7
**CALLED** [2] - 3:4, 3:8
**capabilities** [1] -

15:22
**capable** [1] - 43:5
**car** [1] - 76:21
**caravan** [1] - 74:9
**career** [1] - 6:15
**Carlsbad** [1] - 57:20
**CARRILLO** [1] - 2:6
**carry** [1] - 60:16
**cars** [1] - 12:2
**case** [9] - 4:12, 10:5, 18:16, 33:18, 68:24, 68:25, 69:6, 81:12, 81:13
**Case** [1] - 1:6
**categories** [1] - 39:7
**category** [1] - 33:24
**Cathedral** [2] - 58:23, 59:10
**causing** [1] - 10:24
**center** [3] - 28:13, 28:14, 29:23
**CENTRAL** [1] - 1:2
**Central** [1] - 82:7
**CEO** [2] - 7:12, 9:16
**certain** [1] - 74:21
**certainly** [3] - 4:17, 76:19, 79:23
**CERTIFICATE** [1] - 82:1
**certifications** [1] - 49:2
**Certified** [1] - 1:5
**certify** [1] - 82:7
**cetera** [3] - 12:6, 33:10, 43:15
**challenges** [1] - 10:23
**challenging** [3] - 28:8, 29:11, 29:14
**chance** [1] - 39:23
**change** [6] - 13:25, 16:25, 24:21, 78:9, 79:2,

**UNITED STATES DISTRICT COURT**

79:4
**changed** [1] - 45:4
**changes** [1] - 55:13
**check** [15] - 54:5, 55:23, 56:1, 56:8, 56:9, 60:18, 60:20, 62:21, 62:23, 62:24, 63:10, 63:11, 65:16, 70:23, 74:3
**check-in** [2] - 62:23, 62:24
**chief** [1] - 4:12
**choice** [1] - 35:16
**chose** [3] - 34:14, 74:21, 75:10
**CHRISTOPHER** [1] - 2:11
**cities** [1] - 49:13
**Cities** [1] - 50:2
**City** [2] - 58:23, 59:10
**claim** [1] - 40:6
**Claimant** [1] - 1:9
**clarify** [1] - 33:17
**clear** [7] - 10:15, 20:14, 29:6, 36:1, 38:15, 38:16, 77:8
**click** [1] - 15:12
**clicks** [1] - 15:13
**clients** [2] - 8:12, 9:24
**closed** [1] - 59:13
**Coachella** [2] - 58:17, 62:12
**Code** [1] - 82:8
**colder** [1] - 79:5
**collaborate** [3] - 74:21, 75:5, 75:10
**collaborating** [2] - 74:5
**collect** [4] - 50:22, 51:1, 53:24, 60:13
**collected** [6] - 50:25, 55:18, 55:23, 56:11, 57:2, 61:12
**collecting** [3] - 52:6, 52:21,

56:20
**college** [3] - 48:11, 48:13, 48:14
**com** [5] - 6:22, 30:9, 30:11, 30:12, 42:14
**combination** [1] - 18:17
**coming** [2] - 21:7, 70:20
**comment** [1] - 22:10
**comments** [1] - 42:22
**commission** [3] - 45:8, 51:3, 51:7
**commitments** [1] - 22:25
**common** [2] - 28:5, 30:8
**communicate** [3] - 65:15, 77:17, 78:4
**communication** [5] - 70:15, 71:1, 71:3, 71:16, 79:4
**community** [1] - 48:14
**companies** [6] - 7:17, 8:2, 8:17, 15:19, 74:10, 80:7
**company** [25] - 5:19, 6:17, 6:22, 6:25, 7:3, 7:19, 7:21, 8:5, 8:6, 8:19, 9:7, 9:9, 9:14, 9:21, 9:22, 11:8, 14:20, 14:24, 17:7, 17:16, 18:12, 19:7, 19:12, 71:21, 72:3
**COMPANY** [2] - 1:8, 2:9
**company's** [1] - 80:12
**compile** [3] - 50:24, 55:6, 56:13
**compiling** [1] - 52:17
**complaint** [3] - 78:23, 79:8, 79:12
**completed** [1] - 32:25
**compliant** [1] - 70:21

**complimentary** [1] - 78:21
**computer** [1] - 6:10
**concept** [1] - 30:21
**concern** [1] - 65:13
**concerned** [5] - 5:4, 21:11, 63:16, 63:23, 64:13
**concerns** [1] - 64:22
**conclude** [1] - 68:14
**concluded** [1] - 41:17
**Conference** [1] - 82:12
**Confidential** [2] - 3:17, 3:20
**confirm** [1] - 53:22
**confirmed** [1] - 19:8
**conformance** [1] - 82:12
**confusing** [2] - 28:10, 78:11
**connection** [3] - 36:21, 37:9, 70:11
**consider** [1] - 47:6
**consisted** [1] - 70:13
**constantly** [2] - 15:21, 16:25
**consultant** [3] - 17:10, 19:15, 72:22
**consumer** [4] - 8:16, 14:12, 15:2, 34:2
**consuming** [1] - 5:4
**contact** [3] - 77:6, 77:22, 78:13
**contacting** [1] - 36:3
**contain** [1] - 37:21
**content** [34] - 13:24, 13:25, 14:2, 14:3, 14:7, 15:24, 16:3, 17:21, 17:22, 22:18, 27:13, 27:14, 27:20,

29:17, 30:22, 30:24, 31:7, 31:12, 32:23, 33:4, 33:5, 33:7, 33:15, 33:16, 33:21, 33:25, 34:1, 34:2, 34:25, 35:8, 35:9, 35:12, 35:16, 38:22
**contents** [2] - 12:8, 37:25
**context** [5] - 8:15, 11:15, 13:2, 15:4, 43:17
**continue** [2] - 17:12, 66:16
**continues** [1] - 58:3
**contracted** [1] - 38:6
**control** [9] - 14:22, 35:1, 35:11, 35:12, 35:16, 42:4, 42:8, 42:18
**controller** [3] - 61:23, 61:24, 61:25
**controlling** [1] - 42:6
**controls** [1] - 42:7
**convenient** [1] - 38:3
**Conversation** [1] - 65:5
**conversation** [3] - 21:8, 76:25, 77:1
**conversations** [4] - 23:19, 32:25, 65:9, 71:17
**convince** [1] - 33:13
**cool** [1] - 14:9
**copy** [1] - 36:12
**copying** [1] - 25:14
**core** [1] - 16:7
**corner** [2] - 36:14, 67:6
**Correct** [4] - 51:11, 51:19, 51:22, 52:9
**correct** [49] - 11:2, 26:13, 26:23, 26:24, 30:15, 30:16, 31:11, 31:16, 36:5, 36:22, 37:6,

37:7, 37:10, 37:11, 37:14, 37:24, 38:19, 38:22, 38:23, 39:9, 40:15, 41:1, 41:11, 41:19, 41:20, 42:4, 42:6, 42:10, 42:18, 42:19, 42:21, 43:11, 43:24, 44:17, 44:20, 44:21, 55:1, 56:17, 58:23, 64:12, 64:18, 69:24, 69:25, 72:19, 72:25, 73:20, 80:9, 81:1, 82:9
**correctly** [3] - 8:22, 22:22, 28:3
**cost** [2] - 21:5, 21:11
**counsel** [3] - 4:5, 34:18, 71:11
**COUNSEL** [1] - 2:1
**COUNTER** [1] - 2:3
**COUNTERCLAIMANT** [1] - 2:9
**counterdesignation** [1] - 68:16
**countless** [1] - 22:16
**COUNTY** [1] - 82:3
**couple** [4] - 22:6, 26:25, 36:1, 36:2
**course** [2] - 45:16, 72:10
**Court** [2] - 82:6, 82:20
**court** [2] - 12:15, 47:7
**COURT** [52] - 1:1, 1:23, 4:5, 4:9, 4:20, 5:7, 5:11, 5:14, 5:17, 5:20, 12:20, 16:9, 16:11, 20:6, 20:8, 21:16, 21:18, 26:3, 26:5, 35:20, 36:12, 36:15, 36:17, 39:15, 39:20, 39:22, 41:24, 42:1, 43:23, 43:25, 44:3, 45:24, 46:1, 46:5, 46:10,

46:14, 46:17, 47:6, 47:15, 68:15, 68:18, 68:22, 69:10, 69:12, 71:9, 71:12, 74:25, 79:14, 81:7, 81:9, 81:16, 82:6
**Court's** [1] - 5:5
**courthouse** [1] - 13:15
**COURTROOM** [3] - 5:22, 69:16, 81:15
**CPA** [1] - 66:6
**cranking** [1] - 21:3
**create** [2] - 33:25, 38:21
**created** [6] - 10:2, 31:8, 53:14, 53:15, 53:17, 80:24
**creating** [2] - 22:3, 31:12
**credible** [3] - 13:13, 13:20, 35:8
**critical** [1] - 12:24
**CRM** [2] - 7:5, 7:6
**CRM-related** [1] - 7:6
**cross** [3] - 35:20, 54:2, 79:14
**Cross** [2] - 3:5, 3:9
**CROSS** [2] - 35:22, 79:15
**Cross-Examination** [2] - 3:5, 3:9
**cross-examination** [2] - 35:20, 79:14
**CROSS-EXAMINATION** [2] - 35:22, 79:15
**cross-reference** [1] - 54:2
**CRR** [1] - 1:23
**CSR** [2] - 1:23, 82:20
**cumulative** [3] - 4:15, 4:19, 5:3
**current** [2] - 60:2, 60:4

**Curt** [1] - 68:5
**customer** [7] - 7:6, 8:8, 9:23, 16:5, 17:6, 28:24
**customers** [4] - 8:12, 15:18, 16:1, 18:13
**cut** [4] - 4:24, 55:23, 56:7, 56:9

**D**

**d/b/a** [2] - 9:10, 9:11
**date** [8] - 15:23, 20:13, 20:14, 21:21, 24:4, 36:19, 47:25, 57:7
**Date** [1] - 82:15
**dated** [3] - 37:2, 37:5, 40:4
**days** [2] - 11:23, 68:23
**deal** [2] - 11:9, 41:9
**dealing** [2] - 6:21, 8:2
**dealt** [1] - 7:4
**DEBBIE** [3] - 1:23, 82:5, 82:19
**Debbie** [1] - 82:20
**decade** [1] - 6:20
**decide** [2] - 12:11, 12:23
**decided** [3] - 9:7, 29:7, 81:3
**dedicate** [1] - 23:1
**deeply** [1] - 11:12
**DEFENDANT** [2] - 2:9, 3:4
**Defendant/ Counter** [1] - 1:9
**DEFENDANTS** [1] - 2:3
**Defendants** [1] - 1:6
**defense** [3] - 68:21, 68:24, 69:4
**DEFENSE** [1] - 5:21
**define** [1] - 41:5
**degree** [2] - 6:10, 48:19
**deliberately** [1] -

21:4
**delinquent** [1] - 59:23
**delivered** [1] - 19:19
**demand** [1] - 66:19
**department** [2] - 50:19, 78:13
**departments** [1] - 77:24
**deposition** [13] - 36:10, 41:22, 42:22, 43:21, 45:18, 46:3, 46:19, 47:2, 47:3, 47:7, 80:19, 80:22
**DEPUTY** [3] - 5:22, 69:16, 81:15
**described** [1] - 33:3
**detailed** [1] - 17:11
**determine** [1] - 56:8
**determined** [2] - 51:23, 69:1
**detour** [1] - 7:7
**detractor** [1] - 10:17
**development** [3] - 34:6, 70:5, 70:7
**DEVILLE** [2] - 1:4, 2:3
**Deville** [78] - 4:13, 11:7, 11:16, 17:24, 18:2, 18:17, 18:20, 18:22, 19:17, 23:6, 23:11, 23:22, 25:17, 25:19, 27:9, 27:12, 28:16, 28:21, 29:1, 29:7, 29:25, 32:5, 33:2, 33:18, 34:8, 34:23, 35:2, 36:3, 36:6, 36:20, 37:10, 40:15, 40:18, 42:17, 44:24, 45:2, 50:5, 50:9, 50:11, 51:14, 51:17, 52:14, 53:1, 54:11, 54:17, 54:19, 54:24, 54:25, 57:12, 58:7, 58:17, 59:3,

59:23, 61:21, 61:25, 63:18, 64:1, 64:12, 64:18, 64:24, 65:14, 66:1, 66:2, 66:5, 66:12, 66:15, 66:17, 67:1, 67:17, 67:25, 69:24, 70:1, 72:11, 75:9, 76:15, 77:10, 80:4, 81:3
**Deville's** [11] - 11:1, 16:15, 19:3, 41:19, 71:20, 72:2, 74:8, 75:22, 77:10, 79:20, 80:6
**Deville-related** [1] - 54:24
**Deville/11/740/ 355** [1] - 32:10
**dhinospaan@ yahoo.com** [1] - 1:25
**diagram** [4] - 29:20, 29:21, 30:17, 30:24
**dialogue** [1] - 74:12
**Diego** [3] - 2:13, 75:5, 79:21
**differed** [1] - 45:19
**difference** [1] - 27:19
**different** [5] - 9:15, 29:13, 45:17, 62:24, 73:15
**dimmer** [1] - 15:1
**DIRECT** [2] - 6:1, 69:19
**Direct** [2] - 3:4, 3:8
**directing** [1] - 77:23
**directly** [1] - 44:19
**director** [6] - 50:18, 50:20, 50:22, 70:5, 70:7, 73:16
**disagreed** [1] - 42:25
**discovery** [1] - 80:17
**discretion** [2] - 74:22, 75:18

**discuss** [5] - 21:6, 25:16, 25:18, 40:25, 60:24
**discussed** [2] - 10:16, 23:9
**discussion** [3] - 41:3, 66:11, 76:23
**discussions** [1] - 11:6
**disparaging** [1] - 27:10
**DISTRICT** [2] - 1:1, 1:2
**District** [2] - 82:6, 82:7
**disturbing** [2] - 76:11, 76:17
**DIVISION** [1] - 1:2
**division** [3] - 70:9, 70:17, 77:11
**doctor** [2] - 18:11, 35:3
**document** [8] - 31:21, 37:20, 39:4, 39:6, 39:8, 40:5, 44:11, 45:15
**documents** [4] - 31:21, 37:18, 40:4, 45:5
**dog** [1] - 6:23
**domain** [12] - 30:7, 30:9, 30:10, 30:11, 30:12, 30:14, 42:9, 42:11, 42:12, 42:15
**domains** [1] - 31:9
**done** [10] - 8:1, 17:7, 18:24, 19:10, 19:11, 19:15, 22:6, 22:21, 33:15, 36:4
**door** [1] - 62:5
**dot** [7] - 6:22, 30:9, 30:11, 30:12, 42:14
**dot-com** [5] - 6:22, 30:9, 30:11, 30:12, 42:14
**dot-edu** [1] - 30:9
**dot-org** [1] - 30:9

**DOUGLAS** [1] - 1:3
**down** [27] - 8:17, 12:15, 12:16, 14:18, 24:13, 24:15, 24:24, 25:1, 26:19, 27:20, 28:2, 31:7, 31:14, 31:21, 32:17, 43:10, 43:14, 43:17, 43:18, 45:10, 57:20, 68:19, 74:25, 76:6, 77:14, 81:10
**Draft** [3] - 3:17, 3:20, 20:3
**draft** [4] - 21:22, 21:24, 44:11, 45:11
**dramatically** [1] - 4:25
**Drayna** [5] - 10:7, 10:13, 19:2, 20:19, 44:23
**Drayna's** [1] - 20:22
**dream** [1] - 75:8
**Dreyer** [1] - 80:14
**drive** [1] - 8:17
**driving** [2] - 14:18, 76:15
**dropping** [1] - 76:9
**Duggan** [2] - 72:9, 72:18
**Duggan's** [2] - 72:20, 72:21
**During** [1] - 65:21
**during** [14] - 4:12, 42:22, 59:22, 64:10, 64:16, 64:19, 65:24, 67:20, 71:4, 72:24, 74:12, 74:17, 79:19, 80:19
**duties** [7] - 50:20, 51:12, 52:2, 60:11, 60:12, 60:17, 70:6

**E**

**e-mail** [23] - 20:1, 21:2, 22:14, 23:24, 25:14,

25:16, 26:10, 37:5, 37:13, 37:23, 38:5, 38:18, 39:2, 40:4, 43:1, 44:9, 44:11, 53:12, 56:4, 56:6, 60:21, 60:22, 65:3
**e-mailed** [1] - 61:14
**e-mails** [3] - 43:4, 71:17, 78:20
**early** [6] - 7:18, 10:9, 10:11, 11:23, 20:20, 36:2
**easily** [1] - 15:24
**EASTERN** [1] - 1:2
**edu** [1] - 30:9
**education** [1] - 68:2
**educational** [1] - 6:8
**effect** [2] - 27:25, 31:14
**effectively** [1] - 27:15
**effort** [1] - 44:22
**efforts** [6] - 15:15, 18:4, 23:13, 25:18, 26:18, 42:21
**either** [8] - 22:14, 60:22, 64:11, 64:17, 66:1, 66:11, 79:12, 80:12
**elected** [1] - 4:12
**element** [1] - 13:11
**elsewhere** [2] - 33:4, 33:16
**Email** [3] - 3:16, 3:19, 3:21
**employed** [1] - 27:12, 69:23
**employee** [2] - 54:14, 79:25
**employees** [3] - 67:2, 67:11, 67:14
**employer** [1] - 50:7
**encourage** [1] - 35:14
**end** [2] - 72:9, 77:1

**engage** [1] - 19:13
**engaged** [1] - 24:5
**engine** [20] - 7:1, 11:14, 11:18, 11:24, 12:3, 12:10, 14:3, 14:6, 14:11, 14:14, 15:4, 16:16, 18:6, 23:14, 24:14, 27:10, 33:19, 34:4, 34:7, 35:7
**engines** [6] - 12:6, 12:22, 13:11, 14:13, 15:23, 18:16
**enterprise** [1] - 7:16
**entire** [1] - 6:15
**entities** [3] - 16:15, 51:2, 67:17
**entitled** [2] - 34:8, 82:11
**entity** [7] - 8:19, 11:1, 35:9, 51:25, 52:4, 55:7, 55:9
**Eric** [4] - 23:16, 25:14, 25:16, 72:5
**escapes** [1] - 40:19
**ESQ** [6] - 2:5, 2:5, 2:6, 2:11, 2:11, 2:12
**essentially** [2] - 23:24, 33:3
**estate** [7] - 8:6, 8:14, 8:18, 49:22, 57:10, 58:12, 58:16
**Estate** [1] - 5:19
**ESTATE** [2] - 1:8, 2:9
**estates** [1] - 73:1
**Estates** [6] - 73:19, 75:4, 75:21, 79:7, 79:9, 81:2
**estimate** [1] - 65:11
**estimated** [1] - 21:5
**ET** [1] - 2:3
**et** [4] - 1:5, 12:6, 33:10, 43:15
**EVIDENCE** [1] - 3:15

**evidence** [4] - 5:1, 20:5, 21:15, 26:2
**exact** [1] - 43:17
**exactly** [2] - 32:12, 32:14
**EXAMINATION** [5] - 6:1, 35:22, 44:5, 69:19, 79:15
**Examination** [5] - 3:4, 3:5, 3:5, 3:8, 3:9
**examination** [2] - 35:20, 79:14
**example** [5] - 9:12, 13:8, 13:14, 33:9, 74:7
**examples** [1] - 74:4
**excel** [1] - 53:25
**exception** [1] - 7:25
**exchange** [4] - 21:1, 25:15, 25:19, 26:10
**exchanges** [1] - 22:14
**excited** [1] - 32:18
**excuse** [1] - 63:25
**exec** [1] - 8:2
**exercise** [2] - 19:15, 22:8
**exercises** [1] - 35:5
**Exhibit** [17] - 19:22, 19:25, 20:4, 20:9, 20:10, 21:14, 21:19, 25:7, 25:13, 26:6, 26:14, 36:24, 38:8, 38:24, 40:1, 40:10, 64:6
**exhibit** [2] - 27:3, 71:9
**EXHIBIT** [1] - 3:15
**EXHIBITS** [1] - 3:13
**existing** [1] - 78:1
**expect** [3] - 30:22, 60:5, 65:18
**expected** [2] - 22:22, 45:11
**expense** [1] - 33:22

**expenses** [5] - 33:20, 33:21, 34:6, 34:7
**experience** [5] - 6:14, 7:23, 8:1, 10:18, 15:10
**expert** [2] - 17:2, 35:4
**experts** [1] - 16:22
**explain** [4] - 7:23, 16:17, 40:7, 71:14
**explained** [1] - 16:2
**explanation** [2] - 45:4, 45:7
**explicitly** [1] - 46:21
**expressed** [1] - 65:14
**extensive** [1] - 32:8
**extent** [1] - 4:16
**extra** [1] - 33:16
**eye** [1] - 15:1
**eyes** [2] - 13:23, 33:22

# F

**Facebook** [3] - 32:3, 32:6, 35:14
**fact** [2] - 17:15, 19:9
**factor** [1] - 13:5
**factors** [1] - 22:6
**fair** [2] - 8:24, 14:4
**Fair** [1] - 53:5
**familiar** [4] - 72:14, 73:1, 73:3, 76:1
**fancy** [1] - 44:8
**far** [3] - 12:24, 77:8, 77:22
**fast** [2] - 12:18, 44:8
**favor** [1] - 38:11
**feasby** [1] - 47:15
**FEASBY** [26] - 2:10, 2:11, 4:6, 4:10, 5:6, 5:10, 46:3, 46:6, 46:15, 47:5, 47:16, 53:3, 53:1, 54:11, 54:18, 54:20, 54:25, 58:7, 58:18, 59:3, 59:23, 61:22,

68:14, 68:21, 79:13, 79:16, 81:6
**Feasby** [8] - 3:6, 3:9, 46:2, 46:7, 46:18, 47:4, 47:21, 68:20
**February** [1] - 10:10
**FEDERAL** [2] - 1:23, 82:5
**Federal** [1] - 82:20
**FedEx** [1] - 63:2
**FedEx'd** [1] - 61:15
**fee** [1] - 52:7
**fees** [21] - 50:25, 51:1, 52:21, 55:22, 56:2, 56:6, 56:11, 56:20, 57:2, 58:8, 59:24, 60:13, 61:12, 63:17, 63:18, 63:25, 64:1, 64:14, 64:17
**fees-collected** [2] - 50:25, 57:2
**felt** [6] - 10:23, 22:7, 24:11, 43:2, 76:18, 78:19
**few** [7] - 5:14, 15:11, 16:11, 17:1, 44:4, 64:25, 68:23
**figure** [6] - 18:8, 19:8, 29:21, 32:11, 51:3
**figured** [1] - 19:7
**figuring** [1] - 22:17
**FILEMON** [1] - 2:6
**fill** [2] - 53:10, 54:21
**filled** [2] - 62:11, 79:22
**final** [1] - 69:2
**finally** [1] - 36:4
**financials** [1] - 66:7
**Fine** [1] - 57:12
**fine** [20] - 29:24, 39:15, 50:9, 51:17, 52:14, 53:1, 54:11, 54:18, 54:20, 54:25, 58:7, 58:18, 59:3, 59:23, 61:22,

61:25, 66:1, 66:2, 66:5, 67:1
**FINE** [2] - 1:4, 2:3
**finish** [1] - 5:1
**first** [31] - 10:5, 10:6, 10:8, 11:15, 12:7, 12:22, 14:8, 15:1, 15:2, 15:8, 15:9, 15:11, 15:13, 18:1, 19:5, 19:7, 21:1, 22:10, 22:23, 27:3, 31:3, 36:6, 37:5, 38:21, 39:25, 40:3, 49:12, 51:16, 57:9, 73:15
**five** [1] - 81:14
**fix** [2] - 34:22, 34:24
**flag** [1] - 47:18
**flexibility** [1] - 22:11
**flip** [4] - 20:23, 26:25, 30:25, 31:18
**focus** [2] - 45:1, 73:21
**focused** [2] - 29:17, 33:4
**folks** [5] - 61:16, 75:21, 79:2, 79:7, 79:9
**follow** [9] - 23:24, 38:16, 39:22, 43:7, 56:6, 61:2, 61:9, 63:8, 81:13
**follow-up** [2] - 23:24, 39:22
**following** [3] - 26:16, 26:19, 70:23
**FOR** [2] - 2:3, 2:9
**foregoing** [1] - 82:9
**foremost** [1] - 16:22
**form** [4] - 8:3, 32:14, 53:14, 81:12
**formal** [3] - 11:10, 77:11
**format** [1] - 82:11
**Forsberg** [19] - 17:23, 23:17, 23:19, 24:2, 25:14, 26:18,

28:4, 30:6, 32:25, 33:1, 33:2, 41:15, 41:16, 42:3, 42:8, 42:17, 68:11, 72:6, 80:11
**forth** [5] - 21:1, 45:13, 53:22, 78:21, 79:4
**forward** [1] - 63:14
**forwarded** [1] - 75:9
**foundations** [1] - 10:3
**four** [4] - 9:7, 29:23, 30:4, 67:21
**FOURTH** [1] - 1:24
**fourth** [1] - 7:1
**frame** [7] - 10:10, 13:2, 17:24, 17:25, 20:18, 38:7, 67:20
**franchise** [14] - 50:23, 51:1, 52:7, 53:17, 54:24, 55:4, 57:13, 58:8, 58:20, 59:24, 60:13, 63:17, 63:25, 81:3
**franchisee** [6] - 10:24, 10:25, 54:24, 73:1, 75:15, 75:16
**franchisees** [5] - 29:1, 52:22, 56:1, 57:1, 74:18
**franchises** [9] - 53:7, 53:23, 55:19, 56:15, 64:1, 64:12, 64:18, 66:17, 79:21
**frankly** [1] - 16:7
**free** [3] - 21:11, 34:10, 74:15
**freeway** [1] - 76:22
**frequent** [1] - 79:5
**frequently** [2] - 13:25, 78:4
**Friday** [2] - 25:22, 28:13
**FRIDAY** [2] - 1:14, 4:1
**friend** [1] - 13:4
**friends** [2] -

13:6, 13:9
**front** [3] - 19:20, 20:15, 38:14
**full** [4] - 67:10, 67:13, 79:25
**full-time** [3] - 67:10, 79:25

## G

**G-r-e-g-o-r** [1] - 69:18
**gal** [1] - 72:4
**game** [3] - 12:4, 17:9, 17:21
**geeking** [1] - 28:12
**general** [1] - 40:11
**generally** [3] - 51:5, 70:6, 70:13
**generate** [3] - 16:2, 23:3, 35:9
**generated** [3] - 24:9, 35:1, 44:22
**generation** [2] - 14:3, 33:21
**generic** [1] - 43:17
**gentleman** [3] - 16:20, 72:5, 77:18
**gentlemen** [4] - 46:18, 68:22, 75:5, 81:11
**Geoff** [1] - 40:21
**given** [4] - 4:23, 13:1, 15:5, 43:18
**go-to** [1] - 19:14
**goal** [1] - 27:25
**Gooding** [6] - 23:12, 40:18, 73:3, 73:14, 75:13, 78:17
**Google** [11] - 7:2, 13:19, 14:1, 16:25, 18:6, 18:20, 18:23, 24:19, 32:7, 32:15, 32:16
**Google's** [1] - 13:23
**graduate** [3] - 48:9, 48:16, 48:21
**graduated** [3] - 6:12, 6:16, 48:14
**great** [2] - 13:15, 23:23
**Greg** [11] - 3:16,

3:19, 16:14, 16:20, 17:3, 19:13, 20:1, 25:14, 25:23, 25:24, 32:11
**GREGOR** [2] - 3:8, 69:15
**Gregor** [14] - 4:7, 68:1, 69:9, 69:10, 69:18, 69:21, 69:23, 70:25, 71:14, 74:25, 75:3, 76:1, 79:17, 81:9
**group** [2] - 7:3, 7:25
**grow** [1] - 78:2
**grown** [2] - 9:19, 9:24
**guess** [6] - 8:16, 9:8, 14:15, 15:17, 63:1, 64:3
**guidance** [2] - 11:8, 72:7
**guide** [1] - 47:17
**guy** [2] - 17:17, 38:6
**guys** [4] - 11:25, 15:10, 16:24, 28:12

## H

**half** [1] - 31:25
**hand** [1] - 71:15
**handled** [4] - 70:22, 72:6, 72:16, 78:8
**hard** [2] - 28:14, 31:24
**hater** [1] - 10:17
**head** [1] - 25:22
**heading** [1] - 38:25
**hear** [2] - 10:5, 46:16
**heard** [7] - 7:5, 9:5, 11:14, 13:5, 19:6, 46:20, 71:19
**held** [2] - 6:20, 82:10
**help** [10] - 11:8, 11:12, 17:5, 17:20, 17:21, 24:12, 32:23, 34:3, 71:3, 71:6
**helpful** [2] - 16:17, 33:5
**helping** [3] - 7:4,

11:15, 80:10
**Hempel** [1] - 68:5
**hereby** [1] - 82:7
**high** [5] - 1:6, 15:8, 18:1, 48:4, 48:7, 48:8
**highlight** [1] - 20:13
**highlighted** [1] - 20:16
**HINO** [3] - 1:23, 82:5, 82:19
**Hino** [1] - 82:20
**HINO-SPAAN** [3] - 1:23, 82:5, 82:19
**Hino-Spaan** [1] - 82:20
**hip** [1] - 9:8
**hired** [2] - 17:10, 25:24
**historically** [2] - 10:15, 10:22
**history** [4] - 10:21, 11:21, 19:10, 73:13
**hit** [1] - 18:5
**hold** [5] - 5:1, 6:10, 7:11, 49:1, 68:15
**holds** [1] - 8:20
**home** [2] - 18:10, 19:1
**homepage** [1] - 18:23
**homes** [22] - 50:9, 51:18, 52:14, 53:1, 54:11, 54:18, 54:20, 55:1, 57:12, 58:7, 58:18, 59:3, 59:23, 61:22, 62:1, 63:18, 66:1, 66:2, 66:5, 67:2, 73:1, 75:8
**HOMES** [2] - 1:4, 2:3
**Homes** [6] - 73:19, 75:4, 75:20, 79:7, 79:9, 81:2
**Honor** [36] - 4:6, 5:6, 5:13, 5:18, 20:4, 20:7, 21:14, 21:17, 26:2, 26:4, 35:18, 35:21, 36:9, 36:13, 39:13, 39:21,

39:24, 41:21, 43:20, 44:2, 44:4, 45:23, 45:25, 46:4, 46:7, 46:13, 47:5, 47:14, 68:17, 68:21, 69:8, 69:11, 71:7, 71:10, 79:13, 81:8
**HONORABLE** [1] - 1:3
**honors** [1] - 6:11
**hope** [1] - 8:7
**hopefully** [1] - 28:2
**hosted** [1] - 31:8
**hour** [1] - 4:22
**hours** [1] - 22:17
**housekeeping** [1] - 68:23
**human** [1] - 14:8
**humanly** [1] - 47:13

## I

**icon** [1] - 7:10
**ideally** [1] - 15:9
**ideas** [3] - 74:4, 74:5, 74:11
**identified** [3] - 39:8, 72:13, 80:10
**identifies** [1] - 38:19
**identify** [1] - 73:24
**II** [1] - 81:18
**image** [1] - 27:13
**immediately** [1] - 19:5
**impact** [1] - 21:10
**impacted** [1] - 27:10
**implying** [1] - 38:4
**important** [8] - 10:20, 13:25, 14:2, 14:15, 16:23, 22:8, 22:24, 32:7
**impossible** [2] - 43:9, 43:13
**improve** [2] - 17:12, 24:19
**IN** [1] - 3:15
**Inc** [1] - 58:17
**INC** [2] - 2:3,

2:10
**include** [3] - 25:22, 56:1, 75:21
**included** [4] - 33:1, 68:17, 68:18, 72:4
**including** [1] - 51:2
**increase** [1] - 43:3
**increasing** [2] - 27:20, 43:6
**independent** [1] - 8:5
**Indian** [2] - 58:23, 59:16
**indicate** [1] - 65:17
**indicated** [1] - 4:25
**indication** [1] - 65:22
**Indio** [1] - 58:25
**individual** [1] - 15:20
**information** [3] - 52:18, 54:18, 56:14
**infospace** [1] - 7:1
**InfoSpace** [1] - 16:21
**initial** [1] - 20:2
**input** [1] - 62:15
**insisted** [2] - 41:3, 41:5
**insofar** [1] - 47:6
**instances** [1] - 75:4
**instructed** [1] - 47:11
**intellectual** [1] - 7:9
**interactions** [4] - 76:4, 76:7, 76:12, 77:13
**interested** [1] - 75:11
**Internet** [7] - 6:21, 7:15, 7:21, 7:22, 7:24, 8:3, 11:23
**interstate** [1] - 14:19
**intervening** [1] - 39:10
**introduced** [2] - 72:9, 78:14
**involved** [4] -

17:25, 43:2, 73:25, 76:8
**involving** [1] - 75:4
**Irvine** [1] - 2:7
**issue** [4] - 23:20, 24:1, 44:23, 77:24
**issues** [5] - 4:13, 4:14, 4:18, 78:8, 78:20
**IT** [1] - 72:6
**item** [3] - 40:10, 71:8, 71:15

## J

**Jacobi** [1] - 40:21
**JAMES** [1] - 2:5
**JEFFREY** [1] - 2:11
**job** [13] - 7:3, 7:11, 15:25, 34:13, 42:24, 50:17, 50:20, 51:12, 52:2, 52:13, 70:6, 70:23, 74:1
**jobs** [1] - 6:20
**John** [13] - 13:10, 20:12, 21:20, 25:8, 25:12, 26:8, 26:15, 29:20, 31:3, 38:11, 40:2, 44:8
**JOHN** [1] - 2:12
**john** [1] - 2:16
**Johnson** [6] - 23:12, 40:18, 73:5, 73:16, 75:12, 78:18
**join** [1] - 9:16
**joined** [4] - 9:17, 9:19, 9:20, 15:14
**joint** [1] - 74:9
**JUDGE** [1] - 1:3
**Judicial** [1] - 82:12
**juice** [1] - 13:21
**July** [9] - 47:3, 58:1, 59:8, 59:17, 60:2, 63:19, 64:2, 82:15
**JULY** [2] - 1:14, 4:1
**June** [2] - 59:11, 59:14
**jury** [11] - 4:4,

5:16, 6:8, 6:13, 9:18, 26:8, 29:22, 46:4, 46:12, 71:19, 72:13
**JURY** [1] - 1:14
**jury's** [1] - 5:5

**K**

**keep** [1] - 40:2
**keeping** [1] - 66:25
**KEVIN** [1] - 2:5
**key** [2] - 18:5, 43:18
**kick** [1] - 81:3
**kind** [4] - 11:18, 24:16, 34:1, 74:2
**kinds** [1] - 10:20
**KIRK** [2] - 3:8, 69:15
**Kirk** [3] - 68:1, 69:9, 69:18
**knowledge** [1] - 77:6
**known** [3] - 17:15, 72:15, 73:8
**knows** [3] - 13:19, 26:8, 35:9

**L**

**L.A** [3] - 13:16, 13:19, 35:15
**ladies** [3] - 46:18, 68:22, 81:11
**Laguna** [1] - 57:20
**Lance** [1] - 77:19
**lance** [2] - 77:20, 78:12
**Lange** [3] - 55:13, 55:14, 62:6
**language** [1] - 76:20
**lapse** [1] - 22:21
**Laramie** [1] - 48:15
**large** [1] - 9:3
**largest** [1] - 7:1
**last** [7] - 5:23, 6:20, 7:12, 21:21, 34:20, 69:17, 69:18
**late** [3] - 8:6, 10:8, 20:19

**lawyers** [2] - 46:23, 47:11
**learn** [3] - 13:18, 18:15, 24:5
**learned** [2] - 14:9, 19:10
**least** [4] - 35:1, 45:8, 59:10, 78:7
**led** [2] - 12:4, 24:2
**left** [5] - 4:22, 31:25, 57:16, 72:10
**less** [3] - 4:22, 18:19, 79:5
**level** [13] - 8:16, 30:7, 30:8, 30:10, 30:11, 30:12, 30:14, 42:9, 42:11, 42:12, 42:15
**liability** [1] - 8:20
**liaison** [2] - 70:16, 74:2
**licenses** [1] - 49:2
**lieu** [1] - 47:7
**light** [1] - 14:24
**limits** [1] - 5:2
**line** [1] - 32:22
**Line** [12] - 36:10, 36:11, 41:22, 41:23, 43:21, 43:22, 47:19, 53:4, 55:17, 57:4, 60:10, 66:10
**lines** [2] - 36:16, 37:8
**link** [4] - 28:8, 29:18, 30:17, 35:13
**linkedin** [1] - 32:3
**LinkedIn** [4] - 32:11, 32:12, 32:15, 35:14
**list** [4] - 4:8, 15:6, 15:8, 18:1
**listed** [4] - 32:3, 57:19, 58:12, 58:16
**listening** [1] - 76:20
**listings** [1] - 75:19
**lists** [1] - 58:22
**live** [1] - 47:8
**LLC** [1] - 9:11
**LLP** [1] - 2:4

**located** [2] - 43:19, 49:15
**locations** [1] - 75:22
**log** [7] - 70:15, 71:1, 71:3, 71:16, 74:13, 80:16, 80:24
**logo** [1] - 8:18
**longstanding** [1] - 77:18
**look** [22] - 12:9, 15:12, 18:7, 18:8, 19:20, 25:10, 27:6, 28:18, 29:18, 31:3, 32:2, 32:9, 36:24, 38:8, 38:24, 39:19, 44:23, 57:15, 57:23, 58:10, 58:14, 74:13
**looked** [1] - 12:25
**looking** [4] - 19:2, 30:17, 33:21, 38:17
**looks** [9] - 20:2, 21:22, 26:11, 26:14, 26:16, 26:18, 57:25, 58:11, 58:15
**LOS** [1] - 82:3

**M**

**magazine** [1] - 75:8
**MAGISTRATE** [1] - 1:3
**mail** [23] - 20:1, 21:2, 22:14, 23:24, 25:14, 25:16, 26:10, 37:5, 37:13, 37:23, 38:5, 38:18, 39:2, 40:4, 43:1, 44:9, 44:11, 53:12, 56:4, 56:6, 60:21, 60:22, 65:3
**mailed** [1] - 61:14
**mails** [3] - 43:4, 71:17, 78:20
**main** [3] - 30:21, 58:23, 77:22
**majority** [3] - 15:12, 24:25, 29:4
**management** [1]

**- 7:6
management-related** [1] - 7:6
**manager** [4] - 73:14, 73:17, 79:20, 79:22
**managers** [1] - 60:19
**March** [2] - 10:10, 10:11
**Marie** [2] - 62:2, 62:13
**Mark** [1] - 80:14
**market** [3] - 6:18, 9:13, 19:18
**marketing** [7] - 7:8, 25:23, 25:25, 33:6, 70:21, 72:16, 74:18
**Martin** [4] - 72:8, 72:18, 72:20, 72:21
**material** [1] - 45:20
**matter** [3] - 14:17, 68:23, 82:11
**McCORMICK** [1] - 1:3
**mean** [8] - 8:15, 15:8, 15:9, 22:16, 33:24, 35:11, 75:17, 76:11
**meant** [2] - 23:1, 24:7
**media** [3] - 72:9, 72:21, 72:22
**meet** [2] - 23:24, 74:8
**meeting** [11] - 23:5, 23:9, 23:12, 23:16, 23:21, 36:7, 40:15, 40:17, 40:24, 40:25, 41:3
**members** [1] - 40:15
**memory** [2] - 71:3, 71:8
**mention** [2] - 15:16, 68:25
**mentioned** [7] - 9:23, 20:19, 23:21, 24:17, 51:7, 52:3, 74:1
**Mesa** [1] - 57:20
**mess** [1] - 29:23
**Messrs** [2] - 3:6, 47:21
**met** [2] - 23:23,

**36:6
metasearch** [1] - 6:23
**metro** [2] - 49:13, 50:2
**Michael** [1] - 2:16
**Microsoft** [4] - 7:2, 7:14, 7:17, 7:18
**mid** [2] - 4:24, 7:20
**middle** [1] - 68:24
**might** [10] - 7:8, 10:11, 12:18, 13:4, 21:12, 22:5, 31:17, 66:12, 70:20, 74:4
**Mike** [1] - 76:1
**million** [2] - 14:16, 19:15
**millions** [1] - 18:7
**mind** [2] - 22:4, 38:18
**minutes** [6] - 5:14, 16:11, 36:1, 77:4, 81:14, 81:16
**missing** [1] - 39:12
**mistake** [1] - 30:8
**mitigate** [1] - 24:12
**moment** [3] - 16:13, 28:20, 42:1
**money** [2] - 33:24, 34:12
**monotone** [1] - 47:13
**month** [7] - 22:22, 61:13, 62:9, 62:21, 63:6, 64:10, 78:7
**monthlies** [1] - 64:3
**monthly** [17] - 50:23, 52:6, 53:5, 53:6, 53:10, 53:11, 53:13, 54:6, 55:18, 55:24, 58:3, 61:17, 64:9, 68:7, 68:8, 68:10, 70:23
**months** [2] - 39:10, 45:10

**morning** [8] - 6:3, 6:4, 35:24, 35:25, 69:21, 79:17, 79:18, 81:11
**morrow** [1] - 21:6
**mortgage** [2] - 49:13, 50:3
**mortgages** [1] - 49:25
**most** [2] - 13:25, 18:18
**mostly** [1] - 6:20
**move** [8] - 20:4, 21:14, 26:2, 28:7, 49:4, 49:6, 49:8, 57:4
**moved** [3] - 49:7, 49:12, 49:21
**movie** [2] - 13:8, 13:9
**movies** [2] - 12:2, 13:10
**moving** [1] - 16:23
**MoxiWorks** [4] - 9:5, 9:12, 9:14
**moxiworks.com** [1] - 9:12
**MR** [78] - 4:6, 4:10, 5:6, 5:10, 5:13, 5:18, 6:2, 16:13, 19:24, 20:4, 20:7, 20:10, 20:12, 21:14, 21:17, 21:20, 26:4, 26:7, 35:18, 35:21, 35:23, 36:9, 36:13, 36:16, 36:19, 39:13, 39:19, 39:21, 39:25, 41:21, 41:25, 42:3, 43:20, 43:24, 44:2, 44:4, 44:6, 45:23, 45:25, 46:3, 46:6, 46:7, 46:13, 46:15, 47:5, 47:14, 47:16, 53:3, 55:15, 55:16, 55:17, 57:4, 57:5, 57:6, 60:8, 60:9, 60:10, 64:5, 66:8, 66:9, 66:10, 66:22, 66:23, 68:14, 68:17, 68:21,

69:8, 69:11, 69:13, 69:20, 71:7, 71:10, 71:14, 75:3, 79:13, 79:16, 81:6, 81:8
**MSR** [3] - 54:22, 56:6, 60:19
**MULCAHY** [2] - 2:4, 2:5
**multi** [1] - 22:22
**multi-month** [1] - 22:22

**N**

**name** [21] - 5:23, 9:9, 9:10, 9:14, 9:15, 18:14, 18:19, 40:19, 45:17, 47:22, 57:16, 68:4, 69:17, 70:21, 72:1, 72:4, 72:5, 72:6, 77:19
**name's** [1] - 69:18
**names** [4] - 18:22, 18:24, 40:20, 72:13
**nature** [1] - 5:3
**necessary** [1] - 5:2
**need** [5] - 8:8, 31:8, 39:16, 46:12, 74:13
**needed** [4] - 22:8, 43:2, 61:11, 79:11
**needle** [2] - 7:7, 8:1
**needs** [6] - 72:8, 72:9, 74:3, 74:4, 77:22, 78:6
**nefarious** [1] - 32:13
**neglected** [2] - 68:25, 69:3
**never** [7] - 31:14, 77:7, 77:11, 77:12, 78:22, 79:8, 79:12
**new** [5] - 17:17, 25:22, 40:25, 45:15, 78:1
**news** [2] - 24:6, 33:10
**newspapers** [1] - 33:10

**next** [12] - 5:17, 21:24, 31:17, 31:20, 46:2, 50:3, 56:19, 59:16, 59:21, 62:5, 63:2, 69:14
**night** [1] - 21:23
**Niguel** [1] - 57:21
**none** [2] - 39:7, 45:25
**Northwest** [1] - 6:18
**note** [1] - 23:22
**noted** [1] - 5:7
**nothing** [3] - 21:9, 21:11, 32:4
**notified** [1] - 77:7
**November** [1] - 81:4
**nowhere** [2] - 37:13, 37:23
**nuance** [1] - 11:20
**number** [3] - 7:16, 35:11, 58:22
**numbers** [1] - 62:18

**O**

**Oaks** [1] - 49:17
**oath** [1] - 46:22
**OB** [1] - 40:21
**objection** [4] - 5:7, 20:6, 21:16, 26:3
**objective** [2] - 14:14, 15:7
**obligated** [1] - 29:3
**obviously** [2] - 10:20, 35:16
**October** [6] - 25:15, 26:12, 32:24, 40:5, 44:17, 79:3
**odd** [1] - 77:2
**OF** [6] - 1:2, 1:13, 2:1, 82:1, 82:3, 82:4
**offending** [1] - 27:15
**offer** [1] - 79:23
**office** [14] - 49:18, 57:16, 59:13, 60:19, 62:4, 63:2, 70:5,

70:7, 74:8, 74:23, 75:19, 76:24, 79:19, 80:5
**offices** [7] - 57:19, 58:22, 59:2, 70:19, 74:9, 77:25, 78:2
**Official** [1] - 82:20
**official** [1] - 9:10
**OFFICIAL** [3] - 1:23, 82:1, 82:5
**often** [1] - 19:1
**once** [2] - 78:7
**one** [39] - 4:16, 7:17, 9:2, 14:21, 15:16, 15:22, 16:22, 17:17, 18:25, 29:1, 31:21, 32:9, 33:9, 34:9, 38:12, 42:7, 44:19, 46:6, 51:14, 51:17, 51:24, 52:4, 55:8, 56:15, 59:16, 60:12, 64:14, 67:16, 71:21, 73:18, 74:7, 75:7, 75:15, 76:9, 77:3, 78:12, 79:20, 80:2
**ongoing** [1] - 28:25
**online** [1] - 27:13
**oOo** [1] - 81:19
**open** [2] - 70:19, 77:2
**opened** [3] - 54:25, 55:4, 59:3
**opening** [2] - 76:24, 77:25
**operate** [2] - 9:13, 15:18, 29:12
**operated** [3] - 15:17, 28:16, 32:5
**opinion** [4] - 13:9, 22:9, 35:1, 79:2
**opinions** [1] - 81:12
**opportunities** [1] - 74:20
**opportunity** [2] - 40:8, 69:5
**optimization** [11] - 11:14, 11:18, 14:4, 14:7,

14:14, 16:16, 23:14, 24:15, 33:20, 34:7, 35:7
**OR** [1] - 3:15
**order** [5] - 25:18, 28:19, 31:6, 32:11, 60:16
**org** [2] - 30:9
**ourselves** [1] - 16:5
**out-rate** [1] - 27:14
**outlined** [1] - 45:12
**output** [1] - 22:11
**outrank** [1] - 27:25
**outside** [2] - 28:16, 34:18
**outstanding** [6] - 60:13, 60:24, 61:10, 61:21, 63:24, 63:25, 64:23, 65:19
**overnight** [1] - 61:11
**overruled** [1] - 5:8
**owed** [1] - 60:14
**owing** [3] - 60:5, 62:10, 63:18
**own** [6] - 6:22, 14:22, 15:10, 15:15, 18:4, 24:19, 29:7, 30:22, 33:15, 45:8, 62:15
**owned** [1] - 70:9
**owner** [6] - 61:9, 73:15, 74:22, 75:9, 75:15, 75:16
**owner's** [2] - 72:12, 75:17
**owners** [21] - 50:24, 52:11, 53:17, 53:25, 54:8, 60:18, 62:25, 64:13, 70:17, 70:24, 71:18, 73:11, 73:12, 74:2, 74:5, 74:21, 75:4, 77:25, 78:1, 79:23

**P**

**PAGE** [1] - 3:3

**page** [31] - 12:9, 12:10, 12:11, 12:22, 12:23, 13:14, 13:17, 15:8, 15:9, 15:11, 15:13, 18:1, 19:1, 27:3, 28:7, 29:18, 31:3, 31:17, 31:20, 32:6, 36:10, 36:16, 39:25, 40:3, 47:18, 57:9, 58:14, 59:21, 75:11, 82:11
**Page** [19] - 3:7, 26:14, 27:3, 27:16, 30:25, 31:20, 38:10, 38:13, 41:22, 41:23, 47:16, 47:19, 53:3, 55:15, 57:4, 58:10, 60:8, 66:8, 66:22
**Pages** [1] - 43:15
**pages** [10] - 12:1, 12:2, 12:5, 24:18, 28:7, 29:18, 31:8, 32:22, 43:21, 44:9
**paid** [3] - 51:24, 65:23, 80:2
**Paige** [7] - 68:1, 72:5, 72:14, 72:15, 72:16, 74:19
**Palm** [4] - 49:20, 50:4, 50:12, 58:25
**paperwork** [1] - 78:3
**paragraph** [1] - 31:4
**Park** [1] - 2:6
**parlance** [1] - 28:5
**part** [14] - 8:25, 9:3, 9:4, 16:7, 17:21, 17:22, 28:25, 29:2, 30:12, 33:20, 45:13, 74:1, 78:2, 80:3
**participated** [1] - 70:8
**particularly** [1] - 18:22
**partner** [1] -

40:19
**party** [2] - 43:4, 46:23
**past** [1] - 67:21
**Patrick** [5] - 3:6, 47:3, 47:20, 47:24, 72:7
**Paul** [1] - 10:7
**pause** [1] - 28:20
**pay** [4] - 16:24, 29:1, 29:2, 34:15
**payable** [1] - 62:14
**paycheck** [2] - 51:14, 80:2
**paychecks** [1] - 51:15
**paying** [4] - 29:4, 34:11, 58:7, 63:6
**payment** [9] - 61:9, 61:14, 61:15, 61:16, 62:19, 62:20, 63:9, 65:18, 66:19
**payments** [1] - 64:11
**payroll** [12] - 51:3, 52:25, 67:4, 67:5, 67:8, 67:23, 68:3, 68:6, 68:8, 68:11, 80:6, 80:12
**people** [12] - 7:10, 12:4, 15:11, 18:14, 19:7, 24:25, 25:1, 67:19, 72:1, 72:23, 73:18, 80:10
**people's** [3] - 22:18, 28:2, 33:8
**per** [1] - 43:1
**percent** [4] - 8:13, 12:20, 23:1, 40:22
**percentage** [1] - 51:9
**PEREZ** [1] - 2:10
**performed** [1] - 52:3
**period** [10] - 58:8, 64:10, 70:2, 71:5, 72:24, 73:21, 73:22, 74:17, 77:3
**person** [13] - 13:6, 17:3, 18:12,

22:9, 47:2, 47:10, 55:9, 55:11, 65:6, 65:7, 68:2, 71:21

**person's** [1] - 68:4

**personally** [9] - 17:16, 25:6, 29:7, 37:25, 38:5, 43:3, 43:6, 73:25, 75:25

**perspective** [2] - 72:12, 72:17

**Phase** [2] - 21:4, 39:1

**phase** [1] - 38:21

**phases** [3] - 21:8, 38:19, 45:13

**PHIL** [1] - 2:6

**phone** [7] - 11:11, 41:16, 60:22, 65:5, 71:17, 76:10, 76:13

**phonetic** [1] - 80:14

**phonetic)** [1] - 77:19

**pick** [1] - 22:7

**picking** [1] - 76:8

**picture** [2] - 9:18, 78:5

**pitch** [1] - 74:10

**place** [4] - 13:18, 14:8, 30:18, 47:9

**placed** [6] - 16:3, 33:8, 33:11, 33:16, 35:12, 46:22

**places** [1] - 31:13

**plaintiff** [3] - 69:1, 69:3, 69:5

**plaintiff's** [2] - 4:8, 68:24

**PLAINTIFF'S** [1] - 69:15

**PLAINTIFFS** [2] - 2:3, 3:8

**plaintiffs** [3] - 4:12, 4:22, 69:8

**Plaintiffs/ Counter** [1] - 1:6

**plan** [4] - 38:21, 41:9, 41:12, 41:13

**planning** [3] - 21:5, 26:10, 41:7

**play** [3] - 36:9, 41:21, 43:20

**played** [3] - 36:18, 42:2, 44:1

**Plaza** [1] - 2:6

**point** [16] - 7:17, 16:4, 18:18, 25:24, 28:18, 30:3, 30:21, 30:23, 32:20, 33:11, 39:3, 39:12, 76:21, 77:5, 78:14, 78:15

**pointing** [5] - 12:25, 14:2, 14:5, 22:17, 30:18

**pointless** [1] - 41:13

**points** [3] - 13:17, 32:6, 32:16

**portion** [1] - 51:24

**Portola** [1] - 58:25

**position** [3] - 7:21, 43:8, 43:13

**positive** [1] - 27:13

**possible** [2] - 17:19, 47:6

**possibly** [3] - 15:7, 31:25, 71:17

**practice** [1] - 61:17

**prepare** [1] - 16:15

**prepared** [3] - 16:14, 55:20, 56:25

**prescription** [1] - 35:4

**presence** [2] - 4:4, 5:16

**PRESENT** [1] - 2:15

**present** [3] - 9:19, 46:19, 47:9

**presented** [2] - 37:20, 47:7

**pretend** [1] - 46:11

**prettier** [1] - 24:21

**pretty** [4] - 10:2, 18:1, 70:21, 70:23

**primarily** [1] -

70:16, 72:22

**primary** [2] - 40:25, 41:8

**problem** [20] - 10:16, 10:22, 11:9, 11:17, 18:2, 18:3, 18:21, 19:3, 19:9, 24:12, 27:6, 30:23, 32:23, 34:22, 38:25, 39:4, 44:14, 47:14, 75:14, 75:24

**problems** [1] - 70:19

**proceedings** [2] - 81:17, 82:10

**process** [5] - 15:21, 22:22, 56:19, 78:2

**produce** [4] - 8:7, 11:10, 13:24, 80:22

**produced** [2] - 19:18, 80:16

**producing** [1] - 33:4

**production** [1] - 54:21

**productive** [1] - 27:13

**profanity** [1] - 76:18

**professional** [1] - 49:2

**profile** [1] - 31:7, 32:12

**profiles** [1] - 22:18

**program** [2] - 28:22, 81:4

**programatically** [1] - 12:8

**progress** [2] - 4:23, 24:7

**project** [1] - 23:2

**projections** [1] - 66:1

**projects** [1] - 22:25

**promote** [1] - 38:22

**prompt** [2] - 61:2, 63:11

**proper** [2] - 33:22, 77:23

**properly** [1] - 79:7

**properties** [1] - 29:25

**property** [1] - 7:9

**proposal** [7] - 20:2, 21:12, 22:26, 26:19, 26:22, 27:1, 45:12

**Proposal** [2] - 3:17, 3:20, 20:3

**propose** [1] - 21:4

**proposed** [1] - 21:8

**provide** [13] - 8:23, 8:24, 11:8, 16:6, 29:11, 29:13, 29:15, 56:25, 62:18, 70:10, 71:7, 72:1, 80:4

**provided** [9] - 4:11, 34:10, 52:18, 53:23, 54:3, 72:24, 74:18, 74:20, 78:22

**provider** [5] - 11:24, 34:14, 71:18, 75:14, 77:9

**providing** [8] - 29:9, 67:2, 71:4, 71:21, 73:19, 73:25, 81:2, 81:5

**prude** [1] - 76:19

**publication** [1] - 75:19

**purpose** [4] - 30:24, 33:6, 40:25, 41:8

**pursuant** [1] - 82:8

**push** [4] - 25:1, 31:6, 43:9, 43:14

**pushes** [1] - 27:15

**pushing** [8] - 24:13, 24:15, 24:23, 27:19, 28:2, 31:14, 43:17, 43:18

**put** [17] - 4:19, 10:17, 13:2, 14:7, 20:12, 23:25, 26:8, 26:15, 30:22, 32:12, 32:15, 32:23, 33:12, 35:15, 39:16, 44:9, 62:13

**putting** [3] - 14:20, 31:13, 33:15

**Q**

**Q1** [1] - 20:19

**Q2** [1] - 20:20

**quadrupled** [1] - 10:1

**quality** [3] - 22:11, 23:3, 31:8

**quarter** [2] - 10:9

**questions** [13] - 21:24, 35:19, 39:14, 39:23, 44:2, 45:23, 46:23, 46:25, 47:11, 47:12, 77:25, 79:13, 81:6

**QuickBooks** [2] - 62:14, 62:16

**Quinta** [1] - 58:25

**quite** [3] - 39:3, 43:7, 73:8

**R**

**raise** [2] - 4:5, 28:19

**ran** [4] - 6:25, 7:7, 16:21, 28:22

**range** [2] - 10:12, 70:18

**ranking** [2] - 28:7, 29:18

**rarely** [1] - 27:16

**rate** [1] - 27:14

**re** [3] - 3:17, 3:19, 3:22

**reach** [6] - 25:17, 61:15, 61:20, 62:3, 62:7, 63:13

**reached** [2] - 20:19, 36:20

**reaching** [1] - 62:17

**read** [10] - 3:6, 12:8, 12:22, 14:8, 28:8, 28:14, 29:22, 46:8, 47:20

**readily** [1] - 7:5

**reading** [2] - 47:10, 47:12

**Reading** [6] -

53:4, 55:17, 57:6, 60:10, 66:10, 66:24

**ready** [1] - 5:13

**Real** [1] - 5:18

**real** [9] - 8:6, 8:13, 8:18, 27:25, 44:8, 49:22, 57:10, 58:12, 58:16

**REAL** [2] - 1:8, 2:9

**reality** [1] - 4:20

**realize** [1] - 45:10

**really** [12] - 7:25, 12:10, 13:10, 13:18, 13:24, 14:11, 14:23, 15:21, 18:18, 29:15, 29:17, 78:13

**REALTIME** [1] - 82:5

**realtor.com** [1] - 32:4

**reasons** [1] - 29:6

**rebuttal** [3] - 4:7, 4:14, 69:6

**receive** [5] - 51:14, 54:10, 64:9, 66:16, 66:19

**received** [15] - 20:8, 20:9, 21:18, 21:19, 26:5, 26:6, 51:16, 55:25, 56:14, 56:22, 64:3, 76:16, 78:22, 79:8, 79:12

**receiving** [4] - 44:10, 44:16, 64:11, 64:17

**recent** [1] - 34:20

**recess** [1] - 81:12

**Recess** [1] - 5:15

**recognize** [1] - 59:2

**recollection** [3] - 10:8, 10:13, 58:6

**recommendation** [2] - 33:22, 45:14

**recommendations** [11] - 11:11,

11:12, 16:6, 22:4, 24:8, 24:10, 29:16, 29:17, 31:1, 32:21, 33:9
**reconcile** [1] - 55:22
**record** [5] - 5:23, 46:8, 47:23, 64:5, 69:17
**recorded** [1] - 46:25
**recounted** [1] - 10:21
**recross** [2] - 45:24, 81:7
**Redirect** [1] - 3:5
**redirect** [1] - 44:3
**REDIRECT** [1] - 44:5
**refer** [4] - 25:2, 25:3, 42:11, 64:8
**reference** [5] - 9:5, 24:13, 31:12, 37:13, 54:2
**referenced** [3] - 37:24, 70:25, 80:19
**referencing** [1] - 76:14
**referred** [2] - 25:4, 42:9
**referring** [3] - 11:1, 53:19, 64:6
**reflect** [1] - 59:7
**reflected** [1] - 60:6
**reflects** [1] - 59:6
**refresh** [2] - 71:3, 71:8
**regard** [3] - 4:6, 52:2, 52:13
**regarding** [7] - 4:11, 4:13, 4:14, 4:17, 4:18, 41:4, 66:12
**regards** [4] - 70:17, 74:6, 76:24, 77:23
**region** [1] - 74:18
**regular** [1] - 74:3
**regularly** [1] - 77:17
**regulations** [1] - 82:12
**reimbursed** [1] - 33:23

**reimbursement** [2] - 33:19, 34:5
**REJECTED** [1] - 3:15
**relate** [2] - 11:21, 44:13
**related** [7] - 7:6, 17:13, 19:16, 52:18, 54:19, 54:24
**relates** [2] - 7:24, 44:19
**relation** [1] - 7:6
**relationship** [10] - 28:24, 28:25, 29:2, 66:14, 73:15, 77:8, 77:18, 78:9, 78:17, 79:2
**relatively** [1] - 9:4
**relevant** [1] - 18:18
**relies** [1] - 34:25
**remember** [3] - 55:12, 65:8, 68:4
**renamed** [1] - 9:9
**rep** [1] - 4:11
**repeat** [1] - 43:12
**reply** [1] - 15:20
**report** [18] - 11:10, 16:14, 16:16, 17:11, 17:13, 19:19, 22:3, 24:8, 27:24, 32:24, 33:2, 34:24, 44:16, 45:1, 53:11, 53:13, 55:24, 56:16
**reported** [5] - 36:18, 42:2, 44:1, 81:17, 82:10
**REPORTER** [3] - 1:23, 82:1, 82:6
**reporter** [1] - 12:15
**Reporter** [1] - 82:20
**REPORTER'S** [1] - 1:13
**reports** [19] - 44:22, 50:23, 52:6, 52:8, 53:6, 53:23, 53:24, 54:3, 54:10, 54:16, 54:18, 54:21, 55:6,

55:18, 55:25, 60:19, 62:11
**representative** [4] - 2:16, 63:15, 63:22, 71:22
**represents** [1] - 9:2
**request** [6] - 11:7, 11:10, 37:12, 62:19, 70:22, 75:9
**requested** [1] - 79:24
**requests** [7] - 70:18, 70:19, 71:18, 72:17, 74:2
**research** [6] - 22:16, 22:19, 31:23, 32:8, 32:20, 38:21
**researched** [1] - 11:12
**residential** [1] - 8:13
**resource** [4] - 19:14, 22:7, 22:20, 24:1
**resources** [2] - 23:25, 24:5
**respect** [2] - 41:18, 45:20
**respond** [1] - 21:23
**response** [3] - 25:19, 46:9, 75:11
**responsibilitie s** [1] - 80:3
**responsible** [4] - 8:21, 55:9, 66:5, 66:25
**restaurants** [1] - 13:16
**rested** [3] - 69:3, 69:4
**rests** [1] - 68:21
**result** [4] - 15:6, 19:1, 20:21, 39:11
**results** [13] - 14:16, 15:11, 17:25, 24:24, 24:25, 25:1, 27:10, 27:11, 27:15, 28:2, 31:7, 43:10, 43:15
**returned** [1] - 17:25
**revenue** [1] -

10:1
**review** [2] - 13:8, 20:3
**reviewed** [1] - 24:8
**revised** [1] - 21:24
**revolving** [1] - 23:13
**rich** [1] - 73:16
**rise** [1] - 81:15
**road** [1] - 45:10
**Robert** [1] - 72:7
**Robinson** [7] - 3:6, 46:14, 47:3, 47:20, 47:24, 72:8, 80:7
**Robinson/ Rowlett** [1] - 68:19
**role** [5] - 54:14, 70:4, 72:20, 72:21, 77:20
**roles** [1] - 64:15
**ROOM** [1] - 1:24
**Rowlett** [7] - 3:4, 3:5, 3:7, 5:17, 46:18, 47:17, 47:21
**ROWLETT** [24] - 2:11, 5:13, 5:18, 6:2, 16:13, 19:24, 20:4, 20:10, 20:12, 21:14, 21:20, 26:7, 35:18, 44:4, 44:6, 45:23, 46:7, 46:13, 47:14, 55:16, 57:5, 60:9, 66:9, 66:23
**run** [5] - 54:16, 54:17, 54:21, 75:8, 75:10
**running** [3] - 11:25, 64:2, 75:18
**runs** [2] - 59:10, 59:19

---

# S

**safari** [1] - 6:23
**salary** [1] - 51:24
**sales** [4] - 7:7, 51:4, 51:8, 53:12
**salespeople** [1] - 7:4
**San** [3] - 2:13, 75:5, 79:21

**SANTA** [3] - 1:15, 1:24, 4:1
**Santa** [1] - 13:17
**saw** [2] - 31:22, 45:18
**schedule** [1] - 22:11
**Schema** [1] - 28:8
**schema** [2] - 29:19, 30:17
**school** [4] - 48:4, 48:7, 48:8, 48:21
**Schuster** [2] - 73:7, 78:18
**science** [1] - 6:10
**SCO** [7] - 13:21, 13:24, 15:15, 16:22, 33:22, 42:21, 43:6
**screen** [5] - 20:15, 38:12, 38:14, 40:2, 44:8
**screens** [1] - 46:24
**se** [1] - 12:10
**search** [47] - 6:21, 6:25, 7:1, 7:21, 7:22, 7:24, 8:3, 11:14, 11:18, 11:24, 12:2, 12:6, 12:10, 12:22, 13:11, 14:3, 14:6, 14:11, 14:13, 14:14, 14:16, 15:4, 15:5, 15:11, 15:23, 16:16, 16:21, 17:24, 18:4, 18:5, 18:6, 18:11, 18:12, 18:14, 18:16, 23:13, 24:14, 27:10, 27:15, 31:7, 33:19, 34:3, 34:6, 35:7, 43:10, 43:15
**searcher** [1] - 43:19
**Seattle** [20] - 6:18, 7:10, 19:18, 29:24, 50:25, 53:19, 56:11, 56:16, 56:21, 57:3, 60:25, 63:13, 66:20, 77:6, 77:17, 77:21, 78:5, 78:9, 79:6

**second** [10] - 10:9, 12:23, 16:1, 19:13, 22:13, 28:7, 32:9, 39:20, 46:6, 68:15
**secondly** [1] - 34:14
**Section** [1] - 82:8
**section** [2] - 14:19, 33:3
**see** [33] - 8:17, 8:18, 15:24, 20:15, 21:21, 21:25, 22:15, 26:19, 27:17, 29:21, 29:23, 29:25, 30:6, 31:24, 32:2, 32:15, 32:16, 34:3, 34:16, 35:5, 37:3, 38:11, 38:24, 57:10, 57:16, 57:21, 58:1, 58:4, 59:8, 59:11, 59:17, 81:14, 81:16
**seeing** [1] - 46:24
**seek** [1] - 78:3
**seem** [1] - 33:7
**sees** [2] - 14:1, 24:19
**Seffens** [1] - 81:18
**sell** [2] - 7:4, 8:9
**semi** [1] - 68:10
**semi-monthly** [1] - 68:10
**send** [4] - 34:23, 56:3, 56:5, 60:19
**sense** [2] - 22:4, 78:19
**sent** [11] - 21:22, 23:22, 25:16, 26:19, 31:21, 31:22, 39:6, 62:11, 62:12, 63:2, 75:12
**sentence** [1] - 4:24
**separate** [1] - 9:22
**September** [10] - 9:17, 9:19, 17:4, 23:5, 36:2, 36:19, 40:14, 57:8, 70:2, 73:22
**series** [1] - 24:10

**serve** [1] - 18:17
**service** [7] - 71:17, 71:18, 77:9, 77:10, 79:10, 79:23
**Services** [21] - 5:19, 50:10, 51:21, 52:15, 52:16, 52:19, 52:23, 53:16, 53:18, 54:14, 60:12, 63:16, 63:23, 67:3, 67:6, 67:11, 67:15, 68:12, 79:25, 80:3, 80:4
**services** [21] - 4:11, 7:4, 50:19, 50:21, 50:22, 67:2, 70:8, 70:11, 70:17, 71:20, 71:21, 72:2, 72:3, 72:17, 72:24, 73:19, 73:24, 75:14, 77:22, 78:21, 80:11
**SERVICES** [2] - 1:8, 2:9
**servicing** [2] - 78:24, 79:7
**set** [5] - 11:10, 11:12, 29:6, 43:18, 53:22
**several** [3] - 7:18, 21:8, 32:21
**share** [1] - 75:15
**shared** [1] - 74:11
**sharing** [1] - 71:10
**Sharon** [1] - 81:18
**Sheridan** [3] - 48:3, 48:8, 48:14
**Sherman** [1] - 49:16
**show** [4] - 15:6, 30:20, 71:12, 74:10
**showed** [3] - 42:22, 43:1, 78:16
**shown** [1] - 27:11
**shows** [1] - 28:13
**side** [6] - 14:13, 27:25, 31:13, 34:3, 38:12, 38:13

**sides** [1] - 2:16
**sign** [2] - 8:18, 14:24
**significance** [1] - 47:9
**similar** [2] - 19:15, 35:7
**simple** [2] - 15:3, 32:9
**site** [15] - 10:17, 13:1, 13:13, 13:23, 14:2, 14:10, 15:24, 18:22, 18:25, 33:12, 33:15, 35:15, 35:17
**sites** [9] - 14:1, 16:3, 22:17, 28:17, 28:18, 30:22, 30:23, 32:4, 33:8
**situation** [1] - 75:7
**six** [3] - 7:12, 10:3, 45:10
**skip** [1] - 53:3
**slow** [6] - 12:15, 32:17, 74:25, 76:6, 77:14
**slower** [1] - 12:20
**small** [2] - 8:25, 9:4
**smart** [1] - 12:6
**SoCal** [16] - 29:24, 30:14, 51:21, 52:15, 52:16, 52:19, 52:23, 55:1, 57:10, 57:13, 58:7, 60:12, 62:6, 63:16, 63:23, 66:2
**social** [3] - 72:9, 72:21, 72:22
**software** [3] - 7:4, 7:16, 54:1
**sold** [1] - 18:10
**solutions** [4] - 6:16, 6:19, 7:13, 9:18
**Solutions** [9] - 8:4, 8:5, 8:23, 9:6, 9:11, 9:16, 15:14, 17:4, 34:18
**solve** [2] - 30:22, 32:23
**someone** [5] - 10:18, 15:2, 35:2,

46:10, 77:17
**sometime** [1] - 79:3
**sometimes** [3] - 25:3, 78:7
**somewhere** [2] - 10:12, 35:15
**sorry** [17] - 8:16, 12:19, 16:10, 25:10, 26:2, 29:24, 32:18, 33:1, 39:21, 43:12, 46:16, 56:4, 58:13, 63:21, 75:2, 77:15
**sort** [2] - 29:15, 65:25
**sounds** [2] - 8:23, 32:9
**Southern** [22] - 6:11, 10:24, 10:25, 19:17, 23:6, 23:22, 28:15, 50:10, 50:24, 52:7, 52:22, 53:7, 54:14, 55:19, 62:25, 67:3, 67:11, 67:15, 68:12, 78:16, 79:25, 80:11
**SPAAN** [3] - 1:23, 82:5, 82:19
**Spaan** [1] - 82:20
**space** [2] - 7:7, 8:1
**speakerphone** [1] - 76:17
**speaking** [1] - 41:17
**specialist** [1] - 35:5
**specific** [7] - 32:10, 32:21, 32:22, 43:16, 43:18, 71:4, 71:6
**specifically** [5] - 10:22, 19:17, 34:7, 44:13, 52:4
**spectrum** [1] - 77:3
**speeding** [1] - 16:9
**spelling** [2] - 5:23, 69:17
**spend** [2] - 33:24, 34:12
**spent** [2] - 6:15,

7:11
**split** [3] - 38:12, 40:2, 44:8
**spot** [1] - 54:5
**spreadsheet** [13] - 31:22, 32:21, 50:25, 53:25, 55:20, 55:21, 56:11, 56:13, 56:15, 57:2, 61:11, 61:12, 62:13
**spreadsheets** [3] - 52:17, 56:22, 56:24
**Springs** [4] - 49:20, 50:4, 50:12, 58:25
**spun** [1] - 8:6
**staff** [3] - 19:8, 40:20, 55:13
**stages** [1] - 21:12
**stakes** [1] - 34:1
**stamped** [2] - 58:11, 58:15
**stand** [1] - 46:9
**standard** [1] - 70:20
**start** [7] - 5:14, 21:9, 39:4, 44:10, 50:15, 57:24, 58:13
**started** [6] - 26:12, 26:22, 39:8, 45:15, 51:16, 58:1
**starting** [2] - 5:11, 68:24
**starts** [1] - 59:17
**startup** [1] - 6:22
**STATE** [1] - 82:4
**state** [3] - 5:22, 47:22, 69:16
**statement** [12] - 27:6, 38:25, 39:5, 57:7, 57:15, 58:11, 58:15, 59:6, 60:6, 64:7, 65:15, 71:24
**statements** [2] - 64:9, 66:16
**States** [5] - 8:12, 8:14, 82:6, 82:8, 82:13
**STATES** [1] - 1:1
**statistical** [3] - 50:23, 53:11, 53:13
**stay** [1] - 17:2

**stenographically** [1] - 82:10
**step** [2] - 68:19, 81:9
**still** [2] - 17:1, 21:5
**strategy** [1] - 27:12
**Street** [1] - 2:12
**STREET** [1] - 1:24
**street** [1] - 8:18
**strike** [2] - 39:13, 66:13
**strongly** [1] - 22:7
**structure** [1] - 9:9
**study** [1] - 17:19
**stuff** [5] - 16:2, 16:25, 21:3, 29:10, 32:19
**submit** [2] - 55:23, 56:16
**submitted** [4] - 52:10, 53:6, 53:8, 54:13
**subsequent** [1] - 23:16
**subsequently** [1] - 54:23
**success** [1] - 10:3
**sufficient** [1] - 42:21
**suggest** [1] - 79:9
**suggested** [1] - 42:14
**suggesting** [1] - 23:25
**Suite** [2] - 2:7, 2:13
**summarize** [1] - 28:10
**summary** [1] - 22:14
**Sundberg** [28] - 3:17, 3:19, 16:14, 16:15, 16:18, 16:20, 17:3, 19:13, 20:1, 21:22, 22:3, 22:9, 22:24, 24:1, 24:9, 25:15, 25:23, 25:24, 26:17, 26:22, 32:24, 33:1, 38:6, 38:18, 39:6, 45:12
**Sundberg's** [1] -

44:11
**Sunderland** [1] - 72:7
**supplies** [1] - 8:10
**support** [8] - 70:10, 70:13, 70:20, 71:4, 72:1, 74:18, 81:2, 81:5
**supposed** [1] - 77:12
**surprised** [1] - 24:4
**SWORN** [2] - 5:21, 69:15
**sworn** [1] - 46:21
**system** [1] - 12:5

**T**

**table** [1] - 34:1
**target** [1] - 16:23
**targeted** [1] - 7:21
**tasked** [4] - 19:2, 22:2, 44:23, 73:18
**Taz** [2] - 7:3, 7:25
**Teale** [2] - 77:19, 78:4
**Teale's** [1] - 77:20
**team** [4] - 42:17, 43:9, 43:14, 72:4
**Teather** [17] - 2:16, 42:20, 42:25, 43:2, 43:5, 76:1, 76:5, 76:7, 76:12, 77:5, 77:7, 77:16, 78:5, 78:10, 78:15, 78:16, 79:1
**tech** [3] - 60:13, 63:17, 63:25
**technical** [2] - 15:22, 30:11
**technically** [3] - 15:24, 24:23, 25:2
**technician** [1] - 2:16
**technologies** [2] - 8:7, 29:9
**technology** [21] - 6:15, 8:9, 28:22, 29:3, 29:4, 29:8, 29:13, 29:15,

29:16, 30:5, 32:19, 34:10, 38:12, 41:1, 59:24, 73:16, 73:17, 77:25, 81:4

**term** [5] - 7:5, 8:15, 11:14, 13:21, 15:5

**terminated** [1] - 66:15

**terms** [10] - 5:2, 7:22, 51:9, 51:12, 56:12, 56:18, 56:20, 60:11, 63:17, 80:6

**terribly** [1] - 5:4

**testified** [5] - 26:17, 37:8, 40:14, 41:20, 42:24

**testify** [6] - 4:10, 4:13, 4:17, 42:12, 47:1, 47:9

**testifying** [1] - 4:18

**Testimony** [2] - 3:6, 47:20

**testimony** [18] - 4:14, 5:3, 17:23, 36:10, 41:22, 42:16, 43:21, 45:18, 45:19, 45:20, 46:3, 46:19, 46:21, 47:7, 47:8, 68:14, 71:20, 72:23

**THE** [66] - 2:3, 2:9, 3:4, 3:8, 4:5, 4:9, 4:20, 5:7, 5:11, 5:14, 5:17, 5:20, 5:22, 5:24, 12:20, 12:21, 16:9, 16:10, 16:11, 16:12, 20:6, 20:8, 21:16, 21:18, 26:3, 26:5, 35:20, 36:12, 36:15, 36:17, 39:15, 39:18, 39:20, 39:22, 39:24, 41:24, 42:1, 43:23, 43:25, 44:3, 45:24, 46:1, 46:5, 46:10, 46:14, 46:17, 47:6, 47:15, 64:7, 68:15, 68:18, 68:22, 69:10,

69:12, 69:16, 69:18, 71:9, 71:12, 71:13, 74:25, 75:2, 79:14, 81:7, 81:9, 81:15, 81:16

**theirs** [1] - 14:25

**themselves** [2] - 12:23, 16:6

**therefore** [1] - 32:7

**thick** [1] - 11:19

**thinks** [3] - 13:13, 15:1, 18:20

**Thomas** [2] - 55:13, 62:6

**three** [6] - 30:3, 38:19, 39:7, 76:4, 76:7, 77:13

**throughout** [1] - 58:8

**time-based** [1] - 61:6

**timeline** [1] - 62:21

**Tisa** [1] - 2:16

**Title** [1] - 82:8

**title** [3] - 50:18, 70:5, 73:16

**title's** [1] - 45:4

**titled** [1] - 40:5

**TLD** [1] - 30:7

**today** [6] - 5:1, 8:25, 9:13, 9:23, 45:19, 71:19

**together** [3] - 23:25, 34:15, 34:16

**Tom** [2] - 55:13, 62:15

**tone** [1] - 47:10

**took** [3] - 7:3, 7:7, 11:9

**top** [19] - 17:8, 21:21, 30:7, 30:8, 30:10, 30:11, 30:12, 30:14, 31:3, 31:25, 37:2, 38:18, 42:9, 42:11, 42:12, 42:15, 57:8

**top-level** [12] - 30:7, 30:8, 30:10, 30:11, 30:12, 30:14, 42:9, 42:11, 42:12, 42:15

**topic** [5] - 11:19, 13:1, 13:5, 24:3,

24:5

**totally** [2] - 29:13, 76:25

**touched** [1] - 33:17

**towards** [1] - 72:9

**track** [2] - 45:10, 66:25

**tracking** [1] - 71:16

**tradeoff** [1] - 23:3

**transactions** [3] - 8:13, 8:14, 8:21

**transcript** [2] - 82:9, 82:11

**Transcript** [1] - 1:5

**TRANSCRIPT** [1] - 1:13

**tremendous** [1] - 22:15

**trial** [4] - 46:22, 47:1, 47:2, 80:25

**TRIAL** [1] - 1:14

**tried** [1] - 47:18

**true** [4] - 1:12, 71:24, 71:25, 82:9

**Trulio** [1] - 32:3

**truth** [1] - 46:23

**try** [1] - 14:23

**trying** [5] - 12:16, 15:4, 15:5, 18:11, 30:20

**Tuesday** [1] - 25:15

**turn** [8] - 19:22, 20:10, 25:7, 26:14, 27:3, 31:17, 62:12, 69:5

**turned** [2] - 9:22, 78:3

**turns** [2] - 14:24, 18:9

**two** [10] - 4:17, 15:21, 19:5, 29:23, 31:21, 34:9, 34:20, 51:16, 74:10, 76:7

**Tyley** [4] - 4:7, 68:1, 72:5, 72:14

**type** [5] - 18:4, 70:10, 70:22, 71:4, 74:17

**types** [1] - 28:17

**typically** [4] -

13:4, 56:3, 56:5, 75:17

## U

**U.S** [1] - 1:3

**unavailable** [1] - 47:1

**unaware** [1] - 24:6

**uncomfortable** [1] - 76:20

**under** [3] - 9:14, 35:1, 46:22

**underneath** [1] - 57:9

**understood** [2] - 33:14, 40:24

**unduly** [1] - 5:4

**unfortunately** [2] - 11:18, 12:4

**unique** [2] - 18:13, 28:21

**UNITED** [1] - 1:1

**United** [5] - 8:12, 8:14, 82:6, 82:8, 82:13

**unity** [1] - 74:10

**University** [3] - 6:11, 48:15, 48:17

**unless** [1] - 4:24

**unprofessional** [2] - 76:11, 76:18

**up** [36] - 10:17, 11:15, 14:17, 14:21, 15:6, 15:23, 16:9, 17:2, 18:18, 19:1, 20:13, 21:20, 23:24, 25:8, 25:10, 26:8, 26:15, 29:20, 29:21, 31:25, 32:15, 32:17, 36:1, 39:22, 44:9, 46:10, 60:2, 61:2, 61:9, 63:8, 70:20, 70:23, 76:8, 78:5, 78:16, 80:21

**update** [2] - 23:11, 23:13

**updated** [1] - 22:18

**URL** [1] - 30:10

**uses** [1] - 18:6

## V

**Valley** [2] -

58:17, 62:12

**valuable** [2] - 13:23, 13:24

**value** [2] - 74:23, 75:18

**varied** [1] - 63:10

**variety** [1] - 6:20

**vast** [3] - 15:12, 24:25, 29:4

**VAUGHN** [2] - 2:10, 2:12

**vehicle** [1] - 76:15

**verbiage** [1] - 76:20

**versus** [6] - 15:2, 27:20, 28:22, 51:10, 51:25, 52:4

**via** [2] - 60:21, 65:3

**video** [5] - 36:10, 43:21, 45:18, 45:21, 46:24

**Videotape** [3] - 36:18, 42:2, 44:1

**view** [1] - 34:6

**village** [1] - 57:20

**visibility** [4] - 24:20, 24:25, 28:19, 34:4

**visible** [2] - 17:19, 18:24

**voice** [1] - 47:10

**Volume** [2] - 1:9, 81:18

**VP** [1] - 25:25

**vs** [1] - 1:7

## W

**walk** [1] - 62:4

**wants** [1] - 32:15

**WAS** [2] - 5:21, 69:15

**Watch** [32] - 3:22, 10:4, 10:5, 10:6, 11:16, 17:13, 17:14, 17:16, 18:1, 18:21, 18:25, 19:3, 19:6, 19:9, 19:11, 19:16, 23:9, 24:12, 24:13, 25:17, 28:15, 28:18, 28:23, 28:24, 29:2, 29:24, 30:14, 31:14, 34:11,

41:1, 41:4, 41:10, 43:10, 43:14, 44:13, 44:19

**watched** [1] - 45:20

**WAYNE** [1] - 2:11

**web** [2] - 6:24, 34:5

**website** [12] - 11:24, 11:25, 13:19, 13:20, 14:7, 15:6, 29:12, 33:5, 33:25, 42:4, 42:6

**websites** [12] - 12:25, 15:18, 15:19, 15:20, 18:7, 28:15, 30:3, 32:2, 35:12, 35:13, 41:19

**Wednesday** [1] - 57:8

**week** [5] - 26:11, 26:16, 26:19, 78:7

**wells** [2] - 58:23, 59:16

**WEST** [1] - 1:24

**whole** [1] - 13:23

**willing** [3] - 22:10, 22:20, 23:4

**Windermere** [111] - 3:22, 5:18, 6:16, 6:19, 7:13, 8:4, 8:5, 8:6, 8:23, 8:24, 8:25, 9:1, 9:3, 9:6, 9:11, 9:16, 9:22, 9:23, 10:4, 10:5, 10:6, 10:7, 10:16, 10:19, 10:22, 11:16, 14:16, 15:14, 16:16, 17:4, 17:6, 17:13, 17:14, 17:16, 17:20, 17:21, 18:1, 18:2, 18:13, 18:19, 18:21, 18:25, 19:3, 19:6, 19:9, 19:11, 19:16, 23:9, 24:12, 24:13, 25:17, 28:15, 28:18, 28:23, 28:24, 29:2, 29:24, 30:14, 31:14, 34:11,

34:17, 34:18, 34:22, 36:3, 36:4, 36:21, 37:9, 37:12, 37:14, 37:23, 40:12, 40:22, 41:1, 41:4, 41:10, 42:7, 42:9, 43:10, 43:14, 44:13, 44:19, 50:4, 50:10, 51:20, 52:15, 52:16, 52:19, 52:23, 53:16, 53:19, 54:14, 56:21, 58:12, 58:16, 60:11, 63:15, 63:22, 66:15, 66:16, 67:3, 67:5, 67:11, 67:15, 68:12, 73:10, 73:13, 73:15, 73:19, 75:4, 77:21, 79:6

**WINDERMERE** [2] - 1:8, 2:9

**Windermere's** [2] - 36:25, 40:25

**Windermere. com** [12] - 17:5, 17:12, 17:19, 29:24, 30:4, 30:6, 30:7, 30:10, 30:12, 42:4, 42:15, 42:18

**Windermerewatch.com** [3] - 27:11, 27:14, 31:6

**withdrawn** [1] - 34:21

**WITHDRAWN** [1] - 3:14

**WITNESS** [12] - 5:21, 5:24, 12:21, 16:10, 16:12, 39:18, 39:24, 64:7, 69:15, 69:18, 71:13, 75:2

**witness** [14] - 4:8, 5:17, 35:19, 46:9, 46:11, 46:21, 46:22, 47:8, 64:5, 69:2, 69:14, 71:7

**witness's** [4] - 36:10, 39:14, 41:22, 43:21

**witnesses** [4] - 4:7, 4:8, 4:17,

4:18

**WITNESSES** [1] - 3:3

**witnessing** [1] - 76:10

**Wood** [1] - 40:21

**Wooten** [1] - 62:2

**word** [1] - 12:3

**Word** [1] - 31:21

**words** [9] - 18:4, 18:5, 18:6, 18:17, 25:1, 28:4, 30:4, 34:10, 43:18

**works** [2] - 11:21, 16:22

**worried** [1] - 10:19

**worth** [1] - 14:5

**Wow** [1] - 14:9

**write** [1] - 17:11

**writes** [1] - 13:17

**WSC017449** [1] - 3:18

**WSC017451** [1] - 3:20

**WSC019492** [1] - 3:22

**Wyoming** [4] - 48:3, 48:5, 48:15, 48:17

**Y**

**Yahoo** [1] - 7:2

**year** [2] - 8:14, 9:21

**years** [9] - 6:16, 7:12, 7:18, 9:7, 10:3, 17:1, 34:20, 67:21

**yesterday** [1] - 4:21

**YORK** [2] - 3:4, 5:21

**York** [5] - 3:17, 3:19, 3:21, 5:19, 5:24

**yourself** [1] - 45:18

**Z**

**Zango** [3] - 7:19, 7:20

**Zillow** [1] - 32:3

**-**

**-** [2] - 3:17, 3:20